UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| CHANA FRAND, Individually and on Behalf of All Others Similarly Situated, | No. |
| Plaintiff, | <u>CLASS ACTION</u> |
| v. | |
| FIRSTENERGY CORP., CHARLES E. JONES, JAMES F. PEARSON, STEVEN E. STRAH and K. JON TAYLOR, | <u>DEMAND FOR JURY TRIAL</u> |
| Defendants. | |

**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

{00386868;1 }

Plaintiff Chana Frand ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of United States ("U.S.") Securities and Exchange Commission ("SEC") filings by FirstEnergy Corp. ("FirstEnergy" or the "Company"), as well as media reports about the Company and case filings in *USA v. Borges*, 1:20-mj-00526 (S.D. Oh.) (the "Criminal Proceedings").  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than defendants that purchased or otherwise acquired FirstEnergy securities between February 21, 2017, and July 21, 2020, inclusive (the "Class Period").  Plaintiff seeks to pursue remedies against FirstEnergy and certain of the Company's current and former most senior executives under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule l0b-5 promulgated thereunder.

2.      Defendant FirstEnergy is headquartered in Akron, Ohio.  The Company is an electric utility company with subsidiaries and affiliates involved in the distribution, transmission, and generation of electricity, as well as energy management and other energy-related services. FirstEnergy's ten electric utility operating companies comprise one of the U.S.'s largest investor-owned utilities, serving more than six million customers in Ohio, Pennsylvania, West Virginia, Virginia, Maryland, New Jersey, and New York.  The Company also owned and operated two

nuclear power plants in Ohio—the Perry Nuclear Generating Station and the Davis-Besse Nuclear Power Station.

3.    During the Class Period, defendants issued materially false and misleading statements regarding FirstEnergy's internal controls, business practices, and prospects. Specifically, defendants touted FirstEnergy's legislative "solutions" to problems with its nuclear facilities, but failed to disclose that these "solutions" centered on an illicit campaign to corrupt high-profile state legislators to secure legislation favoring the Company.  Over a nearly three-year period, FirstEnergy and its affiliates funneled more than $60 million to prominent state politicians and lobbyists, including Ohio Speaker Larry Householder ("Householder"), to secure the passage of Ohio House Bill 6 ("HB6"), which provided a $1.3 billion ratepayer-funded bailout to keep the Company's failing nuclear facilities in operation.  In addition, defendants falsely represented that they were complying with state and federal laws and regulations regarding regulatory matters throughout the Class Period, exposing the Company and its investors to undisclosed risks of reputational, legal, and financial harm.

4.    The truth began to be revealed on July 21, 2020.  That day, federal agents announced the arrest of Householder and four other persons, including a prominent FirstEnergy lobbyist, in connection with a $60 million racketeering and bribery scheme.  The 82-page criminal complaint and affidavit detailed a pay-to-play scheme in which FirstEnergy corrupted the legislative process to ensure the passage of HB6.  Prosecutors described the case as involving the "largest bribery, money-laundering scheme" in Ohio history.

5.    On this news, FirstEnergy's stock price fell, trading as low as $22.85 per share on July 22, 2020, down nearly 45% from its closing price of $41.26 per share on July 20, 2020,

damaging FirstEnergy shareholders. This lawsuit seeks recompense for FirstEnergy shareholders' losses, which resulted from defendants' violations of the federal securities laws as detailed herein.

## JURISDICTION AND VENUE

6.      Jurisdiction is conferred by Section 27 of the Exchange Act. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

7.      Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) because the Company conducts business in this Judicial District and the events and omissions giving rise to the claims asserted herein occurred in substantial part in this Judicial District, including the dissemination of false and misleading statements into this Judicial District. In addition, the Criminal Proceedings are pending in this Judicial District, as is civil litigation against the Company for the complained of scheme by Ohio ratepayers, *Smith v. FirstEnergy Corp., et al.*, 2:20-cv-3755 (S.D. Ohio).

8.      In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

9.      Plaintiff, as set forth in the accompanying Certification, which is incorporated by reference herein, purchased FirstEnergy securities during the Class Period and has been damaged thereby.

10. Defendant FirstEnergy is an electric utility company headquartered in Akron, Ohio. The Company's common stock is listed on the New York Stock Exchange ("NYSE") under the ticker symbol "FE."

11. Defendant Charles E. Jones ("Jones") has served as Chief Executive Officer ("CEO") and a director of FirstEnergy throughout the Class Period.

12. Defendant James F. Pearson ("Pearson") served as Chief Financial Officer ("CFO") of FirstEnergy until March 2018, at which time he transitioned to Vice President of Finance of FirstEnergy until his retirement in April 2019.

13. Defendant Steven E. Strah ("Strah") is President of FirstEnergy. He previously served as FirstEnergy's CFO from March 2018 until he transitioned to his current position in May 2020. Prior to March 2018, defendant Strah served as Senior Vice President of FirstEnergy's Utilities Operations.

14. Defendant K. Jon Taylor ("Taylor") took over as FirstEnergy's CFO from defendant Strah. Prior to assuming this position, he was the Company's Controller and Chief Accounting Officer until March 2018, after which time he became President of FirstEnergy's Ohio Operations and, in 2019, its Vice President of Utilities Operations.

15. Defendants Jones, Pearson, Strah, and Taylor are referred to herein as the "Individual Defendants." During the Class Period, the Individual Defendants ran the Company as hands-on managers, overseeing FirstEnergy's operations, business practices and finances, and made the materially false and misleading statements described herein. The Individual Defendants had intimate knowledge about core aspects of FirstEnergy's financial and business operations, including the Company's nuclear operations and the activities alleged in the Criminal Proceedings. They were also intimately involved in deciding which disclosures would be made by the Company.

## SUBSTANTIVE ALLEGATIONS

### Background

16.     FirstEnergy is a utility company based in Akron, Ohio.  FirstEnergy and its subsidiaries are principally involved in the transmission, distribution, and generation of electricity. FirstEnergy's ten utility operating companies comprise one of the nation's largest investor-owned electric systems, which serves over six million customers in the Midwest and Mid-Atlantic regions. FirstEnergy's service areas encompass approximately 65,000 square miles in Ohio, Pennsylvania, West Virginia, Maryland, New Jersey, and New York, with a combined population of approximately 13.3 million.

17.     FirstEnergy owned and operated two nuclear power plants in the State of Ohio, the Perry Nuclear Generating Station and the Davis-Besse Nuclear Power Station, through its subsidiaries FirstEnergy Solutions Corp. ("FES") and FirstEnergy Nuclear Operating Company ("FENOC").[1] The Davis-Besse plant, which opened four decades ago, was the site of the worst corrosion ever found at a U.S. reactor when inspectors discovered an acid leak that closed the plant for extensive repairs from 2002 to 2004.  FirstEnergy was ultimately fined $28 million for misleading regulators regarding the damage as part of a deferred-prosecution agreement.  In subsequent years, maintenance costs continued to rise for the Company as the nuclear facilities aged.  At the same time, energy prices decreased for alternatives to nuclear energy, such as natural

---

[1] Following a March 2018 bankruptcy and later reorganization, FES and FENOC were renamed Energy Harbor LLC (a subsidiary of Energy Harbor Corp.) and Energy Harbor Nuclear Corp., respectively.  Although these subsidiaries were separated and deconsolidated from FirstEnergy's financial results, the Company continued to have numerous, material financial entanglements with FES and FENOC and an active role in financing and overseeing the corrupt conspiracy to pass HB6 as detailed herein.

gas, and FirstEnergy's service areas experienced decreasing demand, diminishing the revenue generating potentials of the two nuclear plants.

18.     At the end of fiscal 2016, FirstEnergy's nuclear generation future looked grim. FirstEnergy reported a weak energy market, poor forecast demand, and hundreds of millions of dollars in losses, owing in large part to challenges associated with its nuclear energy affiliates, FENOC and FES.  Throughout the Class Period, defendants reassured investors that FirstEnergy was pursuing a legislative fix to turn around its nuclear energy fortunes.  For example, in FirstEnergy's 2016 Annual Report, filed on February 21, 2017, the Company stated that it intended to pursue "legislative or regulatory solutions" to address the problem.  Likewise, FirstEnergy's CEO, defendant Jones, repeated this plan on the Company's annual earnings call held with investors the next day, stating that FirstEnergy sought "legislative or regulatory initiatives for [nuclear power] generation that recognize its environmental or energy security benefits."

19.     While the attempt to turnaround the Company's nuclear power woes was received favorably by analysts and investors, what FirstEnergy and its executives concealed was that the Company's legislative "solution" involved an illicit campaign to corrupt high-profile state legislators to secure a massive ratepayer-funded bailout.  Over the next two-and-a-half years, FirstEnergy would spearhead an elaborate scheme to funnel tens of millions of dollars to state lawmakers, blanket media platforms with misleading messages, and illicitly thwart a citizens' ballot initiative.  The Company's most senior executives, including its CEO, defendant Jones, were directly involved in and oversaw these efforts, placing the Company and its shareholders at risk of legal, reputational and financial harm.

20.     In January 2017, former Ohio House Speaker Householder met with FirstEnergy representatives during a flight on a private FirstEnergy jet.  After a 15-year hiatus from politics,

Householder had won back his old seat in 2016 and was eager to re-ascend to his former Speakership. During or around the time of this flight, a corrupt bargain was struck between Householder and the Company wherein FirstEnergy agreed to funnel millions of dollars in payments to Householder for his personal enrichment and to support his bid for Speakership. In exchange, Householder promised to secure the passage of legislation that would provide a $1.3 billion bailout of FirstEnergy's failed nuclear power plants funded by Ohio ratepayers. A lobbyist for FirstEnergy's nuclear subsidiary internally referred to the arrangement as an "unholy alliance."

21.     In February 2017, the corrupt conspiracy between Householder and FirstEnergy went into motion in earnest with the establishment of "Generation Now" and "Energy Pass-Through," 501(c)(4) organizations used to systematically funnel dark money from Company coffers to Householder and his affiliates. The next month, Householder began receiving periodic $250,000 payments, an amount that would steadily increase until it reached into the millions of dollars a month. The conspiracy dubbed FirstEnergy the "Bank" because of the purportedly "unlimited" money it was willing to spend to corrupt the political process. In all, more than $60 million was paid by FirstEnergy and its affiliates to Householder and his operatives in furtherance of the bribery scheme. As lobbyist Neil Clark (characterized in the criminal complaint as Householder's political "hit man") stated in a secretly recorded conversation: "'Nobody knows the money goes to the Speaker's account . . . it's not recorded.'"

22.     These payments were used to bankroll the political campaigns of over twenty state legislative candidates. The FirstEnergy-directed enterprise managed these candidates' campaigns, paid their staffs, and designed and paid for mailers and commercials. Most of these candidates won their elections. All who won voted for Householder as Speaker, and all but two ultimately voted for FirstEnergy's legislative bailout despite its public unpopularity. In addition,

Householder used a portion of the funds to personally enrich himself, including to buy a home in Florida and to settle a personal lawsuit against him.

23.     The day Householder was elected Speaker he quickly moved to uphold his end of the bargain, pledging to create a standing subcommittee on energy generation.  Householder followed through shortly thereafter, securing the votes for HB6 and defending the bill against a citizens' ballot initiative.  The law effectively prevented the shutdown of FirstEnergy's two money-losing Ohio nuclear plants, granting a $9.00 per megawatt hour subsidy to "clean" energy generation.  To pay for this generous subsidy, Ohio ratepayers would be assessed a monthly fixed charge, ratcheting up energy costs for millions of consumers.  The primary beneficiaries of the bill were FirstEnergy's nuclear subsidiaries, which were projected to collect approximately 94% of the payments worth an estimated $160 million annually.

24.     FirstEnergy funded the bill's passage by funneling millions of dollars through dark money political groups.  These groups in turn paid for a massive media campaign in support of HB6 while concealing the Company's involvement.  The $10 million media blitz was used to sway public opinion, often through highly misleading ads, and provided cover for politicians to vote in favor of an unpopular bill.  Householder also personally pressured lawmakers to support the bill, threatening those who opposed him and developing a "hyper local" "Senator-by-Senator game plan" to get the votes necessary to secure passage.

25.     At all times, Householder worked hand-in-hand with FirstEnergy and its affiliates and closely coordinated the legislative and media strategy with high-ranking FirstEnergy representatives.  In the short time between January 2019 and July 2019, the period when Householder became Speaker until HB6 was signed into law, Householder called FirstEnergy's CEO, defendant Jones, at least thirty times.  Throughout the Class Period, Householder held at

least eighty-four phone calls with defendant Jones, fourteen phone calls with FirstEnergy's Vice President of External Affairs, and 188 phone calls with FirstEnergy's Director of Ohio State Affairs. This was at the same time that the conspiracy was receiving millions of dollars from FirstEnergy and taking overt steps to put FirstEnergy's plans to corrupt the legislative process into action. Rather than the work of rogue employees, the affair was directly orchestrated and overseen by FirstEnergy's upper management, including the Individual Defendants.

26.     These illicit activities achieved their aim, and, in July 2019, HB6 passed and was signed into law. Almost immediately, public opposition began to mobilize and citizen groups worked to get on the ballot a voter referendum to repeal the law. Under Ohio rules, the ballot campaign had until October 2019 to gather approximately 265,000 signatures to block HB6 from taking effect.

27.     FirstEnergy went into overdrive to thwart this initiative, secretly funding yet another round of highly misleading political advertisements through its dark money network. At least $38 million was wired through Generation Now into a front company that paid for a media blitz of commercials and fliers orchestrated by the illicit enterprise. These advertisements were intended to stoke fear among Ohio citizens by falsely claiming that China was using the petition drive to invade Ohio's energy grid. The following examples are typical of the underhanded campaign:





28.     FirstEnergy went several steps further, hiring top signature collection firms to prevent them from working on the ballot initiative by creating a conflict of interest. FirstEnergy used Generation Now to pay at least fifteen such firms not to work. In addition, the Company and its affiliates bribed an employee of the citizens' ballot initiative for inside information that could

be used against the campaign. The transaction was implemented by Matthew Borges, a lobbyist for FirstEnergy's nuclear subsidiaries, the former Chairman of the Ohio Republican Party, and current co-criminal defendant in the Householder proceedings. Other operatives bribed signature collectors to subvert the ballot campaign's efforts. FirstEnergy's massive resources and unscrupulous tactics successfully prevented the referendum from gathering the requisite signatures and HB6 remained in effect.

29.     The illicit nature of these activities was well understood by FirstEnergy, the Individual Defendants, and their co-conspirators. As one of the criminal defendants stated on a secretly recorded line, "everybody knows [Householder is] pay to play." As this same criminal defendant, an industry lobbyist, later explained: "'[O]n HB 6 [FirstEnergy] got $1.3 billion in subsidies, free payments . . . so what do they care about putting in $20 million a year for this thing, they don't give a sh*t.'" For a time, FirstEnergy concealed its misdeeds from the public and the market, and defendants' unabashed attitude towards breaking the law successfully inflated the price of FirstEnergy securities.

### Materially False and Misleading Statements Issued During the Class Period

30.     The Class Period begins on February 21, 2017. On that date, FirstEnergy filed with the SEC its annual report on Form 10-K for the fiscal year ended December 31, 2016 (the "2016 10-K"), which was signed by defendants Jones, Pearson and Taylor. The 2016 10-K stated that FirstEnergy would be exploring "[l]egislative or regulatory solutions for generation assets that recognize their environmental or energy security benefits." The 2016 10-K also stated with respect to FES, FirstEnergy's nuclear subsidiary, that "management is exploring capital and other cost reductions, asset sales, and other options to improve cash flow *as well as continuing with*

*legislative efforts to explore a regulatory solution*."[2]  The 2016 10-K further stated that FES

"complies with the regulations, orders, policies and practices prescribed by the SEC, FERC, NRC

and applicable state regulatory authorities."   Defendants Jones and Pearson also filed signed

certifications with the SEC stating that the 2016 10-K did not contain any false or misleading

statement of fact, fairly presented FirstEnergy's results of operations, was the product of effective

internal controls, and was free from fraud.

31.     On February 22, 2017, FirstEnergy held an earnings call with analysts and investors

to discuss its fiscal 2016 financial results led by defendants Jones, Pearson and Taylor.  During the

call, defendant Jones stated:

> *In Ohio, we have had meaningful dialogue with our fellow utilities and with legislators on solutions that can help ensure Ohio's future energy security*. Our top priority is the preservation of our two nuclear plants in the state and legislation for a zero emission nuclear program is expected to be introduced soon. The ZEN program is intended to give state lawmakers greater control and flexibility to preserve valuable nuclear generation. We believe this legislation would preserve not only zero emission assets but jobs, economic growth, fuel diversity, price stability, and reliability and grid security for the region.
>
> *We are advocating for Ohio's support for its two nuclear plants, even though the likely outcome is that [the Company] won't be the long-term owner of these assets. We are optimistic, given these discussions we have had so far and we will keep you posted as this process unfolds.*

32.     On April 27, 2017, July 27, 2017 and October 26, 2017, FirstEnergy filed with the

SEC its quarterly reports on Form 10-Q for the quarters ending March 31, 2017, June 30, 2017,

and September 30, 2017, respectively, which were signed by defendant Taylor.  These documents

claimed that FirstEnergy's nuclear power business continued to comply "with the regulations,

orders, policies and practices prescribed by the SEC, FERC, NRC and applicable state regulatory

authorities."  They also continued to highlight the efforts of FirstEnergy's management to secure

---

[2] Emphasis added unless otherwise noted.

a regulatory or legislative fix for the problems posed by the Company's unprofitable nuclear facilities. For example, the quarterly reports stated that FirstEnergy's management was "continuing with legislative efforts to explore a regulatory solution" for FES or was "continuing . . . efforts to explore legislative or regulatory solutions" for FES. Defendants Jones and Pearson also filed signed certifications with the SEC stating that the quarterly reports did not contain any false or misleading statement of fact, fairly presented FirstEnergy's results of operations, were the product of effective internal controls, and were free from fraud.

33.     On February 20, 2018, FirstEnergy filed with the SEC its annual report on Form 10-K for the fiscal year ended December 31, 2017 (the "2017 10-K"), which was signed by defendants Jones, Pearson and Taylor. The 2017 10-K stated that FirstEnergy would be exploring "legislative or regulatory solutions for generation assets that recognize their environmental or energy security benefits." The 2017 10-K further stated that FES "complies with the regulations, orders, policies and practices prescribed by the SEC, FERC, NRC and applicable state regulatory authorities." Defendants Jones and Pearson also filed signed certifications with the SEC stating that the 2017 10-K did not contain any false or misleading statement of fact, fairly presented FirstEnergy's results of operations, was the product of effective internal controls, and was free from fraud.

34.     On February 21, 2018, FirstEnergy held an earnings call with analysts and investors to discuss its fiscal 2017 financial results led by defendants Jones, Pearson and Taylor. During the call, defendant Jones stated that FirstEnergy had been "very actively involved in a multitude of efforts at both the state and federal levels to support our generation assets," but he was disappointed that those efforts had not yet resulted in "meaningful legislative or regulatory support" for the

Company's nuclear facilities. He stated that FES would "continue to look at all options regarding these units," including by "continu[ing] to support policy solutions."

35.    On April 23, 2018, July 31, 2018, and October 25, 2018, FirstEnergy filed with the SEC its quarterly reports on Form 10-Q for the quarters ending March 31, 2018, June 30, 2018, and September 30, 2018, respectively. These documents claimed that FirstEnergy "and its subsidiaries follow GAAP and comply with the related regulations, orders, policies and practices prescribed by the SEC, FERC, and, as applicable, the NRC, the PUCO, the PPUC, the MDPSC, the NYPSC, the WVPSC, the VSCC and the NJBPU." Defendants Jones and Strah also filed signed certifications with the SEC stating that the quarterly reports did not contain any false or misleading statement of fact, fairly presented FirstEnergy's results of operations, were the product of effective internal controls, and were free from fraud.

36.    On February 19, 2019, FirstEnergy filed with the SEC its annual report on Form 10-K for the fiscal year ended December 31, 2018 (the "2018 10-K"), which was signed by defendants Jones and Strah. The 2018 10-K stated that FirstEnergy "and its subsidiaries follow GAAP and comply with the related regulations, orders, policies and practices prescribed by the SEC, FERC, and, as applicable, the NRC, the PUCO, the PPUC, the MDPSC, the NYPSC, the WVPSC, the VSCC and the NJBPU." Defendants Jones and Strah also filed signed certifications with the SEC stating that the 2018 10-K did not contain any false or misleading statement of fact, fairly presented FirstEnergy's results of operations, was the product of effective internal controls, and was free from fraud.

37.    On February 20, 2019, FirstEnergy held an earnings call with analysts and investors to discuss its fiscal 2018 financial results led by defendants Jones and Strah. In response to an

analyst's question about whether there was "anything at all" that FirstEnergy was working on with respect to energy utility legislation in Ohio, defendant Jones responded:

> Not in any specific form, Julien. Obviously, if our new leaders of the states – we have a new governor, a new speaker of the house, we're going to have a new Chairman of the Public Utilities Commission. ***If they determine that they think the time is right to really put energy policy for the state back on the table in some fashion, legislatively, then we would expect to engage and provide our input***. But it's too early in the process for me to talk about what that might mean.

38.     On April 23, 2019, July 23, 2019, and November 4, 2019, FirstEnergy filed with the SEC its quarterly reports on Form 10-Q for the quarters ending March 31, 2019, June 30, 2019, and September 30, 2019, respectively.   These documents claimed that FirstEnergy "and its subsidiaries follow GAAP and comply with the related regulations, orders, policies and practices prescribed by the SEC, FERC, and, as applicable, the NRC, the PUCO, the PPUC, the MDPSC, the NYPSC, the WVPSC, the VSCC and the NJBPU."   Defendants Jones and Strah also filed signed certifications with the SEC stating that the quarterly reports did not contain any false or misleading statement of fact, fairly presented FirstEnergy's results of operations, were the product of effective internal controls, and were free from fraud.

39.     On February 10, 2020, FirstEnergy filed with the SEC its annual report on Form 10-K for the fiscal year ended December 31, 2019 (the "2019 10-K"), which was signed by defendants Jones and Strah.  The 2019 10-K stated that FirstEnergy "and its subsidiaries follow GAAP and comply with the related regulations, orders, policies and practices prescribed by the SEC, FERC, and, as applicable, the NRC, the PUCO, the PPUC, the MDPSC, the NYPSC, the WVPSC, the VSCC and the NJBPU."   Defendants Jones and Strah also filed signed certifications with the SEC stating that the 2019 10-K did not contain any false or misleading statement of fact, fairly presented FirstEnergy's results of operations, was the product of effective internal controls, and was free from fraud.

40. On April 23, 2020, FirstEnergy filed with the SEC its quarterly report on Form 10-Q for the quarter ending March 31, 2020. The quarterly report claimed that FirstEnergy "and its subsidiaries follow GAAP and comply with the related regulations, orders, policies and practices prescribed by the SEC, FERC, and, as applicable, the NRC, the PUCO, the PPUC, the MDPSC, the NYPSC, the WVPSC, the VSCC and the NJBPU." Defendants Jones and Strah also filed signed certifications with the SEC stating that the quarterly report did not contain any false or misleading statement of fact, fairly presented FirstEnergy's results of operations, was the product of effective internal controls, and was free from fraud.

41. The statements referenced in ¶¶ 30-40 above were materially false and/or misleading when made because they failed to disclose the following adverse facts pertaining to the Company's business, operations and financial condition, which were known to or recklessly disregarded by defendants: (i) that FirstEnergy and its representatives and affiliates had orchestrated a $60 million campaign to corrupt the political process in order to secure the passage of legislation favoring the Company and its affiliates; (ii) that FirstEnergy and its representatives and affiliates had secretly funneled tens of millions of dollars to Ohio politicians to bribe those politicians in order to secure votes in favor of HB6, a $1.3 billion ratepayer bailout for FirstEnergy's unprofitable nuclear facilities; (iii) that FirstEnergy and its representatives and affiliates had conducted a massive, misleading advertising campaign in support of HB6 and in opposition to a ballot initiative to repeal HB6 by passing millions of dollars through an intricate web of "dark money" entities and front companies in order to conceal the Company's involvement; (iv) that FirstEnergy and its representatives and affiliates had subverted a citizens' ballot initiative to repeal HB6 by, among other unscrupulous tactics, hiring more than fifteen signature gathering firms, thereby conflicting them out of supporting the initiative, and bribing ballot initiative insiders

and signature collectors; (v) that, as a result of (i)-(iv) above, defendants' Class Period statements regarding FirstEnergy's regulatory and legislative efforts were materially false and misleading; and (vi) that, as a result of all the foregoing, FirstEnergy was subject to an increased, undisclosed risk of reputational, legal, and financial harm.

42.     In addition, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii) ("Item 303") required the Company's quarterly and annual financial reports issued during the Class Period to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  Defendants' failure to disclose FirstEnergy's involvement in the bribery and corruption scheme detailed herein violated Item 303 because these activities represented known trends and uncertainties that were likely to have a material unfavorable impact on the Company's business and financial results.

**The Truth Begins to Emerge**

43.     On July 21, 2020, the U.S. Attorney's Office for the Southern District of Ohio issued a press release stating, in relevant part:

**Ohio House Speaker, former chair of Ohio Republican Party, 3 other individuals & 501(c)(4) entity charged in federal public corruption racketeering conspiracy involving $60 million**

. . . . The Ohio Speaker of the House was arrested this morning and charged in a federal racketeering conspiracy involving approximately $60 million paid to a 501(c)(4) entity to pass and uphold a billion-dollar nuclear plant bailout.

It is alleged that **Larry Householder**, 61, of Glenford, Ohio, and the enterprise conspired to violate the racketeering statute through honest services wire fraud, receipt of millions of dollars in bribes and money laundering.

Four other individuals were also arrested and charged. They include:

- **Mathew Borges**, 48, of Bexley, a lobbyist who previously served as chair of the Ohio Republican Party;

- **Jeffrey Longstreth**, 44, of Columbus, Householder's longtime campaign and political strategist;

- **Neil Clark**, 67, of Columbus, a lobbyist who owns and operates Grant Street Consultants and previously served as budget director for the Ohio Republican Caucus; and

- **Juan Cespedes**, 40, of Columbus, a multi-client lobbyist.

**Generation Now**, a corporate entity registered as a 501(c)(4) social welfare organization, was also charged.

The five individual defendants had initial appearances via video conference at 1pm today, at which time the case was unsealed.

According to the 80-page criminal complaint unsealed today, from March 2017 to March 2020, the enterprise received millions of dollars in exchange for Householder's and the enterprise's help in passing House Bill 6, a billion-dollar bailout that saved two failing, Ohio nuclear power plants from closing.

The defendants then also allegedly worked to corruptly ensure that HB 6 went into effect by defeating a ballot initiative to overturn the legislation. The Enterprise received approximately $60 million into Generation Now from an energy company and its affiliates during the relevant period.

As alleged, in February 2017, Longstreth incorporated Generation Now as a 501(c)(4) social welfare entity purporting to promote energy independence and economic development; however, the entity was secretly controlled by Householder. As Clark stated in a recorded conversation, "*Generation Now is the Speaker's (c)(4).*" Pursuant to federal law, the names and addresses of contributors to 501(c)(4)s are not made available for public inspection.

In March 2017, Householder began receiving quarterly $250,000 payments from the related-energy companies into the bank account of Generation Now. The defendants allegedly spent millions of the company's dollars to support Householder's political bid to become Speaker, to support House candidates they believed would back Householder, and for their own personal benefit. When asked how much money was in Generation Now, Clark said, "*it's unlimited.*"

The affidavit filed in support of the criminal complaint also alleges:

- In 2018, the enterprise spent energy company-to-Generation Now money on approximately 21 different state candidates – 15 (including Householder) in the primary, and six additional candidates in the general election. The Enterprise spent more than one million in fall 2018 alone to

flood the airways with negative ads against enterprise opponents. Most of these candidates won the 2018 general election. All who won voted for Householder as Speaker.

- Money passed from the energy company through Generation Now was used to pay for Householder campaign staff, which would otherwise have been paid by Householder's candidate committee, Friends of Larry Householder.

- Householder received more than $400,000 in personal benefits as a result of the payments into Generation Now, including funds to settle a personal lawsuit, to pay for costs associated with his residence in Florida, and to pay off thousands of dollars of credit card debt.

- The enterprise paid $15,000 to an individual to provide insider information about the ballot initiative and offered to pay signature collectors for the ballot initiative $2,500 cash and plane fare to stop gathering signatures.

The racketeering conspiracy as charged in this case is punishable by up to 20 years in prison.

"It takes courage for citizens to assist law enforcement in the ways detailed in the affidavit," U.S. Attorney David M. DeVillers said. "We are grateful to those who felt a moral duty to work together with agents in bringing to light this alleged, significant public corruption."

"All forms of public corruption are unacceptable," stated FBI Cincinnati Special Agent in Charge Chris Hoffman. "When the corruption is alleged to reach some of the highest levels of our state government, the citizens of Ohio should be shocked and appalled."

(Bold and italics in original.)

44.     An 82-page criminal complaint and affidavit was filed that same day in the Criminal Proceedings.   These documents detailed a scheme by FirstEnergy and its affiliates and representatives to corrupt the political process and undermine democratic institutions in the State of Ohio in order to secure passage of HB6.  The allegations contained in the criminal complaint and affidavit were supported by detailed transcripts of phone calls, recorded conversations, text messages, bank records and contemporaneous documentary evidence.

45.     While FirstEnergy was identified as "Company A," rather than by name, and defendants in this case have subsequently disavowed their involvement, the complaint and affidavit quote from the Company's SEC filings and statements made by CEO Jones to FirstEnergy shareholders, leaving no doubt that FirstEnergy is in fact "Company A" and the corporate kingpin behind the alleged crimes, and that defendant Jones is the "Company A" CEO identified by prosecutors.  Prosecutors have essentially confirmed as much, and that more charges may be forthcoming as the criminal investigation moves from a covert phase to an overt one, stating at a press conference: "Everyone in this room knows who Company A is . . . ." "We are not done with this case."

46.     On July 22, 2020, *Cleveland.com* published an article entitled, "FirstEnergy was relentless in quest to have Ohio legislature bail out the utility's nuclear plants," which provided the following additional details regarding the Company's illicit activities:

> FirstEnergy Corp. tried and failed more than once to convince state lawmakers to subsidize the company's two Ohio nuclear power plants, but was unable to achieve its goal until Larry Householder became speaker of the Ohio House of Representatives in 2019.
>
> As speaker, Householder wasted little time pushing through House Bill 6, legislation that included the $1 billion nuclear plant bailout at the center of racketeering charges leveled against Householder and four others on Tuesday.
>
> Householder is accused of heading up a criminal enterprise dating back to early 2017 that took in $60 million from FirstEnergy to put Householder and his supporters in power and to ram the bailout legislation through the General Assembly.
>
> House Bill 6 was imminently important to FirstEnergy. It culminated years of work by the struggling Akron-based utility to get out from under crushing debt. But with the federal charges Tuesday surrounding the lobbying effort behind the bailout, some organizations are already calling for its repeal.
>
> "Ohio House Bill 6 was an ugly corporate bailout from the beginning, and it hasn't gotten any prettier," the conservative Buckeye Institute, a Columbus-based think tank, stated on Tuesday. "The Buckeye Institute calls upon policymakers to rectify

the previous error and take decisive action to move the state forward and away from subsidizing crony companies while sticking ordinary Ohioans with higher energy bills."

**Early calls for help**

FirstEnergy let it be known as far back as 2016 that it wanted relief for Perry nuclear plant in Lake County and Davis-Besse nuclear plant east of Toledo.

During an annual energy conference in early 2017, Rep. Bill Seitz, a Cincinnati Republican, revealed that First Energy was in "substantial financial trouble." First Energy proposed something called "zero emission credits," which would allow the utility to charge extra on electric bills because it was generating carbon-free nuclear power.

The credits would allow FirstEnergy to collect $300 million a year in perpetuity.

Bills that would have created the Zero-Emissions Nuclear Resource (ZENR) Program were introduced in the House and Senate in April 2017 and they drew plenty of testimony.

The bill "would enable Ohio to take control of a critical component of its energy future by ensuring our nuclear plants are compensated for the many benefits they provide," then First Energy CEO Charles Jones said in a statement to the House Public Utilities Committee.

**A legislative failure**

Testifying before the same committee, Ned Hill, a professor in the John Glenn College of Public Affairs at Ohio State University, referred to FirstEnergy financial engineering as "fanciful."

"The Committee members have heard that energy markets are complex. And the Committee has been presented with a complex, Rube Goldberg-like financial instrument," Hill testified. "My advice to you: Protect your constituents' wallets whenever an issue is advertised as being complex, and the person offering testimony does not try to provide clarity and simplicity."

The House bill and the companion Senate bill never made it out of the committee. Changes were made and a new bill was introduced in the House in October of 2017, but it too languished in committee.

The Ohio Consumers' Counsel and the Ohio Manufacturers' Association were among those who opposed idea as did then-House Speaker Cliff Rosenberger.

**A new plan of attack**

FirstEnergy wasn't about to give up. In March of 2018, First Energy announced plans to get out of the nuclear power business within three years by closing Davis-Besse in 2020, and the Perry and Beaver Valley plant near Pittsburgh in 2021.

Shortly after the announcement, FirstEnergy Solutions Corp, which was the nuclear division of First Energy, filed for bankruptcy protection. It now operates under the name Energy Harbor.

The company set about lobbying the state legislature for the nuclear subsidies it had failed to obtain. That strategy, according to the federal prosecutors, included funneling millions of dollars to an organization, Generation Now, controlled by Householder.

Householder used some of that money to position himself to become the next speaker. After Rosenberger resigned in April amid a scandal of his own, Rep. Ryan Smith, another bailout opponent, assumed the speaker's job. But Householder courted a number of Democrats and built a coalition to win the power struggle.

**Approving the bailout**

The push for House Bill 6 took off in earnest. After the bill was introduced, First Energy stepped up payments to Generation Now, which paid for mailings and media advertisements to pressure lawmakers into supporting the bill.

The utility financed Ohio Clean Energy Jobs Alliance, which included mayors, school officials, labor unions and economic development officials, to promote the idea of saving the nuclear plants and the jobs they provided.

What was missing was any concrete explanation from FirstEnergy of why it needed the bailout. The company never provided specifics about the plant's profitability, but it didn't matter.

In July 2019, only six months into Householder's term as speaker, HB 6 passed 51-38 and cleared the Ohio Senate. Gov. Mike DeWine did not hesitate to sign it into law.

**Tapping customers for cash**

The bill was a huge boost to FirstEnergy as it required every residential electricity customer in Ohio to pay a monthly surcharge of 85 cents and for large industrial plants to pay an additional $2,400 a month, starting in 2021 and extending through 2027.

It also called for an additional monthly fee to subsidize coal plants in Ohio and Indiana, while eliminating state-imposed mandates on energy efficiency and

renewable energy. Trish Demeter, chief of staff at the Ohio Environmental Council Fund, believes merging the three – the nuclear bailout, the coal subsidies and the rolled-back mandates – helped secure the bill's passage.

For example, it gave the ideologically minded legislator opposed to mandates a reason to vote for it, Demeter said.

With the three issues aligned and the strong-armed tactics employed by Householder and his crew, "it's not surprising that it got through with all of this money and interest fueling that pressure to get it done," Demeter said.

**A failed referendum**

It was a crushing blow to consumer watchdogs and to renewable energy advocates who quickly mounted a drive to overturn the law by referendum only to be met by fierce opposition.

The same forces that conspired to get the bill enacted, moved against the opposition.

TV and radio ads alleged that signing the petition to overturn HB 6 "equated with ceding control of Ohio energy to China," according to federal prosecutors. Workers attempting to get signatures were accosted while doing their job.

The petition drive failed to gain the required number of signatures to be placed on the ballot.

**A boost for investors**

As a final kick in the teeth to the opposition, critics allege proceeds from the increased rates didn't go to bailout the plants but to bolster the share price of the investors who acquired the nuclear plants.

FirstEnergy Solutions, which owned the two Northern Ohio nuclear plants, emerged from bankruptcy in February as Energy Harbor Corp.

Then in May, the board of Energy Harbor agreed to buy back $300 million in stock – on top of the $500 million it had previously approved, thus driving up its share price and allowing investors to cash out their shares – immediately fueling suspicions that enriching shareholders had been the reason for HB 6 all along.

Ned Hill, the Ohio State professor who opposed the bailout, wasn't surprised.

"This was an act of socialism, where you socialize the risk and privatize the benefits," Hill said. "So it's no big surprise they're now going to make sure their investors get a return from their investment in the political process. They won, so they get their cash."

47. The price of FirstEnergy stock plummeted on this news, falling to a low of just $22.85 per share on July 22, 2020, nearly 45% below the stock's closing price on July 20, 2020, of $41.26 per share, on abnormally high trading volume. FirstEnergy shareholders have suffered massive losses as a result of these declines.

## ADDITIONAL SCIENTER ALLEGATIONS

48. As alleged herein, FirstEnergy and the Individual Defendants acted with scienter in that: (i) they knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; (ii) they knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and (iii) they participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. Indeed, the affidavit and complaint filed in the Criminal Proceedings make clear that FirstEnergy's most senior executives directly orchestrated and oversaw the illicit activities alleged therein. For example, defendant Jones is alleged to have had eighty-four personal phone contacts with Householder during the Class Period at the exact time that FirstEnergy was funneling tens of millions of dollars to the enterprise and it was taking part in overt acts in furtherance of the illicit activities detailed herein. The Individual Defendants' scienter is also established by the stunning breadth and magnitude of the alleged activities, which involved the largest money-laundering and bribery scheme in Ohio history. Tens of millions of dollars were transferred from FirstEnergy bank accounts through various dark money accounts to secure, by corrupt means, one of the Company's top legislative priorities. The Individual Defendants also had the motive and opportunity to commit fraud, selling millions of dollars' worth of FirstEnergy stock at artificially inflated prices during the Class Period. Defendant Jones alone sold nearly $10 million worth of his FirstEnergy

shares in insider sales that were highly suspicious in both timing and amount as compared to past practice.

49.    As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding FirstEnergy, their control over and/or receipt and/or modification of FirstEnergy's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning FirstEnergy, participated in the fraudulent scheme alleged herein.

## NO SAFE HARBOR

50.    FirstEnergy's "Safe Harbor" warnings accompanying its reportedly forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.  To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with Generally Accepted Accounting Principles, including those filed with the SEC on Form 8-K, they are excluded from the protection of the statutory Safe Harbor. 15 U.S.C. §78u-5(b)(2)(A).

51.    Defendants are also liable for any false or misleading forward-looking statements pleaded because, at the time each forward-looking statement was made, the speaker knew the forward-looking statement was false or misleading and the forward-looking statement was authorized and/or approved by an executive officer of FirstEnergy who knew that the forward-looking statement was false.  None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## APPLICATION OF PRESUMPTION OF RELIANCE; <br> FRAUD ON THE MARKET

52.     At all relevant times, the market for FirstEnergy securities was an efficient market for the following reasons, among others:

(a)     FirstEnergy securities met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     according to the Company's 2019 10-K, FirstEnergy had more than 540 million shares outstanding as of January 31, 2020;

(c)     as a regulated issuer, FirstEnergy filed periodic public reports with the SEC;

(d)     FirstEnergy regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the Internet and other wide-ranging public disclosures; and

(e)     unexpected material news about FirstEnergy was rapidly reflected in and incorporated into prices for the Company's shares during the Class Period.

53.     As a result of the foregoing, the market for FirstEnergy securities promptly digested current information regarding FirstEnergy from publicly available sources and reflected such information in the price of FirstEnergy securities.  Under these circumstances, all purchasers of FirstEnergy securities during the Class Period suffered similar injury through their purchases of FirstEnergy securities at artificially inflated prices, and a presumption of reliance applies.

54.     A presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because Plaintiff's claims are based, in significant part, on defendants' material omissions.  Because this action involves defendants' failure to disclose material adverse information regarding FirstEnergy's

business, operations and risks, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of defendants' material misstatements and omissions set forth above, that requirement is satisfied here.

## LOSS CAUSATION/ECONOMIC LOSS

55. During the Class Period, as detailed herein, the defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of FirstEnergy securities and operated as a fraud or deceit on Class Period purchasers of FirstEnergy securities by misrepresenting the value of the Company's business and prospects by overstating its earnings and concealing the significant defects in its internal controls. As the defendants' misrepresentations and fraudulent conduct became apparent to the market, the price of the Company's securities fell precipitously as the prior artificial inflation came out of those securities' price. As a result of their purchases of FirstEnergy securities during the Class Period, Plaintiff and other members of the Class (defined below) suffered economic loss, *i.e.*, damages, under the federal securities laws.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

56. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of FirstEnergy securities during the Class Period (the "Class"). Excluded from the Class are defendants, the officers and directors of the Company and FES and FENOC, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

57. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, FirstEnergy securities were actively traded on the

NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there could be hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by FirstEnergy or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

58. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

59. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

60. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

      (a)     whether the Exchange Act was violated by defendants as alleged herein;

      (b)     whether statements made by defendants misrepresented material facts about the business, operations and management of FirstEnergy; and

      (c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

61. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden

of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

62. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

63. During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

64. Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of FirstEnergy securities during the Class Period.

65. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for FirstEnergy securities. Plaintiff and the Class would not have purchased FirstEnergy securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against All Defendants)

66.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

67.     Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions with the Company and their ownership of the Company's securities, the Individual Defendants had the power and authority to cause the Company to engage in the wrongful conduct complained of herein.  The Company controlled the Individual Defendants and all of its employees.  By reason of such conduct, defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

Respectfully submitted,

**ROBERT J. WAGONER CO., LLC**

/s/ *Robert J. Wagoner*
Robert J. Wagoner (0068991)
445 Hutchinson Avenue, Suite 100
Columbus, Ohio 43235
Telephone: (614) 796-4110
Facsimile:  (614) 796-4111
Email: bob@wagonerlawoffice.com

**POMERANTZ LLP**
Jeremy A. Lieberman
(*pro hac vice* application forthcoming)
J. Alexander Hood II
(*pro hac vice* application forthcoming)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
Email: ahood@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
(*pro hac vice* application forthcoming)
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email: pdahlstrom@pomlaw.com

**HOLZER & HOLZER, LLC**
Corey D. Holzer
(*pro hac vice* application forthcoming)
1200 Ashwood Parkway, Suite 410
Atlanta, Georgia 30338
Telephone: (770) 392-0090
Facsimile: (770) 392-0029
cholzer@holzerlaw.com

***Attorneys for Plaintiff***

## DEMAND FOR JURY TRIAL

Please take notice that Plaintiff demands trial by jury in this action.

/s/ *Robert J. Wagoner*
Robert J. Wagoner (0068991)