# EXHIBIT A

**IN THE COMMON PLEAS COURT OF SUMMIT COUNTY, OHIO**
**CRIMINAL DIVISION**

| | | |
|---|---|---|
| STATE OF OHIO, | ) | Case No. CR 2024-02-0473-B |
| | ) | |
| Plaintiff, | ) | JUDGE SUSAN BAKER ROSS |
| | ) | |
| vs. | ) | |
| | ) | |
| MICHAEL J. DOWLING, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| STATE OF OHIO, | ) | Case No. CR 2024-02-0473-C |
| | ) | |
| Plaintiff, | ) | JUDGE SUSAN BAKER ROSS |
| | ) | |
| vs. | ) | |
| | ) | |
| CHARLES E. JONES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| STATE OF OHIO, | ) | Case No. CR 2024-02-0473-D |
| | ) | |
| Plaintiff, | ) | JUDGE SUSAN BAKER ROSS |
| | ) | |
| vs. | ) | |
| | ) | |
| IEU-OHIO ADMINISTRATION CO. LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

4869-9700-7347.v3

| | | |
|---|---|---|
| STATE OF OHIO, | ) | Case No. CR 2024-02-0473-E |
| | ) | |
| Plaintiff, | ) | JUDGE SUSAN BAKER ROSS |
| | ) | |
| vs. | ) | |
| | ) | |
| SUSTAINABILITY FUNDING ALLIANCE | ) | |
| OF OHIO, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

**MOVANT-VICTIM'S MOTION AND BRIEF TO (1) CLARIFY OR, IN THE ALTERNATIVE, MODIFY APRIL 24, 2024 CONFIDENTIALITY AGREEMENT AND STIPULATED PROTECTIVE ORDER AND (2) SET TRIAL DATE**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...........................................................................................1

II.    RELEVANT BACKGROUND .......................................................................2

    A.    The USAO, Movant-Victim, and the State Prosecute Defendants' Corruption ..............................................................................................2

    B.    Defendants Violate Federal Rule of Civil Procedure 26(e), Mislead the Federal District Court, and the State Exposes Their Deception ............................4

        1.    Defendants' Continuing Production Obligation .........................4

        2.    The Withheld Documents ...........................................................5

        3.    Defendants Acknowledge Their "Imminent" Production "Obligation" and Belatedly Concoct a Plan to Avoid It ............................6

III.    ARGUMENT .................................................................................................7

    A.    Movant-Victim, a FirstEnergy Shareholder, Is Entitled to the Constitutional Right and Protections of Marsy's Law ..............................7

    B.    Movant-Victim's Rights Are Being Violated and Defendants Are Victimizing Them Again by Delaying This Matter and Using This Court's Protective Order to Gain an Advantage in the Civil Case .........................8

        1.    The Court Should Clarify that the Protective Order Is Limited to the Two Listed Categories ...................................................10

        2.    In the Alternative, Movant-Victim Requests that the Court Amend the Protective Order to Permit Production of the Withheld Information Prior to Defendants Deposing the Six State Witnesses ..........................................................................11

    C.    Movant-Victim Urges the Court to Set a Trial Date to Allow for a Conclusion of This Matter .......................................................................12

IV.    REQUEST FOR ORAL ARGUMENT ...........................................................13

4869-9700-7347.v3

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Behrens v. Behrens*,
    2024-Ohio-1121 ...........................................................................................................11

*Coon v. OhioHealth Corp.*,
    2023-Ohio-492 (3d Dist.),
    *appeal not allowed*, 2023-Ohio-1979 ......................................................................10

*DR Distribs., LLC v. 21 Century Smoking, Inc.*,
    513 F. Supp. 3d 839 (N.D.Ill. 2021) ...........................................................................8

*In re FirstEnergy Corp. Securities Litigation*,
    2021 WL 2414763 (S.D.Ohio June 14, 2021) .................................................4, 5, 9

*In re FirstEnergy Corp. Securities Litigation*,
    2024 WL 3872948 (S.D.Ohio Aug. 20, 2024)...................................................3, 5

*United States ex rel. Landis v. Tailwind Sports Corp.*,
    303 F.R.D. 419 (D.D.C. 2014)....................................................................................9

**STATUTES, RULES, AND REGULATIONS**

Federal Rules of Civil Procedure
    Rule 26(e)................................................................................................................4, 6

Ohio Constitution, Article I
    §10(a) ....................................................................................................................1, 7
    §10a(A)................................................................................................................7, 12
    §10a(A)(3)..................................................................................................................7
    §10a(A)(7)..................................................................................................................7
    §10a(A)(8)..........................................................................................................7, 12
    §10a(B) ......................................................................................................................7
    §10a(D) ......................................................................................................................7

Ohio Revised Code
    §2913.02....................................................................................................................7
    §2945.71...................................................................................................................12|
    §2945.71(C)(2)........................................................................................................12

Ohio Rules of Civil Procedure
    Rule 26(C)...............................................................................................................10

**Page**

Ohio Rules of Criminal Procedure
    Rule 16 ........................................................................................................................10
    Rule 16(D) ..................................................................................................................10

Summit County C.P. Local Rule, General Division
    Rule 7.14(B) ...................................................................................................................1

4869-9700-7347.v3

## I.    INTRODUCTION

Movant-Victim is the Lead Plaintiff prosecuting a securities action before Chief Judge Marbley in the United States District Court for the Southern District of Ohio (the "Civil Action") that arises from Defendants' criminal scheme, including the conduct that is at the center of this case.[1] Movant-Victim fully supports the State's criminal prosecution.  Movant-Victim is compelled to be heard in this case because Defendants are seeking to use the Civil Action to question the State's criminal witnesses while also seeking to use this Court's Protective Order to evade their discovery production obligations in the Civil Action to gain an unfair advantage over both the Movant-Victim and the State.  Accordingly, Movant-Victim respectfully requests that the Court clarify and confirm that the Protective Order is limited to information or documents (i) reflecting Personally Identifiable Information ("PII") or (ii) "obtained by the Defense Team through other litigation" in which they were designated confidential, as those are the only two categories of information for which the Court's order found good cause to protect.  Protective Order at 2.

In the alternative, Movant-Victim respectfully requests that the Court modify the Protective Order to include the following language:

> Any Discovery Material that does not contain PII or was not received by the Defense Team through other litigation shall not be protected from production in the matter of *In re FirstEnergy Corp. Securities Litigation*, No. 2:20-cv-03785-ALM-KAJ (S.D.Ohio) at least 21 days prior to the deposition of any of the following individuals:  Ebony Yeboah-Amankwah, Robert P. Reffner, Josh Rubin, Matthew Brakey, Steven Staub, and Bradley Bingaman.  Production of Discovery Material shall be accompanied by a copy of this Amended Protective Order and an advisal that the handling of such Discovery Material is subject to its terms.

---

[1]    As discussed in more detail below, Lead Plaintiff is a victim in this case under Article I, Section 10(a) of the Ohio Constitution, commonly known as Marsy's Law.  *See infra* §III.A. Further, as used herein, "Protective Order" refers to the April 24, 2024 Confidentiality Agreement and Stipulated Protective Order; "Movant-Victim" is Lead Plaintiff Los Angeles County Employees Retirement Association; and "Defendants" are Michael Dowling and Charles Jones, collectively. Additionally, unless otherwise noted, all emphasis is added and citations omitted.

- 1 -

## II.     RELEVANT BACKGROUND

### A.     The USAO, Movant-Victim, and the State Prosecute Defendants' Corruption

On July 21, 2020, the United States Attorney's Office for the Southern District of Ohio (the "USAO") moved to unseal an exceptionally detailed Criminal Complaint and accompanying affidavit, detailing what FirstEnergy Corp. ("FirstEnergy") would later confess was a years-long criminal corruption scheme that it had financed and orchestrated through Defendants. *See* Ex. 1 (ECF 192-2 - Criminal Complaint) at PageID 4344-424; Ex. 2 (ECF 259-5 - Deferred Prosecution Agreement ("DPA")) at PageID 6013-43.[2]  Less than four months later, the Federal Bureau of Investigation searched the home of Public Utilities Commission of Ohio ("PUCO") Chairman Samuel Randazzo, who resigned a few days later.[3]

On February 26, 2021, Movant-Victim filed its Consolidated Complaint, alleging Defendants' use of their massive corruption scheme, including the bribing of Larry Householder and Randazzo, to defraud investors.  Ex. 3 (ECF 72 - Consolidated Complaint) at PageID 1545-674.

On July 22, 2021, FirstEnergy confessed to having bribed Householder and Randazzo through Defendants. Ex. 2 (ECF 259-5 - DPA) at PageID 6016.  Among other details, FirstEnergy confessed that Jones had thanked Randazzo for using his position with PUCO to take actions that boosted FirstEnergy's share price – a prototypical example of why FirstEnergy and Defendants had bribed Randazzo. *Id.* at PageID 6041.

---

[2]     All references to Electronic Case Filing ("ECF") are to the documents filed in the Civil Action.  For clarification, Movant-Victim utilizes the Civil Action's PageID references.

[3]     Mark Williams, *Powerful Ohio utilities regulator steps down following FBI search of his home*, The Columbus Dispatch (Nov. 20, 2020), available at https://www.dispatch.com/story/business/2020/11/20/ohio-utilities-regulator-resigns-following-fbi-search-his-home/6355499002/ (accessed Oct. 29, 2024).

On March 9, 2023, a federal jury convicted Householder for his part in FirstEnergy and Defendants' massive corruption scheme.[4]  Defendants' names and crucial roles in the scheme figured prominently in Householder's trial.  Ex. 4 (ECF 444-1 - Defendants' Mot. for Protective Order) at PageID 10074 ("The government focused significant and detailed attention on Jones and Dowling during the recent *Householder* trial, implicitly labeling them as co-conspirators and the alleged architects of the 'Bailout Scheme' that forms the basis for Plaintiffs' claims in this case.").

On December 1, 2023, after the parties in the Civil Action had already taken 32 depositions, Chief Judge Marbley stayed fact discovery in the Civil Action pending resolution of FirstEnergy's motion to stay discovery until after resolution of its interlocutory appeal of Chief Judge Marbley's class-certification order.  *See* Ex. 5 (ECF 578 - Order) at PageID 12722; Ex. 6 (ECF 657 - Plaintiffs' Accounting of Discovery) at PageID 14286-87.

On December 4, 2023, the USAO indicted Randazzo.[5]

On February 14, 2024, the State indicted Defendants and Randazzo.[6]

On August 20, 2024, Chief Judge Marbley denied FirstEnergy's motion to stay and lifted the stay of fact discovery in the Civil Action.  *In re FirstEnergy Corp. Securities Litigation*, 2024 WL 3872948, at *7 (S.D.Ohio Aug. 20, 2024) ("*FirstEnergy II*").

---

[4]	DOJ, *Jury convicts former Ohio House Speaker, former chair of Ohio Republican Party of participating in racketeering conspiracy* (Mar. 9, 2023), available at https://www.justicegov/usao-sdoh/pr/jury-convicts-former-ohio-house-speaker-former-chair-ohio-republican-party (accessed Oct. 29, 2024).

[5]	DOJ, *Grand jury indicts former state public utilities chairman for federal bribery, embezzlement crimes* (Dec. 4, 2023), available at https://www.justice.gov/usao-sdoh/pr/grand-jury-indicts-former-state-public-utilities-chairman-federal-bribery-embezzlement (accessed Oct. 29, 2024).

[6]	Andrew J. Tobias, *Read the indictment of former FirstEnergy execs Chuck Jones, Michael Dowling and state PUCO Chairman Sam Randazzo*, cleveland.com (Feb. 14, 2024), available at https://www.cleveland.com/news/2024/02/read-the-indictment-of-former-firstenergy-execs-chuck-jones-michael-dowling-and-state-puco-chairman-sam-randazzo.html (accessed Oct. 29, 2024).

**B.**     **Defendants Violate Federal Rule of Civil Procedure 26(e), Mislead the Federal District Court, and the State Exposes Their Deception**

**1.**     **Defendants' Continuing Production Obligation**

On June 14, 2021, Chief Judge Marbley issued an Order allowing Movant-Victim to serve on Defendants, and others, two requests for the production of documents.  *See In re FirstEnergy Corp. Securities Litigation*, 2021 WL 2414763 (S.D.Ohio June 14, 2021) (the "June 2021 Order"); Ex. 7 (ECF 691-3 - requests) at PageID 14670-80.  Request for Production No. 2 ("RFP No. 2") seeks the following:

> All documents that the Defendants have produced or provided to, or received from, any regulatory or government agency, federal or state law enforcement agency, or legislative body or representative in connection with the HB6 bribery scheme, including any deposition testimony.

*Id.* at PageID 14679.  Chief Judge Marbley found that without such documents Movant-Victim would "face[] unique undue prejudice without having access to documents that have already been produced in other [governmental] proceedings." *FirstEnergy*, 2021 WL 2414763, at *6 (June 2021 Order).  He further explained that, "without allowing access to already-produced discovery, [Movant-Victim] could find itself in a significantly different position from most of the other litigants related to this matter." *Id.*

On June 28, 2021, Movant-Victim served its requests for the production of documents on Defendants, which reminded Defendants that Federal Rule of Civil Procedure 26(e) requires them to supplement their productions.  *See* Ex. 7 (ECF 691-3 - requests) at PageID 14675 ("you shall supplement your responses as required by Federal Rule of Civil Procedure 26(e)").  Subject to several irrelevant boilerplate objections, Defendants agreed to produce all non-privileged, non-duplicative documents responsive to RFP No. 2.  Ex. 8 (ECF 691-4 - Jones' responses and objections) at PageID 14690-91; Ex. 9 (ECF 691-5 - Dowling's responses and objections) at PageID 14702-03.  Nearly a year later, defendant Jones' counsel acknowledged Jones' ongoing production

- 4 -

obligation in response to RFP No. 2: "***We will produce to Lead Plaintiff any additional documents received from or provided to the government under our continuing discovery obligations in this case***." Ex. 10 (ECF 691-6 - 5/31/2022 R. Israel letter) at PageID 14708.

Nearly three years later, on April 24, 2024, this Court entered the Protective Order pursuant to an agreement between the parties. At the time the Protective Order was entered, Defendants were already subject to Chief Judge Marbley's June 2021 Order, requiring them to produce any documents received from any state law enforcement agency, including the State. Accordingly, Defendants could not override their existing production obligations in the Civil Action by agreeing to terms for entry of a Protective Order in this case. Further, as discussed in more detail below, it was highly improper for them to even attempt to do so without fully informing this Court of their existing production obligations related to the materials that had already been, and would continue to be, produced by the State in this matter.

### 2.    The Withheld Documents

On April 24, 2024, a protective order was entered in this matter "to [1] prevent the dissemination of personally identifiable information ('PII') and [2] preserve the Confidential status of documents obtained by the Defense Team through other litigation." Protective Order at 2. The dockets in this case reflect Defendants' receipt of the "Withheld Documents" (including recorded audio statements, proffer statements, reports of interviews, etc.), which concern, among other witnesses relevant to both cases, Ebony Yeboah-Amankwah, Robert P. Reffner, Josh Rubin, Matthew Brakey, Steven Staub, and Bradley Bingaman (the "Six State Witnesses"). Ex. 11 (ECF 691-10 - discovery identified on the dockets in this case as of September 30, 2024) at PageID 14805-27. The State's filings acknowledge that nearly all these documents are ***not*** confidential. *Id.* Throughout months and multiple filings, that status remained the same, including when Chief Judge Marbley lifted the stay of fact discovery in the Civil Action on August 20, 2024. *FirstEnergy II*,

2024 WL 3872948, at *7. But instead of promptly producing these responsive documents to Movant-Victim in the Civil Action pursuant to Federal Rule of Civil Procedure 26(e), Defendants withheld them and proceeded to schedule the depositions of the Six State Witnesses.

### 3. Defendants Acknowledge Their "Imminent" Production "Obligation" and Belatedly Concoct a Plan to Avoid It

On September 27, 2024, Movant-Victim's counsel emailed counsel for Defendants to remind them of their obligation to produce the Withheld Documents, as the charges and issues in this matter explicitly relate to the HB6 (Ohio House Bill 6) bribery scheme. *See* Ex. 12 (ECF 691-11 - 9/27/2024 J. Forge email) at PageID 14829. Rather than produce the Withheld Documents or respond to Movant-Victim, on September 30, 2024, Defendants pleaded with the State to help them avoid their "imminent" "obligation," even though the Withheld Documents did not contain PII and had not been obtained by the defense team through other litigation. Indeed, their counsel acknowledged that the only way to avoid their "imminent" "obligation" in the Civil Action would be "if the State retroactively designated the Discovery Materials as Confidential Discovery Materials under the terms of an April 24, 2024 Protective Order in the state criminal case, [as] that designation would allow them to refuse to turn over the discovery that they have received in the State criminal case." Ex. 13 (ECF 694 - State's Stay Mot.) at PageID 14864.

On October 1, 2024, the State acceded to Defendants' plan and "retroactively" designated as "confidential" the very same Withheld Documents that the State had, for months, acknowledged were not confidential. Ex. 14 (ECF 691-12 - 10/1/24 State's letter) at PageID 14831. Later that day, Defendants' counsel argued to Movant-Victim and the Special Master in the Civil Action that the

Withheld Documents could not be "produced without violating the existing Order issued by Summit County Common Pleas Judge Susan Baker Ross."  Ex. 15 (10/1/24 C. Rendon email) at 1.[7]

## III.    ARGUMENT

### A.    Movant-Victim, a FirstEnergy Shareholder, Is Entitled to the Constitutional Right and Protections of Marsy's Law

Article I, Section 10(a) of the Ohio Constitution, provides certain rights to victims of criminal offenses, commonly known as Marsy's Law.[8]  Marsy's Law defines a victim as "a person against whom the criminal offense or delinquent act is directly and proximately harmed by the commission of the offense or act."  Ohio Const., art. I, §10a(D).  Specifically, Marsy's Law provides that "a victim shall have the following rights, which shall be protected in a manner no less vigorous than the rights afforded to the accused:" (i) "to be heard in any public proceeding . . . in which a right of the victim is implicated"; (ii) "to full and timely restitution"; and (iii) "to proceedings free from unreasonable delay and a prompt conclusion of the case."  Ohio Const., art. I, §10a(A)(3),(7), (8).  Further, all Marsy's Law victims may appear through counsel "in any proceeding involving the criminal offense or delinquent act against the victim or in which the victim's rights are implicated, may assert the rights enumerated in this section and any other right afforded to the victim by law."  Ohio Const., art. I, §10a(B).

In February 2024, the Summit County Grand Jury indicted Defendants on several felony counts, including aggravated theft of $1,500,000 or more in Count Five, a violation of Section

---

[7]    On September 30, 2024, Movant-Victim served subpoenas for the Withheld Documents on Sustainability Funding Alliance of Ohio, Inc. ("SFAO") and IEU-Ohio Administration LLC ("IEU-Ohio Admin.").  Ex. 16 (SFAO subpoena), Ex. 17 (IEU-Ohio Admin subpoena).  On October 11, 2024, SFAO and IEU-Ohio Admin. objected to their production on the grounds that the Withheld Documents had been designated confidential under the Protective Order.  Ex. 18 (SFAO responses and objections); Ex. 19 (IEU-Ohio Admin. responses and objections).

[8]    Supreme Court of Ohio, *Marsy's Law and Crime Victim Rights*, available at https://www.supremecourt.ohio.gov/marsy-s-law-and-crime-victim-rights/ (accessed Oct. 29, 2024).

- 7 -

2913.02 of the Ohio Revised Code.  *See* Indictment filed on February 9, 2024; *see also* Supplemental Indictment filed on September 11, 2024.  The grand jurors specifically found probable cause that FirstEnergy and/or ***its shareholders were victims*** when they determined that Defendants "did with purpose to deprive the owner, ***FirstEnergy Corp***., a publicly traded corporation, ***and/or the shareholders of FirstEnergy Corp., a publicly traded corporation***," to obtain or exert control "of property or services, to wit: cash, to wit:  $4,333,333.00."  Indictment at 15; Supplemental Indictment at 15.[9]  To be sure, the State's Indictment and Supplemental Indictment expressly acknowledged that FirstEnergy's shareholders, including Movant-Victim, are victims in this matter.  Accordingly, Movant-Victim is entitled to the full extent of rights and privileges afforded under Marsy's Law.[10]

B. **Movant-Victim's Rights Are Being Violated and Defendants Are Victimizing Them Again by Delaying This Matter and Using This Court's Protective Order to Gain an Advantage in the Civil Case**

As set forth above, Defendants have scheduled the depositions of the Six State Witnesses in the Civil Action while simultaneously withholding the Withheld Documents on the grounds that they are precluded from producing them under this Court's Protective Order to gain an unfair advantage in this case and the Civil Action.  Movant-Victim will be prejudiced if the depositions were to proceed when Defendants have the deponents' proffers, statements, reports, etc. while Movant-Victim did not.  *See, e.g.*, *DR Distribs., LLC v. 21 Century Smoking, Inc.*, 513 F. Supp. 3d 839, 973

---

[9]  Indeed, the purpose of Defendants' entire scheme, which included bribing Randazzo, was to unlawfully inflate FirstEnergy's share price which came crashing down with their subterfuge exposed.  *See* Ex. 2 (ECF 259-5 - DPA) at PageID 6041.

[10]  The State has vigorously opposed Defendants' attempts to de-designate FirstEnergy as a victim in this case.  State's Brief in Opposition to Joint Motion to Overrule State's Designation of FirstEnergy as a Victim Under Marsy's Law filed on May 2, 2024 at 1.  While FirstEnergy's status as a victim is inconsistent with its confession to conspiring with Defendants to bribe Randazzo with $4,333,333, it is indisputable that FirstEnergy's shareholders, including the Movant-Victim, did not consent to this taking and are victims of Defendants' criminal scheme.

(N.D.Ill. 2021) ("Parties incur prejudice because they do 'not have the benefit of the documents while selecting deponents, *taking depositions*, conducting third party discovery, and preparing [their] trial strategy and pre-trial documents.'") (Bracketed text in original.); *United States ex rel. Landis v. Tailwind Sports Corp.*, 303 F.R.D. 419, 425-26 (D.D.C. 2014) ("[S]tatements given to FBI agents and other criminal investigators . . . are critical sources of evidence for *both* sides . . . fairness dictates that both sides have equal access to relevant witness statements.") (Emphasis in original.). Chief Judge Marbley echoed these holdings in the Civil Action by ordering production to avoid the very kind of prejudice Defendants seek to inflict through trying to hide behind this Court's Protective Order: "[W]ithout allowing access to already-produced discovery, [Movant-Victim] could find itself in a significantly different position from most of the other litigants related to this matter." *FirstEnergy*, 2021 WL 2414763, at *6 (June 2021 Order).

While Movant-Victim supports the State's motion in the Civil Action to stay the depositions of the Six State Witnesses until after February 1, 2025 (Ex. 20 (ECF 704 - Plaintiffs' Response to State's Stay Mot.) at PageID 15302), there is no guarantee that the State's motion will be granted or that an order granting the motion will withstand an objection. Thus, as discussed in more detail below, to avoid the prejudice that would result from Defendants deposing the Six State Witnesses while still withholding the Withheld Documents, Movant-Victim respectfully requests that the Court either: (1) clarify that the Protective Order is limited to the two categories of information it was explicitly meant to protect (*i.e.*, PII and confidential documents Defendants obtain through other litigation); or (2) amend the Protective Order so as to permit Defendants to produce the Withheld Documents to Movant-Victim prior to deposing any of the Six State Witnesses.

1.     **The Court Should Clarify that the Protective Order Is Limited to the Two Listed Categories**

Rule 16 of the Ohio Rules of Criminal Procedure prescribes a strictly limited list of reasons upon which a prosecuting attorney may rely to certify information for nondisclosure ***to a criminal defendant***.  Crim.R. 16(D) ("If the prosecuting attorney does not disclose materials or portions of materials under this rule, the prosecuting attorney shall certify to the court that the prosecuting attorney is not disclosing material or portions of material otherwise subject to disclosure under this rule for one or more of the following reasons.").  Once information has been produced to a criminal defendant, however, Ohio Rule of Criminal Procedure 16 contains no provision authorizing protective orders to shield information provided to a criminal defendant from discovery in a ***pre-existing*** related matter.  Put simply, the Ohio Rules of Criminal Procedure do not include an analog to Rule 26(C) of the Ohio Rules of Civil Procedure.  Civ.R. 26(C).  This is essential because even if it did, the Court found very limited good cause for the Protective Order here:  "the Court finds that good case exists for the entry of a protective order in this case to [1] prevent the dissemination of personally identifiable information ('PII') and [2] preserve the Confidential status of documents obtained by the Defense Team through other litigation."  Protective Order at 2.  In other words, because there are no other categories of information for which this Court found good cause to support a protective order, the Protective Order did ***not*** give the parties a freehand to designate as confidential anything they want whenever they want and then invoke this Court's authority to prejudice others, especially victims, in related litigation.  Even the Court may not issue a protective order without finding good cause to do so.  """"The burden of establishing good cause for a protective order rests with the movant."""  *Coon v. OhioHealth Corp*., 2023-Ohio-492, ¶31 (3d Dist.), *appeal not allowed*, 2023-Ohio-1979.  "'Merely claiming the information is confidential is insufficient to sustain the burden.'"  *Id*. at ¶32.

Because the Withheld Documents do not contain PII or include confidential "documents obtained by the Defense Team through other litigation," they do not fall within the Protective Order. Protective Order at 2. Nevertheless, Defendants have misconstrued this Court's Protective Order to evade their discovery obligations in the Civil Action and gain an improper advantage over the State in the criminal case. To prevent such abuse and any further gamesmanship, Movant-Victim respectfully requests that the Court clarify and confirm that the Protective Order is limited to the two categories of information/documents the Court found good cause to protect (i) information/documents reflecting PII, and (ii) information/documents "obtained by the Defense Team through other litigation" in which they were designated confidential. *Id.* at 2

> **2. In the Alternative, Movant-Victim Requests that the Court Amend the Protective Order to Permit Production of the Withheld Information Prior to Defendants Deposing the Six State Witnesses**

As set forth above, Movant-Victim would be prejudiced if Defendants are still withholding the Withheld Documents when they depose the Six State Witnesses. If the federal court allows these depositions to proceed in the Civil Action, there is good cause to amend the Protective Order in this case to avoid this prejudice. *See, e.g.*, *Behrens v. Behrens*, 2024-Ohio-1121, ¶12 ("'As a general rule, "good cause" means a [s]ubstantial reason, one that affords legal excuse.'") (Bracketed text in original.). If the Court determines that the existing Protective Order shields from production to the Movant-Victim the retroactively bulk-designated Withheld Documents, then to preserve the rights enumerated under Marsy's Law and avoid prejudicing Movant-Victim, the Court should amend the Protective Order. Specifically, Movant-Victim requests that the Court add the following language to the Protective Order:

> Any Discovery Material that does not contain PII or was not received by the Defense Team through other litigation shall not be protected from production in the matter of *In re FirstEnergy Corp. Securities Litigation*, No. 2:20-cv-03785-ALM-KAJ (S.D.Ohio) at least 21 days prior to the deposition of any of the following

- 11 -

individuals:  Ebony Yeboah-Amankwah, Robert P. Reffner, Josh Rubin, Matthew Brakey, Steven Staub, and Bradley Bingaman.  Production of Discovery Material shall be accompanied by a copy of this Amended Protective Order and an advisal that the handling of such Discovery Material is subject to its terms.

Critically, this Court previously ordered Defendants to produce documents designated confidential under the protective order in the Civil Action (Order Requiring Disclosure filed on September 26, 2024), which confirms the complete overlap in relevance between the Civil Action and state criminal cases and significantly tempers Movant-Victim's request, which simply seeks a parallel order from this Court.

### C. Movant-Victim Urges the Court to Set a Trial Date to Allow for a Conclusion of This Matter

As set forth above, the Ohio Constitution provides a right to the Movant-Victim "to proceedings free from unreasonable delay and a prompt conclusion of the case" and that this right "shall be protected in a manner no less vigorous than the rights afforded to the accused."  Ohio Const., art. I, §10a(A), (8).  Likewise, Section 2945.71 of the Ohio Revised Code requires Defendants be brought trial within 270 days of their February 12, 2024 arrests.  R.C. §2945.71(C)(2).  A timely conclusion of the criminal prosecution could alleviate most of the issues and prejudice addressed in this Motion, as the State has already indicated that it will not consider any of the Withheld Documents to be confidential after trial or resolution of this case.  If the Court were to set this matter for a trial commencing by February 1, 2025, sufficient time would be left in the Civil Action to allow for both the production of the Withheld Documents and the depositions of the Six State Witnesses to proceed following the conclusion of the criminal trial and prior to the conclusion of Civil Action's discovery deadline.  Indeed, this provides the clearest path to protect the legitimate interests of all the parties involved including Movant-Victim, the State, and Defendants.  Accordingly, Movant-Victim respectfully requests that the Court set this matter for a trial on or before February 1, 2025.

## IV.     REQUEST FOR ORAL ARGUMENT

Pursuant to Summit County Court of Common Pleas General Division, Local Rule 7.14(B), Movant-Victim requests oral argument on this Motion and respectfully requests that the Court schedule it for November 15, 2024 at the same time the Court is currently scheduled to hold a hearing on other related motions in this matter.

DATED:  October 30, 2024

s/ Joseph F. Murray
Joseph F. Murray (0063373)
Brian K. Murphy (0070654)
Attorney for Movant-Victim Los Angeles
County Employees Retirement Association
Murray Murphy Moul + Basil LLP
1114 Dublin Road
Columbus, OH 43215
Telephone:  614/488-0400
murray@mmmb.com
murphy@mmmb.com
614/488-0401 (fax)

Jason A. Forge (*pro hac vice* forthcoming)
Attorney for Movant-Victim Los Angeles
County Employees Retirement Association
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
jforge@rgrdlaw.com
619/231-7423 (fax)

- 13 -

4869-9700-7347.v3

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on October 30, 2024, I electronically filed the foregoing with the

Clerk of the Court by using the e-Filing system, which will send a notice of electronic filing to

all counsel of record in this case.

_____
/s/ Joseph F. Murray
Joseph F. Murray

# EXHIBIT 1

AO 91 (Rev. 08/09)  Criminal Complaint

# UNITED STATES DISTRICT COURT

### for the

### Southern District of Ohio

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| | ) Case No. **1:20-MJ-00526** |
| Matthew Borges | ) |
| | ) |
| | ) |

_Defendant(s)_

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____July 16, 2020_____ in the county of _____Hamilton_____ in the

__Southern__ District of _____Ohio_____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1962(d) | Conspiracy to Participate, Directly or Indirectly, in the Conduct of an Enterprise's Affairs through a Pattern of Racketeering Activity |

This criminal complaint is based on these facts:

> See Affidavit

☑ Continued on the attached sheet.

_____
_Complainant's signature_

Blane J. Wetzel, Special Agent, FBI
_Printed name and title_

Sworn to before me and signed in my presence. **via Facetime Video.**

Date: **Jul 17, 2020**

_Stephanie K. Bowman_
_Judge's signature_

City and state: _____Cincinnati, Ohio_____     Hon. Stephanie K. Bowman, U.S. Magistrate Judge
_Printed name and title_

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

UNITED STATES

V.

LARRY HOUSEHOLDER,                    Case No. 1:20-MJ-00526
JEFFREY LONGSTRETH,
NEIL CLARK,                           <u>Filed Under Seal</u>
MATTHEW BORGES,
JUAN CESPEDES, and
GENERATION NOW

## <u>AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT</u>

I, Blane J. Wetzel, being first duly sworn, hereby depose and state as follows:

1.      I make this affidavit in support of a criminal complaint against defendants **LARRY HOUSEHOLDER**, **JEFFREY LONGSTRETH**, **NEIL CLARK**, **MATTHEW BORGES, JUAN CESPEDES,** and **GENERATION NOW**.

2.      I am a Special Agent with the Federal Bureau of Investigation, and have been since August 21, 2016.  I am assigned to the Public Corruption Squad of the Cincinnati Division Columbus Resident Agency. In my capacity as a Special Agent, I work on the Southern Ohio Public Corruption Task Force - comprised of various state and federal agencies, and am responsible for investigating violations of federal law, including, but not limited to, public corruption, extortion, bribery, and theft from programs receiving federal funds. I have conducted and participated in public corruption investigations that involved the use of advanced investigative techniques such as the use of: Title III interceptions; confidential human sources; consensually-monitored meetings; execution of search warrants on computers, emails, other electronic communication devices and physical structures; pen register and trap/trace devices; financial record analysis; and physical surveillance. During these investigations, which included bribery, extortion, and efforts to defraud the government, I have participated in monitoring court authorized wire interceptions, conducted consensually recorded conversations, conducted witness interviews, analyzed telephone toll data, and analyzed documents such as legislation and financial records.

3.      By virtue of my training and experience, through conversations with and review of reports from other experienced agents who have conducted numerous public corruption investigations, I have become familiar with how some public officials improperly solicit or accept benefits or other things of value from a private citizen with intent to be influenced or rewarded in connection with the business or transaction of the governmental agency for which they work. I also investigated public officials and their associates who employ various deceptive means to further corrupt activity to include orally and electronically communicating in coded conversation, using a middleman to distance oneself from corrupt activity, and providing false exculpatory

information as an attempt to disguise the nature of their corrupt activity. I have had the opportunity to assist in multiple public corruption wiretap investigations, including monitoring and reviewing transcripts of court authorized intercepted communications involving bribery and extortion.

4.      Prior to joining the FBI, I worked as policy director for a member of the Michigan House of Representatives. I performed duties such as: drafting legislation, managing constituent relations, managing legislative issues, and providing strategic political advice to my employer. In addition to working in an official capacity for the State of Michigan, I was also employed by that same legislator as a member of his campaign team. Working on the campaign, I became familiar with the rules, regulations, practices, and norms of campaign finance.

5.      The information set forth in this affidavit was obtained during the course of my employment with the FBI, through personal observations, the statements of witnesses/cooperators, and recordings of conversations. Since this affidavit is being submitted for the limited purpose of obtaining a criminal complaint, I have not included every fact known to me concerning this investigation. I have set forth only the facts necessary to establish probable cause that federal crimes have been committed.

6.      As set forth in this affidavit, there is probable cause to believe that, beginning in or about 2016 and continuing to the present, in the Southern District of Ohio and elsewhere, the Defendants, **LARRY HOUSEHOLDER**, **JEFFREY LONGSTRETH**, **NEIL CLARK**, **MATTHEW BORGES**, **JUAN CESPEDES**, and **GENERATION NOW**, and others known and unknown, being persons employed by and associated with an enterprise, which engaged in, and the activities of which affected interstate commerce, did knowingly and intentionally conspire with each other and others known and unknown to violate Title 18 United States Code, Section 1962(c), that is, to conduct and participate directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, as that term is defined in 18 U.S.C. §§ 1961(1) and 1961(5), consisting of multiple acts indictable under 18 U.S.C. §§ 1343, 1346 (relating to honest services wire fraud); 18 U.S.C. § 1951 (relating to interference with commerce, robbery, or extortion); 18 U.S.C. § 1952 (relating to racketeering, including multiple acts of bribery under Ohio Revised Code § 3517.22(a)(2)); 18 U.S.C. § 1956 (relating to the laundering of monetary instruments); 18 U.S.C. § 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity); and multiple acts involving bribery, chargeable under Ohio Revised Code § 2921.02. It was part of the conspiracy that each Defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise, all in violation of 18 U.S.C. § 1962(d).

## GENERAL STATEMENT OF THE LAW

7.      Title 18, United States Code, Section 1962(c) and (d) provides as follows:

(c)  It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities which affect, interstate or foreign commerce, to conduct or participate, directly or

indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . .

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection . . . . (c) of this section.

Section 1961 in turn, defines the terms "enterprise" and "pattern of racketeering activity" as used in Section 1962 as follows:

(4) "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity;

(5) "pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any term of imprisonment) after the commission of a prior act of racketeering activity.

Section 1961(1) defines "racketeering activity," in relevant part, as follows:

(A) [A]ny act or threat involving . . . bribery[,] . . . which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under . . . title 18, United States Code: . . . section 1343 (relating to wire fraud) . . . section 1951 (relating to interference with commerce, robbery, or extortion), section 1952 (relating to racketeering) . . . section 1956 (relating to the laundering of monetary instruments), section 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity) . . . .

**PROBABLE CAUSE**

8.    Defendants **LARRY HOUSEHOLDER**, **JEFFREY LONGSTRETH**, **NEIL CLARK**, **MATTHEW BORGES**, **JUAN CESPEDES**, and **GENERATION NOW**, and others known and unknown, constituted an "Enterprise," (hereinafter "Householder's Enterprise") as that term is defined in Title 18, United States Code, Section 1961(4), that is,  a group of individuals and entities associated in fact.  Householder's Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise, and the enterprise engaged in, and its activities affected, interstate commerce. As described below, there is probable cause to believe that the named defendants conspired to conduct and participate in the conduct of the affairs of Householder's Enterprise through a pattern of racketeering activity.

3

9. To summarize, from March 2017 to March 2020, Householder's Enterprise received approximately $60 million from Company A[1] entities,[2] paid through Generation Now and controlled by Householder and the Enterprise. In exchange for payments from Company A, Householder's Enterprise helped pass House Bill 6, legislation described by an Enterprise member as a billion-dollar "bailout" that saved from closure two failing nuclear power plants in Ohio affiliated with Company A. The Enterprise then worked to corruptly ensure that HB 6 went into effect by defeating a ballot initiative. To achieve these ends, and to conceal the scheme, Householder's Enterprise passed money received from Company A Corp. affiliates through multiple entities that it controlled. Householder's Enterprise then used the bribe payments to further the goals of the Enterprise, which include: (1) obtaining, preserving, and expanding Householder's political power in the State of Ohio through the receipt and use of secret payments; (2) enriching and benefitting the enterprise, its members, and associates; and (3) promoting, concealing, and protecting purposes (1) and (2) from public exposure and possible criminal prosecution.

## I. Background

10. In 2016, Company A Corp.'s nuclear generation future looked grim. (Company A Corp. is described further below.) In its November 2016 Annual Report to Shareholders, Ohio-based Company A Corp. and its affiliates reported a weak energy market, poor forecast demands, and hundreds of millions of dollars in losses, particularly from its nuclear energy affiliate, Company A-1. Given this backdrop, Company A announced future options for its generation portfolio as follows: "legislative and regulatory solutions for generation assets"; asset sales and plant deactivations; restructuring debt; and/or seeking protection under U.S. bankruptcy laws for its affiliates involved in nuclear generation.

11. Consistent with this forecast, Company A actively sought a "legislative solution" for its two, affiliated nuclear power plants in Ohio. For example, during Company A's fourth-quarter 2016 earnings conference call, Company A Corp. President and CEO stated:

> In Ohio, we have had meaningful dialogue with our fellow utilities and with legislators on solutions that can help ensure Ohio's future energy security. Our top priority is the preservation of our two nuclear plants in the state and legislation for a zero emission nuclear program is expected to be introduced soon. The ZEN program is intended to give state lawmakers greater control and flexibility to preserve valuable nuclear generation. We believe this

---

[1] I have used pseudonyms for all people and entities except for the Defendants, and the entities registered by the Defendants or for which they are signatories on bank accounts.

[2] As described in this affidavit, "Company A" refers collectively to Company A Corp., Company A-1, and Company A Service Co., all of which are defined below. Prior to February 2020, Company A-1 and Company A Service Co. were both wholly-owned subsidiaries of Company A Corp. Company A-1 and its affiliates filed for bankruptcy in 2018 and were divested from Company A Corp. in February 2020. Notably, all three entities share a common first name, and Enterprise members and associates often just referred generically to the "company" or used the common first name in communications, as quoted below.

> *legislation would preserve not only zero emission assets but jobs, economic growth, fuel diversity, price stability, and reliability and grid security for the region.*
>
> *We are advocating for Ohio's support for its two nuclear plants, even though the likely outcome is that [Company A] won't be the long-term owner of these assets. We are optimistic, given these discussions we have had so far and we will keep you posted as this process unfolds.*

12.     However, attempts to obtain a legislative solution had failed to pass, including the ZEN (Zero-Emissions Nuclear Resource Program) energy proposals outlined in House Bill 178, Senate Bill 128, and House Bill 381 in 2017.

13.     While Company A was in search of a solution to its nuclear energy problem, Householder was re-entering politics, winning back his State House seat in Perry County, Ohio, with the goal of winning back the Speakership in January 2019.  Following his January 2017 trip on Company A's private jet, in March 2017, Householder began receiving quarterly $250,000 payments from Company A into a bank account in the name of a 501(c)(4) entity secretly controlled by Householder called Generation Now.  In 2017 and 2018, Householder's Enterprise received into Generation Now, and the entities it controlled, over $2.9 million from Company A.  Members of Householder's Enterprise used Company A's payments for their own personal benefit and to gain support for Householder's political bid to become Speaker.  In the spring and fall of 2018, the Enterprise spent millions in Company A money to support House candidates involved in primary and general elections whom the Enterprise believed both would vote for Householder as Speaker and, ultimately, would follow his lead as Speaker and vote for bailout legislation for Company A.

14.     The investigation shows that the plan worked.  Householder-backed candidates that benefitted from Company A money received by Generation Now (described throughout this affidavit as, "Company A-to-Generation-Now" payments[3]) helped elect Householder as the Ohio Speaker of the House in January 2019.  And Householder fulfilled his end of the corrupt bargain shortly thereafter. Three months into his term as Speaker, HB 6 was introduced to save from closure Company A-1's two failing nuclear power plants.  Specifically, HB 6 subsidized nuclear energy operations in Ohio through a monthly charge on all Ohioan's energy bills.  Neil Clark described the legislation as a "bailout" for Company A's nuclear assets, worth $1.3 billion to Company A.

15.     After the introduction of the bailout legislation, Company A began increasing its payments into Generation Now for the benefit of the Enterprise.  On April 30, 2019, roughly two weeks after introduction of the legislation, Company A wired $1.5 million to Generation Now.  In the month of May 2019, while the controversial legislation was pending before lawmakers, Company A wired four additional payments totaling $8 million.  The Enterprise used some of that

---

[3] "Company A-to-Generation-Now" payments is an inclusive label describing payments from accounts controlled by Company A Service Co., Company A-1, and Energy Pass-Through, which, as set forth below, is funded solely by wires from Company A Service Co.

5

money for mailers and media advertisements to pressure members to support the legislation; the Enterprise also used Company A money for their personal benefit, as described below. In the same month that the Enterprise received $8 million from Company A, Householder and other Enterprise members pressured House members to vote for HB 6, and instructed at least one representative to destroy text messages from Householder after Householder attempt to gain support for HB 6 from the representative.

16.     On May 29, 2019, HB 6 passed the House, and after Enterprise members exerted pressure on the Senate, the legislation was passed and was signed into law by the Governor. That process took about two months. However, the law would not go into effect until October 22, 2019. Shortly after the Governor signed the legislation, a campaign began to organize a statewide ballot-initiative referendum ("Ballot Campaign") to overturn the legislation. This required Ballot Campaign organizers to collect the signatures of registered voters in order to put the referendum of HB 6 on the 2020 ballot. And so, Company A's and the Enterprise's fight continued.

17.     In response, from July 24 to October 22, 2019, Company A-controlled accounts wired over $38 million into Generation Now to defeat the ballot initiative so HB 6 would go into effect. The Enterprise funneled the money to various accounts and entities controlled by the Enterprise to purchase media ads and mailers against the ballot initiative, to conflict out signature-collection firms, and to pay off and bribe signature collectors supporting the referendum. The members and associates of the Enterprise also used the Company A money to enrich themselves and further their personal interests.

18.     Company A entities paid Householder's Enterprise $60,886,835.86 in secret payments[4] over the approximately three-year period in exchange for the billion-dollar-bailout. The Enterprise concealed the payments by using a 501(c)(4) to receive the bribe money, and then transferring the payments internally to a web of related entities and accounts. The millions paid into the entity are akin to bags of cash—unlike campaign or PAC contributions, they were not regulated, not reported, not subject to public scrutiny—and the Enterprise freely spent the bribe payments to further the Enterprise's political interests and to enrich themselves. As Defendant Neil Clark stated in a 2019 recorded conversation,[5] Company A operated as the Enterprise's "Bank"—Clark explained, "*Generation Now is the Speaker's (c)(4)*," and Company A's "*deep pockets*," and the money to the Enterprise through Generation Now was "*unlimited*." Defendant Matthew Borges similarly described Company A's payments to the Enterprise as "*Monopoly money*."

19.     The Enterprise used some of the Company A money to help enact the bailout legislation. Additionally, the Enterprise used millions of dollars of Company A bribe money to further Householder's political ambitions by funding his own campaign, and the campaigns of members and candidates who would eventually support Householder's election for Speaker. The Company A payments funded the operating costs of the Enterprise and paid for Householder's political and campaign staff. The Defendants also paid themselves personally millions of dollars

---

[4] This includes Company A payments into Generation Now and other Enterprise-controlled entities.

[5] ███████████████████████████████████████████████

in Company A bribe payments, funneled through Generation Now and other entities controlled by the Enterprise. This includes allowing for the payment of at least $500,000 in what appears to be personal benefits to Householder that was passed through Longstreth controlled accounts. In addition, the Enterprise had over $8 million of Company A money in their controlled accounts at the end of 2019, which represents further profit to Enterprise members.

## A. The Defendants and Householder's Enterprise

20.    **Larry Householder** is the current Speaker of the Ohio House of Representatives. He previously served as a House member representing Ohio's 72nd District from 1997 to 2004, including as Ohio Speaker of the House from 2001 to 2004. In 2004, Householder resigned from office after reports of alleged corrupt activity surfaced in the media and were publically referred to the FBI. He was never charged. Householder won his House seat back in the fall of 2016. He was elected Speaker again in January 2019, after what the media described as a bitter leadership battle that lasted nearly a year.

21.    Householder's path to Speakership was unusual. Householder and then-House-member Representative 1, both of whom are Republicans, were both candidates to be Speaker of the House of Representatives for the 133rd General Assembly. After the then-Speaker's resignation in May 2018, a protracted conflict lasting eight weeks began to select a Speaker for the remainder of the 132nd General Assembly. Ultimately, Representative 1 became Speaker pending the upcoming 2018 election, after the unprecedented conflict that was resolved using a House rule that could only be employed after ten failed attempts to select a Speaker. Despite Representative 1's selection in mid-2018 for the remainder of the 132nd General Assembly, Householder aggressively sought support for his candidacy for Speaker. He did so in a number of ways, including by providing financial support, paid for in large part by Company A, for certain candidates running for House seats in the spring 2018 primary and the November 2018 general election. In the end, his strategy was successful, as he won the Speakership despite Representative 1 serving in that role prior to the election.

22.    Householder's Enterprise has several purposes, one of which is to increase Householder's political power through corrupt means. In his role, Householder solicited and accepted payments from Company A into his 501(c)(4) account; he used the bribe payments to further his political interests, enrich himself and other members and associates of the Enterprise, and to assist in passing and preserving the bailout legislation; and, in return for the benefits received, he coordinated passage of HB 6 and attempted to influence legislators to support the bailout, among other things.

23.    Householder benefitted personally through the Enterprise. For example, while funded by Company A-to-Generation-Now bribe money, at least $300,000 passed through and funded accounts controlled by Jeff Longstreth, which the Enterprise used to pay legal fees and settle a lawsuit against Householder. Over $100,000 of the Company A-to-Generation-Now bribe money was passed through Longstreth-controlled accounts and used to pay costs associated with Householder's Florida home. In addition, at least $97,000 of the Company A-to-Generation-Now bribe money was used to pay expenses for Householder's 2018 House campaign.

24.     **Jeff Longstreth** is Householder's longtime campaign and political strategist. Neil Clark identified Longstreth as Householder's "*political guy*," his "*implementer*," and one of his "*closest advisors*," who was instrumental to the Enterprise's efforts to pass HB 6.

25.     The investigation corroborates Clark's statements. Although Longstreth is not employed by the State of Ohio, he is Householder's chief political strategist. Longstreth runs Householder's political campaign, and the investigation shows that he and his staff managed the 2018 campaigns for the Enterprise-backed candidates (at times internally referred to by the Enterprise as "Team Householder" candidates). Householder and Longstreth even shared office space, rented from their Political Advertising Agency. In addition, Longstreth led the messaging efforts both in the campaign to pass HB 6 and to defeat the referendum, and was a point of contact for Company A. Phone records show that Householder and Longstreth have communicated on a regular basis for years.

26.     Longstreth also plays a critical role with respect to the Enterprise's finances. He is a signatory on both of the Generation Now bank accounts and the person who transfers money out of the accounts to other entities to further the Enterprise. Longstreth also controls entities that receive Company A-through-Generation-Now payments to further the Enterprise. Among these, Longstreth owns and operates JPL & Associates. Throughout the relevant period, Longstreth transferred over $10.5 million of Company A's bribe payments directly from Generation Now's primary bank account to JPL & Associates' primary bank account. In addition, Longstreth received indirectly another $4.4 million, which was transferred from the Generation Now account through another entity (Front Company, described below) and then into accounts that he controlled. Longstreth then used Company A payments funneled through Generation Now to further Householder's and Company A's interests and to pay personal benefits to members and associates of the Enterprise. Longstreth benefitted personally through the conspiracy's actions, receiving over $5 million in Company A-to-Generation-Now money during the relevant period, including at least $1 million, which he transferred to his brokerage account in January 2020.

27.     **Neil Clark** owns and operates Grant Street Consultants, an Ohio-based lobbying firm that focuses on legislative, regulatory, and procurement lobbying at the Ohio Statehouse. Prior to becoming a lobbyist, Clark served as a budget director for the Ohio Senate Republican Caucus. During the relevant period, Clark worked as a lobbyist for various interest groups.

28.     Along with Longstreth, Clark is, in his own words, one of Householder's "*closest advisors*." According to Clark during recorded conversations in 2019, Clark served as Householder's "*proxy*" in the Enterprise's efforts to further the enactment of HB 6 and ensure HB 6 went into effect in October 2019 by defeating the subsequent ballot-initiative challenge. Clark also communicated directly with House members to further the Enterprise. In 2019, Clark described himself in recorded communications as Householder's "*hit man*" who will do the "*dirty shit*." Clark stated, "*when [Householder's] busy, I get complete say. When we're working on stuff, if he says, 'I'm busy,' everyone knows, Neil has the final say, not Jeff. Jeff is his implementer*." Borges confirmed Clark's role, and similarly described Clark as Householder's "*proxy*" relating to Company A's matters in a recorded conversation with CHS 1. Clark benefitted personally from Company A's payments to the Enterprise, receiving at least $290,000 in Company A-to-Generation-Now money.

8

29. **Matthew Borges** is a registered lobbyist for Company A-1, a subsidiary of Company A. As described below, the investigation has shown that Borges was a key middleman and was at the center of the effort to thwart the referendum to stop HB 6 from taking effect through a ballot-initiative drive. On August 5, 2019, shortly after the Ballot Campaign was announced, Borges incorporated 17 Consulting Group. Two days later, Borges opened a bank account for 17 Consulting Group, and that same day Generation Now wired $400,000 into the account. Over the next few months Generation Now wired a total of $1.62 million into the account.

30. There is probable cause to believe that, approximately a month after Generation Now began wiring money into Borges' 17 Consulting account, Borges paid $15,000 to CHS 1 in exchange for inside information about the Ballot Campaign, which Borges would use to help defeat the Ballot Campaign. Bank account records show that the $15,000 paid to CHS 1 came from the 17 Consulting Group account, which was funded by Generation Now wires. Borges also paid another co-conspirator Juan Cespedes, $600,000 of Generation Now money from his account. With the money wired from Generation Now, Borges also paid a private investigator during this period, which, as described below, is consistent with the Enterprise's strategy of investigating signature collectors that worked for the Ballot Campaign.

31. Toll records show Borges had contact with Householder in January 2019 and April 2019—key time-periods, as described below, involving official action by Householder. Borges benefitted directly from the $1.62 million from Generation Now wires. Specifically, he paid himself over $350,000 from Company A-to-Generation-Now proceeds.

32. **Juan Cespedes** served as a key middleman, participating in strategy meetings and communicating with Enterprise members and associates regarding strategic decisions. Cespedes is a multi-client lobbyist, whose services were retained by Company A-1. He was central to Company A-1's efforts to get the bailout legislation passed in Ohio. As explained below, a contract between Company A-1 and Cespedes's lobbying company, the Oxley Group, shows Company A-1 hired Cespedes to pursue the bailout legislation starting in the spring of 2018. Consistent with this, records show that Cespedes was the "lead consultant" relating to Company A-1's attempts to pursue legislation that would save its failing nuclear power plants. In internal documents, Cespedes tracked "Householder camp" candidates who later received Company A-to-Geneartion-Now money, and he advised that if Householder becomes Speaker, the nuclear energy bailout "will likely be led from his Chamber."

33. He was paid by both, receiving approximately $600,000 from the Enterprise[6] and $227,000 from Company A in 2019. He also was in regular contact with both Company A and Enterprise members during the relevant period. As set forth below, Cespedes and Longstreth communicated regularly through text messages discussing the coordination of millions of dollars in Company A payments to the Enterprise, attaining public officials' support for the bailout, sending media and mailers supporting the bailout legislation, and hiring signature firms to defeat the ballot campaign, among other things. In one telling exchange, which is supported by toll

---

[6] The $600,000 paid to Cespedes was passed through the 17 Consulting Group bank account, which was funded exclusively by Generation Now.

records and search warrant returns, Cespedes coordinated the timely payment of $15 million from Company A to Generation Now.

34.    **Generation Now, Inc.**, received approximately $60 million from Company A entities during the relevant period. As set forth more fully below, Generation Now registered with the IRS as a 501(c)(4), which is an IRS designation for a tax-exempt, social welfare organization. Pursuant to federal law, the names and addresses of contributors to 501(c)(4)s are not made available for public inspection. The Enterprise concealed the bribery scheme by funneling the money through Generation Now, which hid the payments and the scheme from public scrutiny. Generation Now's accounts had a combined balance of approximately $1.67 million as of January 1, 2020, money that is a direct benefit to the Enterprise. As described below, after making wire transfers to Coalition in early 2020, the Generation Now accounts were replenished by a $2 million wire from Energy Pass-Through in March 2020, bringing the combined balance of the accounts to approximately $2.29 million, again, money that is a direct benefit to the Enterprise.

### B.    Related Entities Controlled by the Enterprise

35.    The Enterprise used and relied on a number of different entities to further the conspiracy. The following entities were controlled by, worked directly with, or funneled payments for the benefit of the Enterprise:

a.    **JPL & Associates LLC** is controlled by Longstreth. Longstreth is the signor on five different bank accounts that have received money directly from Generation Now, including two JPL business accounts, one personal account, and two accounts named "Constant Content." Bank records show numerous internal money transfers of Generation Now money among Longstreth-controlled accounts. In total, JPL's main business account received over $10.5 million in Company A–to-Generation-Now wires during the relevant period, which Longstreth then transferred internally to his other accounts. Longstreth also received indirectly $4.4 million, which had been funneled from Generation Now, through another entity, ("Front Company," discussed below) and into Longstreth's Constant Content accounts. Analysis of the accounts shows that the money was used to pay benefits directly to Enterprise members and to further the Enterprise's interests by paying campaign staff for preferred Householder candidates, among other things. After the ballot initiative campaign failed and HB 6 became law for the benefit of Company A, Longstreth consolidated most of the Enterprise funding into JPL-controlled accounts. As of January 1, 2020 that total balances within JPL-controlled accounts exceeded $6.5 million. This money is a direct benefit to the Enterprise.

b.    **"PAC"** is a federal PAC through which Generation Now funneled Company A payments in furtherance of the conspiracy. The Enterprise primarily used the PAC during the May 2018 primary as a way to conceal the source of media buys for Team Householder candidates. The attorney who is listed as the treasurer for Generation Now and who is a signor on the Generation Now accounts along with Longsreth, is the treasurer and a signor of the PAC.

c.    Although Longstreth was not a signor on the PAC bank account, documents obtained via a search warrant, , confirm Longstreth's control over the PAC. For example, a Word document titled "Client Information Request Form," last modified by Longstreth in October 2016,

listed Longstreth as the "Executive Director or President" of the PAC.[7]  In addition, Longstreth's resume, created by Longstreth in November 2016, states that Longstreth oversees political activities for the PAC.  Contribution forms for the PAC list Longstreth as the "Contact" and include Longstreth's email and phone number.  Toll records corroborate Longstreth's role, showing frequent contact with the attorney when Generation Now needed to move money to and from PAC.

   d. In early 2018, the PAC bank account was funded almost entirely by a $250,000 wire and a $750,000 wire from Generation Now, on April 2 and April 12, 2018, respectively.[8]  By April 30, 2018, nearly all of the million dollars was paid to two media services firms, which spent the money on media buys and other efforts to benefit Householder candidates, including Householder himself, in advance of the May 8, 2018 Ohio primary election.

   e. The account was unused until Generation Now wired an additional $50,000 to the account in September 2018, in advance of the fall 2018 election.  Close to $40,000 of that wire was paid to a political strategy group within weeks of the wire.  Aside from payments to the attorney's law firm, the balance remained in the account.

   f. The account remained largely inactive from October 2018 until January-February 2020, when the Enterprise wired $1,010,000 of money from Company A to the "Coalition," (described below), which passed through to PAC roughly the same amount of money over the next two months.  Expenditures from the PAC in FEC filings, along with media purchased by PAC, show that the Enterprise used the Company A money funneled to the PAC to benefit Team Householder candidates for the 2020 primary election.

   g. **"Coalition"** is another 501(c)(4) non-profit entity for which the attorney who is treasurer and signor for the PAC is the signor on the Coalition's bank account.  The attorney incorporated the Coalition in Delaware one day after he incorporated PAC.  Longstreth's resume states that he oversees political activities for the Coalition.  Search warrant returns indicate that Longstreth possessed a copy of the W-9 taxpayer identification form for the Coalition.  He also saved Word documents characterized as "scripts" to use when soliciting money from donors to the Coalition.

   h. For calendar years 2017 through 2019 the Coalition was funded almost exclusively through: A) $90,000 from Company A, B) $300,000 from "Energy Pass-Through" (a Company A pass-through, as set forth below), and C) $200,000 from an interest group that was funded exclusively by $13 million from another energy company that supported HB 6 and separately paid $150,000 to Generation Now during the relevant period.  Outgoing payments from the Coalition account were over $100,000 in two wires to JPL & Associates; $54,000 wired to Generation Now; $191,000 wired to Media Placement Company 1; and $200,000 wired to a public relations firm.

---

[7] ███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

[8] Prior to the wire transfers from Generation Now, the PAC's bank account had a balance of $2,703.20.

i.      The Coalition account was largely unused from August 2018 until January 2020 when, as described directly above, the Enterprise used the Coalition as a pass-through for Company A-to-Generation-Now money to PAC, which the Enterprise then used to support Householder-backed candidates in the 2020 primary election.  The benefit of passing the money through the Coalition first, was that the PAC listed the Coalition as the source of the $1,010,000 million in FEC filings, not Generation Now.  The Enterprise sought to conceal Generation Now as the source of PAC funds in 2020 for numerous reasons, including, as explained below, Generation Now had generated negative media publicity in 2019 and candidates expressed concern to Householder about their association with it.

j.      Thus, this account is a mechanism for Generation Now to spend secret money for the benefit of Householder and the Enterprise.

k.      **"Dark Money Group 1"** is an entity used by the Enterprise to conceal the source of media buys during the 2018 general election, similar to the way the Enterprise used PAC for the primaries in 2018 and 2020.  An Ohio lobbyist incorporated Dark Money Group 1 in Ohio on September 21, 2018 and opened its bank account on September 25, 2018.

l.      The majority of activity in the account occurred roughly a month later, between October 2018 and Election Day on November 6, 2018.  From October 19 to October 29, 2018, Generation Now wired $670,000 into the account; Company A wired $500,000 into the account; and other corporate interests wired $300,000 into the account, totaling $1,470,000.  From October 22 to November 2, 2018, Media Placement Company 2 then spent $1,438,510 on media buys for ads paid for by Dark Money Group 1 that generally targeted rivals of candidates aligned with Householder.  Since Election Day in 2018, the account has been largely unused.

m.      **"Front Company"** is a pass-through entity used by the Enterprise to fund the campaign against the referendum in furtherance of the conspiracy.  The for-profit entity was organized in Ohio on July 30, 2019, just days after the Ballot Campaign to overturn HB 6 began.  "Associate 1" and "Associate 4" of Longstreth and Householder are signers on its bank account.

n.      From August 1, 2019 through October 2019, Company A-controlled accounts wired Generation Now $38 million; Generation Now then wired $23 million from those payments to Front Company, the vast majority of which was used to pay signature collection firms to fight against the Ballot Campaign and to pay for media opposing the Ballot Campaign.  Generation Now was the sole source of money deposited into the Front Company account.  By November 2019, less than $5,000 remained in the Front Company account.

## C. Company A and Its Affiliates

36.      **Company A Corp.**  Incorporated in Ohio, Company A Corp. is a public utility holding company for its subsidiaries.  As a holding company, Company A Corp. directs and controls the various subsidiary entities within Company A Corp.  Per United States Securities and Exchange Commission documents, Company A Service Co. is a principle subsidiary, and

Company A-1 is a wholly-owned subsidiary of Company A Corp. Company A Corp. and its subsidiaries are involved in the generation, transmission, and distribution of electricity.

37. **Company A Service Co.** "provides legal, financial and other corporate support services at cost, in accordance with its cost allocation manual, to affiliated [Company A] companies." Company A Service Co. is under the management of Company A Corp.'s leadership team. The Service Co. does not have its own CEO or board of directors. Among the shared services Company A Service Co. provides to Company A's affiliated companies, including Company A-1, are "external affairs," including "corporate contributions"; "Federal/State/Local Regulatory Affairs"; and "advocacy at the Federal, State, and Local levels." According to Company A's SEC Form 10-K, Company A Service Co. provided: $112 million in shared services for Company A-1 and other debtors from April 1, 2018 to December 31, 2018; and $152 million in shared services to these entities from January 1, 2019 to December 31, 2019. Pursuant to Company A-1's governmental affairs contract with Cespedes relating to its efforts to pass legislation to save Company A's failing nuclear power plants, explained in detail below, Company A Service Co. acted as "*the authorized agent of [Company A-1] for purposes of executing and administering this Agreement and is acting in each such case solely in its capacity as authorized agent.*" As set forth below, Company A Service Co. was the Company A affiliated entity that wired the bulk of the millions of dollars to Generation Now for the benefit of Company A-1.

38. **Company A-1** "provides energy-related products and services to retail and wholesale customers." Company A-1 owns and operates nuclear generating facilities through affiliates, one of which owns two nuclear power plants in Ohio and sells the entire output from these plants to Company A-1. Another affiliate, by agreement, operates the nuclear generation plants. During most of the relevant period, Company A Corp. was the parent company for each of these entities.

39. On March 28, 2018, Company A-1 announced that Company A-1 was closing the two power plants by 2021. Three days later, Company A-1 and other Company A affiliates, filed Chapter 11 bankruptcy. Company A Corp. and Company A Service Co. did not seek bankruptcy protection. Pursuant to the bankruptcy plan, Company A Corp. proposed separating from Company A-1, its nuclear generation arm.[9]

40. Records obtained by the FBI indicate that, on June 4, 2018, a few months after filing Chapter 11 bankruptcy, Company A-1 entered a contract with Oxley Group LLC, which listed Cespedes as the "supplier contact."[10] The term of the contract was from May 1, 2018 to April 30, 2019. Under scope of services, Cespedes was contracted to perform "Government Relations" for Company A-1, which included "*assist[ing] [Company A-1] in attaining necessary funding through government action to allow for the financial stability/sustainability of its two nuclear power plants.*" In other words, Cespedes's job was to help Company A-1 attain

---

[9] In February 2020, Company A-1 emerged from bankruptcy under a new name and Company A Corp. divested its ownership interest in the company.

[10] ███████████████████████████████████████████████████████████

government funding—*i.e.,* legislative help—to save its two nuclear power plants from closure. Pursuant to the contract, among other things, Company A-1 was actively seeking specific legislative help to save the two nuclear plants, including "*getting a resolution*" passed, "*making our issue a campaign priority for incoming elected officials to achieve a solution in the first quarter of 2019,*" and receiving "*consistent updates on the pending House Speaker race,*" a reference to the Speakership race between Householder and Representative 1.

41.     These priorities became reality.  As described below, on April 12, 2019, just three months after Householder became Speaker with the help of Company A bribe payments, HB 6 was introduced by two freshman, "Team Householder," representatives.  HB 6 created a new Ohio Clean Air program to subsidize power plants fueled by nuclear and solar power, which had the effect of saving Company A's nuclear plants from closure with over $1 billion in subsidies for nuclear energy.

42.     **"Energy Pass-Through"** is a non-profit 501(c)(4) that was incorporated in Ohio on February 8, 2017—two days after Generation Now was incorporated in Delaware.  A week later, on February 16, 2017, Company A wired $5 million into the Energy Pass-Through bank account—the first transaction in the account.  The account was thus funded solely by the initial $5 million wire from Company A.  The Energy Pass-Through account then made the following transactions:

- $300,000 wire to Generation Now on March 15, 2018 (weeks before Company A filed for bankruptcy);
- $300,000 wire to Coalition on May 1, 2018;
- $100,000 wire to Generation Now on May 4, 2018; and
- $500,000 wire to Generation Now on August 16, 2018.

43.     Aside from the initial $5 million seed money, the account received no other deposits until October 10, 2019.  On that date, Company A wired $10 million to its Energy Pass-Through account.  That same day, Energy Pass-Through wired $10 million to Generation Now.  Similarly, on October 18, 2019, Company A wired another $10 million to Energy Pass-Through.  On October 22, 2019, the day the ballot initiative failed and HB 6 officially became law, Energy Pass-Through wired $3 million to Generation Now, and wrote a $4,330.86 cashier's check to Generation Now.  On March 3, 2020, Energy Pass-Through wired another $2 million to Generation Now.  Based on my training and experience, there is probable cause to believe that this account was used as a pass-through from Company A to the Enterprise.

## II.     Enterprise Creates and Uses Generation Now to Receive Bribe Payments

### A.  Creation of Generation Now

44.     On or about February 6, 2017, Generation Now, Inc. was incorporated in Delaware, and two bank accounts were opened at Fifth Third Bank (x3310 and x6847).  Subpoenaed bank records show that an attorney and Jeff Longstreth were signatories on both accounts.  On or about

July 26, 2017, Generation Now registered with the Ohio Secretary of State as a foreign nonprofit corporation "organized exclusively for the promotion of social welfare and economic development purposes within the meaning of Section 501(c)(4) of the Internal Revenue Code ('the Code'), or the corresponding section of any future federal tax code." The attorney, signed the application as the treasurer of Generation Now.

45.     Although Householder was not listed on registration documents or in account records for Generation Now, the Enterprise used Generation Now to receive secret payments for Householder. Recorded conversations indicate that the Enterprise intended to use Generation Now, a 501(c)(4), in this way. For example, in a recorded call, Clark discussed with Householder, the use of a 501(c)(4), controlled by Householder, to receive payments: "*what's interesting is that there's a newer solution that didn't occur in, 13 years ago, is that they can give as much or more to the (c)(4) and nobody would ever know. So you don't have to be afraid of anyone because there's a mechanism to change it.*" Clark believed that Householder should utilize his 501(c)(4) to gain political support in his campaign for Speaker against Representative 1 because reportable-hard dollars will cause industry groups to give to both sides, the implication being that Householder would obtain larger amounts of cash through a (c)(4).[11]

46.     Similarly, in a recorded conversation in mid-2019, Clark summed up the benefit of 501(c)(4)s to Householder as follows:  "*it's secret, a (c)(4) is secret.  Nobody knows the money goes to the Speaker's account, it is controlled by his people, one of his people, and it's not recorded.  A (c)(4) is non-recorded.*"[12]

**B.  Use of Generation Now to Receive Millions in Secret Payments from Company A**

47.     At the time it was aggressively lobbying for legislative action to save its two nuclear power plants, Company A was paying millions in secret payments to the Enterprise through Generation Now.  Table 1 lists each Company A payment received by Generation Now during the relevant period, starting from March 2017 (shortly after Company A started its ZEN energy legislative campaign and Householder won his House seat back) until March 2020:

Table 1:  Company A Payments to Generation Now Bank Account x3310

| Date | Amount | Method | Source |
|---|---|---|---|
| 3/16/2017 | $250,000 | Wire | Company A Service Co. |
| 5/17/2017 | $250,000 | Wire | Company A Service Co. |
| 8/10/2017 | $250,000 | Wire | Company A Service Co. |
| 12/8/2017 | $250,000 | Wire | Company A Service Co. |
| 3/15/2018 | $300,000 | Wire | Energy Pass-Through |
| 5/4/2018 | $100,000 | Wire | Energy Pass-Through |
| 8/16/2018 | $500,000 | Wire | Energy Pass-Through |

[11]
[12]

| Date | Amount | Method | Source |
|---|---|---|---|
| 10/16/2018 | $400,000 | Check | Company A Service Co. |
| 10/29/2018 | $100,000 | Check | Company A Service Co. |
| 4/30/2019 | $1,500,000 | Wire | Company A Service Co. |
| 5/7/2019 | $1,500,000 | Wire | Company A Service Co. |
| 5/15/2019 | $2,500,000 | Wire | Company A Service Co. |
| 5/22/2019 | $2,500,000 | Wire | Company A Service Co. |
| 5/29/2019 | $1,500,000 | Wire | Company A Service Co. |
| 6/5/2019 | $2,000,000 | Wire | Company A Service Co. |
| 6/13/2019 | $1,361,899 | Wire | Company A Service Co. |
| 6/20/2019 | $2,116,899 | Wire | Company A Service Co. |
| 7/5/2019 | $1,879,457 | Wire | Company A-1 Corp. |
| 8/2/2019 | $734,250 | Wire | Company A Service Co. |
| 8/7/2019 | $4,390,000 | Wire | Company A Service Co. |
| 8/22/2019 | $653,000 | Wire | Company A Service Co. |
| 8/29/2019 | $2,003,000 | Wire | Company A Service Co. |
| 9/5/2019 | $2,403,000 | Wire | Company A Service Co. |
| 9/12/2019 | $2,403,000 | Wire | Company A Service Co. |
| 9/19/2019 | $4,695,000 | Wire | Company A Service Co. |
| 9/26/2019 | $2,445,000 | Wire | Company A Service Co. |
| 10/3/2019 | $4,160,000 | Wire | Company A Service Co. |
| 10/8/2019 | $1,600,000 | Wire | Company A Service Co. |
| 10/10/2019 | $10,000,000 | Wire | Energy Pass-Through |
| 10/17/2019 | $248,000 | Wire | Company A Service Co. |
| 10/22/2019 | $3,000,000<br>$4,330.86 | Wire<br>Cashier Check | Energy Pass-Through |
| 3/3/2020 | $2,000,000 | Wire | Energy Pass-Through |
| **Total:** | **$59,996,835.86** | | |

48.    In addition to the $59,996,835.86 that Company A paid directly to Generation Now, Company A made $890,000 in other timely payments to the Enterprise, to include: Company A payments of $500,000 to Dark Money Group 1 and $90,000 to Coalition, and an Energy Pass-Through payment of $300,000 to Coalition, all of which are detailed below. These payments bring the total amount of direct payments from Company A to the Enterprise during the relevant period as $60,886,835.86. During the time of the conspiracy, other entities besides Company A deposited money into Generation Now; the amounts of those deposits, however, are dwarfed by the Company A payments.

| Generation Now Deposits (2017-2020) | | |
|---|---|---|
| **Funding Entity** | **Total** | **Percentage** |
| Company A & Energy Pass-Through | $59,996,835.86 | 93% |
| Energy Interested Parties | $1,500,000.00 | 2% |
| Other | $2,853,319.82 | 5% |
| **Total** | $64,350,155.68 | |

### C. Householder's Control of Generation Now

49.     Although Householder's name is not on Generation Now's paperwork, Householder's statements, Clark's statements, and a review of documentation obtained pursuant to search warrants and grand jury subpoenas shows that Householder controls Generation Now to further the Enterprise's goals.

50.     Clark stated expressly in multiple recorded conversations in 2019 that Generation Now is Householder's entity.[13]  In a 2019 recorded meeting, Clark discussed making "soft money" payments to Householder relating to the passage of unrelated legislation.  Clark stated that the Speaker would have to see the check before it goes to Generation Now.  Clark explained that they could write a check—a "*noticeable number . . . $15-20-25,000*"— to "*Gen Now and hand deliver the check to the Speaker*."  Clark then made clear:  "*Generation Now is the Speaker's (c)(4), that's the one I work for*."

51.     The next day, Clark again referenced "*Gen Now*" as a (c)(4) that works like a PAC but there's "*no reporting*."  Clark stated that he was "*not on any documents*" connected to Generation Now, but they call him "*the overseer*" of Generation Now, explaining further, "*I'm the Speaker's appointed guy to do that.  Okay, so, it's like having him in the room.*"  Clark then explained an upcoming Generation Now meeting that will be attended by Householder:

> *When I, so like, we have a meeting on Friday, he's going to be in the room, so I'll be just like everyone else, I'll be, I'll be another fucking staffer.  When he's out of the room, I'm the guy.*

Later in the conversation, Clark indicated again that "*Gen Now*" "*is the Speaker's (c)(4),*" that Householder created for himself.  Clark stated that he spent $450,000 out of the Generation Now account that very day; and Clark further stated that he "*spent close to $20 million in the last eight weeks*."  Bank records corroborate both statements.  When asked how much money was in Generation Now, Clark said, "*it's unlimited*."

---

[13]

52. Later that day, Clark explained that the $450,000 paid out of Generation Now went to pay off fifteen signature collection firms nationwide so that they would be conflicted out from working on behalf of the Ballot Campaign, which bank records confirm, as described below.

53. In subsequent recorded calls and meetings, Clark discussed Householder's connection to Generation Now. For example, in a recorded call on August 8, 2019, Clark stated that Jeff Longstreth was Householder's "*political guy*" who "*could influence the Speaker.*" He similarly explained later in the call, Longstreth is Householder's "*political guy, he's the guy that does, remember that Committee I work for, Generation Now, I've been talking about.*"

54. Clark also discussed the individuals making a payment to Householder into Generation Now.[14] During a call on August 19, 2019, Clark discussed taking a trip with Householder or his advisors to further the unrelated legislation. During the call, Clark stated, "[*Longstreth] and I are the two principal advisors to the Speaker.*" According to Clark, "*Jeff actually runs all the races and selects people, etc.*" Clark also stated that the individuals "*might write a check to the (c)(4)*" of the Speaker totaling $50,000. Clark said it would be ideal if they could hand the check to Householder personally—as Clark explained, "*it's his (c)(4)*"—though Clark explained that typically the (c)(4) money is wired into the account. Bank records corroborate Clark's assertion that money into Generation Now is usually wired into the account.

55. Recorded statements by Borges to CHS 1 also show Householder's use of Generation Now, and further confirm Clark's statements. As explained fully below, in August 2019, Borges received $1.62 million in wire transfers from Generation Now and then used a portion of that money to attempt to bribe CHS 1 to help defeat the ballot initiative. On September 10, 2019, during a recorded conversation, Borges discussed the divide between the ballot initiative supporters (to include the CHS 1) and the supporters of HB 6 and stated, "*The only people on my side is this fucking company*," which Borges confirmed was "[Company A]." Borges described the relationship between Company A and Householder to CHS 1 as follows:

> And, and Larry also, you know, <u>so it's this unholy alliance between Larry and [Company A] and [Borges' firm]</u>. . . . [Borges' firm] doesn't care about Larry; he's helping with the issue our single largest client cares a lot about and [] unless you are somehow affiliated directly to [Company A] or work for one of their interests or you just want to suck up to Larry, you're on your side (as to whether to overturn HB 6).

56. Borges also discussed Householder's direct involvement in managing Generation Now. Specifically, on September 13, 2019, he stated the following about Associate 3, who is Generation Now's public relations spokesperson:

> Like [Associate 3] who has to, who has to, answer to the press obviously, he wants to quit so bad 'cause he's like "this is my

---

[14] ████████████████████████████████████

*reputation now" you know . . . <u>but he can't because the Speaker won't let him</u>, but he god he hates this shit.*

57.     When CHS 1 asked whether Householder was "*putting the squeeze on [Associate 3]*," Borges responded that, "*Larry thinks that this stuff is good for us*." When CHS 1 asked Borges why Householder does not just retire, Borges responded, "*No. That's just not how he's wired*." Borges indicated he was not aware of what Householder was making off the relationship with Company A, but Borges stated it was "*insane*" what "*Jeff and those guys*" are making off the relationship.

58.     Borges also reinforced Clark's role in the Enterprise, specifically his role as Householder's proxy to Generation Now: "*Neil sits in meetings and he'll say 'I'm the proxy for the Speaker in this meeting . . . so anything you tell me' and you kind of think it's typical Neil bullshit stuff except it is not; <u>he's really acting as his proxy</u>*." This corroborates Clark's own statements that he was acting as Householder's proxy for purposes of passage of HB 6 and the effort to defeat the ballot initiative through the use of Generation Now.

59.     Householder's admissions confirm Clark's and Borges' statements that Householder controls Generation Now. In a January 10, 2018 recorded call[15] with Clark, Householder discussed financial contributions from various industries, including payday lenders and nursing homes, two industries for which Clark is a lobbyist. During the call, the following conversation occurred:

> LH: "*Now switching gears. So we are looking at the payday lenders. <u>And we are expecting big things in (c)(4) money from payday lenders....</u>*
>
> NC: *Right. Right.*
>
> LH: "*So far, I think we are what, fifty? I think* [speaking to someone else in the room]
>
> NC: *Are you, you're checking now with Jeff right?*
>
> LH: *Right.*
>
> NC: *You should have gotten twenty-five or fifty from [owner of firm], correct*?
>
> LH: *Yes.*
> . . . .
>
> LH: [After confirming with someone in the background] *Twenty five total . . . Twenty-five total is what we've got.*"

---

60. Generation Now's bank records match the description of the checks discussed during ████████ Subpoenaed bank records from Generation Now's account show, indeed, that at the time of the call, a check for $25,000 from payday lending company (written on October 18, 2017) had been deposited into the Generation Now account. Clark's reference to "[the owner of the firm]" was a reference to president of the company, which wrote the $25,000 check. The reference to "Jeff" during the ████████ is likely a reference to Jeff Longstreth. During another portion of the same ████████, Householder and Clark discussed another industry's "501(c)(4)." Householder confirmed to Clark during the call that this entity gave 30,000 to "the (c)(4)." Again, Generation Now's bank account revealed a $30,000 check (written on October 19, 2017) from the entity that was deposited into the Generation Now account prior to the ████████

61. Householder's connection to Generation Now was further clarified during a call on February 5, 2018 between Householder and Clark, during which Householder again inquired about "(c)(4) money." Specifically, Householder stated, "*I'm sitting here with [Associate 2] . . . we're talking about (c)(4) money, and we're trying to figure out where the payday lenders were going to be at. Can you help me with that?*" Associate 2 is the Finance Director for Householder's campaign; text communications show that he/she solicited and collected money for Generation Now, and he/she was paid out of the Generation Now account. This call is consistent with the January 10, 2018 call with Clark where Householder was seeking 501(c)(4) money from Clark's clients.

62. Text message communications between Householder and Longstreth also show that Householder controlled Generation Now. For example, in a June 12, 2019 text message, Householder asked Longstreth, "*When does the Gen Now TV message change? I think it is burnt in - well burnt in.*" Longstreth responded, "*They are working on a draft now. Polling shows it's working.*" Similarly, on June 23, 2019, Householder texted to Longstreth that "*Gen Now has had issues,*" explaining that "*I've had several members - concerned members of House leadership come in privately and discuss their concern over next years [sic] House campaigns based on HB 6 messaging, mail, TV and radio.*" In addition, Householder sent messages to Longstreth asking about "*running positive radio*" for a member, explaining, "*[g]ot to protect the troops – especially make sure they believe we are protecting them.*" These text messages show that Householder is involved in Generation Now media buys to further HB 6. They also show that the pressure the Enterprise was putting on House members through Generation Now media efforts to further HB 6 created political problems for some House members, and those members went directly to Householder to voice their "concern" about Generation Now's activities.

63. Finally, search warrant returns also confirm that Householder is involved directly in Generation Now. For example, a Word document originally created by Longstreth on February 5, 2017 and titled "Friends of LH Meeting Template," listed a meeting agenda for the Friends of Larry Householder campaign, and on the same page of the Word document and directly below, a meeting agenda for Generation Now. According to the template, the Friends of Householder campaign listed Associate 1, Householder, and Staffer[16] as "Attendees" of a Monday meeting that lasted from "11-12:00pm" (highlights in original)[17]:

---

[16] ████████████████████████████████████

[17] The investigation indicates that Enterprise members refer to Householder in writing as "SLH."



64.     The meeting involved discussion about fundraising and member recruitment, among other things. The Generation Now meeting—detailed directly below on the same, two-page Word document—listed Householder, Longstreth, and Associate 1 as "Attendees" of that meeting, which was scheduled one hour later from "12:00-1:00":

**Generation Now- Monday Staff Meeting**

12:00-1:00 Mondays at 25
Lunch will be served promptly at noon.
Attendees- SLH, JPL, ▮

Goal: recap the previous week and set goals and expectations for the following week.

65.     The format of the Generation Now meeting was the same as the Friends of Householder[18] meeting and involved discussion about fundraising, messaging, budget, and campaigns, among other things. This document shows that, immediately after he met with his campaign staff, Householder met personally with his Enterprise members and associates about their collective efforts involving Generation Now, further showing Householder's direct involvement and connection with Generation Now.

### III.     Enterprise Used Company A Payments to Increase Householder's Political Power

66.     The Householder's Enterprise benefitted from Company A's money by spending Company A-to-Generation Now funds to back Householder-selected candidates who would help elect Householder as Speaker. The Enterprise also used the money to pay for part of Householder's own campaign.

### A.  Building Team Householder

67.     Members of the Ohio House of Representatives serve two-year terms, and are limited to four, consecutive, two-year elected terms. At the end of 2018, the then-current Speaker would be term-limited and the legislature would elect a new Speaker to begin the 2019 legislative session. The investigation shows that by the end of 2016, the Enterprise implemented a strategy for Householder to take over the Speakership in 2019.

---

[18] "Friends of Householder" is the name of Householder's public campaign committee.

68.     The Enterprise's strategy included raising money through a "C4" and recruiting candidates who, if elected, would support Householder for Speaker. Documents such as "Game plan 2018," possessed by Longstreth illustrate this point:



69.     That this document was created in October 2016, a few months before Longstreth opened the Generation Now account in February 2017, shows that the Enterprise followed this strategy and its level of commitment in so doing. The question "who is our [redacted]" is a reference to the wealthy, financial backer of the then-current Speaker; and thus, the Enterprise is asking in its "Game plan 2018" document, "who will be our financial backer?" Longstreth's proposed option, "[redacted]?" is the CEO of Company C, which is a company whose interests align with Company A.

70.     To implement the two-fold strategy of recruitment and fundraising, the Enterprise needed to recruit a team of electable candidates who would support Householder's bid for speakership. A combination of financial records, documents recovered from search warrants, media reports, legislative records, and witness interviews show that the Enterprise selected a group of candidates to run for open seats in the primary against supporters of Householder's rival, Representative 1, who was backed by the then-current Speaker. The Enterprise managed the selected candidates' campaigns, paid to staff them, and designed and paid for their mailers and commercials. The Enterprise spent Generation Now money on approximately 21 different candidates – 15 (including Householder) in the primary, and six additional candidates in the general election.[19] Most of these candidates won the 2018 general election. All who won voted for Householder as Speaker; and all but two, voted for the legislative bailout for Company A.[20]

---

[19] Some of the candidates supported in the primary election were not supported in the general election, which based on my training and experience is likely because the candidates were in safe districts and would prevail without spending resources on the campaign.
[20]

71.     Additionally, Householder's political campaign benefited from Company A-to-Generation Now money directly in two ways.  First, Company A-to-Generation Now money was used to pay for staff, which would otherwise have been paid by Householder's candidate committee, Friends of Larry Householder.  Not having to pay staff salaries using campaign dollars gave Householder a competitive advantage against his opponents.   Secondly, Householder benefited because Company A-to-Generation Now money, which passed through the PAC, purchased advertisements for Householder's race for the 72nd district. In total, at least $97,000 was spent by the Enterprise on Ohio house district 72 between April 16th and April 25th to purchase direct mail and radio advertisements.

72.     Documents recovered from Longstreth show the Enterprise's planning and preparation in building Team Householder.  For example, a document entitled "Team Skills," which was last modified in February 2018, proposed a list of individuals for a leadership team for 2019, including Speaker of the House, Speaker Pro Tempore, Majority Floor Leader, Assistant Majority Leader, Majority Whip, and Assistant Majority Whip.  After Householder was elected Speaker in 2019, all of the individuals, except for one, became part of Householder's leadership team.  (The exception was a representative who did not support Householder for Speaker).

73.     In terms of the actual candidates selected to be part of Householder's team, agents recovered numerous documents from Longstreth, which listed largely the same select group of candidates, such as one entitled "2018 Official Primary Matchups," that provide evidence of the recruitment and vetting process.  Agents recovered dozens of similar documents, which referred to this group of candidates as "recruitment updates," "our team," or "Team Householder."  Regardless of the name, however, it is clear the Enterprise considered the election of these candidates an integral part of its strategy for a Householder Speakership.

74.     Notably, Longstreth's list mirrored House members that Company A intended to support in the 2018 election.  For example, a Word document in Cespedes' possession, titled "Householder" and created May 8, 2018 at 10:49pm—after polls closed the night of the Ohio Primary—listed the Householder candidates versus the Representative 1 candidates.

### B.  Funding "Team Householder"

75.     Based on my training and experience, I know that in order to execute its strategy of electing Team Householder candidates, the Enterprise needed to raise a substantial amount of money.  The House's then-current Speaker had picked Representative 1, not Householder, to be his successor.  As Cespedes explained in a document  created March 18, 2018, "[Redacted] is a lame duck Speaker but is heavily involved in the campaign to elect [Representative 1] as the next Ohio Speaker."  This meant that the war chest of the then-current Speaker had accumulated through the Ohio House Republican Organizational Committee (OHROC) would be spent on Speaker/Representative 1-backed candidates.[21]  Based on my training, experience, and the

---

[21] Media reports indicate that the then-current Speaker controlled OHROC and determined how funds were dispersed. *E.g.* https://www.dispatch.com/news/2018051 0/householder-flexes-muscles-within-ohio-house-gop.  Bank records show funds controlled by representatives were deposited into OHROC and that corporate contributions also were deposited into the fund.

investigation, to beat the OHROC-backed candidates in the primaries, the Enterprise needed to out-fundraise them and execute successful campaign messaging for the "Team Householder" candidates.

76.    An excel spreadsheet recovered from Longstreth, titled "Campaign Budget 2017-18" and last edited in September 2017, shows that the Enterprise estimated the amount needed to implement its strategy was more than $2 million:

| Position | Salary | Team Lead | FT/PT/IND | Overhead factor | Employment factor | | Total Cost to employ |
|---|---|---|---|---|---|---|---|
| Driver | $ 10,000.00 | | IND | 1 | 1 | $ | 10,000.00 |
| Research/Content | $ 108,000.00 | | FT | 1.7 | 1.25 | $ | 229,500.00 |
| Finance Team | $ 72,000.00 | | IND | 1 | 1 | $ | 72,000.00 |
| Political Team | $ 65,000.00 | | FT | 1.7 | 1.25 | $ | 138,125.00 |
| Communications Team | $ 150,000.00 | | FT | 1.7 | 1.25 | $ | 318,750.00 |
| Creative Team | $ 72,000.00 | | IND | 1 | 1 | $ | 72,000.00 |
| Field/Grassroots Directc | $ 80,000.00 | | FT | 1.7 | 1.25 | $ | 170,000.00 |
| Digital Media Team | $ 300,000.00 | | FT | 1.7 | 1.25 | $ | 637,500.00 |
| Administrative | $ 42,000.00 | | FT | 1.7 | 1.25 | $ | 89,250.00 |
| Executive Director | $ 120,000.00 | Jeff | IND | 1 | 1 | $ | 120,000.00 |
| | | | | | | | |
| Transportation | | $ 24,000.00 | | | | | |
| Rent | | $ 91,000.00 | | | | | |
| Office Supplies | | $ 12,000.00 | | | | | |
| Legal | | $ 36,000.00 | | | | | |
| Misc. | | $ 36,000.00 | | | | | |
| i360 Data | | $ 48,000.00 | | | | | |
| | | | | | | | |
| | $ 1,019,000.00 | $ 247,000.00 | ######### | | | $ | 1,857,125.00 |

77.    Similarly, during a January 10, 2018 recorded conversation, Clark and Householder discussed their plan to "*orchestrate (c)(4) checks*" to help Householder fund campaigns for his benefit.  Specifically, Clark estimated that Householder would "*need a hundred and twenty thousand per race*," to which Householder responded, "*I'd say one fifty, but yeah, you're in the ballpark.*"  They then discussed how to raise the amount they need in 501(c)(4) checks to fund candidate campaigns.  Clark also mentioned that, "*some people decided to help [Representative 1]*" for Speaker, to which Householder responded, "*yeah, we can fuck them over later.*"

78.    Ultimately, the Enterprise funded approximately twenty-one candidate campaigns, which, using the metric discussed by Clark and Householder in the January 2018 call, meant that Householder would need to raise between roughly $2.5 million and $3.0 million to fund the campaigns.

### C. Volume and Timing of Company A Payments to Enterprise during 2018 Election Cycle

79.    At the same time the Enterprise worked on a "game plan" to secure Householder's ascension to Speakership, Company A needed a solution for its Ohio nuclear plants.  The investigation shows that the Enterprise and Company A formed, what Company A-1 lobbyist

Borges called, "an unholy alliance." Company A funded Householder's Speakership bid in exchange for a legislative fix for its nuclear power plants.

80. The volume of Company A's payments, the timing of these payments, communications and coordination amongst co-conspirators and Company A, the official action taken by Householder, and the actions to maintain the official action, show the corrupt arrangement was Company A funding Householder's speakership bid in exchange for a legislative fix.

81. As described above, the vehicle to collect the vast amounts of money needed for Householder's Speakership bid was Generation Now. From the time the Generation Now bank accounts were opened in 2017 through the November 2018 general election, the Enterprise received approximately $4.6 million into Generation Now. More than half of that money came from Company A or the Energy Pass-Through, fully funded by Company A. More than a half million of the remaining money came from energy-related entities that either had a relationship with Company A or an interest in the bailout legislation. The remaining amount of money (approximately $1.6 million) came from approximately 31 other interest groups.

82. The investigation shows Company A made regular, quarterly payments of $250,000 into Generation Now's main bank account almost immediately after Longstreth opened it in 2017. But, in March 2018, approximately two weeks before Company A's Corp. affiliates filed for bankruptcy, Company A began funneling payments to Generation Now through Energy Pass-Through. The payments wired from Company A Service Co. into the Energy Pass-Through originated from account x6496, the same account used to wire payments directly from Company A Service Co into Generation Now. In the final month before the 2018 general election, Company A dropped another $500,000 into the Generation Now account. This time the money was paid by check from account x4788.[22] The payments from Company A from 2017-2018 are summarized below.

---

[22] Bank records indicate that x4788 is also a Company A Service Co. account. For example, the checks to Generation Now from x4788 were signed by the Senior VP and CFO for Company A Service Co, who is now the President of Company A Corp.

| | | | |
|---|---|---|---|
| March 16, 2017 | $250,000 | wire | Company A Service Co (x6496) |
| May 17, 2017 | $250,000 | wire | Company A Service Co (x6496) |
| August 10, 2017 | $250,000 | wire | Company A Service Co (x6496) |
| December 8, 2017 | $250,000 | wire | Company A Service Co (x6496) |
| March 15, 2018 | $300,000 | wire | Energy Pass-Through (originally from Co. A Service Co. x6496) |
| May 4, 2018 | $100,000 | wire | Energy Pass-Through (originally from Co. A Service Co. x6496) |
| August 8, 2018 | $54,000 | wire | Coalition (originally from Co. A Service Co. x6496 through Energy Pass-Through) |
| August 16, 2018 | $500,000 | wire | Energy Pass-Through (originally from Co. A Service Co. x6496) |
| October 9, 2018 | $400,000 | check | Company A Service Co. (x4788) |
| October 29, 2018 | $100,000 | check | Company A Service Co. (x4788) |
| **Total:** | **$2,454,000** | | |

83. In addition, Company A Service Co. paid the Enterprise an additional $500,000 to Dark Money Group 1 on October 29, 2018, bringing the total that Company A paid to the Enterprise through Generation Now in 2017-2018 as $2,954,000.[23]

84. Toll records corroborate the close coordination between the Enterprise and Company A during the 2018 primary, even though the payments were sent via Energy Pass-Through. For example, several days before a $300,000 payment through Energy Pass-Through on March 15, 2018, multiple communications between Householder and Company A occurred:

| Date | Time | Caller | Called Party | Duration |
|---|---|---|---|---|
| March 12, 2018 | 14:03 | Householder | Sr. VP of External Affairs for Company A Service Co. | 24 seconds |
| March 12, 2018 | 15:06 | Sr. VP of External Affairs for Company A Service Co. | Householder | 3:03 minutes |
| March 12, 2018 | 15:11 | Sr. VP of External Affairs for Company A Service Co. | Householder | 9 seconds |
| March 12, 2018 | 16:59 | Householder | Ohio Director of State Affairs, Company A Corp.[24] | 11:34 minutes |

[23] This number does not include $90,000 that Company A paid to the Coalition on March 21, 2017 and $300,000 that Company A paid to the Coalition on May 1, 2018 (through Energy Pass-Through).
[24] ███████████

| Date | Time | Caller | Called Party | Duration |
|------|------|--------|--------------|----------|
| March 12, 2018 | 17:45 | Ohio Director of State Affairs, Company A Corp. | Householder | 0 seconds |
| March 12, 2018 | 17:45 | Ohio Director of State Affairs, Company A Corp. | Householder | 13 seconds |
| March 12, 2018 | 19:55 | Householder | Ohio Director of State Affairs, Company A Corp. | 11:17 minutes |
| March 13, 2018 | 17:22 | Sr. VP of External Affairs for Company A Service Co. | Householder | 1:32 minutes |
| March 13, 2018 | 17:24 | Sr. VP of External Affairs for Company A Service Co. | Householder | 56 seconds |
| March 15, 2018 | Energy Pass-Through Payment for $300,000 | | | |

85. A similar pattern occurred with respect to the May 4, 2018 payment of $100,000 through Energy Pass-Through, just days before the May primary, this time between Longstreth and Company A:

| Date | Time | Caller | Called Party | Duration |
|------|------|--------|--------------|----------|
| April 27, 2018 | 10:49 | Sr. VP of External Affairs for Company A Service Co. | Longstreth | 0 seconds |
| April 27, 2018 | 10:49 | Sr. VP of External Affairs for Company A Service Co. | Longstreth | 3 seconds |
| April 27, 2018 | 10:55 | Longstreth | Sr. VP of External Affairs for Company A Service Co. | 2:47 minutes |
| April 27, 2018 | 13:37 | Longstreth | Sr. VP of External Affairs for Company A Service Co. | 2:56 minutes |
| April 28, 2018 | 10:38 | Sr. VP of External Affairs for Company A Service Co. | Longstreth | 1:30 minutes |
| April 28, 2018 | 11:40 | Longstreth | Sr. VP of External Affairs for Company A Service Co. | 2:14 minutes |
| April 30, 2018 | 9:11 | Longstreth | Sr. VP of External Affairs for Company A Service Co. | 2:11 minutes |

| Date | Time | Caller | Called Party | Duration |
|------|------|--------|--------------|----------|
| May 1, 2018 | 18:41 | Ohio Director of State Affairs, Company A Corp. | Longstreth | 15:49 minutes |
| May 3, 2018 | 22:09 | Ohio Director of State Affairs, Company A Corp. | Longstreth | Text |
| May 4, 2018 | 6:10 | Longstreth | Ohio Director of State Affairs, Company A Corp. | Text |
| May 4, 2018 | 6:18 | Ohio Director of State Affairs, Company A Corp. | Longstreth | Text |
| May 4, 2018 | 6:25 | Longstreth | Ohio Director of State Affairs, Company A Corp. | 14:12 minutes |
| May 4, 2018 | Energy Pass-Through Payment for $100,000 | | | |

86. Toll records around this period do not otherwise show regular contact between Householder and Company A employees or Longstreth and Company A employees, further demonstrating the significance of these calls.

**D. Enterprise Spending Company A Money on Spring 2018 Election**

87. Not only was the volume of the Company A payments critical to the Enterprise's efforts, but the timing was also significant. As noted above, during the 2018 election, the then-current Speaker was a lame duck Speaker, who had picked Representative 1 to be his successor. Thus, the Enterprise needed a substantial amount of money to beat the Representative 1 candidates in the May primary election. Company A came through, paying the Enterprise $1.4 million before the May 8, 2018 primary date.

88. But the Enterprise's ability to capitalize on an unexpected opportunity that arose a month before the primary election date also demonstrates how critical the volume and timing of payments from Company A was. On April 12, 2018, about a month before the primary, the then-current Speaker abruptly resigned. The Enterprise seized upon this opportunity.

89. Because of the money accumulated in the Generation Now war chest, the majority of which came from Company A, the Enterprise was able to move close to $1 million in the three weeks before the primary. In fact, the same day that the Speaker resigned, bank records reveal that the Enterprise wired $750,000 to the PAC. (That wire followed a $250,000 wire Generation Now sent to the PAC in early April.) The majority of the $1 million from Generation Now was wired to a media services company and a political strategy firm for media buys and mailers for Team Householder candidates. In addition, Generation Now wired $234,450 to JPL in three increments between April 12 and May 7, adding to the already $775,054 it wired to JPL in the first quarter of 2018. This money also was mostly spent on the campaign to elect Team Householder

candidates. The disbursements from Generation Now and their relative distribution dates to the PAC and JPL leading up to the primary were as follows:

| | | | |
|---|---|---|---|
| Jan. 29, 2018 | Generation Now | $109,513 wire | JPL |
| Jan. 30, 2018 | Generation Now | $14,514 wire | JPL |
| Feb. 21, 2018 | Generation Now | $109,513 wire | JPL |
| Mar. 12, 2018 | Generation Now | $132,000 wire | JPL |
| Mar. 22, 2018 | Generation Now | $200,000 wire | JPL |
| April 2, 2018 | Generation Now | $250,000 wire | PAC |
| April 5, 2018 | Generation Now | $209,513 wire | JPL |
| **April 12, 2018** | **Speaker resigns** | | |
| April 12, 2018 | Generation Now | $750,000 wire | PAC |
| April 12, 2018 | Generation Now | $109,513 wire | JPL |
| April 19, 2018 | Generation Now | $71,337 wire | JPL |
| May 7, 2018 | Generation Now | $53,600 wire | JPL |
| **May 8, 2018** | **Ohio primary** | | |

**Total: over $2 million**

90. Phone records corroborate the fact that the Speaker's resignation marked a significant moment of mobilization for the Enterprise, which was made possible because of the payments from Company A. On the day of the Speaker's resignation, Householder and Longstreth had a 31-minute call. Shortly thereafter, they both began making the rounds. Householder contacted Company A Service Co.'s Sr. Vice President of External Affairs, and proceeded to have a 5-minute phone call. Longstreth communicated with Company A Corp.'s Ohio Director of State Affairs, and followed immediately with a call to the attorney for the PAC and then communication with an executive of Political Strategy Firm 1. Longstreth and Householder then communicated with many Team Householder candidates throughout the day.

91. All told, Generation Now spent more than $1.8 million on the Spring 2018 primary races—largely by funneling the Company A-to-Generation-Now money through the PAC.[25] The specific use of the money is confirmed by subpoenaed records. For example, nearly all of the Generation Now money wired into the PAC was sent to either to Media Services Company 1 or the Political Strategy Firm 1. Checks were issued from Media Services Company 1 to various radio stations for media buys. Many of these checks note the House district race related to the buy, and the district races denoted on those checks correspond with Longstreth's lists of Team Householder candidates.

92. Not only did Generation Now spend $1.8 million on Team Householder candidates, but at least $90,000 of that money funded campaign expenses for Householder's own campaign, thus benefitting him personally, outside the context of his public campaign fund.

---

[25] This figure excludes payments to Associate 2 for salary and Generation Now rent payments to the Political Advertising Agency during the same time frame.

93. In addition to bank records, the PAC filed an FEC mid-year report in 2018, outlining its expenditures in the primary. Although the report failed to list candidates by name— and those candidates did not report in-kind gifts or contributions from the PAC—the report did list expenditures in connection with certain Ohio House districts. And, those House Districts again corresponded with the Enterprise's candidates. The amounts listed in the PAC's FEC report, which correspond to particular House Districts, total more than $800,000.

94. While the investigations shows that the PAC paid Media Services Company 1 and Political Strategy Firm 1 nearly the entire million dollars it had received before the Spring 2018 primary, bank records from JPL x9192 show that Longstreth also dispersed approximately $1 million of the money he received from Generation Now to media, communication, and strategy consulting companies, in support of the Enterprise's primary efforts from January to May 2018.

95. The timing of these payments also evidence money laundering by the Enterprise in furtherance of its purposes with the payments from Company A. For example, on March 12, 2018, Generation Now wired the JPL x9192 account $132,200 for "advertising." The next day, JPL x9192 wired $132,240 to Election Marketing Company 1. Between April 5 and 12, 2018, Generation Now wired a total of $319,026 to JPL x9192, which then wired Direct Mail Company 1 $250,000 between April 6 and April 13, 2018. The evidence of money laundering is even stronger considering that Longstreth is a signatory on the Generation Now and x9192 accounts, demonstrating that he used the JPL account as a pass-through to pay the companies.

96. Ultimately, the Enterprise's efforts were successful, with most Team Householder candidates winning their primaries. On or about July 24, 2018, a few months after the primaries, $215,000 was wired from Longstreth-controlled accounts to settle a personal lawsuit against Householder. On August 1, 2018, the same day that Householder was meeting with Company A executives in Columbus, according to documents in Cespedes' possession, a court filing in Franklin County Court "released and forever discharged" the judgment against Householder and Householder Ltd. The main JPL account was funded with wire transfers from Generation Now, which was funded in large part by Company A wires. In addition, bank records show that JPL's main account also paid Householder's attorneys involved in the lawsuit in May 2017 via two checks totaling $60,000. At the time JPL made those payments, it had received more than $78,000 from Generation Now, which had been funded solely by a $250,000 wire from Company A, a $25,000 deposit from the CEO of Company C, and $200 deposit from Longstreth on the date he opened the account.[26] JPL also paid the same law firm additional fees totaling $25,308.43 in 2018.

**E. Fall 2018 Election**

97. The investigation shows that, after the primaries, the Enterprise refocused its efforts on ensuring the Team Householder candidates won the general election in November. As set forth below, the Enterprise used a new corporate entity (Dark Money Group 1) to further its purposes, which was funded by Company A, Generation Now (as funded by Company A), and related interests, and then used almost all of those funds to further the campaigns of Team Householder candidates.

---

[26] As set forth above, Company C has interests aligned with Company A.

98. First, for its part, from August to October 2018, Company A paid an additional $1.5 million into the Generation Now war chest. As detailed in the chart above, the payments from Company A came in the form of checks or via Energy Pass-Through. Prior to these payments, the Enterprise needed money—Generation Now had less than $4,000 in its account just prior to an Energy Pass-Through $500,000 wire in August 2018. Just like in the primary season, Generation Now funneled a substantial amount of its Company A money through a separate entity—this time Dark Money Group 1—to run negative ads against Team Householder opponents.

99. Within days of its incorporation in September 2018, Dark Money Group 1 opened a bank account at Huntington Bank, the same bank used by Longstreth. A few weeks later, Generation Now wired a total of $670,000. Bank records show that the only deposits in the account were as follows:

| October 19, 2018 | $400,000 | wire | Generation Now |
| October 24, 2018 | $150,000 | wire | Generation Now |
| October 26, 2018 | $100,000 | wire | Company B[27] |
| October 29, 2018 | $500,000 | EFT | Company A Service |
| October 29, 2018 | $120,000 | wire | Generation Now |
| October 29, 2018 | $100,000 | check | CEO of Company C[28] |
| October 30, 2018 | $100,000 | check | Individual 3[29] |
| **Total:** | **$1.47 million** | | |

100. No other money was paid into Dark Money Group 1's account. Again, the volume and timing of the payments from Company A proved crucial to the Enterprise's success. Funneled through Energy Pass-Through to Generation Now, Company A infused over a million dollars into Dark Money Group 1 in the fall of 2018 alone, which allowed the Enterprise to flood the airways with negative ads against its opponents in the final days before the election.

101. Specifically, bank records show that out of the $1.47 million deposited into the Dark Money Group 1 account, Dark Money Group 1 paid more than $1.438 million to Media Placement Company 2, a firm that bought television and radio ads in Dark Money Group 1's name. Federal Communications Commission (FCC) records confirm the expenditures. Specifically, public documents filed with the FCC show Media Placement Company 2 purchased more than $1.3 million worth of advertisements for Dark Money Group 1 in the ten days before the election. Based on the television and radio stations targeted, the bulk of the media buys were spent on ads in the districts of Team Householder candidates in tight races.

102. The strategy worked. The clearest example comes from one highly contested House District race. Although the Enterprise initially backed Candidate 1 in the primary, Candidate 1 lost in the Spring 2018 primary, beat by Representative 2. In the general election, Representative 2 faced a tight race against the opposing party's candidate. However,

---

[27] Company B is an energy company with interests aligned with Company A.

[28] Company C has interests aligned with Company A.

[29] Individual 3 does not appear to be related to Company A or have aligning interests.

Representative 2 ultimately prevailed by 137 votes. Representative 2's victory was credited to a negative ad run by Dark Money Group 1, which showed the opposing candidate taking a field sobriety test, yet only receiving a speeding ticket. The ad essentially accused the candidate of misusing his authority. Although the candidate and the police union condemned the ad, the damage was done—the opposing candidate, who reportedly had a 10-point lead before the ad aired, lost the election. Media reports credited the Dark Money Group 1 ad with tipping the scales.

103. After the election, Householder took credit for the ad against the opposing candidate, remarking to Individual 1, that he (Householder) had put $500,000 into that race in the final weeks. Householder's comment was made during a meeting after the election in November 2018, where Individual 1, who was a prospective Team Householder candidate for the 2020 election, was being interviewed by Householder. Based on this discussion, Individual 1 understood from Householder that if he/she were selected, he/she would have Householder's financial backing, just like Representative 2. This showed Householder's control over Dark Money Group 1 funds. Individual 1 has provided other information relevant to the investigation that has been independently corroborated.

104. A copy of the video ad run against the opposing candidate was recovered by agents from Longstreth. Notably, the video in Longstreth's possession appears to be a "draft" or "rough cut" of the Dark Money Group 1 ad, evidenced by the file name of the video, which appears in the left-hand corner of the recovered video. The fact that this video was recovered from Longstreth also demonstrates the Enterprise's control over Dark Money Group 1, and how the payments from Company A were spent.

105. Representative 2's race exemplifies the benefit Company A provided to the Enterprise by way of its timely payments during election seasons. However, the benefit to the Enterprise was not limited to the cash infused into Dark Money Group 1. Generation Now paid Longstreth another $809,000 between the time of the May primary and November election. Through JPL, Longstreth paid himself, his associates, and a number of campaign managers working on the campaigns of Team Householder candidates. Indeed, CHS 1, who has provided reliable and credible information corroborated by the investigation, advised that he/she was working on the campaign of a Team Householder candidate during the fall 2018 general election, but that CHS 1 was paid by Longstreth. (Subpoenaed records confirm the main JPL account, which had received money from Generation Now, paid the CHS.) This shows that Company A-to-Generation-Now money was used by the Enterprise to benefit Team Householder candidates—thus, providing a benefit to Householder himself. Longstreth also paid several media, communications, strategy and direct mail groups. Besides Dark Money Group 1 and JPL, Generation Now also paid rent to Political Advertising Agency and $10,000 a month to Associate 2 for "fundraising."

106. Ultimately, the Enterprise's "Game plan 2018" worked. By coordinating and financially backing the Team Householder candidates using Company A money, the Enterprise helped elect a group of representatives loyal to Householder. All of the candidates who were financially supported by the Enterprise and won in the 2018 general election voted to make Householder, instead of Representative 1, Speaker. With their votes, Householder secured the

Speakership in 2019. And, as described in the next section, two of the Team Householder candidates carried the Company A legislative bailout for him.

## II.    The Bailout:  Enterprise Passes Legislation for Company A

107.    Having secured Householder's power as Speaker, the Enterprise transitioned quickly to fulfilling its end of the corrupt bargain with Company A—passing nuclear bailout legislation. In fact, on January 7, 2019, the day he was elected Speaker, Householder pledged to create a standing subcommittee on energy generation.[30]  Householder then followed through shortly after his election as Speaker by passing the HB 6 legislation and defending the bill against the ballot initiative challenge.

108.    The Enterprise's efforts to pass the legislation and preserve it against the Ballot Campaign challenge were funded entirely by Company A, through payments to Generation Now. While HB 6 was pending in the House, Company A wired Generation Now $9,500,000. When the bill was pending in the Senate, Company A wired Generation Now $7,358,255. And, to fund its efforts to defeat the Ballot Campaign, Company A wired an additional $38,000,000 to Generation Now. The volume and frequency of these payments provide further evidence of the Enterprise's corrupt arrangement with Company A. These facts, including the Enterprise's passage of HB 6, its efforts to defeat the subsequent Ballot Campaign, and Company A's involvement and coordination funding these efforts, are set forth fully below.

### A.  House Bill 6

109.    Consistent with their agreement, the Enterprise implemented a strategy to pass a legislative fix for Company A shortly after Householder was selected Speaker. The strategy involved ramming a sweeping piece of legislation—HB 6—through the House and pushing the Senate to agree. First, Householder picked freshman representatives, which Householder helped elect by using Company A-to-Generation-Now dollars for their benefit in the 2018 election, to sponsor the bill that he helped draft. Second, Householder created a new subcommittee to hear the bill, which was comprised mostly of Householder supporters. Third, the Enterprise engaged in an expensive media blitz, funded by Company A-to-Generation-Now payments, to pressure public officials to support the bill. Fourth, Householder strong-armed House members, particularly opponents of the bill. Finally, Householder and the Enterprise pressured Senators to pass the legislation. The expediency and funding of this legislative effort and the tactics used by the Enterprise—along with timely communications between Enterprise members and agents of Company A—are further evidence of the agreement between Householder and Company A.

110.    This is precisely what Enterprise-member-and-Company A-lobbyist Juan Cespedes planned. In a Word document agents recovered from Cespedes titled "Ohio Legislator Background" and authored May 3, 2018, Cespedes referenced Householder as a "*current*

---

[30] https://www.daytondailynews.com/news/state--regional-govt--politics/larry-householder-elected-new-ohio-house-speaker/a3ltKxDAm3jT5HTd7vrDWK/

*candidate for Ohio Speaker*," and noted that, "*he is willing to work on energy legislation. Traditionally close to Company A*."  In another document titled "Ohio Fundraising Suggestions" and created on September 6, 2018, Cespedes suggested that Company A should continue to support the "Larry Householder Caucus" financially because "*Householder has a history of favorably rewarding those who provide both early and late money into his efforts*."  Cespedes mentioned in the document that Company A's CEO had a conversation with Householder "*where [CEO] suggested that we would/should independently support him as Company A-1*."  Cespedes also laid out Company A's aspirations for the bailout legislation in a document titled "[Company A-1] Ohio 1st Draft Timeline" and authored by Cespedes on November 20, 2018.  In this document, Cespedes wrote that although the next Speaker remains unclear, there should be "Speaker's race clarity mid-December" 2018, and "*[i]f Householder is successful, the effort will likely be led from his Chamber*," with "*potential legislative introduction*" for [Company A-1] in early 2019.

### i.   House Bill 6 Background

111.    On April 12, 2019, roughly three months after Householder became Speaker, HB 6 was introduced.  Although titled "Ohio Clean Air Program," the investigation shows that HB 6 essentially was created to prevent the shutdown of Company A's nuclear plants.  HB 6 creates the Ohio Clean Air Program, which allows nuclear or solar clean air resources to apply to be certified clean air resources, and therefore, eligible for a subsidy of $9 per megawatt hour produced.  In order to pay for the subsidy, the Ohio Air Quality Development Authority, which is tasked with administering the Ohio Clean Air Program, will institute and collect a monthly fixed charge to all residential, commercial, industrial, and large consumers.  The fixed fee is projected to produce $140 million annually for the first year, then $200 million annually thereafter.

112.    Ohio currently has six solar facilities over 50 megawatts of nameplate capacity, which serves as the minimum threshold necessary to apply to receive the subsidy.  They produce a combined 1,095 megawatts of power. For comparison, the Company A-1 nuclear plants produced a combined 18,315,007 megawatts in 2018.  Given the power produced, Company A-1 would collect approximately 94% of the subsidy, which total more than $160 million annually. Newspaper reporting throughout the state characterized HB 6 as a "bailout" for the benefit of Company A-1 specifically.[31]  Clark also characterized HB 6 as a bailout for Company A.

113.    Under HB 6, the subsidy will be dispersed at the direction of the Ohio Air Quality Development Authority.  As passed, HB 6 will add six new members to the Ohio Air Quality Development Authority, increasing the total from seven to thirteen.  Pursuant to HB 6, three of those new appointees will be selected by the Speaker of the House.

---

[31] *See* https://www.cincinnati.com/story/news/politics/2019/05/29/ohio-house-passes-nuclear-plant-bailout /1270558001/; https://www.toledoblade.com/local/environment/2019/06/03/Protesters-oppose-House-Bill-6/ stories/20190603170.

## ii.    Householder "Crafts" HB 6 and Creates Subcommittee for HB 6

114.    Freshman representatives, Representatives 3 and 4, who were elected in November 2018, sponsored HB 6.  Both were "Householder" candidates and Generation Now spent money supporting both by paying for advertising, campaign strategy, and staffing.[32]    Although Householder was not a listed sponsor of the legislation, on the day of the introduction, he publically supported the legislation and gave a press conference to explain how it would affect Ohio.  During the recorded press conference, Householder characterized HB 6 as "*the mysterious energy bill we've been working on for quite a while in the House of Representatives*."

115.    Householder further admitted during the April 12, 2019 press conference that he "*crafted*" the legislation with the freshman representatives.  Specifically, when Householder was asked where the amount of the subsidy came from, Householder responded, "*it's based on our brains.  For me, I look back, <u>for two years I've had this in my head</u>, and I've had various versions on that white board over the last several months.   And as I talked with [the freshman representatives], we were able to define it even closer*."  As described above, Householder received his first $250,000 payment from Company A in March 2017, roughly two years prior to introduction of the bill.

116.    HB 6 was referred to the House Energy and Natural Resources Committee after introduction.  But during the Committee's first meeting, HB 6 was then referred to a newly created subcommittee, the House Energy and Natural Resources Subcommittee on Energy Generation (the "Energy Generation Subcommittee").  Householder publically announced that he would form a subcommittee on energy generation on February 6, 2019 in conjunction with a press release about House rules for the 133rd General Assembly.  Two days later, Householder formalized the Energy Generation Subcommittee in a press release announcing the committee assignments of House members.  Since its inception, the subcommittee only has been assigned one bill—HB 6.  At the April 12, 2019 press conference, Householder admitted that HB 6 "*is why that Subcommittee was created*."

117.    Eight House members were assigned to the Energy Generation Subcommittee.  Six of the eight members had voted for Householder for Speaker.  The two members who did not record votes for Householder signed on to be co-sponsors of HB 6.  In the end, all but two members of the subcommittee voted to pass HB 6.

118.    The subcommittee held four meetings on the legislation, before referring the bill back to the full House Energy and Natural Resources Committee on May 2, 2019 with a substitution.  HB 6 then had multiple committee meetings within the House Energy and Natural Resources Committee, and was amended further before being referred back to the House floor less than a month later on or about May 23, 2019.

119.    After HB 6 was referred from committee on May 23, 2019, it was subsequently referred to another committee for a substitution—the Rules and Reference Committee, which is run by Householder.  Generally every bill going from a substantive committee to a floor vote

---

[32] Representative 3 also received $18,700 in direct contributions to his campaign account from Company A.

passes through the House Rules and Reference Committee to receive a date for a floor vote. However, it is unusual for a bill to be amended during such passage. Based upon my training and experience, once a bill has been vetted by committee and recommended for passage, it is uncommon for it be amended in another committee. For context, the House Energy and Natural Resources Committee and Energy Generation Subcommittee held ten committee meetings and heard testimony from dozens of stakeholder groups before amending the legislation, a process lasting just under sixty days. But, on May 28, 2019, HB 6 was referred to the Rules and Reference committee, and was amended through the introduction of a substitute bill.

120.     Among other things, the substitute bill added a provision permitting an electric company with taxable property that is fueled by nuclear power (a company such as Company A) to file a petition for a reduction in taxable property value. This provision was an added benefit to Company A Corp.

121.     After its final set of substitutions, HB 6 returned to the House floor—the same day that HB 6 was amended by the Rules and Reference House Committee chaired by Householder— where it was scheduled to be voted out on May 29, 2019. When a vote was called, the House elected to informally pass, which based on my training and experience, I know is a procedure used by Speakers to reschedule legislation that would have failed to pass if a vote were taken at the time of roll call. When an informal pass is taken, further negotiations and compromises are necessary for the Speaker to acquire the necessary votes for the bill to pass. After the informal pass was taken, the House stood at recess. Based on my training and experience, this shows that Householder did not have support for passage of the bill in the House at that time.

122.     The Speaker gained support for passage later that day, likely through the pressure tactics described below. Upon returning from the aforementioned pass, HB 6 was amended four additional times. After those amendments, HB 6 was called to vote by the Speaker and passed 53-43.

### iii.     Generation Now Media Blitz to Provide "Cover"

123.     The uncertain path to passage is significant. To members of the Enterprise, there was a real possibility, up until the final vote, that HB 6 would not pass. The investigation shows that, during this time, the Enterprise created a media campaign costing approximately $15 million dollars.

124.     The Enteprise's media campaign demonstrates the significance of HB 6 to the Enterprise, and thus, provides further evidence of the corrupt arrangement with Company A. Documents possessed by Longstreth show that the Enterprise had budgeted for an 8-week campaign, where the "overall budget would be $15-16m for a full burn." The media campaign was designed to pressure legislators to vote for HB 6 by targeting their constituents. The media campaign urged Ohioans to contact their representatives to save jobs in Ohio and protect their communities from "big oil." The campaign provided cover for those representatives who were voting for HB 6 and applied constituent pressure to unsupportive House members and those who were undecided.

125. Bank records and text messages between Longstreth and Cespedes show that Company A funded the entire campaign. For just the House portion of the media blitz, Company A wired approximately $9.5 million into the main Generation Now account between April and May 2019:

| April 30, 2019 | $1,500,000 | wire | Company A Service Co |
|---|---|---|---|
| May 7, 2019 | $1,500,000 | wire | Company A Service Co |
| May 15, 2019 | $2,500,000 | wire | Company A Service Co |
| May 22, 2019 | $2,500,000 | wire | Company A Service Co |
| May 29, 2019 | $1,500,000 | wire | Company A Service Co |
| **Total:** | **$9,500,000** | | |

126. Text messages recovered from Longstreth show communications with Cespedes about the $15 million budget:



127. The money from Company funded a media blitz—television ads, radio ads, mailers, and digital media—with all of the Company A money running through the Enterprise, which got paid for the work.

128.     Based on my training and experience, the fact that Generation Now, the Speaker's 501(c)(4) entity, conducted the media campaign is significant.  First, it is further evidence of the corrupt relationship with Company A—the Enterprise likely would not be spending millions of dollars from Company A that was passed through a 501(c)(4) account for the benefit of Company A's main legislative priority absent an agreement with Company A.  Second, it allowed the Enterprise to control the messaging in a way that would benefit the Enterprise and provided the autonomy to spend the money how it deemed appropriate.  Third, based on my training and experience, it solidified Householder's political power by showing members the strength and reach of his political operation.  Finally, the members of the Enterprise financially benefited from this arrangement.

129.     The messaging of the media campaign focused on the loss of jobs if HB 6 did not pass, and urged constituents to contact their representatives to support HB 6.  The media campaign also claimed that not passing HB 6 would allow "big oil" to harm constituents' communities.  In the search warrant return from Longstreth's possession, the FBI recovered a draft script for a Generation Now HB 6 commercial to run in the districts of two representatives from the Cincinnati area (highlights in original):



130.     The draft transcript was written on the letterhead of Political Advertising Agency 1, which is consistent with publicly filed FCC documents, showing television ad time purchased

by the Political Advertising Agency or its sister company, Media Placement Company 1 during this timeframe. For example, Media Placement Company 1 purchased $63,105 of airtime on Generation Now's behalf, from WKRC Channel 12 in Cincinnati, beginning on May 24, 2019. WKRC airs in the representatives' districts. The content shows Householder and the Enterprise influencing public officials through the ad buys.

131. The media campaign was successful and provided "cover" for Householder supporters to vote in favor of a bailout they otherwise may not support. In fact, Representative 3, a freshman sponsor of the bill, texted Longstreth after the vote and celebration about "the cover":



132. Likewise, Householder himself acknowledged the importance of "protecting" the representatives who had voted in favor of HB 6. A little more than two weeks following HB 6's passage from the House, Householder texted Longstreth to inquire as to whether "we" were running positive advertisements for Representative 5, who had voted "yes":



133.    The exchange about the representative is particularly interesting given that Representative 5 voted against Householder for Speaker, but supported HB 6. Thus, Householder's message appears to convey a newfound allegiance for a representative who voted for HB 6, thus showing HB 6's significance to Householder. The exchange also showed Householder's direct involvement in the Enterprise's messaging and media campaign and Householder's understanding that public officials know that Householder is behind Generation Now messaging.

134.    The media campaign was effective in using constituents to pressure the targeted representative. For example, even mailers that unexpectedly arrived after the vote prompted constituents of "no" voters to call and complain. For example, Representative 6, angrily contacted Longstreth about a mailer that arrived in his district after the vote, urging Representative 6 to have the "courage" to save jobs and vote for HB 6.





135.    The text exchange also shows that Representative 6 knew exactly who to contact about the Generation Now ads.   The same day, after receiving Representative 6's angry texts,

Longstreth texted Householder to warn him about what had happened in Representative 6's district.



This further shows Householder's involvement in using Generation Now money for mailers targeting public officials to support HB 6.

### iv. Householder Attempts to Gain Votes for Bailout

136. The investigation provides probable cause to believe that Householder and the Enterprise attempted to influence and provide advice to legislators in an effort to pass HB 6 after receiving millions of dollars from Company A.

137. Representative 7 was one such legislator who was contacted directly by Householder to gain support for HB 6. On or about Tuesday, May 28, 2019—the same day that HB 6 was sent to the Rules and Reference House Committee chaired by Householder—I interviewed Representative 7, a current member of the Ohio House of Representatives. Representative 7 advised that HB 6 had been handled unlike any legislation that Representative 7 had seen before. Representative 7 advised that Householder had been attempting to secure yes votes for HB 6 for several weeks. According to Representative 7, despite his efforts, Householder did not have enough votes to pass HB 6. Representative 7 was aware of fourteen Republican Caucus members who had committed to be no votes and was aware of only two Democratic members who would vote yes. Representative 7 felt the bill would not pass unless something drastic changed.

138. Representative 7 also explained that he was in frequent contact with Clark, at the direction of Householder. Representative 7 explained that Clark is a close advisor of Householder, and was working with Representative 7 extensively on a piece of legislation unrelated to HB 6. Representative 7 felt it was unusual and odd that Clark was assigned by Householder to work with a member on legislation, instead of House policy staff, but complied with Householder's request. Clark and Representative 7 had daily contact, and Representative 7 felt that they had become friends.

139. On the day before the meeting with Representative 7, Clark had spoken with Representative 7. According to Representative 7, Clark warned him not to vote against HB 6. Clark told Representative 7 that people who vote against Householder lose a lot, including committee chairmanships, caucus financial aid, and that their legislation may not continue to legislatively progress. Representative 7 relayed that he was unsure if the information from Clark

was meant to be a threat from Householder, passed to him via Clark, or if it was a warning from a friend.

140.    During the interview, Representative 7 received a text message from Householder, which said:



Representative 7 showed FBI Agents, including me, the message when it was received. Representative 7 then responded to the text, addressing Representative 7 by his title, politely reiterating Representative 7's contrary position.  Householder immediately responded, "*I just want you to remember – when I needed you – you weren't there. twice.*"  These messages show that Householder was attempting to gain legislative support vote for HB 6.

141.    Representative 7, later provided screen shots of the aforementioned text message exchange with Householder.  The screen shots matched the messages Representative 7 showed FBI agents during the interview.  In addition, Representative 7 provided a screen shot of the stored contact information for the sender of the text messages, Householder.  That contact information contains Householder's name and phone number.

142.    The day after I interviewed Representative 7, HB 6 passed.

143.    Representative 7's statements about Householder's active interest in HB 6 were corroborated by a recorded conversation involving Clark referenced above, on or about May 31, 2019.  During the call, Clark first confirmed that the "clean air bill" was really "a nuclear plant bailout."  Clark then mentioned Representative 7 by name, stating that Householder had called Representative 7 three or four times about the vote and that Clark then had to meet with Representative 7 about the vote.  Clark relayed that he told Representative 7 that Householder would not let Representative 7 carry separate legislation unless he voted for the energy bill.  Clark then stated that Representative 7 decided to vote against the bill and Householder was very angry.

144.    In a subsequent recorded call, Clark elaborated about Representative 7. Clark stated that Householder had told him (Clark) that Clark was going to have to get Representative 7's vote on HB 6.  Clark then called Representative 7, who told Clark he could not vote for HB 6.  When Representative 7 tried to explain why, Clark told him, "No one cares about your opinion."  Clark further explained that Representative 7 tried to call Householder a few days later and tried to negotiate with him.  Householder asked Clark what he should do and Clark told Householder to kill Representative 7's bill.

145.     On May 31, 2019, Representative 7 contacted me and indicated that he had been instructed to delete certain messages sent to him by Householder. This message was delivered to Representative 7 through a third party, ████████████████████████████████ Individual 2, who communicated a message from Jeff Longstreth. Representative 7 told me that Longstreth was charged with managing Householder's campaign operations. That included both his individual campaign, and the campaigns of all Republican candidates throughout the state. This is corroborated by the Enterprise's use of Generation Now to support House member campaigns.

146.     Specifically, Individual 2 told Representative 7 that he (Individual 2) had spoken to Longstreth earlier that day. During their conversation, Longstreth reportedly told Individual 2 to instruct Representative 7 to delete the text messages that he received about HB 6 from Householder. If Representative 7 complied with this instruction, all would be forgiven in terms of his vote against HB 6. Individual 2 then relayed the message to Representative 7. Upon receiving the message from Individual 2, Representative 7 was immediately concerned and contacted me. Representative 7 relayed the message delivered by Individual 2.

147.     Toll records corroborate the instruction that Representative 7 received to delete his messages. Specifically, toll records show that Longstreth contacted Individual 2 at 8:29AM, 11:21AM and 8:14PM. The 8:14PM call lasted for 6 minutes and 53 seconds, immediately after which, Individual 2 contacted Representative 7. That call lasted for nearly 10 minutes. Immediately after the call with Individual 2 ended, Representative 7 contacted me.

148.     For context, Householder maintained control of the Enterprise and OHROC, which Householder renamed the House Republican Campaign Committee (HRCC). As outlined in this affidavit, Householder's Enterprise selects political candidates and supports their election efforts. That support comes in a variety of forms, including individual campaign contributions, money and staffing from HRCC, and dark money resources provided by the Enterprise. Overwhelmingly, the candidates selected by the Enterprise are successful in their election or reelection efforts. Therefore, based on my training and experience, not complying with a command from Householder, and as a result losing your support or worse having an opponent supported, would decrease the chances of reelection.

### v.    The Enterprise Pressures Senators to Pass HB 6

149.     HB 6 passed the House on May 29, 2019. In reference to HB 6, Company A-1 released a statement on May 29, 2019: "*This bill provides an effective legislative solution to keep [Company A-1's] nuclear power plants open for many years to come, while preserving 4,300 highly-skilled jobs and an important revenue source*." The statement went on, "*Until the Senate vote, [Company A-1] will continue to engage in a constructive dialogue with legislators about the need to protect 90% of the state's zero-emissions electricity and provide the majority of Ohioans considerable savings on their electricity bills.*"

150.　The day after Company A-1's press release, HB 6 was introduced to the Ohio Senate. Although HB 6 passing the House helped the Enterprise maintain its agreement with Company A, it did not fulfill the agreement. Rather, the Enterprise needed to ensure HB 6 passed the Senate and was signed into law.

151.　Shortly after the bill was introduced in the Senate, the Enterprise began pressuring for Senate passage. To fund the effort, Company A wired more than $7 million into Generation Now, which records show used the money, in part, for polls, media buys, and mailers:

| | | |
|---|---|---|
| June 5, 2019 | $2,000,000 | wire from Company A Service Co. |
| June 13, 2019 | $1,361,899 | wire from Company A Service Co. |
| June 20, 2019 | $2,116,899 | wire from Company A Service Co. |
| July 5, 2019 | $1,879,457 | wire from Company A-1. |
| **Total:** | **$7,358,255** | |

152.　Text messages from Longstreth recovered during the investigation show that Company A had budgeted for, and was paying for the costs associated with the campaign to pass HB 6 through Senate.

153.　The Enterprise's efforts regarding the Senate began a few days after HB 6's House passage. On June 3, 2019, Longstreth pulled the "whole HB 6 team" together for a strategy session. This meeting appears to have been partially prompted by Householder's response to the negative press the passage of HB received.





154.    Following the above message and phone call from Householder, Longstreth texted Company A-1 lobbyist Cespedes:  "*Speaker has asked me to pull together the whole HB 6 team on Monday. Are you available*?"  Longstreth added, the "*Speaker is on a rampage*."  Cespedes responded, "*Understood. Just let me know what I should be prepared for. I want to make sure I have answers and do not want the speaker's rage directed at me lol*."  After Longstreth stated that Householder "*was pissed*" about a newspaper article, Cespedes replied, "*Aw fuck. Sorry to hear that. I've got your back. You have been great. Let's just regroup and get the rest of the deal done*."  Consistent with the investigation, the context of these messages indicates that the Longstreth and Householder's "win" is the same "deal" referenced by Company A-lobbyist Cespedes—successful passage of HB 6.

155.    Based on text messages recovered during the investigation, the meeting went forward as planned, and Associate 1 drafted meeting minutes, which were sent to Longstreth and were recovered by agents.  Portions of the minutes are excerpted below.



**Generation Now, Inc. Meeting**
**Monday, June 3, 2019**

I.  Recap HB 6 strategy for House
    A.  Member feedback: what worked, what didn't
        1.  What didn't work: our calls, the TV was weak (didn't mention the members' names) – new strategy needs to be targeted cable mentioning the names.
        2.  What didn't work: the bill repeatedly changing, which meant the message repeatedly changed.
        3.  What did work: calls for "on the fence" members ( ▮▮▮ relayed she was feeling the heat from calls, talked to ▮▮▮ and he was feeling an influence by proxy).
        4.  What did work: their names. Anything that mentioned their names, they got lots of feedback from friends, family, district people: radio, mail.

II. Senate strategy
    A.  Senator-by-Senator game plan: hyper local
    B.  Change in media/ digital approach
    C.  Timeline
        **1. Hard stop June 30 (based off refueling for the Nukes)**

Need to develop a 10-day plan to decide what we're doing going forward. If we're not successful in the next 10 days, the Nukes need to be stripped out and put into the budget. Have 10 days to run through a media strategy and see where we are.
• Sub bill introduced June 10-11
• Conference committee will begin June 15

Run through a direct mail piece (named), direct cable (named), direct radio (named), continue our broadcast strategy

156.    These meeting minutes not only outline the Senate campaign, but confirm what Generation Now did during the House's consideration of the bill. The investigation showed that the Enterprise followed the steps outlined in the notes, and that Householder remained engaged during the process. For example, the same day as the June 3, 2019 meeting, Householder and Longstreth had the following exchange:



157. Longstreth attempted to call Householder directly after these text messages. The next morning at 8:04 a.m., Householder and Longstreth had a call lasting 34 minutes and 39 seconds.

158. Householder then followed up with Neil Clark regarding the June 3 meeting that same day:



159. These exchanges show Householder directly involved in the Enterprise's efforts to persuade Ohio senators to pass HB 6.

160. The messages also show that Householder was chief decision maker regarding Generation Now, even providing direction with respect to the Generation Now ads. On June 12, 2019, about a week after the HB 6 team meeting, Householder reached out to Longstreth regarding the Generation Now television ads, essentially telling Longstreth to change them. Moreover, Longstreth acquiesced to Householder, indicating that he would change them the following week, thus demonstrating that Householder had the final word as to Generation Now messaging:







161. Householder's mention of the "*poor sum bitch*" driving his pickup truck and crying about losing his job is likely a reference to an HB 6 advertisement paid for by Generation Now, which depicts an employee at one of Company A-1's nuclear power plants describing job losses if the plant closes, while he drives his pickup truck down a road. This further shows Householder's involvement in the Generation Now media buys supporting the Company A bailout.

162. Consistent with the strategy outlined in the June 3 team meeting, numerous commercials "*paid for by Generation Now*" began airing while HB 6 was in the Senate under consideration. These commercials featured the same actors depicted in the May commercials, however, consistent with the June 3rd meeting notes, the commercials targeted particular senators and urged voters to call the particular senator and urge them to support HB 6 so thousands of Ohioans will not lose their jobs. For example, one ad targeted Senator 1, The ad states in part, "*Senator [1] can save our jobs in Ohio for Ohio . . . Senator [1], Ohio families need your help before June 30... ask Senator [1] to pass HB 6 before summer break . . . more jobs, lower bills, for Ohio.*" The commercial ends with "*Paid for by Generation Now, Inc.*"

163. A document recovered by agents from Longstreth's possession appears to be a draft script, complete with redlining and highlights, for a set of commercials targeting senators, including Senator 1. The text is similar to the commercial described above. Senator 1, and the

other senators on the draft transcript, were the same senators identified in the June 3rd meeting minutes as senators to target with messaging. Direct mail pieces were recovered from Longstreth's possession that targeted other senators identified in the June 3rd meeting minutes. For example, Senator 2 was identified as a senator to target with a message of saving jobs and money and to convey a sense of urgency. Messages recovered from Longstreth state that the Enterprise was spending $68,000 per week in Senator 2's district.

164.    Mock mailers targeting Senator 2's district were also recovered from Longstreth's possession, consistent with the messages discussed at the meeting:





165.    In addition to the draft mailers copied above, budget documents recovered from Longstreth that track Generation Now's spending per week of 20 senators, including Senator 2, corroborate Longstreth's statement that he was spending $68,000 in Senator 2's district.  For example, the following excel spreadsheet entitled "HB 6 Paid Media Week 6 June 2019" (copied below), shows that the Enterprise spent approximately $45,780 on radio, social, and mail advertisements during that week.  The $45,780 does not include the amount spent on television ads, which the spreadsheet depicts as $500,000 for all 20 senators.  If that $500,000 amount were divided equally amongst the 20 senators, $25,000 would be added to Senator 2's amount, totaling $70,780—which is close to what Longstreth approximated in his text message.

| DIST | LAST | FIRST | CALLS | CABLE | RADIO | SOCIAL | MAIL | NOTES |
|------|------|-------|-------|-------|-------|--------|------|-------|
| | | | | | Week 6 June 7-14 | | | |
| | | | | | $ 7,177 | $ 5,500 | $ 30,000 | |
| | | | | | $ 16,279 | $ 5,500 | $ 30,000 | |
| | | | | | $ 12,805 | $ 5,500 | $ 30,000 | |
| | | | | | $ 10,525 | $ 5,500 | $ 30,000 | |
| | | | | | $ 16,304 | $ 5,500 | $ 30,000 | |
| | | | | | $ 16,304 | $ 5,500 | $ 30,000 | |
| | | | | | $ 7,425 | $ 5,500 | $ 30,000 | |
| | | | | | $ 8,260 | $ 5,500 | $ 30,000 | |
| | | | | | $ 13,127 | $ 5,500 | $ 30,000 | |
| | | | | | $ 10,280 | $ 5,500 | $ 30,000 | |
| | | | | | $ 18,417 | $ 5,500 | $ 30,000 | |
| | | | | | $ 7,400 | $ 5,500 | $ 30,000 | |
| | | | | | $ 19,417 | $ 5,500 | $ 30,000 | |
| | | | | | $ 19,318 | $ 5,500 | $ 30,000 | |
| | | See Separate Sheet | | | $ 9,081 | $ 5,500 | $ 30,000 | |
| | | | | | $ 7,870 | $ 5,500 | $ 30,000 | |
| | | | | | $ 7,212 | $ 5,500 | $ 30,000 | |
| | | | | | $ 8,938 | $ 5,500 | $ 30,000 | |
| | | | | | $ 7,600 | $ 5,500 | $ 30,000 | |
| | | | | | $ 9,800 | $ 5,500 | $ 30,000 | |
| | | | $ 66,160 | $ 500,000 | $ 233,539 | $ 110,000 | $ 600,000 | |
| | | | | Survey | $0 | | | |
| | Cincinnati | $122,500 | | | | | | |
| | Columbus | $134,400 | | GRAND TOTAL: | | $ 1,961,899 | | |
| | Cleveland | $195,300 | | | | | | |
| | TOTAL | $452,200 | | | | | | |

166.    Like the media campaign during the House's consideration of HB 6, the costly media campaign targeting Senators provides further evidence of the corrupt arrangement.

167.    In addition to a media blitz, Householder continued to use his Team-Householder-candidate-turned-sponsor-of-HB 6, Representative 3, to support the bill through the Senate.  On June 10, 2019, Longstreth and Householder had the following exchange:



168.    Consistent with this exchange, Representative 3 testified before the Senate Energy and Public Utilities Committee as a proponent of HB 6 the next day. This shows Householder working with "the team" to coordinate support for passage of HB 6 by using Team Householder candidates to influence public officials in the Senate.

169.    While in the Senate, HB 6 was further amended. Those amendments included a provision that gave an electric distribution utility, such as Company A Corp., the ability to decouple its energy rates. Decoupling is the dissociation of annual revenue from volume of energy sales. The decoupling mechanism was based upon the baseline revenue the company received in 2018. Therefore, if a given year's annual revenue is less than it was in 2018, the company may charge retail customers a rider, or surcharge, to compensate for the lost revenue. Company A Corp.'s CEO referred to this provision, in a call with investors on November 4 2019, as addressing company risk. In response to an investor question, the CEO stated "*[decoupling] fixes our base revenues and essentially it takes about one-third of our company and I think makes it somewhat recession-proof. So, I get a question a lot about where I'm worried about a future recession. It's 2 million customers in Ohio that this is going to help make sure that that doesn't impact us.*" This addition was a further benefit to Company A Corp., and, based on my training, experience, and the investigation in this matter, likely came as a result of the successful influence campaign waged by Company A and the Enterprise.

170.     The Enterprise's strategy, funded by Company A, worked. The Senate passed HB 6 approximately a month and half after it was introduced. The House, which concurred in the Senate's amendments, adopted the Senate's version of HB 6 on July 23, 2019. It was signed by the governor later that same day (July 23, 2019).

171.     In a press release the next day, Company A-1 stated that it "*applauded the enactment of House Bill 6 into law, a monumental step in helping to avoid the premature closure of the company's two nuclear plants in Ohio.*" Company A-1 CEO commended the legislature for "*drafting a bill that preserves the state's nuclear assets,*" and stated specifically that Company A-1 was "*thankful for the support and commitment by Speaker Householder and Senate President [Redacted].*"

172.     As explained in detail below, a campaign to overturn the legislation through a ballot initiative began immediately after passage and continued until the campaign to overturn HB 6 failed on October 21, 2019, at which point the bailout legislation became law, saving the two nuclear power plants from closure.

### vi.     The Enterprise and Company A's Coordination

173.     Enterprise members and associates coordinated with Company A executives and lobbyists while it was receiving millions of secret dollars from Company A and pressuring public officials to support the bailout.

174.     According to a review of text messages and toll records, Cespedes was in regular contact with Company A and served as a conduit between Company A and other members and associates of the Enterprise while the Enterprise pushed for passage of HB 6. For example, the aforementioned exchange between Cespedes and Longstreth, where, in the context of planning an HB 6 team meeting, Cespedes told Longsteth "*Let's just regroup and get the rest of the deal done*[,]" illustrates this point. These messages, which were premised on the Speaker's "*rampage*" also show Householder's direct involvement in Company A's and Generation Now's efforts to get the "*the rest of the deal done*"—specifically, passage of HB 6.

175.     Longstreth and Cespedes also discussed Generation Now mailers supporting HB 6. On June 3, 2019, Cespedes texted "*gen now mail is still dropping. We are getting reports that's [sic] it's been hitting late,*" to which Longstreth responded that "*90% was delivered by the vote*" and "*Members like seeing the mail because voters don't know when the vote was.*" Several days later, Cespedes told Longstreth, "*Mail and radio looks good to me.*" These communications show that Company A—through Cespedes—was involved directly in Generation Now's media strategy to promote member support of HB 6.

176.     In addition, Longstreth and Cespedes discussed coordinating Company A payments to Generation Now. On June 4, 2019, Cespedes texted to Longstreth, "*Text me the # I need an invoice for $2M*"; Longstreth responded, "*working on it now.*" On June 10, 2019, Cespedes texted, "*Make sure I get the invoice for this week as early as possible, please. Thanks.*" Longstreth

56

responded, "*Yeah, I'm thinking it will be lower this week. Probably 1.3 ish.*" Cespdedes replied, "*Ok, thanks. I appreciate everything that you are doing. <u>Let's keeping pushing this group</u>.*"

177.     On June 12, Cespedes and Longstreth had the following exchange:



178.     Two days later, Cespedes followed up:



179. One minute later, Longstreth texted the Chief Operating Officer of Political Advertising Company, to check on Company A's media spend, as requested by Cespedes:



180. After sending the message to COO, Longstreth immediately resumed his text exchange with Cespedes:



**+16145781107 Jeff Longstreth**

Yes, I'll have ▮▮▮▮ send me everything they've done and I'll compile the mail info.

Status: Sent
Delivered: 6/14/2019 3:00:02 PM(UTC+0)

6/14/2019 3:00:02 PM(UTC+0)

Source Extraction:
Legacy (5)

**+16145815826 Juan Cespedes**

Thanks

Status: Read
Read: 6/14/2019 3:00:29 PM(UTC+0)

6/14/2019 3:00:24 PM(UTC+0)

Source Extraction:
Legacy (5)

**+16145815826 Juan Cespedes**

Also, what have we given you spend so far: I've lost track. Trying to subtract against $15M budget to see how much room I have left

Status: Read
Read: 6/14/2019 3:04:47 PM(UTC+0)

6/14/2019 3:01:11 PM(UTC+0)

Source Extraction:
Legacy (5)

**+16143781107 Jeff Longstreth**

I'll get that. I think we are pretty close to on budget.

Status: Sent
Delivered: 6/14/2019 3:05:17 PM(UTC+0)

6/14/2019 3:05:16 PM(UTC+0)

Source Extraction:
Legacy (5)

**+16145815826 Juan Cespedes**

Yes, you are doing a great job managing budget.

Status: Read
Read: 6/14/2019 3:45:21 PM(UTC+0)

6/14/2019 3:17:49 PM(UTC+0)

Source Extraction:
Legacy (5)



181.    After further discussion between Cespedes and Longstreth in the following days about coordinating payment, public officials' support for the bailout, hiring signature firms to defeat the Ballot Campaign, and media and mailers, Longstreth and Cespedes again discussed Company A payments to Generation Now.   For example, on June 18, 2019, Cespedes to Longstreth, "*I think we have to shave off the 33k, but I'll check*," and "*Just confirmed to round down to $16M even*."

182.     The combination of phone records, bank records, and text messages paint a clear picture of the partnership between the Enterprise and Company A in working towards their agreement.  Indeed, key Enterprise members had regular and timely phone contact with Company A  executives as Householder was taking official action on Company A's behalf while the Enterprise received millions from Company A.  For example, toll records show that Householder had 30 phone contacts with Company A Corp.'s CEO from January 2019 to July 2019—the period from when Householder became Speaker until HB 6 was introduced and signed into law.  This includes a phone call on January 7, 2019, the day Householder was elected Speaker; and multiple, lengthy phone calls in the weeks leading up to introduction of HB 6 and shortly after passage of the bill.  Indeed, over the period from February 2017 to July 2019, Householder had 84 phone contacts with the Company A Corp.'s CEO, 14 phone contacts with Company A Service Co.'s VP of External Affairs, and 188 contacts with Company A Corp.'s Ohio Director of State Affairs.  Similarly, Longstreth had timely phone contact in the first half of 2019 with Company A Service Co.'s VP of External Affairs and Company A-1's VP of Government Affairs.  Longstreth's contact with Company A exceeded even Householder's over the course of the conspiracy, to include significant phone contacts with Company A executives during the period from February 2017 to October 2019.[33]

183.     Clark described Householder's corrupt arrangement with Company A during a recorded meeting in June 2019.[34]  Clark first described how another Ohio public official received money from Company A into that public official's 501(c)(4) but did not come through for Company A when they needed help passing HB 6.  Clark stated, when that public official "*knew that Larry did not have his votes, ran away from him.*"  Clark then stated that Householder, on the other hand, took millions from Company A "*but he went to war for them.*"  Clark concluded that he wanted to be around politicians like Householder who "*will go to the wall, but those guys that go to the wall can only do it once a year because if they do it all the time <u>everybody knows they're pay to play</u>.*"  Clark explained that the way politicians get exposed for "pay to play" is through "stupidity" or "people who get aggrieved leak it."

184.     Householder admitted his official action for the benefit of Company A in text messages with Longstreth.  In a June 10, 2019 exchange, Longstreth told Householder that one of the "*biggest issues we've heard from the Senate*" was "*Does [Company A-1] really need the money*?*"; Householder responded, for the Company A-1 "subsidy": "*we only put in what they need*"—showing Householder and the Enterprise drafted the bill for Company A's benefit and with Company A's specific interests in mind.  Similarly, in a June 25, 2019 exchange, after Longstreth referenced the potential ballot referendum that could overturn HB 6, Householder stated, "*Stay on the good side of [Company A-1] and we'll do the defend*" of the referendum, exactly what the Enterprise did.

185.     Because Company A appeared to provide whatever the Enterprise needed to achieve its goals, the Enterprise members referred to Company A as their "Bank" for the benefit

---

[33] These toll records likely underrepresent the total volume of phone contacts between the Enterprise and Company A because messages from iPhone to iPhone are not captured in toll records due to end-to-end encryption.  For example, most text messages between Cespedes and Longstreth, the content of which are captured in search warrant returns, are not contained in toll records because they are both iPhone users.

[34]

of the Enterprise.  As Clark stated in a recorded conversation[35] in July 2019:  "*We call Company A 'the Bank' because they can do, they can do, they can fund these things for 20 years if they want to. . . . They've got too much money, too much power*."  Later in the conversation, Clark discussed the individuals giving a $15,000 to $25,000 check to Householder's 501(c)(4), relative to other contributions into Generation Now, specifically payments by Company A.  Clark stated, "*you'll walk in with your check and you'll be respectful, and they'll remember it as that number. Remember, he gets checks from 'the Bank'; remember, I told you what the 'the Bank' is, you know, $1.5 million dollars, $2 million dollars.*"[36]

186.  Indeed, according to Clark, the amount of money from Company A to the Enterprise was "*unlimited.*"  As he later explained, "*on HB 6, Company got $1.3 billion in subsidies, free payments, . . . so what do they care about putting in $20 million a year for this thing, they don't give a shit.*"  Clark went on:  "*[Company A] is deep pockets.*  Clark explained:  *I did this campaign.  All we cared about was getting the subsidy.*"  In other words, Company A paid the Enterprise millions of dollars in exchange for the Enterprise's efforts to pass HB 6 because it received "*$1.3 billion in subsidies*" in return—the essence of the corrupt exchange.

## III.  The Enterprise Fights the Ballot Campaign to Ensure HB 6 Goes Into Effect

187.  Immediately after passage of HB 6, "Ballot Campaign" mobilized to repeal HB 6 through a ballot referendum.  Under Ohio law, in order to place a referendum on the ballot, a group must collect 1,000 certified signatures and submit proposed ballot language to the Ohio Attorney General for approval.[37]  The approval ensures that the description of the referendum meets the "fair and truthful" standard outlined in the Ohio Revised Code.

188.  After the Ohio Attorney General approves the language, and the Ohio Secretary of State certifies the signatures collected, the proponents of the ballot referendum must collect signatures from registered voters totaling six percent of the voters who participated in the last gubernatorial election.  In this case, six percent equals approximately 265,000 signatures.  Those signatures also must be validated by the Ohio Secretary of State.  If the requisite number of signatures are collected and validated, the referendum appears on the ballot for a popular vote by the residents of Ohio.

### A.  The Enterprise Fights Back

189.  Ballot Campaign's original ballot proposal language was submitted on July 29, 2019 and rejected by the Ohio Attorney General on August 12, 2019.  A revised petition was filed on August 16, 2019, and subsequently approved by the Ohio Attorney General on August 29, 2019.  After approval, the Ballot Campaign had until October 21, 2019 to collect the requisite number of signatures.

---

[35] ███████████████████████████████

[36] ███████████████████████████

[37] *See* Ohio Rev. Code § 3519.01.

190.    Even before the Governor signed HB 6 into law, and the Ballot Campaign organized, the Enterprise was mobilizing to defeat a ballot initiative in June 2019.  On June 19, 2019, Cespedes wrote to Longstreth, "*Borges mentioned this morning that the opposition has engaged signature gatherers. Not sure who or if it's real. Just want u to be aware.*"  Longstreth responded, "Thanks for letting me know."  Then, on June 27, 2019, Cespedes wrote Longstreth, "*Let's just get all of the signature firms hired tomorrow.*"  Longstreth responded, "*We can hire the good ones.  We can't hire them all.*"  To which Cespedes replied, "*Yeah, let's get all the good ones?  If I need to up the budget, I will.*"  Cespedes later texted his intent with regards to the ballot initiative, "*I was hoping that we could take out all the big players and limit their chances.  It's impossible to referendum proof imo.  We can make it tougher.*"  This shows Company A actively working with the Enterprise to preserve the HB 6 bailout.

191.    But the investigation indicates that the Enterprise was concerned that a ballot initiative would block HB 6 from taking effect.  For example, on July 22, 2019, the day before the bill passed the Senate, Clark discussed a potential referendum during a recorded conversation.[38]  He explained that it would "*piss off the Speaker,*" and if the opposition succeeded in getting it on the ballot in 2021, the bill would be "stayed" until then.  Clark further explained that he was in charge of the effort to kill the signature collection effort for the Speaker, and estimated that it had a 20% success rate.

## B.  Generation Now Takes Heat in the Media for Funding HB 6 Ads

192.    At the same time discussion of a ballot initiative was ramping up, the media was reporting that Generation Now was the source of dark money behind the passage of HB 6.[39]  The Cincinnati Enquirer and Dayton Daily News reported that millions of dollars in dark money from Generation Now flooded the airways with television and radio ads supporting HB 6.  Although some articles tied Generation Now to Jeff Longstreth, none made the link to Householder or understood that Company A was funding Generation Now.  In fact, the news reports at that time attributed Company A as funding an alliance, which had spent about $275,000 on HB 6 ads.  In what appears to be an effort to deflect attention, Householder was quoted in the media as saying:

> It's a priority bill for me because I've always cared about the energy in the state of Ohio. I'll tell you who's paying for these ads: it's working men and women from Ohio, who want to save their jobs and it's Ohio corporations, headquartered in Ohio, that want to stay here. That's who's paying for it.[40]

193.    Householder was also receiving pressure from House members about his use of Generation Now to further HB 6, as Householder told Longstreth in a text exchange:

---

[38] ████████████████████████████

[39] Who paid for all the nuclear bailout ads raining on Ohio?, 2019 WLNR 21024343 (July 2, 2019).

[40] Who paid for all the nuclear bailout ads raining on Ohio?, 2019 WLNR 21024343.



194.  In addition to showing Householder's knowledge that Generation Now was taking a hit in the media, the message also shows that some public officials knew that Householder was behind the Generation Now campaign to pressure members to support HB 6, particularly relevant given the millions of dollars Householder's Enterprise spent on media buys and ads urging Ohio citizens to pressure public officials to support House Bill 6.

195.  In the wake of the negative press and pressure from House leadership relating to Generation Now media buys supporting HB 6, the Enterprise used "Front Company," which was controlled by the Enterprise, to conceal their efforts to combat the referendum.  As described below, the Enterprise pumped $23,000,000 of Company A-to-Generation-Now money into Front Company and used the organization to fund criminal acts to defeat the referendum.

## C. The Enterprise Used Front Company to Defeat Ballot Campaign

196.  HB 6 was important to the Householder's Enterprise because it received millions of dollars into Generation Now from Company A in exchange for enactment of the bailout legislation. And, thus, the repeal of HB 6, which would prevent HB 6 from taking effect in October 2019, was viewed as a threat to Householder's Enterprise.  But, the Enterprise also viewed the Ballot Campaign as a threat to its power and territory generally.

197.  For example, at the dinner club meeting on September 23, 2019, in the context of a discussion about the Ballot Campaign, Householder told Clark in a recorded meeting[41]: "*It is so important, it is so important, that they are not successful, because when the legislature votes on something it needs to stay law*."  Staffer followed up, "*it's the beginning of your Speakership; it sets a bad precedent for the next six years, what we need to make them realize is that you (Householder) can't be fucked with*."  Clark then agreed, "*it sends the message to everyone else . . . . if you attack a member, we're going to fucking rip your dick off*."  Enterprise members thus made clear that preserving their legislative victory was necessary to proving the strength of the Enterprise going forward.

198.  As set forth above, Front Company—organized and registered under Ohio law on July 30, 2019, less than a week after the bill was signed by the governor—is a pass-through entity through which the Enterprise funneled Company A-to-Generation-Now money to further the conspiracy.  Associate 1, along with Associate 4—who had hundreds of phone contacts with Enterprise members from July to October 2019, including regular calls with Clark, Longstreth,

[41] ██████████████████████████████████████████████

and Borges—opened the Fifth-Third Bank checking account for the Front Company on August 12, 2019. Between August 1, 2019 and October 31, 2019, over $23 million was deposited into Front Company's account. Subpoenaed bank records show that *every penny of that $23 million came from Generation Now via Company A entities—specifically, Company A Service Co. and Energy Pass-Through—wired approximately $38 million to Generation Now*.

199. The Enterprise funneled the Company A payments through the Front Company account to defeat the Ballot Campaign. One of the clearest examples, again, comes from Longstreth. On September 26, 2019, Company A wired $2,445,000 to Generation Now (Longstreth-controlled), which wired a total of $2.1 million to Front Company (Associate 1-controlled) (over the next several days), which wired $2.2 million on September 30, 2019 to Constant Content (Longstreth-controlled), which wired $1.22 million to Direct Mail Company the same day. The Enterprise passed the remaining $21 million through Front Company to pay Media Placement Company 1 and the Political Advertising Agency for television commercials[42] (approximately $6.9 million), Petition Signature Services Co 1 (approximately $11 million) and Petition Signature Services Co 2 ($688,000) for ballot petition signature services, Billboard Co for billboards ($150,000), and approximately $3,500 for t-shirts. Front Company also funneled another $2.2 million to a different Constant Content account controlled by Longstreth.

200. In terms of commercials and fliers, the Company A money wired from Generation Now to Front Company funded a media blitz of commercials and fliers orchestrated by the Enterprise. Again, the media campaign against the ballot initiative is indicative of the corrupt exchange with Company A.

201. These advertisements intended to invoke fear by asserting that China was invading Ohio's energy grid, and that signing the petition equated with ceding control of Ohio energy to China. For example, Front Company mailed the following fliers to hundreds of thousands of Ohioans:



---

[42] Public filings on the FCC website show that Media Placement Company 1 bought television ads for Front Company between August 2019 and October 2019.



These above fliers were mailed to voters throughout the state of Ohio.

202.     During the September 23, 2019 recorded dinner-party, in which Householder also was present, Clark relayed the story behind the second flier, which Clark and Householder thought was hilarious. Through laughter, Clark described what he termed "*the direct mail piece*" as "*so fucking cold-blooded.*" He stated that Jeff designed it. He explained that because 15 out of the 150 signature collectors hired by the opposition had prior arrests, they were technically criminals under the law.     When Representative 8 (another representative of the Ohio House of Representatives, who is not known to be part of the Enterprise asked how they knew the signature collectors had prior arrests, Householder explained, "*they have to sign up and when they sign up, we run a background check.*" [43]  Clark went on to explain, *"[s]o Jeff, of course, designs a piece going 'they're coming to your house, criminals . . . don't answer the door . . . decline to sign.'"* As Clark explained, he later had to explain the direct mail piece to Associate 4—that they were mailing 4.9 million pieces explaining that the people coming to your house for signatures are criminals, and Associate 4 refused to put his name on it.  Clark played hardball with Associate 4, and told him that he (Clark) had to get off the phone now and tell his boss (presumably Householder) that Associate 4 didn't want to do it.  Clark explained that eventually, Associate 4 agreed on a softer piece.

203.     The investigation later revealed that payment for the postage on these same fliers was ultimately paid for by Generation Now, but had been funneled through at least three bank accounts.  Specifically, the fliers were sent "presorted standard US Postage PAID Columbus OH Permit 6871."  According to U.S. Postal records, a Digital & Print Marketing Group is the account holder of Permit 6871, and the customer reference ID lists a company related to Direct Mail Company 2.  Subpoenaed bank records show that the Digital & Print Marketing Group received approximately $3.5 million from Direct Mail Group 2 in October 2019, which received approximately $3.6 million combined from Longstreth's Constant Content bank accounts, which received a combined $4.4 million from Front Company—all of which originally came from

---

[43] Householder was likely referring to Ohio Secretary of State Form 15, which Ohio law requires to be filed by people working being compensated for working on behalf of a statewide ballot petition.  *See* Ohio Rev. Code 3501.381.

Company A through Generation Now. In other words, the Enterprise funneled Company A money through three different Enterprise-controlled accounts before purchasing the fliers through third parties. The efforts made by Enterprise members in this regard are further evidence of their intent and the corrupt exchange with Company A.

204. Generation Now money also funded television commercials purportedly sponsored by Front Company, which continued the same theme from the fliers. These ads asserted that China was taking over Ohio's energy, igniting fear that the Chinese government is behind the drive to repeal HB 6 and wanting to take Ohio energy jobs.[44] The ads proposition Ohioans to choose between supporting HB 6 or handing over Ohio's energy to the Chinese Government.

For example, one ad aired in Cincinnati claimed:

> *They took our manufacturing jobs. They shuttered our factories. Now they are coming for our energy jobs. The Chinese government is quietly invading the American electric grid, intertwining them financially in our energy infrastructure. Now a special interest group boosting Chinese financial interests is targeting Ohio energy, taking Ohio money, exporting Ohio jobs, even risking our national security. They are meddling in our elections. In the coming weeks you may be approached on the street or at your door to sign a petition to defund U.S. jobs and energy. They will ask for your name, your address, your signature. Tell them no. Don't sign your name to a plan that kills Ohio jobs, harms Ohio communities, and endangers our energy independence. China turned off the power on Ohio manufacturing. Don't let them do it to you. Don't sign the petition allowing China to control Ohio's power.*

During the commercial, images of the Chinese government and leadership were displayed:




---

[44] https://www.cincinnati.com/story/news/politics/2019/09/30/ads-claim-foreign-entities-are-invading-ohios-energy-grid/2423655001/.



The ad ended with a plea to not sign the petition, because doing so would allow China to take control over Ohio's power:



205.    Thus, although the fliers and ads claimed they were paid for by Front Company, in reality, the Enterprise paid for them and concealed that fact by wiring money from Generation Now to Front Company.  By using Front Company for the media campaign, the Enterprise further concealed its corrupt arrangement with Company A

206.    Other evidence demonstrates that the Enterprise used Front Company as a front for Generation Now.  For example, public filings on the FCC website show that Media Placement Company 1, which received approximately $6.9 million from Front Company bank account, bought television airtime between August 2019 and October 2019 across Ohio for Front Company. For instance, for the week of September 5, 2019 to September 9, 2019, records show that Media Placement Company 1 bought approximately $66,300 in television spots from WKRC Cincinnati for Front Company.  (Media Placement Company 1 had purchased airtime slots for Generation Now in the past, including advertisements that supported candidates associated with Householder during the 2018 election cycle.)

207.    The FCC filings also match the commercials' content.  In one disclosure statement that was filed with the FCC, Front Company stated that the issue addressed by the advertisements was "Chinese influence of Ohio Energy."  This description ties both the fliers and commercial content back to Front Company.  Additionally, the content of the commercials themselves contain a clue as to their origin and funding source, tying the Enterprise to Front Company.  Specifically, M.M., pictured below, who served as project manager at one of the Company A-1 nuclear power plants, appeared both in Generation Now advertisements in support of the passage of HB 6 in the

spring of 2019, as well as the aforementioned commercial by Front Company opposing the referendum, which aired in the fall of 2019.



208.    The Generation Now money also was used to buy t-shirts for Front Company. Bank records, subpoena returns, and photos from social media provide the confirmation.

### D. The Enterprise Conflicts Out Signature Firms

209.    Besides paying for advertisements, mailers and t-shirts, Generation Now subverted the Ballot Campaign by hiring signature collection firms in an effort to conflict them from working for the Ballot Campaign. Bank records show that between July 23, 2019 and July 30, 2019, Generation Now spent over $549,250 retaining the services of national signature collection firms to defeat the ballot initiative. The retention of signature collection firms is in keeping with practices outlined by Clark in multiple recorded conversations. In those instances, Clark advised his clients that if they would retain as many of the signature collection firms as possible, then those firms could not work for their opposition, which would decrease the likelihood that the referendum would collect the requisite number of signatures for a ballot initiative.

210.    For example, in a meeting on July 24, 2019, which was recorded,[45] Clark stated that he wired about $450,000 today hiring signature collections people to not work. He repeated that

[45] ██████████████████████████████████

he had "*hired them not to work.*" Clark continued, explaining that he had hired 15 companies nationwide—nine of the biggest ones—and sent them all checks ranging $50,000 to $100,000 to not to work, and $10,000 payments to the smaller firms. Clark stated that these people on the phone, "*they are all full of shit. I have been a lobbyist for 39 years, been around a long time. It always goes circular to someone going well we'll give you a kickback.*" Clark later confirmed, during the same conversation, that the $450,000 used to pay the collection firms came from Generation Now.

211. A spreadsheet tracking the hiring and payment of signature firms in July 2019 was recovered from Cespedes' possession. The document's properties reveal that Associate 1 created the spreadsheet on July 26, 2019—two days after Clark's statements detailed directly above. (That it was recovered from Cespedes' possession demonstrates the close coordination between members and associates of the Enterprise and Company A.) The document shows the signature firms that the Enterprise retained, whether the firms are under contract, the contract price, and the status of payments, which reflected payments of $431,750 by July 29, 2019.

212. A review of Generation Now's subpoenaed bank records and Clark's toll records corroborate his statements and the contents of the spreadsheet. Generation Now bank records confirm that payments were made from the Generation Now bank accounts. The records further show that some of these firms, along with other petition firms, received additional payments in the fall of 2019.

213. Further, Clark's toll records show contact with some of these firms around the same time period. For example, on July 23, 2019, the same day that Generation Now wired one firm $75,000, Clark's toll records show he had multiple contacts with a founding member of the firm. Similarly, Clark placed calls to an executive of Petitioner Signature Services Co 3 on July 22 and 29, 2019, in close proximity to Generation Now's wire of $50,000.[46]

214. These wires also are consistent with text message exchanges recovered during the investigation. On June 19, 2019, while HB 6 was still pending in the Ohio Senate, Cespedes told Longstreth that "*Borges mentioned this morning that opposition has engaged signature gathers. Not sure who or if it's real. Just want you to be aware.*" As explained above, about a week later, on June 26, 2019, while HB6 was still pending in the Senate, Cespedes and Longstreth discussed the need to hire signature firms and that Cespedes would "up" the budget if necessary:

---

[46] Petition Signature Services Co 3 received approximately $6,205,154 from Generation Now between July 2019 and October 2019. Phone records also show Jeff Longstreth had phone contact with the same executive during the same time period.



215.  Less than an hour later, Clark sent Longstreth a message stating, *"I have a new list to send you."* Clark then texted Longstreth an excel spreadsheet listing various petition gathering firms, which included firms that received wires from Generation Now a month later as indicated by Clark on the recording.

### E. The Enterprise Bribes an Employee of Ballot Initiative for Inside Information

216.  Based on my training, experience, and the investigation in this case, in order defeat the Ballot Campaign and ensure HB 6 went into effect in October 2019, the Enterprise would benefit from real-time information about how successful the signature collection effort was in order to best allocate their resources.  However, the investigation revealed that the Enterprise's own daily, internal estimates about the signature collection were not adding up to the numbers claimed by the ballot initiative proponents.

217.  Indeed, during the September 23, 2019 recorded dinner party, Clark explained, in the presence of Householder, how the Enterprise was addressing the ballot campaign:

> *Every day we send out a crew of 235 people and we survey about 2600 sites . . . and we stay there to see if they have people there . . . so then we do every day do a report estimating how many signatures they've done . . . [they now have about 80 people collecting signatures] . . . how many signatures do you think you can collect in an hour;  how many can you collect in a shift; they were working in the first few weeks 10 hours shifts, most people just working 6;  so in all the math that was done, they weren't getting where they were, so we kept saying it wasn't right,  until last week they started advertising they needed more people; they went to some of our subs, they couldn't get any of our A class subs . . .*

71

As this conversation shows, until the previous week, the Enterprise could not determine the reason for the discrepancy between their numbers and the numbers claimed by the signature gatherers. Thus, they needed inside information about the ballot initiative.

218.    The Enterprise attempted to obtain such information by utilizing Borges to bribe CHS 1, who was associated with the Ballot Campaign. CHS 1 was employed by Ballot Campaign in its efforts to repeal HB 6 through a ballot initiative. CHS 1 has provided reliable information proven credible through multiple sources. CHS 1 managed signature collectors. As described below, Borges offered to and did pay CHS 1 to provide inside information about the Ballot Campaign such as the number of signatures collected, the number of collectors, and geographic focus of collection efforts. CHS 1 was upset about Borges' solicitation and contacted the FBI after meeting with Borges in early September. Thereafter, CHS 1 recorded his conversations with Borges, including Borges' payment of $15,000 to him.

219.    On or about September 1, 2019, Borges contacted CHS 1 and, during a meeting the next day, offered a substantial amount of money for inside information that Borges would use for his client to defeat the referendum campaign. Specifically, according to CHS 1, Borges offered that if CHS 1 provided inside information, Borges would provide CHS 1 with monetary payments, a job, or agree to pay CHS's debts. Borges further indicated that others are getting "fat" off the HB 6 issue, so they might as well benefit, too. Then Borges asked CHS 1 to think about the offer and get back to him. Borges initially reached out to CHS 1 just two days after the Ohio Attorney General approved the ballot language and just weeks after Generation Now wired over a million dollars of Company A money to Borges' LLC, 17 Consulting.

220.    In a text message following the meeting, CHS 1 told Borges he could not accept the bribe payment. These text messages were provided to me. Specifically, CHS 1 told Borges, "*I've thought about it. I don't need overnight.*" CHS 1 went on: "*At the beginning of this I thought I could walk my information into Larry's office and sell it for enough to retire on.*'" CHS 1 continued, he "*would LOVE to have those wiped out, to be debt free, and not to have to worry... but, I can't put a price tag on my integrity or my word.*" CHS 1 explained that he could not "*sell this team down the river,*" concluding: "*So. It may not land me in the car, house, job, or financial situation I want to be in – but I couldn't face myself if I did anything but work for this and do it honestly.*" Borges responded that he understood, but made clear his intent: "*No matter what – don't ever tell anyone about our conversation from earlier.*"

221.    At the direction of the FBI, CHS 1 reconnected with Borges and expressed interest in Borges' offer. During telephonic contact between the two, Borges advised CHS 1 that he would need to evaluate how to move forward. Borges followed up asking for CHS's employment contract and stating, "*I'll make an offer to buy you out. It will be substantial.*" Operating at the direction of agents, CHS 1 responded, "*What will a buyout entail? Like. . .  what would I be doing, work-wise?*" Borges responded simply*, "Give me a day or two to figure this out."* Borges then started soliciting CHS 1 for inside information about Ballot Campaign. For example, Borges texted: "*Have you guys started door to door?*" Borges and CHS 1 then had the following exchange:



CHS 1 then provided a limited amount of inside information—the "ballpark" vote count for one region in the state. Borges responded, "*Got it. I'll get this done.*"

222. These messages indicate that the *substantial* "buy out" Borges previously offered was tied to sensitive information the CHS 1 would provide about the Ballot Campaign. Borges made clear that he was working on behalf of a group of individuals, and that Borges needed inside information—the signature count, for example—to "*nail down the opportunity*" because "*they just want to know they have the right source.*"

223. A series of text message exchanges followed, during which Borges and CHS 1 set a time to meet in person. In one of those messages Borges stated, "*I've gotten more clarity. Protects you.*" In another, Borges texted, "*I promise this will be worth your while.*"

224. CHS 1 eventually met with Borges on September 10, 2019 to discuss the deal. The meeting was recorded. Borges framed the exchange as a private transaction between the two of them that no one would know—despite the prior solicitation and text messages, which made clear that Borges was working on behalf of others. But Borges' true motivations became clear, and demonstrate how much Borges and the Enterprise wanted inside information about the Ballot Campaign. For example, when CHS 1 asked how the deal would work, Borges told CHS 1 that it would help to know locations in advance and they "*really need to know how many signatures you have.*" Borges then asked CHS 1 whether he had access to the statewide numbers or only his region. Borges also stated that he and his firm were working for Company A on the ballot project, and that Householder, Company A, and Borges' firm formed an "*unholy alliance.*"

225. On September 13, 2019, during a consensually recorded meeting, Borges gave CHS 1 a $15,000 check, funded entirely by Company A-to-Generation-Now money. Although in initial conversations Borges had indicated that the money was an advance for insider information to defeat Ballot Campaign, when Borges handed the check to CHS 1, he said that it was Borges's own money, that no one knew about the transaction, and that it was for the CHS 1's help in planning a reunion amongst former staffers. This contradicted what Borges had previously stated. Showing his corrupt intent, Borges also told the CHS that if this transaction came to light, it would be bad for both CHS 1 and Borges—in fact, Borges told CHS 1 he would "blow up" the CHS's house if the information got out, a threat that CHS 1 treated as a joke. Borges then proceeded to ask CHS 1 about the number of signature collectors working on behalf of the ballot campaign. Borges also made numerous statements about the Enterprise, including identifying Householder, Clark, and Longstreth as being involved. For example, Borges stated, "*Larry was putting the squeeze*" on Associate 3, Generation Now's spokesperson, and would not allow Associate 3 to quit; Clark was serving as Householder's proxy; and that it was "*insane*" how much Enterprise members were making off Company A. Borges also described being present when Enterprise members met with Company A executives to look at advertisements, and driving the Company A CEO to see signature collectors who were working on behalf of the Ballot Campaign.

226. On multiple occasions following the meeting, Borges reached out in recorded phone calls and text messages to CHS 1 to receive the same type of insider information relating to signature collection to repeal HB 6 that Borges offered payment for during their conversation on September 1. For example, Borges sent CHS 1 the following messages, among others:

> We were told you guys had 120,000 signatures. Any idea if that's right?
>
> Any idea how many total signatures you guys have? We were told 80,000 today.
>
> Any intel you have would make me a hero. Thanks.

And, despite repeatedly asking for inside information after paying the CHS 1 $15,000 in Company A-to-Generation-Now money, Borges never again mentioned CHS 1 performing any specific work unrelated to the Ballot Campaign.

227. Other evidence corroborates that Borges' actions were in furtherance of the Enterprise's efforts to defeat the Ballot Campaign. Significantly, around the same time that Borges was in contact with the CHS 1, Borges was in contact with Cespedes. Specifically, on September 1, 2019, Borges' cellphone contacted Cespedes' cellphone around 5:14PM. That call lasted for approximately 28 minutes. Less than ten minutes after that call, Borges called CHS 1 and spoke to the CHS for nine minutes. Within one minute of the completion of the call with CHS 1, Borges attempted to call Cespedes, who did not answer. They eventually connected 10 minutes later and toll records show the call lasted for 25 minutes and 30 seconds. Within one minute of the

completion of that call, Borges then called Associate 4, of Front Company.[47] Toll records also show that Borges was in regular contact with Clark, Longstreth, and Cepedes during this period.

228.     Moreover, as set forth above, bank records obtained via grand jury subpoena show that the $15,000 came from Generation Now, by way of an account Borges opened in August 2019 under the name of 17 Consulting Group LLC.  Borges registered "17 Consulting Group LLC" with the Ohio Secretary of State on August 5, 2019.  Two days later, Borges opened a bank account under the name "17 Consulting Group LLC."  Bank records indicated that Borges is the only signatory on the account and opened the account as President/Owner/CEO of 17 Consulting Group LLC.  A day after Borges opened the account, Generation Now wired $400,000 into the account. In fact, Generation Now wired a total of $1.15 million into the account between August 8, 2019, the day the account was opened, and September 13, 2019, the day CHS 1 was given the aforementioned $15,000 check.  During that period, aside from $100 Borges deposited when he opened the account, Generation Now was the sole source of deposits.  In addition to the $15,000 check to CHS 1, the bank records show that, on September 16, 2019, three days after the $15,000 check was given to CHS 1, a check for $100,000 was written to 614 solutions LLC, which is an Ohio business registered to Juan P. Cespedes.

## F.  The Enterprise Bribes Signature Collectors

229.     In addition to attempting to bribe CHS 1, the Enterprise tried to subvert the Ballot Campaign's efforts by bribing signature collectors working on behalf of the Ballot Campaign . Specifically, through intermediaries, the Enterprise offered Ballot Campaign signature collectors approximately $2500 and plane fare to stop collecting signatures and provide inside information relating to the Ballot Campaign's HB 6 referendum efforts.  The payment was split into two segments—half upon signing a contract with Front Company and half upon proof the plane fare was used to fly home, away from Ohio.  The Enterprise believed that if it could reduce the number of people collecting signatures for the Ballot Campaign, they could ensure the Ballot Campaign would fail to collect the requisite number of signatures.

230.     Clark outlined this very strategy during the recorded dinner conversation on September 23, 2019.  Concerned that the Ballot Campaign would collect enough signatures, Clark explained, "*so we have to go out on the corners and buy out their people every day. We started doing that today and everybody's having a fucking shit fit.*"  When questioned about the logistics of the operation, Clark was very coy, but explained that they have 235 spotters in the field and that the spotters call and say people are here and then others go buy them off.  Clark continued, "*if we knock off 25 people, collecting signatures, it virtually wipes them out in next 20 days; this ends the whole fucking thing, ends in, that's how hard it is, in addition to the TV, the direct mail, and everything else. . . .*"  It was at this point in the conversation, when Householder interrupted, as explained above, and said, "*It is so important, it is so important, that they are not successful, because when the legislature votes on something it needs to stay law.*"

231.     Toll records show that Clark was not exaggerating during the dinner.  Following the dinner, Clark had 45 contacts with Contractor 1, a principal of Petition Signature Services Co 2, who markets himself/herself as a leading expert in ballot initiative access and strategy.  The

---

[47]     https://www.dispatch.com/news/20190828/nuclear-bailout-supporters-cry-chinese-conspiracy-but-get-funding-from-same-bank.

contacts occurred in October 2019, when as, explained below, "Meghan" and "Marcus" were contacting and trying to bribe signature collectors working for the ballot initiative.

232.     With the money wired from Generation Now to Front Company, the Enterprise paid the Petition Signature Services Co 2 over $600,000 in October 2019.  The same day as the first wire transfer from Front Company to the Petition Signature Services Co 2, Signature Collector 1 for the Ballot Campaign received the following unsolicited text message from "Meghan," which toll records identify as Contractor 1:



233.     The following day, "Marcus" purportedly from Front Company, contacted Signature Collector 1, Signature Collector 2, and Signature Collector 3, via text (copied below) and several other signature collectors.  The subscriber records for "Marcus's" telephone number show contact with these signature collectors on the date and time in question.  Moreover, "Marcus" had contact with Contractor 1 around the same time



234.    The text messages copied above were attached as exhibits to the sworn statements of Signature Collectors 1, 2, and 3 in a lawsuit filed by proponents of the Ballot Campaign, claiming among other things, interference by Front Company.  While working for the Ballot Campaign, Signature Collector 2 explained in his/her affidavit that after he/she received the text message, he/she spoke to "Marcus" briefly but hung up before he gave the details of the offer. Signature Collector 3's sworn affidavit states that after he/she received the text, "Marcus" called him/her and offered him/her a plane ticket home and $2500 split into two parts. Three other affidavits were filed in support of the lawsuit, demonstrating similar communications with "Marcus" who identified himself as working on behalf of Front Company, one of which was accompanied by a recording of the call, described the same offer as Signature Collector 3, and included a proposed contract (described below) that "Marcus" sent.

235.    The contract attached to one of the affidavits described the "services" to be provided as follows:  "*provide statewide ballot issue advice and expert consultation on Ohio statewide ballot measures and the associated petition circulation and signature collection matters related to the referendum of HB 6 related issues, which occurs within a 90 day period upon enactment HB 6.*"  This shows that the Enterprise was again paying agents of the ballot campaign for inside information relating to the Ballot Campaign to hurt the campaign's efforts.

236.    Each affidavit disclosed that the signature gatherer had completed an Ohio Secretary of State "Form 15" as required by Ohio law, which included their name and telephone number.  These forms were filed with the Ohio Secretary of State.  Significantly, the investigation shows that the Enterprise likely had access to those forms.  During the recorded conversation on September 23, 2019, which preceded the above text messages from "Meghan" and "Marcus," Clark and Householder referred the forms.  In the context of explaining the mailer, which alleged the signature gatherers were criminals, Representative 8 asked, "*how do you know they have arrests?*"  Householder responded that "*they have to sign up and when they sign up we run a background check.*"  Based on my training and experience and the investigation to date, "sign up" is likely a reference to the Form 15.

237. The Enterprise having access to the Form 15s is consistent with subpoenaed records. Bank records for Borges' 17 Consulting account show that he paid a private investigations firm, over $177,880 between September 13 and October 15, 2019. The last check Borges paid to the investigation firm indicated that it was for "10/8/19," which is the same date of Contractor 1's texts to one of the above signature collectors. This information is consistent with what Householder's statements on September 23, 2019.

238. Moreover, any ambiguity as to Marcus' affiliation when he attempted to bribe the signature collectors is resolved by one of the affidavits filed in federal court, which included a copy of the contract sent by "Marcus" to the signature collectors. The contract confirmed that the contracting party was Front Company and confirmed the cash buyout in the affidavits: $2500, split into two payments: One half (50%) immediately upon execution of this Agreement and One half (50%) *immediately following the fulfillment of initial instructions shared with you through additional conversations with a representative from [Front Company]...*" The contract was signed by Longstreth on behalf of Front Company and further required that notices be sent to:

Generation Now
c/o Jeff Longstreth
Columbus, OH
jefflongstreth@gmail.com

239. The contract further had a confidentiality requirement aimed at concealing both Generation Now and the agreement itself, showing the Enterprise's role in bribing the signature collectors. The confidentiality provision prohibited the signature collector from disclosing: "(a*) the identity of GenNow*; (b) that [name] has been engaged by the [Front Company] to perform the Services described herein, or (c) the existence, terms, provisions, or conditions of this Agreement or the agreement with [Front Company]."[48] Again, the "Services" included providing inside information relating to the campaign to overturn HB 6.

240. Like the Enterprise's efforts to pass HB 6, the Enterprise was working closely with Company A to defeat the ballot initiative. For example, in September 2019, while the Enterprise was spending millions trying to defeat the Ballot Campaign, Enterprise-Member-and-Company A-1-Lobbyist Borges referenced a meeting between members of the Enterprise and Company A executives, including "the CEO of the company", a few days earlier:

> *I was driving those guys back to the airport and they were like we want to stop and see somebody (a signature gatherer). Well . . . I know for sure there will be one at the Worthington library because there's one there every day. So we stopped and for sure there was one there . . . the guy wants to get out and talk to him. . . . It was the CEO of the company . . . .*

---

[48] Emphasis added.

241.    Later during the conversation, Borges again referenced the meeting with Company A, stating, "*I had the Company brass there – and they were up at [redacted] looking at ads, I mean, Dispatch calls our ads a lie today.*"  Again, as set forth above, in a prior conversation, Borges described Householder's interest in the bailout and his firm's relationship with Company A as "*an unholy alliance.*"  This shows the Enterprise working with Company A to discuss strategy for defeating the ballot initiative, to include bribing and paying off employees and signature collectors for the ballot campaign.

242.    Toll records also show frequent and close contact between the Enterprise and Company A during this period in which, Company A paid the Enterprise over $38 million.  For example, on October 10, 2019, Longstreth had multiple phone contacts with a person associated with Energy Pass-Through, the same day that Company A Service Co. wired $10 million to Energy Pass-Through, which then wired $10 million to Generation Now.

243.    The Enterprise's efforts were a success:  on October 21, 2019, the Ballot Campaign failed to collect enough signatures, and HB 6 went into effect.  Householder celebrated enactment of the law through an October 21, 2019 press release, in which he noted expressly that the new law would bailout Company A's failed nuclear power plants.  Specifically, Householder stated:  "*I am pleased that House Bill 6 will go into effect at midnight tonight and am confident it will produce positive results for Ohio.*"  Among the benefits of the bill, Householder highlighted, "*First, HB 6 will save the operation of two Ohio nuclear power plants.*" (Emphasis added.)

244.    The next day, Energy Pass-Through wired $3 million to Generation Now, which wired $2,921,000 to JPL's main account two days later.  That money and some of the Company A-to-Generation Now money remaining in other accounts were consolidated into Longstreth-controlled accounts, which personally benefitted Longstreth and Householder.  For example, on or about January 13, 2020, Longstreth wired $1 million to his brokerage account.  After the transfer, over $5 million remained in Longstreth-controlled accounts.

245.    Similarly, between September and December, Householder used $101,825 in Company A-to-Generation Now payments funneled through Longstreth-controlled accounts to pay for costs associated with his residence in Florida.  This was in addition to payments made to settle Householder's personal lawsuit in 2017 and 2018, and to pay off approximately $20,000 in credit card debt owed by Householder in 2020.

246.    On January 22, 2020 and February 6, 2020, Generation Now wired to the Coalition a total of $1,010,000, which then transferred the money to PAC.  According to FEC filings, PAC spent $1,039,131.11 between February and March on legal services, bank fees, polling, research, direct mail services, advertising via TV, radio and digital, and media production.

247.    Additionally, bank records show that on February 13, 2020, Generation Now wired the Coalition an additional $250,000. Subsequent to that transfer, Generation Now's funds were replenished by a $2,000,000 wire transfer from Energy Pass-Through on March 3, 2020.  This occurred shortly after Company A-1 was divested from Company A Corp. as a result of the bankruptcy proceedings, which was premised in part on the financial solvency of Company A-1 due to HB 6.  In May 2020, Company A-1 announced a $300 million buyback plan, whereby

Company A-1 would spend $300 million repurchasing shares from shareholders thereby boosting stock prices.[49]

## CONCLUSION

248.   The above facts establish probable cause that Householder's Enterprise is an association-in-fact enterprise affecting interstate commerce, and the Defendants conspired to participate in the conduct of the affairs of the enterprise by agreeing that a co-conspirator would commit a pattern of racketeering activity.   To summarize, while operating together—and functioning as Householder's "team"—the Defendants enriched themselves and increased Householder's political power by:  engaging in a scheme to defraud the public of the honest services of Householder, involving the receipt of millions of dollars in secret bribe payments through Householder's 501(c)(4) account in return for Householder taking official action to help pass a legislative bailout for two nuclear power plants; bribing and attempting to bribe individuals working on behalf of the Ballot Campaign in an attempt to receive inside information and defeat the Ballot Campaign; and concealing the scheme, their illegal activity, and the source of the funds by transferring the Company A-to-Generation-Now payments through other controlled entities and knowingly engaging in monetary transactions with the proceeds.

249.   Based on the forgoing, I request that the Court issue the proposed criminal complaint, and arrest warrants for the individuals listed below, as there is probable cause to believe **LARRY HOUSEHOLDER**, **JEFFREY LONGSTRETH**, **NEIL CLARK**, **MATTHEW BORGES, JUAN CESPEDES,** and **GENERATION NOW** have violated 18 U.S.C. § 1962(d) (Conspiracy to Participate, Directly or Indirectly, in the Conduct of an Enterprise's Affairs through a Pattern of Racketeering Activity).

---

[49] Ohio nuclear bailout beneficiary OKs extra stock buybacks: Capitol Letter, 2020 WLNR 13486449 (May 13, 2020); https://www.cleveland.com/open/2020/05/with-ohio-bailout-law-secured-firstenergy-solutions-successor-moves-to-increase-share-buybacks-by-300-million.html.

## REQUEST FOR SEALING

250.    I further request that the Court order that all papers related to this application, including the affidavit, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

Blane J. Wetzel
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on _____ July 17 _____, 2020 **via Facetime Video.**

STEPHANIE K. BOWMAN
UNITED STATES MAGISTRATE JUDGE

# EXHIBIT 2

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

|  |  |
|---|---|
| **UNITED STATES OF AMERICA,** | **CASE NO.** ___1:21-cr-86___ |
| **Plaintiff,** | |
| **vs.** | **JUDGE BLACK** |
| **FIRSTENERGY CORP.,** | **DEFERRED PROSECUTION AGREEMENT** |
| **Defendant.** | |

The United States Attorney's Office for the Southern District of Ohio ("USAO-SDOH" or "government") and the Defendant, FirstEnergy Corp., by its undersigned representative and counsel, pursuant to the authority granted by the Board of Directors, agree as follows:

1.   **Criminal Information and Acceptance of Responsibility:**   FirstEnergy Corp. acknowledges and agrees that the government will file the accompanying Information in the United States District Court for the Southern District of Ohio charging FirstEnergy Corp. with conspiracy to commit honest services wire fraud in violation of Title 18, United States Code, Sections 1343, 1346, 1349.  FirstEnergy Corp. knowingly waives any right to indictment on this charge, as well as all rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b), and agrees to the filing of a joint motion to toll Section 3161 upon the filing of this Agreement.

FirstEnergy Corp. admits, accepts, and acknowledges that it is responsible under United States law for the acts of its current and former officers, employees, and agents. FirstEnergy Corp. admits, accepts, and acknowledges that it is responsible under United States law for the acts as charged in the Information and as set forth in the Statement of Facts, attached as Attachment A and incorporated by reference into this Agreement, and that the facts alleged in the Information and described in the Statement of Facts are true and accurate.

Should the USAO-SDOH pursue the prosecution that is deferred by this Agreement, FirstEnergy Corp. agrees that it will neither contest the admissibility of nor contradict the Statement of Facts in any such proceeding, including any trial, guilty plea, or sentencing proceeding. Neither this Agreement nor the criminal Information is a final adjudication of the matters addressed in such documents.

2.   **Elements of the Offense:**  The elements of the offense set forth in the Information, to which the Defendant agrees are established by the Statement of Facts, attached as Attachment A, are as follows:

any criminal proceeding brought by the government against FirstEnergy Corp. or its affiliates or subsidiaries; and (b) FirstEnergy Corp. or its affiliates or subsidiaries shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that any such statements or testimony made by or on behalf of FirstEnergy Corp. or its affiliates or subsidiaries prior or subsequent to this Agreement, or any leads or evidence derived therefrom, should be suppressed or are otherwise inadmissible. The decision whether conduct or statements of any current director, officer or employee, or any person acting on behalf of, or at the direction of, FirstEnergy Corp. or its affiliates or subsidiaries, will be imputed to FirstEnergy Corp. for the purpose of determining whether FirstEnergy Corp. has violated any provision of this Agreement shall be in the sole discretion of the government.

8.   **Limitations of Agreement:** This agreement is binding upon FirstEnergy Corp. and the USAO-SDOH and does not bind (a) other components of the Department of Justice, (b) other federal agencies, (c) any state or local law enforcement or regulatory agency. However, the USAO-SDOH will bring the cooperation of FirstEnergy Corp. and its compliance with its obligations under this Agreement to the attention of any such authorities or agencies if requested to do so by FirstEnergy Corp.

9.   **Notice:** Any notice to the government under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service, addressed to the United States Attorney's Office for the Southern District of Ohio, 221 East Fourth Street, Suite 400, Cincinnati, OH 45213. Any notice to FirstEnergy Corp. shall be given by personal delivery, overnight delivery by a recognized delivery service, addressed to Chief Executive Officer, FirstEnergy Corp., 76 South Main Street, Akron, OH 44308, with Copy to the Chief Legal Officer, FirstEnergy Corp., 76 South Main Street, Akron, OH 44308.

10.   **Entire Agreement:** This agreement, along with any attachment(s), is the complete agreement between the parties. It supersedes all other promises, representations, understandings, and agreements between the parties. No amendments, modifications, or additions to this Agreement shall be valid unless they are in writing and signed by the government, the attorneys for FirstEnergy Corp., and a duly authorized representative of FirstEnergy Corp.

VIPAL J. PATEL
Acting United States Attorney

*Emily N. Glatfelter / Matthew C. Singer*
EMILY N. GLATFELTER
MATTHEW C. SINGER
Assistant United States Attorneys

11

## CORPORATE OFFICER'S CERTIFICATE

I have read this Agreement and carefully reviewed every part of it with outside counsel for FirstEnergy Corp. I understand it, I voluntarily agree to it, on behalf of FirstEnergy Corp. Before signing this Agreement, I consulted outside counsel for FirstEnergy Corp. Counsel fully advised me of the rights of FirstEnergy Corp., of possible defenses, of the applicable Sentencing Guidelines' provisions, and of the consequences of entering into this Agreement.

I also carefully reviewed the terms of this Agreement with the FirstEnergy Corp. Board of Directors. I have advised and caused outside counsel for FirstEnergy Corp. to advise the Board of Directors fully of the rights of FirstEnergy Corp., of possible defenses, of the applicable Sentencing Guidelines' provisions, and of the consequences of entering into the Agreement. I acknowledge, on behalf of FirstEnergy Corp., that I am completely satisfied with the representation of counsel.

By signing below, I certify that no promises or inducements have been made other than those contained in this Agreement. Furthermore, no one has threatened or forced me, or any other person authorized this Agreement on behalf of FirstEnergy Corp., in any way to enter into this Agreement. I also certify that I am an officer of FirstEnergy Corp. and that I have been duly authorized by FirstEnergy Corp. to execute this Agreement on behalf.


July 20, 2021
_____
Date

_____
Steven E. Strah, President & CEO
FIRSTENERGY CORP.

12

## CERTIFICATE OF COUNSEL

We are counsel for FirstEnergy Corp. in the matter covered by this Agreement.  In connection with such representation, we have examined carefully the relevant FirstEnergy Corp. records and have discussed the terms of this Agreement with Steven E. Strah, President & Chief Executive Officer, and the FirstEnergy Corp. Board of Directors.  Based upon our review of the foregoing matters and discussions with FirstEnergy Corp. and its Board of Directors, we are of the opinion that the representative of FirstEnergy Corp. has been duly authorized to enter into this Agreement on behalf of FirstEnergy Corp. and that this Agreement has been duly and validly authorized, executed, and delivered on behalf of FirstEnergy Corp. and is a valid and binding obligation of FirstEnergy Corp..  Further, we have carefully reviewed the terms of this Agreement with the FirstEnergy Corp. Board of Directors and the Chief Executive Officer of FirstEnergy Corp. We have fully advised them of the rights of FirstEnergy Corp., of possible defenses, of the Sentencing Guidelines' provisions and of the consequences of entering into this Agreement. To our knowledge, the decision of FirstEnergy Corp. to enter into this Agreement, based on the authorization of its Board of Directors, is an informed and  voluntary one.


July  20,  2021
Date

Stephen G. Sozio
James R. Wooley
Adam Hollingsworth
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH 44114
Phone: +1.216.586.3939
sgsozio@jonesday.com
jrwooley@jonesday.com
ahollingsworth@jonesday.com
*Attorneys for FirstEnergy Corp.*

**ATTACHMENT A:**
<u>**STATEMENT OF FACTS**</u>

*The United States and FirstEnergy Corp. stipulate and agree that if this case proceeded to trial, the United States would prove the facts set forth below beyond a reasonable doubt. They further stipulate and agree that these are not all of the facts that the United States would prove if this case had proceeded to trial.*

The following Statement of Facts is incorporated by reference as part of the Deferred Prosecution Agreement (the "Agreement") between the United States Attorney's Office for the Southern District of Ohio and FirstEnergy Corp. FirstEnergy Corp. hereby agrees and stipulates that the following information is true and accurate. FirstEnergy Corp. admits, accepts, and acknowledges that it is responsible for the acts of its current and former officers, directors, employees, and agents. FirstEnergy Corp. admits, accepts, and acknowledges that it is responsible for the conduct set forth below.

FirstEnergy Corp. is an Akron, Ohio–based public utility holding company. During the relevant period (2016 until in or about February 2020), FirstEnergy Corp. was the parent company to entities involved in energy generation, including the entity formerly known as FirstEnergy Solutions ("FES"). As of November 16, 2016, FES had a separate and independent Board of Directors from FirstEnergy Corp., and on March 31, 2018, FES filed for Chapter 11 bankruptcy protections. FirstEnergy Corp. also serves as the parent company for FirstEnergy Service Company ("FirstEnergy Service"), which provided financial and other corporate support services to FirstEnergy Corp. and its subsidiaries.

FirstEnergy Corp. and its subsidiaries are subject to civil enforcement by the Securities and Exchange Commission ("SEC"), and are regulated directly by the Federal Energy Regulatory Commission ("FERC"), which is an independent agency within the United States Department of Energy ("DOE"). FirstEnergy Corp.'s Ohio utility subsidiaries are regulated directly by the Public Utilities Commission of Ohio ("PUCO").

I.    **Relevant Entities and Individuals**

Executive 1 served in senior executive positions for FirstEnergy Corp. and FirstEnergy Service from approximately 2015 to October 2020.

Executive 2 served in a senior executive position from approximately 2011 until October 2020.

Partners for Progress, Inc. was incorporated in Delaware on or about February 6, 2017, weeks after certain FirstEnergy Corp. senior executives traveled with Public Official A on the FirstEnergy Corp. jet to the presidential inauguration in January 2017.  On or about February 8, 2017, Partners for Progress registered as a foreign nonprofit corporation in Ohio, specifically as a 501(c)(4) entity "to engage in activities consistent with those permitted of an organization exempt from tax under Section 501(c)(4) of the Internal Revenue Code.…"

Although Partners for Progress appeared to be an independent 501(c)(4) on paper, in reality, it was controlled in part by certain former FirstEnergy Corp. executives, who funded it and directed its payments to entities associated with public officials.  For example, FirstEnergy Corp. executives directed the formation of Partners for Progress and decided to incorporate the entity in Delaware, rather than Ohio, because Delaware law made it more difficult for third parties to learn background information about the entity.  Certain FirstEnergy Corp. executives were also involved in choosing the three directors of Partners for Progress, two of whom were FirstEnergy Corp. lobbyists.  Before Partners for Progress was formally organized, Executive 2 directed that $5 million be designated for an unnamed 501(c)(4) in December 2016.

FirstEnergy Corp. exclusively funded Partners for Progress through payments from FirstEnergy Service, which totaled approximately $25 million between 2017 and 2019, approximately $15 million of which was paid to Generation Now.  Certain former FirstEnergy

Corp. executives directed Partners for Progress to make payments in 2018, 2019, and 2020, including payments to Generation Now, which helped conceal FirstEnergy Corp. as the source of the payments from the public.

Public Official A represented the State of Ohio's 72 District in the Ohio House of Representatives since January 2017. Public Official A served as the Speaker of the Ohio House of Representatives from January 7, 2019 to July 30, 2020.

Between 2017 and March 2020, FirstEnergy Service paid more than $59 million ($16,904,330.86 attributed to FirstEnergy Corp. and $43,092,505 attributed to FES) to Generation Now – a purported 501(c)(4), which FirstEnergy Corp. knew was operated for the benefit of and controlled by Public Official A, upon its inception in early 2017. For example, on March 7, 2017, Individual A emailed wiring instructions for Generation Now to Executive 2, noting that "*[t]his is the organization that [Executive 1] and [Public Official A] discussed.*" In response, Executive 2 forwarded the email internally, and carbon copied Individual A, stating, "*Let's do $250,000 asap and we will do $1M by year-end 2017.*" Similarly, on August 1, 2017, Executive 2 asked, "*Are we at $500k for the c(4) now?*" to which Individual A replied, "*Yes.*"

Public Official B was the Chairman of the Public Utilities Commission of Ohio ("PUCO") from April 2019 until November 21, 2020, when he resigned. PUCO regulates FirstEnergy Corp.'s Ohio utility subsidiaries. Prior to serving as the Chairman of PUCO, Public Official B worked for a private law firm and served as the general counsel for an industrial group of energy users whose interests often conflicted with FirstEnergy Corp.'s interests. Public Official B also was the sole owner of Company 1 and Company 2, both of which entered a contract with FirstEnergy Corp. in 2010. Public Official B, through Company 1, also entered into a consulting services agreement with FirstEnergy Corp., through FirstEnergy Service, in 2013. Between 2010 and January 2, 2019,

16

FirstEnergy Corp. paid the Company 1 and Company 2 over $22 million, including $4,333,333, which was wired on or about January 2, 2019, through FirstEnergy Service to Company 1 for Public Official B's benefit.

### II.    Conduct

FirstEnergy Corp., through the acts of its officers, employees, and agents, conspired with public officials and other individuals and entities to pay millions of dollars to and for the benefit of public officials in exchange for specific official action for FirstEnergy Corp.'s benefit.

FirstEnergy Corp. paid millions of dollars to Public Official A through his 501(c)(4), Generation Now, in return for Public Official A pursuing nuclear legislation for FirstEnergy Corp.'s benefit in his capacity as a public official. Use of 501(c)(4) entities was central to the scheme because it allowed certain FirstEnergy Corp. executives and co-conspirators to conceal from the public the nature, source, and control of payments to and for the benefit of Public Official A.

FirstEnergy Corp. paid $4.3 million dollars to Public Official B through his consulting company in return for Public Official B performing official action in his capacity as PUCO Chairman to further FirstEnergy Corp.'s interests relating to passage of nuclear legislation and other specific FirstEnergy Corp. legislative and regulatory priorities, as requested and as opportunities arose.

Primary among FirstEnergy Corp.'s priorities was the passage of nuclear legislation. FirstEnergy Corp. sought official action from Public Official A and Public Official B in the form of helping draft nuclear legislation that would further the interests of FirstEnergy Corp. and FES and by pressuring and advising public officials to support nuclear legislation for FirstEnergy Corp.'s and FES's benefit. FirstEnergy Corp. prioritized nuclear legislation in part because of the

"decoupling" provision in House Bill 6 that was pursued by FirstEnergy Corp., along with FirstEnergy Corp.'s interest in bailing out the Ohio nuclear plants. The decoupling provision allowed FirstEnergy Corp.'s Ohio electric distribution subsidiaries to receive a fixed amount of distribution-related revenue from residential and commercial customers based on the 2018 collection period, which was a year of high electricity sales for FirstEnergy Corp. In addition, the decoupling provision enacted by House Bill 6 allowed FirstEnergy Corp. to continue to recover lost distribution revenue ("LDR") in a fixed amount based on its 2018 LDR recovery, despite the elimination of energy efficiency programs in House Bill 6. Decoupling therefore would guarantee FirstEnergy Corp.'s Ohio electric distribution subsidiaries a fixed amount of revenue by tying its distribution revenue to the 2018 level and continued collection of LDR.

FirstEnergy Corp. also relied on Public Official B to help FirstEnergy Corp. address its concern that the future earning power of its Ohio utility subsidiaries would be negatively impacted by the rate distribution case scheduled for 2024. The electric security plan ("ESP") that FirstEnergy Corp. and its relevant entities were operating under—ESP IV—was set to terminate in 2024, at which time FirstEnergy Corp. would be required to file a new rate case. FirstEnergy Corp. believed that the expiration of ESP IV and filing of the new rate case in 2024 would result in decreased revenue and negatively impact FirstEnergy Corp.'s financial outlook, and therefore, sought a "*fix for the Ohio hole.*" In November 2019, under Public Official B's leadership, PUCO terminated the requirement of FirstEnergy Corp.'s Ohio electric distribution subsidiaries to file a new rate case in 2024.

### A. Relevant Background

In 2016, FirstEnergy Corp. reported a bleak outlook with respect to its energy generation business. In its November 2016 Form 10-Q, FirstEnergy Corp. reported a weak energy market,

poor forecast demands, and hundreds of millions of dollars in losses, particularly from its nuclear energy affiliate, FES. FirstEnergy Corp. announced future options for its generation portfolio as follows: legislative and regulatory solutions for generation assets; asset sales and plant deactivations; restructuring debt; and/or seeking protection under U.S. bankruptcy laws for its affiliates involved in nuclear generation. FirstEnergy Corp. repeated these options in its 10-K filed on February 21, 2017 and reported a "*substantial uncertainty as to FES' ability to continue as a going concern and substantial risk that it may be necessary for FES, and possibly FENOC, to seek protection under U.S. bankruptcy laws, which would have a material adverse impact on FirstEnergy's and FES' business, financial condition, results of operations and cash flows.*" FirstEnergy Corp. further noted that,

> [b]ased upon continued depressed prices in the wholesale energy and capacity markets, weak demand for electricity and anemic demand forecasts, FES' cash flow from operations may be insufficient to repay its indebtedness or trade payables in the long- term. Although management is exploring capital and other cost reductions, asset sales, and other options to improve cash flow as well as continuing with legislative efforts to explore a regulatory type solution, the obligations and their impact to liquidity raise substantial doubt about FES' ability to meet its obligations as they come due over the next twelve months and, as such, its ability to continue as a going concern.

During FirstEnergy Corp.'s fourth-quarter 2016 earnings conference call on February 22, 2017, Executive 1 focused on legislative and regulatory efforts:

> In Ohio, we have had meaningful dialogue with our fellow utilities and with legislators on solutions that can help ensure Ohio's future energy security. Our top priority is the preservation of our two nuclear plants in the state and legislation for a zero emission nuclear program is expected to be introduced soon. The ZEN program is intended to give state lawmakers greater control and flexibility to preserve valuable nuclear generation. We believe this legislation would preserve not only zero emission assets but jobs, economic growth, fuel diversity, price stability, and reliability and grid security for the region.

> *We are advocating for Ohio's support for its two nuclear plants,*
> *even though the likely outcome is that FirstEnergy won't be the*
> *long- term owner of these assets. We are optimistic, given these*
> *discussions we have had so far and we will keep you posted as*
> *this process unfolds.*

In 2017 and 2018, FirstEnergy Corp. attempted to seek relief for its nuclear power generation facilities through a federal solution for its energy generation business. To further a federal solution, certain FirstEnergy Corp. executives met with federal officials and hired consultants with close connections to federal officials to lobby and assist in securing official action to subsidize the nuclear and coal plants through DOE action and the FERC rulemaking process. FirstEnergy Service also approved a $5,000,000 wire to a 501(c)(4) entity connected to federal official(s), on or about May 1, 2017, shortly after hiring a consultant with close connections to those federal official(s).

By the fall of 2018, FirstEnergy Corp. believed the federal government may not take FirstEnergy Corp.'s requested action. Accordingly, while FirstEnergy Corp. continued conversations about a potential federal solution, they focused on a state solution to save the Ohio nuclear power plants.

### B. Public Official A

#### *The State Solution for the Nuclear Plants*

At the same time FirstEnergy Corp. had been pursuing a federal solution for its Ohio nuclear power plants, FirstEnergy Corp. was pursing state legislation in Ohio to save the power plants through help from Public Official A, including the ZEN (Zero-Emissions Nuclear Resource Program) energy proposals outlined in House Bill 178, Senate Bill 128, and House Bill 381 in 2017, which failed to gain the support necessary for passage before Public Official A became Speaker in 2019. For example, on or about November 5, 2016, Executive 1 told Individual B,

"*Pass on to [Public Official A]. When we were talking on Weds I told him there was gonna be a sense of urgency but couldn't tell him all the details. If we don't move on some type of supplant in first half of 2017 it will be too late. These plants will be shut, sold, or bankrupt. I don't have any contact info for him.*"

Central to FirstEnergy Corp.'s state solution strategy was payments for Public Official A's benefit to Generation Now, which was Public Official A's 501(c)(4), as Public Official A pursued the Ohio House Speakership. The FirstEnergy Corp. payments began in 2017, as Public Official A began executing his strategy to regain the Speakership. This was consistent with the strategy that Executive 2 had outlined in an internal presentation, explaining that 2017 political contributions are "*strictly money spent to influence issues of key importance to FirstEnergy in 2017, such as saving our baseload generation*" and that FirstEnergy Corp.'s "*preferred manner of giving is through section 501(c) groups, as these are considered 'dark money' because they are not required to disclose where the donations come from.*" The presentation noted that "*the bulk of our contribution decisions are to c(4)s.*"

In furtherance of its strategy, in 2017, FirstEnergy Corp., through FirstEnergy Service, wired $1,000,000 to Generation Now consisting of four quarterly payments for Public Official A's benefit, following Public Official A's trip to Washington D.C. with certain FirstEnergy Corp. executives for the inauguration. These payments were intended to contribute to Public Official A's power and visibility for the speakership and allowed him to support other candidates who would in turn support his speakership.

In return, FirstEnergy Corp. expected and intended that Public Official A and his team would further FirstEnergy Corp.'s efforts to save the power plants. Throughout 2017, FirstEnergy Corp. executives discussed with members of the Public Official A team ways in which Public

Official A could assist with FirstEnergy Corp.'s efforts to save the nuclear power plants.

FirstEnergy Corp. continued to contribute to Generation Now to assist Public Official A in winning the speakership but changed its method of payment in 2018. Rather than send the money directly from FirstEnergy Service to Generation Now, the FirstEnergy Corp. payments came from Partners for Progress, which had been fully funded by FirstEnergy Corp. On or about March 15, 2018 – two weeks before FirstEnergy Corp. subsidiaries filed for bankruptcy protection and FirstEnergy Corp. requested emergency action from the Department of Energy – FirstEnergy Corp. wired $300,000 from Partners for Progress to Generation Now for Public Official A's benefit. Four days before the payment, Executive 1 met with Public Official A to "*[d]iscuss Speaker race and votes needed.*" Likewise, certain FirstEnergy Corp. executives wired $100,000 from Partners for Progress to Generation Now on or about May 4, 2018, four days before the Ohio primary election.

FirstEnergy Corp. also sent approximately $400,000 for Public Official A's benefit, at Public Official A's request, through another 501(c)(4) in late April 2018, which through a series of transactions ultimately paid approximately $400,000 for media benefiting Public Official A before the May 2018 primary.

FirstEnergy Corp. continued to fund Public Official A's campaign for Speaker leading up to the fall 2018 election. On August 5, 2018, Executive 1 asked Executive 2, "*[Is] [Public Official A] looking for more money*?" to which Executive 2 responded, "*You know the answer to the [Public Official A] question, but I don't know for how much he'll ask. I'll get a list from [Ohio Director of State Affairs] as to the House races he's most interested in winning and I'll have something for you as to what fepac is doing in those races. He'll want hard money first and then C(4) money for sure. I'll be back to you today.*" Later that day, Executive 2 followed up and said, "*[Public Official A]  wants to hear about us – status of company, what's important to us this year*

22

*and next year. Money will come up – help with key races and C(4).*" Following a meeting involving Executive 1 and Public Official A, on or about August 16, 2018, FirstEnergy Corp. wired $500,000 from Partners for Progress to Generation Now for Public Official A's benefit.

A few weeks later, on or about August 24, 2018, Executive 1 and Executive 2 arranged for Public Official A to attend a presidential roundtable, during which Public Official A would ask whether Federal Official 1 intended to fix FirstEnergy Corp.'s issues at the federal level. Public Official A told Ohio Director of State Affairs, "*I simply said [Federal Official 1], I'm [Public Official A] former Ohio Speaker and I was planning on discussing this in the Roundtable but the acoustics were horrible. He said yes they were – I couldn't really hear much of anything – I then stated that his support in replacing the CPP was beneficial to Ohio but we need more in order for our zero emissions nuclear plants and coal fired facilities to remain an important part of our overall energy solution. He then stated that he had put a plug in it and now plans to fix it.*" Public Official A reported the same information to Executive 1, explaining that "*I opted to talk to him during the photo opt one on one*" and that "*He said they plan on fixing it.*"  The following exchange then occurred:

> Executive 1:    "*Got it. Thanks for the help!*"
>
> Public Official A: "*Thank you for your help.*"
>
> Executive 1:    "*We are rooting for you and your team!*"
>
> Public Official A: "*I'm rooting for you as well . . . we are on the same team*"

In October 2018, FES paid Generation Now another $500,000 for Public Official A's benefit – $400,000 of which was hand-delivered to Public Official A during an in-person meeting on or about October 10, 2018. On October 2, 2018, about a week before the payment, Executive 2 told Executive 1, "*I know you know this, but this is where companies and people get in political*

*trouble – everyone is in a rush and they all need a ton of hel$p. Let me gather everything. I'll bring it to you and you/we can decide*." On October 10, 2018, the day of the meeting, Executive 1 texted Executive 2, "*FES meeting with Public Official A today. I told him to be nice but listen to us*." Executive 2 replied, "*He'll learn about the $400k at this mtg*." Executive 1 then responded, "*They better get it done quick or he won't be able to spend it*." Following the meeting, Public Official A thanked Executive 1 via text for the money from FES, stating, "*$400k… thank you*."

In addition to the $500,000 directly from FES to Generation Now in October 2018, FirstEnergy Corp. made a $500,000 electronic transfer of funds to Dark Money Group 1 for Public Official A's benefit on October 29, 2018, a few days before the November election. This funds transfer occurred after Public Official A traveled to Akron to meet with Executive 1 on October 23, 2018.

Following the October 23, 2018 meeting, FirstEnergy Corp., through Executive 1 and Executive 2, also persuaded other energy-interested companies to send payments to Dark Money Group 1 to support Public Official A. For example, following the meeting with Public Official A, Executive 2 texted Executive 1, "*I talked to [Company Executive C]. He's going to contribute $100k to our effort with [Dark Money Group 1]. As for your [ ] Friday morning message to [CEO of Company B]: . . . I met with [Public Official A] a few days ago. We believe in [Public Official A] and think he can and will be Ohio's next Speaker. That's important to all of us. He has a need for a final push. We've committed $700k to the effort and I'd like to ask for your help with $100k*." A few days later, on October 26, 2018, Executive 2 asked Executive 1 if he could call CEO of Company B "*on the [Public Official A] $100k matter*?" Executive 1 responded, "*I'm on it*." Executive 2 texted Executive 1 later the same day indicating that Company B is going to do "$100k." Executive 1 responded that "[*Company B Executive*]" should "*take credit with Public*

*Official A too*" and later that day indicated that "*the money has already been wired*." In total, following Public Official A's October 23, 2018 trip to Akron to meet with Executive 1, the following payments were made to Dark Money Group 1:

| | | | |
|---|---|---|---|
| October 26, 2018 | $100,000 | wire | Company B |
| October 29, 2018 | $500,000 | EFT | FirstEnergy Service |
| October 29, 2018 | $100,000 | check | CEO of Company C |

The day before the November 2018 general election, Executive 1 texted Public Official A, asking, "*24 hours left. How's it looking*?" Public Official A responded, "*I am encouraged by the House races. Unless this blue wave shows up in the some races – I think we look great*."

On November 7, 2018, the day after the election, Executive 1 texted Public Official A and asked, "*How did your candidates do*?" Public Official A responded that "*we were a net -4*." Public Official A told Executive 1 that "*I literally need 1 more vote for Speaker*." Executive 1 asked if Public Official A was "*counting [Representative 11] or not*?" and stated that, "*I'll make sure it happens*." Later that day, Public Official A asked Executive 1 "*if you would just ask [Individual C] to set up a meeting w me and engage in getting this Spkrs race worked out [sic] so the way we want it. That would be perfect. Need him to focus*." Executive 1 responded, "*On it*."

FirstEnergy Corp.'s plan to fund Public Official A-approved House races through payments to Generation Now to help get Public Official A elected Speaker in return for introducing nuclear legislation was successful. On January 7, 2019, the Ohio House of Representatives selected Public Official A as Speaker.  The day of his election, Public Official A texted Executive 1: "*[t]hank you for everything it was historical*." In a separate text exchange that day, Individual C texted Executive 1, Executive 2, and two FE lobbyists, "*Congrats [Executive 1] and [Executive 2]. Big win in Ohio Speaker vote*," and then, "*2019 could be FE's year*." Executive 1 responded,

"*Hate to say this but we still need to get DOE help for plants so we can use Ohio to help the parent.*"

### *Passage of House Bill 6*

Following Public Official A's election as Speaker, FirstEnergy Corp. executives and representatives worked directly with Public Official A in drafting the nuclear legislation leading up to House Bill 6's introduction in the House. FirstEnergy Corp. sought the nuclear legislation both for the interests of its subsidiaries, including FES, and to further the interests of the FirstEnergy Corp. parent company.

From when House Bill 6 was introduced in April 2019 to October 2019, FirstEnergy Corp. worked directly with FES to support Public Official A through payments to Generation Now with the intent and for the purpose that, in return, Public Official A would take specific official action relating to the passage of House Bill 6 and the defeat of the ballot referendum initiative to overturn House Bill 6. FirstEnergy Corp. paid the money to Public Official A through Generation Now intending to influence and reward Public Official A in connection with passage of House Bill 6 and defeating the ballot referendum.

During that period, FES paid over $40 million through wire transfers to Generation Now for Public Official A's benefit, while FES was involved in bankruptcy proceedings. In addition, FirstEnergy Corp. paid over $13 million through wire transfers from Partners for Progress to Generation Now during this period.

Money paid from FirstEnergy Corp. to Generation Now in April 2019 through October 2019 was intended to benefit Public Official A; was intended to help Public Official A in his campaign to pressure and advise public officials to support passage of House Bill 6; and was intended to help Public Official A's efforts to defeat the ballot referendum, which included a plan

to pass alternate legislation if the proponents of the ballot referendum gained enough signatures to put the repeal of House Bill 6 on the ballot for a referendum. Certain FirstEnergy Corp. executives knew that the money paid to Generation Now was controlled by Public Official A and was for Public Official A's benefit to use as he directed. Public Official A and his team instructed how much money to pay into Generation Now to further their efforts to pass House Bill 6 and to defeat the ballot referendum. A purpose of the Generation Now ads was to provide legislators with the necessary cover to support House Bill 6.

For example, following opponent testimony in a House subcommittee that challenged House Bill 6 on April 23, 2019, Executive 2 told Executive 1, "*Today was opponent testimony. Went long. Expected stuff. Tell [Public Official A] to put his big boy pants on. Ha.*" Later that day, Executive 1 forwarded Executive 2 the content of a message from Public Official A that read, "*I hope FES is ready for a fight because the first shot was fired at us tonight. Nobody screws with my members ... my name ain't [Representative 10] or [Representative 1]. I asked [Individual D] to make ads this morning.*" Executive 1 then texted Executive 2, "*FES Needs [sic] to pay for these ads,*" explaining, "*they can spend some money on the real fight.*" Executive 1 later texted Public Official A, "*I will be pushing FES to engage,*" and then followed up, "*I'll talk to FES tomorrow about paying for [the ads.] What kind of budget.*" Public Official A responded, "*I'll find out – I'd like to blister Columbus and eastern Ohio where the shale play is.*"

The next day, Executive 1 texted Public Official A, "*Spoke to FES creditor rep. They will step in and help.*" Public Official A responded that he is having breakfast with Individual A to discuss and will call Executive 1 after they meet. Public Official A responded to Executive 1, "*I may want to run things past [Individual A] to make sure [Individual D] doesn't overcharge. I'm cheap.*" Executive 1 replied to Public Official A, "*OK. I would say you are a bargain – not cheap.*"

On May 1, 2019, FES Executive A texted Executive 2, "*Can someone change the Generation Now website so it looks more like our positive commercial? Less conventional power plants, more blue skies, fields and some wind turbines*." Executive 2 responded, "*[FES Executive A] – don't disagree, but remember, you're just the bank for these spots. They're not yours if you know what I mean. You change them, and they're yours – along with the criticism and results*."

Specific official action by Public Official A relating to the passage of House Bill 6 included helping draft the nuclear bailout legislation at FirstEnergy Corp.'s and FES's direction and pressuring and advising other public officials to take official action to support the nuclear legislation. While House Bill 6 was pending, FirstEnergy Corp. sought from Public Official A specific official action in the form of pressuring and advising other officials to support the "decoupling" provision supported by FirstEnergy Corp. and to support an extension of the term of the nuclear subsidy duration to ten years.

For example, on April 15, 2019, three days after Public Official A introduced House Bill 6, Executive 2 emailed Executive 1 and several other FirstEnergy Corp. executives and employees about "*talking points*" for "*educating legislators*" relating to the "*decoupling language which we proposed be included in the recently-introduced Ohio Clean Energy Bill (House Bill 6)*." In the same email chain, Executive 2 made clear that the decoupling language in House Bill 6 was the result of coordination with the Speaker's office.

In a May 4, 2019 text message, Public Official A told Executive 1 he needed information about FirstEnergy Corp. "*[a]s I begin to enter into the 'all out war' part of the HB 6 debate*," so that Executive 1 could help Public Official A "*shap[e] an argument*" in gaining support for House Bill 6.

On June 27, 2019, while House Bill 6 was pending in the Senate, Public Official A texted Executive 1 that "*House / Senate negotiations are occurring.*" Executive 1 responded, "*Negotiate hard. 10 years and decoupling back in*!" Public Official A then replied, "*10 years?*"; "*[FES Executive B] told me $148M for 6yrs was what was necessary*." Executive 1 then responded, "*I was told you knew about it. They fucked up. You'll be fighting this same issue in 5 years because they will not be able to take it public without more years*." Executive 1 later told Public Official A, "*You don't want to have to deal with this twice as Speaker*."

On July 13, 2019, Executive 1 texted Executive 2 and FES Executive A that he told Public Official A "*why 10 years is a must*" and Public Official A is "*on board with pushing HB6 to 10 if he can*."

On July 16, 2019, FES Executive A texted Executive 1 and Executive 2, "*Speaker is saying he needs at least a little help from Governor to get our years increased*." The next day, FES Executive A again texted Executive 1, "*House doesn't have quite enough votes*," to which Executive 1 responded, "*[Public Official A]  is negotiating. I'm in the loop*." Later that day, Executive 1 texted Executive 2, "*Some big concessions by the speaker on the budget. Hopefully he did a little horse trading along the way*." That day, Executive 2 texted Executive 1 and FES Executive A, "*HB 6 passed Committee (with decoupling). 9-4 vote. No additional years for FES – 7 years*." HB 6 then went back to the House for a vote on the Senate's amendments to the bill, and Executive 2 texted Executive 1, "*Now I'm hearing the Speaker is scrambling for one vote*."

On July 17, 2019, FES Executive A pleaded to Executive 1 that, "*If we only end up w the 7 years I will do exactly as you say, which is say thank you and go back to my nose on the grindstone*," but, FES Executive A continued, "*[t]hat said, is there anything we can do to get another year or 2? If that is not feasible and all hope is lost, can we get a 2 or 3 year extension*

option at year 7? We could base it on some type of test of whether FERC has given subsidies etc." Executive 1 responded FES Executive A: "*[State Official 2], [Public Official B], [Company C Executive] and [Official Aide 1] are fighting to the end and we've been talking to them all day. Conference on budget is ongoing and Speakers [sic] delegation is gonna try to negotiate budget movement for tenure on HB6. Everything that can be done is being done. If we don't get it, we work to pass an addendum as soon as [Senator 3] is out.*"

On July 23, 2019, the day that House Bill 6 was signed into law with the decoupling provision included, Executive 2 texted Executive 1 a screenshot showing House Bill 6 passing with 51-38 votes, and the following conversation occurred:

> Executive 2: *Boom! Congrats. This doesn't happen without ceo leadership.*
>
> Executive 2: [Image of House vote]
>
> Executive 1: *We made a bbiiiiiiiig bet and it paid off. Actually, 2 big bets. Congrats to you and the entire team! See if [name] has any Pappy and we'll all head to Columbus tonight.*
>
> Executive 2: *Huge bet and we played it all right on the budget and HB 6 – so we can go back for more!*
>
> Executive 2: *No party tonight. We are going to plan one with the Speaker later.*
>
> Executive 2: *You should call the Speaker today.*
>
> Executive 1: *Already texted him…*

### Defeating the Ballot Referendum

FirstEnergy Corp. and FES agreed to pay millions of dollars to Public Official A through payments to Generation Now in return for and in connection with Public Official A's efforts to defeat the ballot referendum, which included specific official action by Public Official A. Specific official action agreed to included efforts by Public Official A to have House Bill 6 interpreted as a "tax" such that it could not be challenged through a ballot referendum under law; and, if the ballot initiative gained enough signatures to put the referendum of House Bill 6 on the ballot, to

advance alternate legislation by Public Official A, to include making clear that House Bill 6 was a tax and thus could not be challenged through a ballot referendum.

For example, on July 16, 2019, prior to passage of House Bill 6, Executive 2 texted Official Aide 1 that he "*[j]ust remembered some language added late to House version to help make it harder to challenge via referendum. Speaker worked with fes on it. Senate probably took it out and now folks want it back in*."

On July 24, 2019, FES Executive A texted to Executive 2: "*[Individual H], [FES Executive C] and myself are point on referendum. He has a mtg w [sic] Speaker on it tomorrow. I am talking to Speaker later today . . .*" Executive 2 later responded, "*I'm very concerned about the referendum.*" FES Executive A replied, "*We are taking [Public Official A's] lead on fighting the referendum.*" FES Executive A replied further, "*Am I supposed to go against what [Public Official A] is telling us to do*?" Two days later, Executive 2 texted FES Executive A, "*I had a good conversation with [Public Official A] today re: the referendum issue. I think you're in excellent hands. I know more about his personal involvement and engagement. We should all be following his lead. I know you/fes are and we will as well*."

On September 4, 2019, Executive 2 told Executive 1 he intended to take steps to convince another Ohio public official to publicly state that House Bill 6 was a tax because, under Ohio law, a tax would not be subject to a ballot referendum. In response, Executive 1 texted Executive 2, "*We should check with [Public Official A] to make sure he's on board with this before we step in. He seemed pretty confident in his referendum strategy and plans to pass it as a tax in a new bill if they get enough signatures. Just want to make sure he agrees*."

To further the scheme, FirstEnergy Corp. used Partners for Progress, a 501(c)(4) controlled

by and operating for the benefit of FirstEnergy Corp., to conceal payments to Public Official A. In October 2019, FirstEnergy Corp. paid $10 million (October 10, 2019) and $3 million (October 22, 2019) to Generation Now for Public Official A's benefit by first wiring the money through Partners for Progress rather than paying the money to Generation Now directly. FirstEnergy Corp. paid the $13 million at Public Official A's and FES's request, knowing and with the intent that the money was in return for Public Official A's efforts to defeat the ballot referendum and ensure House Bill 6 became law, to include specific official action for alternate legislation if the ballot referendum received enough signatures to get on the ballot.

For example, on October 9, 2019, Executive 1 texted FES Executive A, "*Just got word the $ is being wired today. $10M.*" Executive 1 told Executive 2, "*I did speak with Public Official A and he says they need it and will spend it. Talked to him about future and he says the future is now. He understands it's not our issue and truly appreciates the support.*" In exchange for Executive 1's agreement to wire the $10 million to Public Official A, FES Executive A promised Executive 1 that FES would pay additional funds in connection with the transfer of real estate to FirstEnergy Corp. after FES's bankruptcy.

On October 19, 2019, a few days before the ballot referendum's signatures were due, Executive 1 texted Executive 2 and FES Executive B, "*Just spoke to the big guy. He's got the 'tax' bill ready to go and believes he's got [Senator 3] on board*…." FES Executive B responded, "*That is good news. Having both [Public Official A and Senator 3] on board and ready is critical for us next week to be ready to deal with the outcome of the signatures and the court.*" Executive 2 also texted Executive 1, "*I wish we had this state and federal team in place when we first started our generation push. Darn it.*"

On October 23, 2019, Executive 1 texted FES Executive A: "*You are a worrier but then*

*it's a pretty big deal. For what it's worth [State Official 3] and [Public Official A] think it's game over. But that's private conversation unless they've told you the same thing. And [Public Official A] has a 'quick fix' anyway.*" Executive 1 went on, "*he and I have been chatting too. More about raising him $$$$.*"

### Public Official A's Term Limit Ballot Initiative

In February 2020, Public Official A and his team approached FirstEnergy Corp. about funding a ballot initiative championed by Public Official A, which would change Ohio law to increase term limits for Ohio public officials. The term limit initiative would allow Public Official A to potentially remain in power as Speaker for up to sixteen additional years, which would give Public Official A additional time as Speaker to further FirstEnergy Corp.'s interests through official action.

For example, on February 28, 2020, Executive 1 and Individual B had the following conversation:

Executive 1: . . . . *Talked to Speaker today. He's an expensive friend*

Individual B: *I did not know what he wanted to talk to you about.*

Executive 1: *His term limit initiative. 16 years lifetime max in legislature starting when it passes. No need to switch houses. But after 16 your [sic] done for good.*

Individual B: *I think it's a great idea especially if he stays there*

Executive 1: *He told me he'll retire from there but get [sic] a lot done in 16 more years.*

Individual B: *Probably more than five previous Speakers combined*

Individual B: *He will make Ohio great again*

Executive 1: *Yep*

The next day, Executive 1 texted Public Official A, "*Work with [Individual A] on ballot initiative? You coming up for Home Opener?*" Public Official A responded, "*Yes. I haven't thought much about Opening Day yet.*" Executive 1 later texted Public Official A, "*[Executive 2] is contacting [Individual A] to do 2 early next week,*" to which Public Official A responded, "*Very much appreciated.*" In text message exchanges the next day, Executive 2 stated, "*On Monday/Tuesday of next week, we are hoping to do a $2M contribution from our C(4) to Generation Now*"; and "*[w]e are going to make a significant contribution to Generation Now from Partners for Progress next Monday/Tuesday.*" Executive 2 stated in a subsequent message that Public Official A's term limit initiative "*extends and stabilizes existing leadership – good for the home team.*"

On March 2, 2020, FirstEnergy Corp. paid $2 million to Public Official A by wiring the money from FirstEnergy Corp.'s 501(c)(4), Partners for Progress, to Public Official A's 501(c)(4), Generation Now, to advance Public Official A's term limits initiative.

### C. Public Official B

#### *FirstEnergy Corp.'s Consulting Agreement with Public Official B*

Prior to December 2018, FirstEnergy Corp. made payments to Public Official B pursuant to agreements with Public Official B through Company 1. The payments were made from FirstEnergy Service to Company 1's bank account, in part, for Public Official B's benefit.

A 2013 consulting agreement was subsequently amended in 2015. The 2015 amendment coincided with and was made in exchange for Public Official B's industrial group withdrawing its opposition to a 2014 PUCO Electric Security Plan settlement package involving FirstEnergy Corp.'s Ohio electric distribution subsidiaries. The amended agreement called for an increase in

Public Official B's retainer and supplemental payments through 2024. Although the amended agreement does not appear to have been executed, from 2015 through June 2018, FirstEnergy Corp. paid into the Company 1 account pursuant to the terms of the agreement with Public Official B. Invoices from Company 1 were structured to bypass FirstEnergy Corp.'s Level of Signature Authority levels for purposes of internal approval of the payments.

In January 2019, Public Official B received a payment of $4,333,333, which represented the remaining payment amounts designated in the amended consulting agreement from 2019 through 2024. FirstEnergy Corp. was under no legal obligation to make the payment at that time.

### *Public Official B as PUCO Chairman*

FirstEnergy Corp. paid the entire $4,333,333 to Company 1 for Public Official B's benefit with the intent and for the purpose that, in return, Public Official B would perform official action in his capacity as PUCO Chairman to further FirstEnergy Corp.'s interests relating to passage of nuclear legislation and other specific FirstEnergy Corp. legislative and regulatory priorities, as requested and as opportunities arose.

In December 2018, Public Official B discussed the $4,333,333 payment with Executive 1 and Executive 2. For example, on December 17, 2018, Public Official B emailed Executive 2 and others the announcement stating that PUCO was seeking applications for a commissioner. The next day, on December 18, 2018, Executive 1 and Executive 2 met with Public Official B at Public Official B's condominium. During the meeting at Public Official B's condominium, Executive 1, Executive 2, and Public Official B discussed the remaining payments under the consulting agreement and Public Official B's candidacy for the open PUCO chair position.

The next day, Public Official B texted Executive 1 and Executive 2 detailing the remaining payments under his consulting agreement with FirstEnergy Corp. from 2019 to 2024. The

payments totaled $4,333,333.  Public Official B added, "*Thanks for the visit. Good to see both of you*," to which Executive 2 responded immediately, " *Got it, [Public Official B]. Good to see you as well. Thanks for the hospitality. Cool condo*."

Later that day, Executive 1 texted Public Official B and Executive 2, "*We're gonna get this handled this year, paid in full, no discount. Don't forget about us or Hurricane [Executive 1] may show up on your doorstep! Of course, no guarantee he won't show up anyway*." Executive 1 then attached an image of a venomous snake protruding from a hurricane. Public Official B replied, "*Made me laugh – you guys are welcome anytime and any whereI [sic] can open the door. Let me know how you want me to structure the invoices. Thanks*." Public Official B then added, "*I think I said this last night but just in case – if asked by the administration to go for the Chair spot, I would say yes*."

After meeting with Public Official B in December 2018 to discuss the payout and Public Official B's candidacy for PUCO Chairman, certain FirstEnergy Corp. executives pushed to have Public Official B appointed as the PUCO Chairman. Under Ohio law, PUCO consists of five public utilities commissioners appointed by the governor with the advice and consent of the senate. The governor must designate one commissioner to be chairperson of PUCO, who serves at the governor's pleasure. PUCO commissioners are selected from a list of individuals submitted to the governor by the public utilities commission nominating council. FirstEnergy Corp. executives' efforts to have Public Official B appointed as PUCO Chairman included working directly to advance the appointment of Public Official B as PUCO Chairman so that Public Official B could further FirstEnergy Corp.'s interests in that role through official action. FirstEnergy Corp.'s plan was for Public Official B to be appointed to the open seat as PUCO Chair and another individual appointed to a second projected opening on PUCO.

On January 2, 2019, FirstEnergy Service wired the $4,333,333 to Public Official B's

Company 1 bank account. That same day, Executive 2 texted Executive 1:

> *[Executive 1] - this text came to me this morning from [Public Official B]. His mtg with Gov.-elect is this Friday and I suspect, absent any problem, things will go down as we've discussed, with [Individual E] getting [PUCO Official 1]'s seat as soon as [PUCO Official 1] leaves. In any event, pls see [Public Official B]'s mssg re: meeting with us soon in Akron.*
>
> *[Executive 2], I would like to come to Akron on 1/10, 1 /11, 1/14 or 1/15 to get a better understanding of the "hole" (size, shape, life expectancy and so on). Also, I would like to discuss a couple concepts that I landed on after our recent meeting. If [Executive 1] is available to discuss concepts, that would be a plus. If none of the above days work, get me a couple that do, please.*

Executive 1 responded with a date and time for meeting Public Official B, then stated: "*So you're saying [Public Official B] as Chair and [Individual E] on later?*" Executive 2 replied, "*That's their plan, but nothing certain until [Public Official B]'s meeting. Four people in [State Official 1] world, you, [Public Official B] and I know about this.*"

Later that day, Executive 2 and Executive 1 discussed the upcoming meeting between Executive 1, Executive 2, and Public Official B further. Executive 2 asked Executive 1, "*Is there anyone internally you'd like to include? I'll ask him about his location preference. My guess is that he's on point to figure out what we need and to report back as to how it should be/could be fixed.*" Executive 1 replied, "*I think just you and me. Don't want too many on the inside right now. That's probably his preference also.*" Executive 2 then forwarded a text from Public Official B: "*From [Public Official B]. Probably best if it is you and [Executive 1]. If more is required, I can follow up. I don't think that we will get into the weeds. That can come once we get comfortable with a conceptual framework.*"

On January 14, 2019, Executive 2 texted Executive 1 about the "*Ohio hole,*" "*extending*

*our ESP*," among other things. Executive 2 then texted Executive 1 about the timing of what would become House Bill 6: "*[Public Official B] was talking about the number of weeks needed for him to coalesce parties on the broad construct of an energy bill. Before introduction*." According to Executive 2, Public Official B estimated "*the 6 to 8 week time frame to pull together (not necessarily pass) the legislative component assumes that the new administration makes the appointment ASAP and runs from the date of the appointment*."

On January 18, 2019, Executive 1 texted Executive 2, "*…Once [Public Official B] is announced, we need him to help with [Individual E]. Sounds like he already did but will need more*." Executive 2 responded, "*[Individual F] told me that once [Public Official B] is in, [State Official 1] will lean on him on everything including who should be the next commissioner*."

On January 28, 2019, at the same time certain FirstEnergy Corp. executives were lobbying to have Public Official B appointed PUCO Chair, Executive 2 texted Executive 1 about a solution to the Ohio "hole" and an update on Public Official B's nomination: "*[Executive 1] – [Individual G] and I just finished a good meeting with [Public Official B] on the way to solve the 2024 issue. No one internal knows we met with him*." Executive 1 responded, "*Any word on his status*?" Executive 2's reply indicated he spoke with State Official 2 and, "*no decision but that he had a great conversation with Gov this morning*."

Days later, Executive 2 and Executive 1 became concerned that Public Official B would need to pull out of the PUCO selection process because a disclosure in connection with an FES bankruptcy filing indicated that Company 1 had received payments from FES. In response to the news, Executive 1 lamented in a text message to Executive 2 on January 31, 2019, "*Great. Now we have none on the list*." Executive 2 responded, "*This is awful*." Executive 1 then texted, "*Back to legislative fix for Ohio hole*."

38

Later that day, however, their concern dissipated as Public Official B cleared the selection process. Executive 2 texted Executive 1, "*Nominating Council has been delayed and is now in Executive Session.*" Executive 2 later texted Executive 1, "*That bullet grazed the temple.*" Executive 1 responded, "*Forced [State Official 1]/[State Official 2] to perform battlefield triage. It's a rough game.*" Minutes later, Executive 2 forwarded an email that read, "*[Public Official B] got the most votes.*" Executive 1 texted Public Official B the next day, "*Most of the media coverage is very fair. There will be some shots take but that's inevitable. Hang in there til it's done and it will quiet quickly.*"

The plan to get Public Official B appointed PUCO chairman was successful. On February 4, 2019, Public Official B's selection as the Chairman of PUCO was announced. That day Executive 1 texted Company C Executive, "*Now work on the [Public Official B]/[Individual E] parlay. Once [Public Official B] is in he'll help with [Individual E] and my Speaker friend will too.*" The next day, Executive 1 texted Public Official B, "*Congratulations!*" Public Official B responded, "*Thanks, [Executive 1] – the last four days have been tuff.*" Public Official B went on, "*Thanks goes to some great good friends.*"

The day Public Official B's confirmation as PUCO became public, Company C Executive texted Executive 1: "*Let's try not to fuck this up,*" while attaching an article announcing Public Official B was selected as the next PUCO Chair.

On or about February 13, 2019, Executive 2 told Public Official B, "*[Executive 1] is meeting with [Public Official A] today*" and asked him, "*Anything you think [Executive 1] should raise?"* Public Official B responded that "*We need coordination between executive and legislative branches to get sensible stuff over the goal line.  Absent that, the current polarization will pull everything under.*"

*Official Action by Public Official B*

After his appointment as PUCO Chairman, Public Official B performed official action, including acts related to House Bill 6 and the elimination of FirstEnergy Corp.'s requirement to file a new base rate case in 2024, furthering FirstEnergy Corp.'s specific legislative and regulatory interests at the direction of and in coordination with certain FirstEnergy Corp. executives, as FirstEnergy Corp. requested and as opportunities arose.

For example, with respect to House Bill 6, on June 28, 2019, Executive 2 texted Executive 1, "*Just heard from [Public Official B].. [sic] decoupling looks good.*" Executive 2 explained to FES Executive A on July 10, 2019, that Public Official B told Executive 2 regarding the "*audit issue*": "*I am engaged and hope I can help.*" Executive 2 went on, "*Having [Public Official B] engaged is key. He doesn't use the word lightly.*"

On July 11, 2019, Executive 2 texted Executive 1: "*[Executive 1] – I had a long talk with [Public Official B] last night about audit language. He is mtg today with [Senator 4] and Senate Counsel. We have a good plan to help. Just wanted u to know your team is engaged and helping – and we will get it if we can keep fes from negotiating against themselves.*"

On July 13, 2019, Executive 2 texted Executive 1 that he heard from Public Official B regarding "*the audit*" language, explaining, "*[Public Official B] thinks he has it nailed and the language works. Confidentially, [FES Executive B] agrees."*

On July 16, 2019, Executive 2 and Executive 1 texted relating to the status of House Bill 6 and the budget. The conversation went as follows:

> Executive 2: *Budget conferees are meeting now - so the budget looks to be good to go (or they wouldn't be meeting). Our SEET language is in the bill. Still awaiting word on HB6 but our intel is that [Official Aide 1], [State Official 2] and [Public Official B]*

> *are still trying to get fes some more years.*
>
> Executive 1: *Decoupling*?
>
> Executive 2: *Will be offered tomorrow by [Senator 5] with help from [Senator 6]. Stupid they're making her offer it, but we are convinced there's no monkey business. It's greased.*

About a week later, on July 23, 2019, House Bill 6 passed the legislature with the decoupling provision advocated by FirstEnergy Corp. That day, Executive 1 sent to Public Official B a photo-shopped image of Mount Rushmore with the face of Public Official B, alongside Executive 2, Ohio Director of State Affairs, and Company C Executive, imposed over the four presidential faces with the caption, "*HB 6 FUCK ANYBODY WHO AINT US.*"  Public Official B commented that his picture was smaller than the others and then responded, "*funny.*"

In addition, at FirstEnergy Corp.'s request and direction, Public Official B performed official action to fix FirstEnergy Corp.'s "Ohio hole" through a PUCO opinion eliminating the requirement that FirstEnergy Corp.'s Ohio electric distribution subsidiaries file a new base rate case when ESP IV ended in 2024.

For example, on November 5, 2019, Executive 1 texted to Executive 2 an article published that day, in which Morgan Stanley projected low growth for FirstEnergy Corp. because of "*a rate case review in 2024.*" In his note accompanying the article, Executive 1 told Executive 2, "*Here's the MS down grade due to the 'Ohio hole.'*"

On November 10, 2019, Executive 1 texted Company C Executive, "*And, the FE rescue project is not over. At EEI financial conference. Stock is gonna get hit with Ohio 2024. Need [Public Official B] to get rid of the 'Ohio 2024' hole.*" A few days later, on November 15, 2019, Executive 2 texted Executive 1, "*I spoke with [Public Official B] today. Told me 2024 issue will be handled next Thursday (November 21).*" Executive 2 later texted, "*he's going to make the*

*requirement to file go away, but I do not know specifically how he plans to do it.*"

On November 21, 2019, Executive 2 texted Executive 1, "*Today is our day for action on the 2024 issue.*" Executive 1 suggested that Public Official B make a "*public statement*" about the ruling, to which Executive 2 responded, "*On it.*" Later that day, PUCO issued a ruling that FirstEnergy Corp.'s Ohio electric distribution subsidiaries were no longer required to file a new rate distribution case in 2024. Executive 2 later texted Executive 1 the PUCO decision, which highlighted the following language from the Opinion and Order: "*we find that it is no longer necessary or appropriate for the Companies to be required to file a new distribution rate case at the conclusion of the Companies' current ESP.*"

Pursuant to House Bill 6, part of FirstEnergy Corp.'s revenue would have been decoupled at least until its next base distribution rate case, which was scheduled for 2024. The November 21, 2019 decision by PUCO eliminated FirstEnergy Corp.'s Ohio electric distribution subsidiaries' requirement to file its new rate distribution case at the conclusion of ESP IV in 2024. The November 21, 2019 PUCO decision addressed the 2024 "Ohio hole" by extending the time before the FirstEnergy Ohio utility subsidiaries were required to file a base rate case.

On November 22, 2019, approximately a day after PUCO's rate case policy change benefitting the energy company, and the day after news of the decoupling rider application became public, Executive 1 thanked Public Official B via text message. Specifically, Executive 1 texted Public Official B an image showing FirstEnergy Corp.'s stock increase with a note that stated, "*Thank you*!!" Public Official B responded, "*Ha – as you know, what goes up may come down. [Name] helped. Thanks for the note. Spoke to [name]last night.*" Executive 1 replied, "*Every little bit helps. Those guys are good but it wouldn't happen without you. My Mom taught me to say Thank you,*" to which Public Official B replied, "*Thanks.*"

On January 15, 2020, a few months later, it appeared that another commissioner would be appointed to PUCO in 2020. Public Official A texted Executive 1, "*Who do you like for this PUCO board appointment*." That evening, Executive 1 texted Public Official A's message to Executive 2: "*Who do you like for this PUCO board appointment*"; Executive 1 followed up, "*Got this from [Public Official A] a little while ago*." Executive 1 then texted, "*But I think [Public Official B] wants the incumbent D re-upped because he's very cooperative with [Public Official B]*." Executive 1 later told Executive 2, "*Tell [Public Official B] [Public Official A] asked me I [sic] my response was whoever [Public Official B] wants*."

Executive 1 then texted Public Official A back as follows: "*[PUCO Official 2] is the commissioner who's up this April. [Public Official B] likes [PUCO Official 2]. [Public Official B] has been outstanding. Approved our decoupling filing today and got a 5-0 vote including [PUCO Official 2], even though Staff bureaucrats wanted to modify HB 6 language*." Public Official A responded, "*Very good*." Public Official A then stated, "*I need to have my appointee to make recommendation for Gov. I will take care of it tomorrow*."

In a March 4, 2020 text message exchange about possible future favorable action by Public Official B, Executive 1 summarized official action already performed by Public Official B at the request of FirstEnergy and stated: "*He will get it done for us but cannot just jettison all process*." After describing certain acts taken by Public Official B, Executive 1 explained that there is "*a lot of talk going on in the halls of PUCO about does he work there or for us? He'll move it as fast as he can. Better come up with a short term work around*."

As set forth in the Corporate Officer's Certificate, I am duly authorized to execute this Agreement on behalf of FirstEnergy Corp. I have read the Statement of Facts and have carefully reviewed it with counsel for FirstEnergy Corp. and FirstEnergy Corp.'s Board of Directors. On behalf of FirstEnergy Corp., I acknowledge that the Statement of Facts is true and correct.


July 20, 2021
_____
Date

_____
Steven E. Strah, President & CEO
FIRSTENERGY CORP.


July 20, 2021
_____
Date

_____
Stephen G. Sozio
James R. Wooley
Adam Hollingsworth
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH 44114
Phone: +1.216.586.3939
sgsozio@jonesday.com
jrwooley@jonesday.com
ahollingsworth@jonesday.com
*Attorneys for FirstEnergy Corp.*

# EXHIBIT 3

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | | |
|---|---|---|
| In re FIRSTENERGY CORP. SECURITIES LITIGATION | ) ) ) | No. 2:20-cv-03785-ALM-KAJ |
| | ) | CLASS ACTION |
| | ) | |
| This Document Relates To: | ) ) | Judge Algenon L. Marbley |
| ALL ACTIONS. | ) ) | Magistrate Judge Kimberly A. Jolson |
| | ) ) | DEMAND FOR JURY TRIAL |

CONSOLIDATED COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

MURRAY MURPHY MOUL + BASIL LLP
JOSEPH F. MURRAY (0063373)
  murray@mmmb.com
1114 Dublin Road
Columbus, OH 43215
Telephone: 614/488-0400
614/488-0401 (fax)

Liaison Counsel

ROBBINS GELLER RUDMAN & DOWD LLP
DARREN J. ROBBINS (darrenr@rgrdlaw.com)
MARK SOLOMON (marks@rgrdlaw.com)
JASON A. FORGE (jforge@rgrdlaw.com)
TOR GRONBORG (torg@rgrdlaw.com)
BRIAN E. COCHRAN (bcochran@rgrdlaw.com)
SARA B. POLYCHRON (spolychron@rgrdlaw.com)
TING H. LIU (tliu@rgrdlaw.com)
FRANCISCO J. MEJIA (fmejia@rgrdlaw.com)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiffs

Lead Plaintiff Los Angeles County Employees Retirement Association ("Lead Plaintiff"), together with Plaintiffs Amalgamated Bank (defined herein), City of Irving Supplemental Benefit Plan and Wisconsin Laborers' Pension Fund (collectively "Plaintiffs"), individually and on behalf of all other persons similarly situated, allege the following based upon personal knowledge as to each Plaintiff and each Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by FirstEnergy Corp. ("FirstEnergy" or the "Company," which terms include subsidiaries that FirstEnergy owned and controlled, unless otherwise indicated), as well as media reports about the Company and case filings in *USA v. Borges*, 1:20-mj-00526 (S.D. Oh.) (the "Criminal Proceedings"). Plaintiffs believe that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

1.        This is a securities class action on behalf of all purchasers of FirstEnergy securities between February 21, 2017 and July 21, 2020, inclusive (the "Class Period"). Plaintiffs seek to pursue remedies under §§11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act") and §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), as well as SEC Rule 10b-5 promulgated thereunder, against FirstEnergy, certain current and former senior Company insiders, and the investment banks which underwrote two FirstEnergy debt offerings during the Class Period.

2.        FirstEnergy is an electric utility company headquartered in Akron, Ohio that serves much of the Midwest and Mid-Atlantic regions. Its family of ten operating companies comprise one of the largest investor-owned utility companies in the United States.

3.     Throughout the Class Period, FirstEnergy and its most senior executives bankrolled one of the largest corruption and bribery schemes in U.S. history.  Unbeknownst to investors, FirstEnergy spent tens of millions of dollars on an unprecedented multi-year scheme to corrupt legislators and regulators, who FirstEnergy used to draft and pass legislation designed to provide $2 billion in benefits to FirstEnergy – all at ratepayers' expense.  FirstEnergy's scheme extended to the highest offices of the Ohio legislature, including the office of the Speaker of the House, and to the top energy regulator in the state, the Chairman of the Public Utilities Commission of Ohio ("PUCO").  FirstEnergy employed an elaborate network of lobbyists, shell companies and political action committees; saturated media markets with a false and misleading advertising campaign funded through difficult-to-trace dark money networks; and directly subverted the free and fair operation of Ohio elections.

4.     FirstEnergy's scheme to corrupt the political process and suborn the regulatory framework was not the work of rogue employees, but personally overseen and facilitated by the senior echelon of Company management, including FirstEnergy's then-Chief Executive Officer ("CEO") Charles E. Jones and numerous other executives responsible for FirstEnergy's regulatory affairs, legal compliance, financial reporting and investor disclosures.  Corruption became a fundamental aspect of the Company's business model as the key to unlocking $2 billion in critical subsidies and overcoming the Company's most pressing operational challenges.

5.     Specifically, during the Class Period, FirstEnergy claimed that it was pursuing and ultimately secured a "solution" for the bailout of its two failing nuclear plants, the Perry Nuclear Generating Station and the Davis-Besse Nuclear Power Station (the "Nuclear Plants"), through the passage of Ohio House Bill 6 ("HB6").  HB6 was a purported "clean energy" bill designed to incentivize low carbon dioxide emitting power production, in particular nuclear power generation. In addition to a ratepayer-funded $1.3 billion bailout of the Nuclear Plants, HB6 also included a

- 2 –

ratepayer-funded "decoupling" provision worth some $700 million in subsidized revenues for FirstEnergy. "Decoupling" in this context means that FirstEnergy could charge higher rates for electricity than supply-and-demand principles would otherwise justify, allowing FirstEnergy to lock-in hefty profits regardless of how much electricity ratepayers actually used.

6.     This corruption-based business model exposed FirstEnergy to catastrophic risks (and now the reality) of financial, regulatory, legal and reputational loss, and FirstEnergy and its senior insiders went to great lengths during the Class Period to conceal these risks from investors. In fact, FirstEnergy and its executives repeatedly affirmatively reassured investors that the Company was **not** engaged in any illicit activities and "compl[ied]" with all laws and regulations applicable to its regulatory affairs and investor disclosure obligations. FirstEnergy also provided investors with pages of "Risk Factors" purporting to detail the most significant risks facing the Company, while concealing any mention of the monumental risks stemming from the political corruption scheme then being spearheaded by the Company and its executives. FirstEnergy's misrepresentations of material facts about these corrupt activities was part of an overarching "Bailout Scheme" designed to generate billions of dollars in illicit proceeds for the Company.

7.     For a time, the Bailout Scheme was a resounding success. During the Class Period, the price of FirstEnergy stock soared to over $50 per share, allowing the Company to raise $5 billion in a "transformational" equity raise and two public bond offerings. Company insiders were also richly rewarded, receiving tens of millions of dollars in excess compensation tied to FirstEnergy's apparent success. For example, in 2019 alone, FirstEnergy paid Jones over $20 million, which included $18 million in performance-based stock units. Numerous Company insiders also took advantage of FirstEnergy's inflated stock price to sell millions of dollars of their own personal FirstEnergy shareholdings. Jones alone sold nearly 265,000 FirstEnergy shares for $10 million at

artificially inflated prices during the Class Period – more than double the number of shares he sold in the preceding ten years.

8.      On July 21, 2020, however, the U.S. Attorney's Office for the Southern District of Ohio and the Federal Bureau of Investigation ("FBI") announced the arrests of Ohio House Speaker Larry Householder ("Householder") and several accomplices and publicly filed a criminal complaint and supporting 80-page affidavit (the "Criminal Complaint."), revealing critical aspects of the Bailout Scheme.  The Criminal Complaint was the product of a years-long investigation that included court-authorized wire intercepts of phone calls and text messages, extensive analyses of financial records, documents seized pursuant to court-authorized search warrants, media reports, legislative records and witness interviews.  The Criminal Complaint detailed how FirstEnergy (identified as "Company A") had served as the criminal enterprise's corrupt corporate kingpin, financing its illegal operations and closely coordinating with the criminal defendants to ensure the passage of HB6 and, later, thwart a democratic referendum to repeal the bill.  The Criminal Complaint documented how the Company was dubbed the "Bank" by conspirators for its willingness to spend "unlimited" money to further its corrupt ends, a partnership which FirstEnergy's own lobbyist referred to as the "unholy alliance."  In short, the Criminal Complaint described how FirstEnergy and its top executives illegally funneled $60 million into the hands of corrupt politicians to get HB6 passed into law and avoid its repeal.  The return on investment of the Company's $60 million corrupt investment in HB6 promised to be extraordinary:  $2 billion at the expense of Ohio ratepayers.

9.      On the news of FirstEnergy's central role in the Bailout Scheme, the price of FirstEnergy stock plummeted, falling below $23 per share on July 22, 2020, down *45%* from its closing price of more than $41 per share on July 20, 2020, inflicting billions of dollars of losses on FirstEnergy investors.

- 4 –

10.     In the days that followed, Jones attempted to disavow any culpability for the activities revealed in the Criminal Complaint, proclaiming that "FirstEnergy acted properly in this matter," and that, "at no time [did] our support for nuclear plants in Ohio interfere or supersede our ethical obligations to conduct our business properly.  The facts will become clear as the investigation progresses."  He reassured investors, "I've never made a payment directly to a lobbyist in my life nor asked any lobbyists to make a payment to anyone else on behalf of our company in my life."

11.     As would later be revealed, these and similar statements merely sought to perpetuate the Bailout Scheme, as FirstEnergy confirmed in October 2020 by firing Jones and other top executives for their roles in the scheme.  Among other misconduct, FirstEnergy identified Jones's role in an illicit $4 million payment to the former head of PUCO, Chairman Samuel Randazzo ("Randazzo"), who had drafted key portions of HB6 in consultation with and at the direction of FirstEnergy representatives and publicly testified in support of the bill.

12.     Due to the Bailout Scheme's exposure, the Company, *inter alia*: (i) is now the subject of dozens of lawsuits and regulatory and governmental investigations; (ii) has lost an estimated $2 billion in purported benefits promised by HB6; (iii) admitted to internal control deficiencies and wrongdoing by its most senior executives; (iv) drew down nearly $2 billion from credit facilities to cover expected costs associated with fallout over its role in the Bailout Scheme; and (v) and suffered credit downgrades to junk status for its corporate debt by all three major credit rating agencies.

13.     As a result of the Bailout Scheme, FirstEnergy investors have suffered billions of dollars in losses and economic damages under the federal securities laws, which this lawsuit seeks to recover.

### JURISDICTION AND VENUE

14.     Jurisdiction is conferred by 28 U.S.C. §1331, §22 of the Securities Act and §27 of the Exchange Act.  The claims asserted herein arise under §§11, 12(a)(2) and 15 of the Securities Act

- 5 –

(15 U.S.C. §§77k, 77l(a)(2) and 77o) and §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

15.     Venue is proper in this District pursuant to §22 of the Securities Act, §27 of the Exchange Act and 28 U.S.C. §1391(b) because FirstEnergy conducts business in this District and the events and omissions giving rise to the claims asserted herein occurred in substantial part in this District, including the dissemination of false and misleading statements into this District.   In addition, the Criminal Proceeding is pending in this District, as is civil litigation against the Company for the complained of scheme by Ohio ratepayers, *Smith v. FirstEnergy Corp., et al.*, 2:20-cv-03755 (S.D. Ohio).

16.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## CLASS ACTION ALLEGATIONS

17.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of FirstEnergy securities during the Class Period (the "Class").   Excluded from the Class are defendants, the officers and directors of the Company, FirstEnergy Solutions Corp. ("FES"), FirstEnergy Nuclear Operating Company ("FENOC") and Energy Harbor LLC, Energy Harbor Corp. and Energy Harbor Nuclear Corp. (collectively, "Energy Harbor"), at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

18.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, FirstEnergy common stock was actively traded on the NYSE, and FirstEnergy debt was actively traded in relevant debt markets.  While the exact number

- 6 –

of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by FirstEnergy or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice customarily used in securities class actions.

19.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

20.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

21.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the Exchange Act and/or the Securities Act were violated by defendants as alleged herein;

(b)     whether statements made by defendants misrepresented material facts about the business, operations and management of FirstEnergy; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

22.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

4823-8789-7564.v3

## PLAINTIFFS

23.     Lead Plaintiff Los Angeles County Employees Retirement Association ("LACERA") is a governmental pension plan that administers defined retirement benefits for employees of Los Angeles County and participating agencies.  Established in 1938, LACERA is the largest county retirement system in the United States.  As of June 30, 2020, LACERA had over 170,000 members and maintained assets of more than $58 billion.  LACERA, as set forth in its previously filed Certification in this action (ECF No. 33-4), which is incorporated by reference herein, purchased FirstEnergy securities during the Class Period and has been damaged thereby.

24.     Plaintiff Amalgamated Bank, as Trustee for the LongView LargeCap 500 Index Fund, LongView Quantitative LargeCap Fund, LongView Broad Market 3000 Index Fund, LongView LargeCap 500 Index Fund VEBA, LV LargeCap 1000 Value Index Fund, LongView Quantitative MidCap Fund, LongView Quant LargeCap Equity VEBA Fund and LongView Core Plus Fixed Income Fund ("Amalgamated Bank"), is a New York City-based investment bank.  Amalgamated Bank serves thousands of labor unions, nonprofits, social impact enterprises, political organizations, foundations and individuals.  Amalgamated Bank has over $40 billion in assets under management and custody.   Amalgamated Bank, as set forth in the accompanying Certification, which is incorporated by reference herein, purchased FirstEnergy securities during the Class Period and has been damaged thereby.

25.     Plaintiff Wisconsin Laborers' Pension Fund is a multi-employer defined benefit plan operated for the benefit of more than 9,000 active and retired construction craft laborers in Wisconsin.  Wisconsin Laborers' Pension Fund, as set forth in the accompanying Certification, which is incorporated by reference herein, purchased FirstEnergy securities during the Class Period and has been damaged thereby.

26.     Plaintiff City of Irving Supplemental Benefit Plan provides supplemental benefits for government and police employees for the City of Irving, Texas.  City of Irving Supplemental Benefit Plan, as set forth in the accompanying Certification, which is incorporated by reference herein, purchased FirstEnergy securities during the Class Period and has been damaged thereby.

## EXCHANGE ACT ALLEGATIONS

**Exchange Act Defendants**

27.     Defendant FirstEnergy is an electric utility company headquartered in Akron, Ohio with subsidiaries and affiliates involved in the distribution, transmission and generation of electricity, as well as energy management and other energy-related services.  Its ten electric utility operating companies comprise one of the United States' largest investor-owned utilities, serving more than six million customers in Ohio, Pennsylvania, West Virginia, Virginia, Maryland, New Jersey and New York.  During the Class Period, the Company also owned and operated the Nuclear Plants.  The Company's common stock is listed on the New York Stock Exchange ("NYSE") under the ticker symbol "FE."

28.     Defendant Charles E. Jones ("Jones") served as CEO and a director of FirstEnergy during the Class Period.  He was terminated by the Company in October 2020 for his role in the Bailout Scheme.

29.     Defendant James F. Pearson ("Pearson") served as Chief Financial Officer ("CFO") of FirstEnergy until March 2018, at which time he transitioned to Vice President of Finance of FirstEnergy until his retirement in April 2019.  He was also a key member of the FES Restructuring Working Group, which oversaw the Company's efforts to reduce its liabilities in connection with the Nuclear Plants.

30.     Defendant Steven E. Strah ("Strah") was appointed Acting CEO of FirstEnergy in October 2020.  Prior to this time, he served as President of FirstEnergy, a position he had held since

– 9 –

May 2020.  Strah also previously served as FirstEnergy's CFO beginning March 2018 and, prior to that time, the Company's Senior Vice President of FirstEnergy's Utilities Operations.

31.     Defendant K. Jon Taylor ("Taylor") took over as FirstEnergy's CFO from Strah. Prior to assuming this position, he was the Company's Controller and Chief Accounting Officer until March 2018, after which time he became President of FirstEnergy's Ohio Operations and, in 2019, its Vice President of Utilities Operations.

32.     Defendant Michael Dowling ("Dowling") served as FirstEnergy's Senior Vice President ("SVP") of External Affairs during the Class Period.  He was terminated by the Company in October 2020 for his role in the Bailout Scheme.

33.     Defendant Dennis M. Chack ("Chack") served as FirstEnergy's SVP of Product Development, Marketing and Branding during the Class Period.  He was terminated by the Company in October 2020 for his role in the Bailout Scheme.

34.     Defendant Ty R. Pine ("Pine") served as a FirstEnergy lobbyist and its Ohio Director of State Affairs during the Class Period.

35.     Defendant Robert Reffner ("Reffner") served as FirstEnergy's SVP Chief Legal Officer.  Previously, during the Class Period, Reffner served as FirstEnergy's VP Legal and VP General Counsel in 2018.  He was terminated by the Company in November 2020 for his role in the Bailout Scheme.

36.     Defendant Leila L. Vespoli ("Vespoli") served as FirstEnergy's Executive VP of Corporate Strategy and Regulatory Affairs and Chief Legal Officer until her retirement in April 2019.  She was also a key member of the FES Restructuring Working Group, which oversaw the Company's efforts to reduce its liabilities in connection with the Nuclear Plants.

37. Defendant John Judge ("Judge") is the CEO and President of Energy Harbor. He assumed this position in February 2019, prior to which he served as the Chief Risk Officer of FirstEnergy.

38. Defendant Donald R. Schneider ("Schneider") served as CEO and Chairman of FES at the start of the Class Period. He remained CEO of FES until defendant Judge assumed that position in March 2019. Schneider remained FES Chairman until FES completed its bankruptcy restructuring and emerged as Energy Harbor.

39. The defendants referenced in ¶¶28-38, above, are collectively referred to as the "Officer Defendants." FirstEnergy and the Officer Defendants are referred to as the "Exchange Act Defendants" or "defendants."

40. During the Class Period, the Officer Defendants ran the Company as hands-on managers, overseeing FirstEnergy's operations, business practices and finances, and made the materially false and misleading statements described herein. The Officer Defendants had intimate knowledge about core aspects of FirstEnergy's financial and business operations, including the Company's nuclear operations, the Company's external affairs and lobbying efforts, and the activities alleged in the Criminal Proceedings. They were also intimately involved in deciding which disclosures would be made by the Company. The Officer Defendants personally orchestrated the corrupt and fraudulent scheme detailed herein, and several have been fired subsequently by FirstEnergy for their involvement in the Bailout Scheme and related misconduct.

## SUBSTANTIVE ALLEGATIONS

### A.     FirstEnergy's Nuclear Problem

41. FirstEnergy and its subsidiaries comprise one of the nation's largest investor-owned electric systems, historically generating electricity from nuclear, fossil fuel, wind and solar sources and serving over six million customers in the Midwest and Mid-Atlantic regions. FirstEnergy's

service areas encompass approximately 65,000 square miles in Ohio, Pennsylvania, West Virginia, Maryland, New Jersey and New York, with a combined population of approximately 13.3 million.

42.     FirstEnergy owned and operated the Nuclear Plants through its wholly owned subsidiaries, FES and FENOC.[1]  Beginning in 1996, FENOC failed to properly implement corrosion control and corrective action programs at its Davis-Besse plant.  To conceal the damage from these failures, in late 2001, FENOC made a series of false statements to the United States Nuclear Regulatory Commission (the "NRC").  Eventually, inspectors discovered at Davis-Besse the worst corrosion ever found at a U.S. reactor, including an acid leak that closed the plant for extensive repairs from 2002 to 2004.  In January 2006, FENOC admitted to making false representations to the NRC, but, to avoid a criminal conviction, FENOC entered into a deferred prosecution agreement with the government that required it to pay $28 million in fines and community service projects.  FirstEnergy also entered into an $85 million settlement with investors to resolve allegations of fraud in connection with the incident.  *See In re First Energy S'holder Derivative Litig.*, No. 5:03-cv-01826 (N.D. Ohio).

43.     In the wake of the Davis-Besse incident, the maintenance costs at the Nuclear Plants continued to climb as demand for nuclear power declined due to less-expensive alternatives, such as natural gas.  FirstEnergy focused on cost reductions, asset sales and deactivations, but FirstEnergy continued to leak profits through the Nuclear Plants.

44.     By 2016, FirstEnergy had decided to exit the competitive energy-generation market entirely to focus on the monopolistic regulated energy-transmission market.  The Nuclear Plants

---

[1]     Following a March 2018 bankruptcy and later reorganization, FES and FENOC were renamed Energy Harbor LLC (a subsidiary of Energy Harbor Corp.) and Energy Harbor Nuclear Corp., respectively.  Although these subsidiaries were separated and deconsolidated from FirstEnergy's financial results, the Company continued to have numerous, material financial entanglements with FES and FENOC and an active role in financing and overseeing the corrupt conspiracy to pass HB6, as detailed herein.

were key obstacles to this transition, as FirstEnergy forecast that the Nuclear Plants would result in hundreds of millions of dollars in losses. The Nuclear Plants grew to dominate FirstEnergy earnings calls and analyst coverage, as investors grew increasingly concerned about the potential liabilities stemming from the Nuclear Plants. In response, defendants reassured investors that FirstEnergy was pursuing a legislative fix. For example, in FirstEnergy's 2016 Annual Report, filed on February 21, 2017, the Company stated that it intended to pursue "legislative or regulatory solutions" to address the problem. Likewise, FirstEnergy's CEO, Jones, repeated this plan on the Company's annual earnings call held with investors the next day, stating that FirstEnergy sought "legislative or regulatory initiatives for [nuclear power] generation that recognize its environmental or energy security benefits."

**B.    FirstEnergy Tries and Fails to Escape Its Liabilities Through Bankruptcy Proceedings**

45.    Despite being ostensibly a separate company with its own board of directors, FES was deeply intertwined with, and dependent upon, FirstEnergy. To escape the potentially limitless expenses associated with decommissioning the Nuclear Plants, as well as environmental liabilities from closing its fossil fuel sites (such as coal-burning sites), FirstEnergy needed to get rid of FES. Towards this end, on March 28, 2018, FirstEnergy announced its intention to shut down the Nuclear Plants. Then, on March 31, 2018, FES, FENOC and related entities (collectively referred to as "FES") filed for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Ohio.

46.    After entering FES into bankruptcy, FirstEnergy deconsolidated FES from its financial statements. According to FirstEnergy's 1Q18 Form 10-Q, filed on April 23, 2018, the deconsolidation resulted in a $1.2 billion gain for FirstEnergy. However, FirstEnergy and FES remained operationally intertwined. For example, FES did not have the ability to perform functions like "external affairs and communications." As part of the bankruptcy, these services would

- 13 –

continue to be provided by FirstEnergy via its subsidiary, FirstEnergy Service Corporation ("FESC"), under a shared services agreement between FirstEnergy and FES.

47.     FES was so dependent on FirstEnergy, the bankruptcy court described the two companies as "joined at the hip" and FES as "utterly incapable" of operating without the shared services agreement.  The bankruptcy court described the continuing reliance on FirstEnergy by FES – including for FES's legal, external affairs and communications activities – in pertinent part as follows:

> *One of the FE Non-Debtor Parties, FirstEnergy Service Corporation ("FESC"), has historically provided shared corporate-level services to [FES] and [FirstEnergy] alike.  These functions include*, *inter alia*, human resources, information technology, controller, ***legal, external affairs and communications***, corporate real estate and records management, supply chain, fleet engineering, fleet operations and outage support, environmental, and corporate affairs and community involvement services (the "Shared Services").  *As of the Petition Date, the Debtors had little or no personnel or equipment of their own dedicated to these functions*, and many of these services would have been, as stated in the declaration of the Debtors' chief restructuring officer, "nearly impossible and prohibitively expensive for the Debtors to replace . . . .  **The Debtors would be utterly incapable of operating their businesses in any form, let alone in a 'business-as-usual' manner, absent the Shared Services**." (Decl. of Charles M. Moore, ECF No. 24, ¶22.)  The Debtors and FE Non-Debtor Parties are also party to a number of intercompany agreements related to the core generation business of the Debtors, including, *inter alia*, power purchase agreements, operating and maintenance agreements, and fuel supply agreements. . . .  ***These are only two significant ways among several that the Debtors and FE Non-Debtor Parties were joined at the hip as of the Petition Date***.[2]

48.     FirstEnergy and FES were equally enmeshed financially, as FirstEnergy had loaned (on both a secured and unsecured basis) more than $700 million to FES.  Bankruptcy filings described the continued financial entanglement between the two companies as follows:

> FE Corp. is both a secured creditor and an unsecured creditor of FES and is expected to play an active role in the Debtors' chapter 11 cases.  FE Corp. is owed

---

[2]     *In re LLC Energy Harbor, Pleasants Corp.*, No. 5:18-BK-50757, ECF No. 3135 (Bankr. N.D. Ohio Aug. 29, 2019).  All "Bankruptcy ECF No." references contained in this sub-section refer to filings in the bankruptcy proceeding.  Emphasis is added and citations are omitted throughout unless otherwise indicated.

- 14 –

$700 million on account of the secured revolving credit facility and approximately $4.4 million in unsecured debt obligations.[3]

49.     FES's creditors saw no meaningful distinction between FirstEnergy and FES, accusing the companies of failing to recognize any of the formal corporate boundaries purportedly separating them, as reflected in the following bankruptcy filing:

> Prior to the commencement of these Cases, it appears that the Debtors' ultimate parent, FirstEnergy Corp. ("FEC"), *operated the Debtors without regard to corporate boundaries, legal separateness, and independent fiduciary duties*. As the Court is aware, the Committee is analyzing an array of dubious prepetition transactions that appear to have been orchestrated by non-debtor FEC to the detriment of one or more of the Debtors.[4]

50.     Because FirstEnergy was operationally and financially intertwined with FES, FES's creditors were prepared to commence litigation against FirstEnergy over FES's inability to pay its debts. For all practical purposes, any actual or potential FES liabilities were also potential liabilities for FirstEnergy, including the billions of dollars needed to decommission the Nuclear Plants. Though FirstEnergy had paid into a trust fund for decommissioning costs, the funds were insufficient. Some estimates put the shortfall at well over a billion dollars. FirstEnergy was left with two options: (i) obtain a release of future liabilities from the bankruptcy court; or (ii) postpone the decommissioning process to delay those expenses as far into the future as possible.

51.     To resolve its liabilities tied to the Nuclear Plants (and fossil-fuel sites), FirstEnergy proposed to the bankruptcy court a "settlement" with FES in which: (i) FirstEnergy would contribute cash, assets and debt forgiveness to satisfy FES's creditors; (ii) FES's creditors would release FirstEnergy from liability for FES's debts; and (iii) the bankruptcy court would grant FirstEnergy sweeping releases from any and all future claims asserted against FES by parties not involved in the bankruptcy.

---

[3]     Bankruptcy ECF No. 55.

[4]     Bankruptcy ECF No. 756.

52.     The broad release sought by FirstEnergy met stiff resistance from multiple stakeholders.  If granted, FirstEnergy would be released from potential claims brought by local, state or federal agencies, as well as citizens or environmental groups, in connection with nuclear decommissioning or environmental cleanup expenses.  The Department of Justice ("DOJ"), on behalf of the Environmental Protection Agency ("EPA"), panned the release as attempting to saddle the debtors with liabilities arising from FirstEnergy's ownership of the impacted sites, stating in pertinent part as follows:

> Here, [FirstEnergy] owned and/or operated many of the Sites for years before the Debtors became owners or operators and therefore have significant independent liabilities based on their own acts or omissions during the time of their ownership and operation that have nothing to do with the Debtors.[5]

53.     Various stakeholders also protested FirstEnergy's efforts to keep them out of the negotiations, including various governmental agencies, including the EPA and the Office of the Ohio Attorney General ("Ohio AG"), as well as citizens and environmental groups.  For instance, a January 29, 2019 notice from the relevant governmental agencies complained that they had been excluded from negotiations and stated their "particular concern" regarding FirstEnergy's "liability for decommissioning Debtors' nuclear facilities."[6]

54.     On March 12, 2019, the DOJ, on behalf of the EPA, formally objected to the plan of reorganization, contending that because the breadth of the proposed releases violated environmental laws.  The DOJ's bankruptcy filing stated in pertinent part as follows:

> The Disclosure Statement should explain the legal authority for allowing the Reorganized Debtors to not protect public health and safety from hazards, contamination, or defects on their property should they arise in whole or part from acts or omissions prior to the Effective Date.  The Disclosure Statement should note

---

[5]     Bankruptcy ECF No. 2398 at 3.

[6]     Bankruptcy ECF No. 2035 at 2.

that the Governments believe that this and any similar provision in the Plan is forbidden by law.[7]

55.      Further briefing by the DOJ accused FirstEnergy and FES of "abus[ing]" the bankruptcy process by placing the nuclear decommissioning costs and other environmental liabilities on FES while releasing FirstEnergy, the culpable party.  The DOJ filing stated in pertinent part as follows:

> **At this point, the contours of the deal struck by the Debtors, FE Non-Debtor Parties, and favored creditors are clear: FirstEnergy Corp. would agree to contribute cash and other value to the reorganization, and in exchange the Debtors would seek to use the bankruptcy proceeding to release FirstEnergy Corp. and all other FE Non-Debtors from extensive independent, non-derivative liabilities (to the Governments and others)** based on the FE Non-Debtors' own independent acts or omissions.  **This scheme is an abuse of the bankruptcy system** that would impermissibly allow the FE Non-Debtors "to receive a major benefit of the bankruptcy process without having to be subject to any of its burdens and safeguards."[8]

56.      Other stakeholders piled on.  For example, the Ohio Consumer Counsel focused on the future costs of decommissioning the Nuclear Plants, stating in pertinent part as follows:

> [T]he Plan allows FES's future equity holders (owners) to enjoy the upsides of any future improvement in FES's operations while they shed certain downside risks that could instead be ultimately imposed upon Ohioans.  Were funds for decommissioning to be inadequate, for example, consumers or taxpayers might be (unfairly) called upon to fund FirstEnergy and FES's power plant decommissioning liabilities to federal and state governments.  Under FES's own Plan these decommissioning events will stretch for at least 60 years into the future.  Even FES concedes that its projected decommissioning costs for power plants and related environmental liabilities exceeds $2 billion.[9]

57.      The Environmental Law and Policy Center ("ELPC") likewise objected that FES's revenues would be insufficient to cover cleanup and decommissioning expenses, so if the bankruptcy

---

[7]      Bankruptcy ECF No. 2276.

[8]      Bankruptcy ECF No. 2423.

[9]      Bankruptcy ECF No. 2395 at 2-3.

court allowed FirstEnergy to escape its liability for these expenses, ratepayers would be stuck with the bill.[10]

58.     In response to these objections, FES described the releases as "essential" terms of the plan of reorganization and a "condition precedent" to obtaining assets and funds from FirstEnergy that would satisfy FES's creditors.  FES warned the bankruptcy court that it was "highly likely" that its settlement with FirstEnergy would be "terminated" if the court did not approve the releases, which it claimed provided the "cornerstone" to the bankruptcy agreement between FirstEnergy, FES and its creditors.

59.     In a subsequent bankruptcy filing, FES predicted that if the Court did not approve the terms of release, FirstEnergy would renege on its settlement agreement with FES and FES's creditors (which it was entitled to do by its terms), thus withdrawing billions in financial support, and sue FES over its debt obligations.  FES stated in pertinent part as follows:

> Without these releases, and the related consideration and claims waivers being provided under the FE Settlement Agreement, not only would this Plan not be possible, but it is unlikely that [FES] would be able to reorganize at all.  Instead, [FES] would likely expend all [its] resources litigating against [FirstEnergy], *leaving the Debtors unable to confirm a plan* over the rejection and objection of [FirstEnergy] – who hold[s] over $2 billion in asserted claims (including $700 million in secured claims) against [FES].[11]

60.     FirstEnergy submitted its own briefing in which it continued to describe the third-party releases as necessary pieces of the settlement, the plan of reorganization and FirstEnergy's proposed contribution of $3 billion into the FES estate.  FirstEnergy threatened that removal of the releases would have "disastrous" effects on the agreements in place between FirstEnergy, FES and the creditors, stating in pertinent part as follows:

---

[10]     Bankruptcy ECF No. 2419 at 3, 6.

[11]     Bankruptcy ECF No. 2397 at 4-5.

4823-8789-7564.v3

[FirstEnergy] strongly[s] support [FES's] effort to successfully reorganize their businesses and responsibly decommission their power facilities and have agreed to contribute approximately $3 billion of value towards those efforts pursuant to a settlement agreement approved by this Court. In exchange for this substantial contribution, *[FirstEnergy] require[s] that their businesses and operations be separated completely from the Debtors, their businesses and liabilities related thereto*. [FirstEnergy's] Third Party Release is one of many aspects of this separation.

During the March 19, 2019, hearing . . . the Court asked for supplemental briefing on two questions . . . . With regard to the first question, the scope and effect of the [FirstEnergy's] Third Party Release – *as well as the disastrous consequences of its removal from the Plan* – are set forth in detail in the Disclosure Statement and are further described herein for the Court's benefit.[12]

61.     FES's creditors also threatened that the bankruptcy "would fall apart" if the Court did not approve the "essential" releases. Without them, the creditors asserted, FirstEnergy, FES and the creditors would end up in endless litigation, stating in pertinent part as follows:

The releases being provided in the Plan to [FES's] non-debtor parent, FirstEnergy Corporation, and its non-debtor subsidiaries (*i.e.*, the "FE Non-Debtor Parties") are *essential* to the success of the Debtors' reorganization. . . . *Without these releases, the FE Settlement Agreement would fall apart*, the Debtors and their creditors would be back to the drawing board on a plan of reorganization (if one were still possible), the estates and the FE Non-Debtor Parties would find themselves enmeshed in sprawling, expensive, and complex litigation of indefinite duration . . . .[13]

62.     On April 4, 2019, the bankruptcy court held a hearing on the issue of the third-party non-consensual releases and found them to be unconfirmable under Sixth Circuit precedent. The Court orally denied the motion to approve FES's disclosure statement – effectively halting the bankruptcy process. The next day, April 5, 2019, *Crain's Cleveland Business* published an article titled "Judge puts up major roadblock in FirstEnergy Solutions' bankruptcy case," which stated in pertinent part as follows:

---

[12]     Bankruptcy ECF No. 2400 at 2.

[13]     Bankruptcy ECF No. 2399 at 2.

But Judge Alan Koschik gaveled a *huge wrench* into the companies' attempts to separate and survive independently. That was evident in a 5.5% decline in FirstEnergy Corp.'s (NYSE: FE) stock price.

\*     \*     \*

Whether Koschik put the case *in the garbage or back to square one* remains to be seen. What he did do, according to court dockets, was deny the approval of what is often a routine but critical document in a bankruptcy case. . . .

In this case, it's no small issue over no small potential amount of cash. FirstEnergy's plan was to separate itself from FES and any future responsibility it and FES might have for the cleanup of old coal plants and the Davis-Besse and Perry nuclear power plants, with FirstEnergy contributing around $1 billion to a deal that would leave FES a stand-alone company owned by its creditors.

63.     Having failed to convince the bankruptcy court to grant it an express release of liability for the decommissioning expenses, and with one of its failing nuclear plants set to close in less than a year, FirstEnergy was left with only one option. Specifically, FirstEnergy now needed to postpone expected decommissioning expenses for the Nuclear Plants indefinitely. The Company had been laying the groundwork for this backup plan for two years, placing in motion a corrupt scheme that would ultimately result in the passage of HB6.

### C.     The Legislative "Fix"

#### 1.     The Corrupt Passage of HB6

64.     Throughout the Class Period, FirstEnergy maintained to the investing public that it had ample "decision-making and oversight processes in place for political contributions and expenditures to ensure such contributions or expenditures [were] legally permissible and in the best interests of FirstEnergy." Externally, the Company used its political action committee ("FirstEnergy PAC") to establish a facade of legitimate corporate contributions, all while it secretly poured millions into the Bailout Scheme to subvert Ohio's political process for its own gain. FirstEnergy utilized a complex web of individuals and entities to carry out its massive corruption scheme, through which it drafted, introduced, passed and then defended HB6.

- 20 –

65.     Householder's name was synonymous with public corruption, having finished his prior term as a state representative in 2004 while under federal investigation.  Back in office in 2017, FirstEnergy was already courting him, including taking him (and his sons) on a trip aboard FirstEnergy's private jet to President Trump's inauguration ceremony in January of that year.  In the months that followed, FirstEnergy further solidified its relationship with Householder by initiating payments to two newly minted 501(c)(4) organizations and bringing in additional members to the scheme: (i) Partners for Progress (formed January 26, 2017); and (ii) Generation Now (formed February 6, 2017).

66.     On March 5, 2017, the *Pittsburgh Post-Gazette* published an article titled "Beaver Valley Plant Hopes for State Aid."  The article reported that, according to Jones, FirstEnergy's top priority was "getting legislation that would recognize – monetarily – nuclear energy's lack of carbon emissions" and that in Ohio the legislation would "create a program where customers would pay a surcharge to fund zero-emission credits given to nuclear plants."  The article further reported that Jones was "expect[ing] an Ohio bill in support of nuclear energy to be introduced soon" and was "optimistic, 'given the discussions we've had so far,' that it will pass."

67.     Leading up to Ohio's spring 2018 primary elections – the first critical step in drumming up support for Householder's election to the speakership – FirstEnergy PAC had officially disbursed (and disclosed) a total of $464,204 in political contributions since 2017.  The unusual size of these donations caught the eyes of the press.  For example, on April 20, 2018, *Cleveland.com* posted a story titled, "FirstEnergy PAC writes big checks to House Speaker hopeful Larry Householder, campaign allies," which reported that these "big checks" totaled about $149,000 in early 2018 alone.  Disclosing these contributions, which represented only a fraction of FirstEnergy's true financial contributions to Householder and his affiliates, allowed FirstEnergy to distract attention away from its largesse in support of the Bailout Scheme, including, *inter alia*:

- 21 –

(a)    In 2017 and 2018, First Energy contributed $2.9 million to the Bailout Scheme, which defendants concealed throughout the Class Period.

(b)    On a single day in 2019, April 30, 2019 – about two weeks after HB6 was officially introduced – FirstEnergy made a $1.5 million payment to the Bailout Scheme, which defendants concealed throughout the Class Period.

(c)    In May 2019, FirstEnergy contributed $8 million to the Bailout Scheme, which defendants concealed throughout the Class Period.

68.    FirstEnergy routed most of its payments through Generation Now, whose bank accounts Jeff Longstreth ("Longstreth"), Householder's strategist, had opened. Almost immediately after its formation, FirstEnergy began making $250,000 quarterly payments to Generation Now, while also seeding Partners for Progress with $5 million soon after its launch.

69.    Longstreth has since pled guilty, admitting his involvement in the criminal conspiracy "to conceal the nature, source, ownership, and control of payments made by [FirstEnergy] to GENERATION NOW" for the benefit of Householder and other politicians and lobbyists "relating to the passage and preservation of [HB6] that would go into effect and save the operation of [the Nuclear Plants]."

70.    FirstEnergy's illegally large and illegally concealed contributions and payoffs enabled it to do exactly what campaign finance limits are designed to prevent: unfairly and clandestinely influence elections by buying the loyalty of Householder and other public officials to get HB6 written, considered and passed into law. The Bailout Scheme used FirstEnergy money for primary and general elections, successfully placing in office candidates who supported Householder's bid to become Ohio's Speaker of the House and, ultimately, pass HB6.

71.    With FirstEnergy's corrupt backing, on January 7, 2019, Householder was elected to serve as Speaker of the House for Ohio's 133rd General Assembly.

72.     Soon thereafter, FirstEnergy executives broadened the reach of the Bailout Scheme by buying the support of soon-to-be PUCO Chairman Randazzo with an illicit $4 million payment. Shortly after receiving FirstEnergy's money, Randazzo performed his part, using his position as PUCO Commissioner to help write and support HB6.

73.     On April 12, 2019, Householder introduced HB6 in the Ohio House.

74.     On May 29, 2019, Ohio's corrupted House members gathered enough votes to pass HB6. The bill provided the "fix" for FirstEnergy's nuclear problems, including $1.3 billion in subsidies for the Nuclear Plants funded by Ohio ratepayers. These subsidies meant the Nuclear Plants would not have to be decommissioned and FirstEnergy could avoid billions in decommissioning expenses.

75.     In the months that followed passage in the Ohio House, FirstEnergy paid over $7 million more to buy support in the Ohio Senate. In exchange, a lucrative "decoupling" provision was added to HB6, providing another $100 million to FirstEnergy *annually*, again at ratepayers' expense. Through decoupling, HB6 effectively locked in the Company's 2018 revenue level – a record year due to hot weather and other factors – for the next five years. Regulators would later extend the effect of this provision until 2030. As a result, the public would be forced to continue paying higher rates to FirstEnergy, even if consumers used less electricity.

76.     "Decoupling" refers to regulatory measures that break the link between electricity sales and profits. In theory, without revenue decoupling, utilities have a strong incentive to increase their revenues with wasteful and costly energy consumption increases and a strong disincentive to advance energy efficiency – undermining society's environmental interests. Decoupling measures flip these incentives by paying utility companies to promote various energy-saving initiatives and programs, effectively compensating them for encouraging the public to use less electricity, which would otherwise reduce the companies' revenues.

- 23 –

77.     What made the HB6 decoupling provision such an unprecedented windfall for FirstEnergy, at the public's expense, is that it did not include the standard mandates to require the Company to promote various energy-saving initiatives and programs.  For FirstEnergy, it was money for nothing (other than the corrupt payments in support of the Bailout Scheme, that is).  As summarized by the National Resources Defense Council:

> HB 6 contains what some have called a "decoupling" provision, but this section of the law passed last year had absolutely nothing to do with energy efficiency (which HB 6 effectively extinguished as a priority for all the state's major utilities).  ***Instead, that section awarded FirstEnergy a legal entitlement to unconscionably inflated annual revenues, usurping the authority of the state's utility regulators***.  That revenue guarantee should go straight into the legislative dustbin, along with the rest of HB 6.
>
> This kind of chicanery has nothing to do with "revenue decoupling," which uses small annual rate adjustments (both up and down) to ensure that fluctuations in sales don't affect utilities' ability to recover costs to operate their business as authorized by their regulators, following an open public process.

78.     The Ohio Senate passed this amended version of HB6.  On July 23, 2019, the Ohio House voted to approve the amended bill, and Ohio's governor signed it into law the same day.

79.     In a July 24, 2019 press release, Judge, on behalf of Energy Harbor, applauded the enactment of HB6 into law, calling it "a monumental step in helping to avoid the premature closure of the company's two nuclear plants in Ohio while preserving 4,300 highly-skilled jobs and an important economic engine for the state economy."  Judge commended Ohio's legislature for "'drafting a bill that preserves the state's nuclear assets, reduces the customers' electric bills and provides rigorous oversight to protect customers if market conditions change.'"  Judge praised the Bailout Scheme's quarterback, Householder, stating, "'We're also thankful for the support and commitment by Speaker Householder.'"

80.     By July 2019, FirstEnergy's reported contributions through its PAC had increased to nearly $1 million.  Again, FirstEnergy's disclosure of what seemed like large contributions gave the appearance of business as usual, diverting attention from the Bailout Scheme.  As the *Columbus*

*Dispatch* reported shortly after the passage of HB6: "There's nothing wayward about it – the donations are legal and disclosed – but you can safely say FirstEnergy Corp. realized a good return on its investment in Ohio politicians." Using these disclosed contributions for cover, FirstEnergy shot down any notion of impropriety, representing, "'FirstEnergy Corp. *makes and discloses all campaign contributions* in accordance with applicable state and federal laws.'"

### 2. The Corrupt Fight Against the Repeal of HB6

81. Due to the negative impact HB6 would have on Ohio ratepayers and environmental efficiency efforts, a referendum movement to repeal HB6 sprung up immediately. To appear on the upcoming ballot, supporters of the referendum had to collect approximately 265,000 signatures. FirstEnergy, Householder, and the other members of the Bailout Scheme jumped into action to prevent the referendum from making it to a vote.

82. From July 2019 to October 2019, FirstEnergy paid over $38 million into the Bailout Scheme (which defendants concealed throughout the Class Period).[14] At this point, the scheme was using other shell entities to further obscure FirstEnergy's connection to these payoffs, including Ohioans for Energy Security (which received $23 million from Generation Now). It was reported that in 2019, FirstEnergy also "donated $20 million to a dark money group, Partners for Progress" and "[t]he money from FirstEnergy Solutions found its way to Generation Now shortly before the Senate and House voted, on July 17 and 23, respectively, to pass House Bill 6, which was signed into law by DeWine."

83. FirstEnergy spent millions of dollars on mailers and ads discouraging Ohioans from signing the petitions. The ad campaign used offensive and misleading tactics, such as tying the repeal effort to the communist Chinese government as reflected in the following ad:

---

[14]     According to one report, FES (now known as Energy Harbor), also paid $1.88 million to Generation Now on July 5, 2019.





84. Lobbyist and co-conspirator Matt Borges executed other means to defeat the proposed referendum. Borges and his company, 17 Consulting Group, served as a conduit through which the Bailout Scheme spent over $1 million to defeat the proposed referendum. To that end, Borges used accounts he controlled to transfer $600,000 from Generation Now to Juan Cespedes ("Cespedes") (a lobbyist also working on behalf of FirstEnergy in furtherance of the Bailout Scheme), who used this money to disrupt signature collection efforts, engage others in anti-referendum efforts, and enrich himself.

85. FirstEnergy went so far as to fund over a half-million dollars in payments to 15 separate signature collection operations. These firms were paid to do absolutely nothing, effectively

- 26 –

preventing them from working for the repeal side. The Bailout Scheme also hired "blockers," meant to disrupt signature gathering efforts by intimidating those who may consider signing in support of the referendum. Borges even bribed those working for the repeal campaign for inside information or to stop collecting signatures.

86.     Defendants' payoffs once again paid off. The repeal campaign simply could not overcome the Bailout Scheme's unscrupulous tactics despite enjoying widespread public support, failing to meet an October 21, 2019 deadline. The very next day, FirstEnergy used an affiliate to send an additional $3 million to Generation Now.

87.     Defendants wasted no time in taking a victory lap. On November 4, 2019, during the Company's third quarter 2019 analyst conference call, Jones boasted that the HB6 decoupling provision "essentially takes about 1/3 of our company and I think makes it somewhat recession-proof."

### 3.     Meanwhile, Back in Bankruptcy Court

88.     On April 18, 2019, less than a week after Householder had introduced HB6 in the Ohio House, FES filed with the bankruptcy court an amended plan of re-organization that removed the supposedly indispensable non-consensual third-party releases. Despite FirstEnergy's prior threats to the contrary, the bankruptcy settlement did not unravel. HB6 provided the secret key ingredient to FirstEnergy's longstanding efforts to resolve its liabilities and potential claims relating to the Nuclear Plants.

89.     That same day, FirstEnergy issued a press release contradicting its prior statements that the third-party non-consensual releases were the cornerstone of the settlement between FirstEnergy, FES and the creditors and were necessary to justify the capital contributions it was making to the FES estate. Now, with HB6 providing the necessary financial support, FirstEnergy

stated it no longer expected the removal of the releases to impact its future liability, stating in pertinent part as follows:

> Standing behind our corporate responsibilities is a core value of FirstEnergy, including through the FES bankruptcy. . . .
>
> Following the judge's recent decision involving FES['s] bankruptcy, FES committed to engage with the Department of Justice and other concerned parties. In light of this commitment, we agreed to remove the broad third-party releases from the comprehensive settlement. While the non-consensual releases served to bring finality to FirstEnergy's involvement with these legacy assets, ***this change does not, in our assessment and experience, increase liabilities or obligations to our company***.

90.     On August 2, 2019, ELPC filed another objection to the latest plan of reorganization, despite the removal of the third-party releases, on the same basis it had previously articulated, *i.e.*, that FirstEnergy was leaving FES with inadequate funding to cover the future costs for nuclear decommissioning and environmental clean ups at the fossil fuel sites owned or being transferred to FES.

91.     FirstEnergy's response made clear that HB6 alleviated the Company's prior concerns. With HB6 having been signed into law, FES stated that any concern over deficient capitalization was alleviated by the legislative bailout. As a result of HB6, FES would be the recipient of substantial cash flows to further support future cleanup costs. In support of its opposition to the ELPC objection, FES submitted an expert declaration opining on the impacts of HB6 on FES's operations, as well as the bankruptcy proceedings, which highlighted that HB6 would delay nuclear decommissioning for the Nuclear Plants, reduce the decommission trust deficit, and provide resources to cover future environmental liabilities. The filing stated in pertinent part as follows:

> Listed below are key activities that are expected to occur with the passage of HB6:
>
> Reorganized NG would receive a nuclear resource credit (cash) up to $9.00 for each MWh of electricity a nuclear resource produces. Based on the anticipated annual generation of the Debtors' nuclear stations in Ohio, this would yield ***incremental operating cash flow of approximately $150 million per year***.

*　　*　　*

> Nuclear decommissioning activities and associated cash outlays, including spent fuel management costs and any required nuclear decommission trust deficit payments, ***are expected to be reduced during the projection period as a result of rescinding deactivation notices*** for the Ohio nuclear units.

*　　*　　*

> If the scenario described above is realized, the Debtors' capacity to meet expected post-emergence obligations of the Debtors would ***increase*** as a result of generating incremental cash flow over an extended period of time, thus ***increasing available cash resources*** to cover future environmental liabilities and other obligations. At the same time, ***post-emergence obligations would likely decrease*** as a result of ceasing deactivation activities at several plants.[15]

92. The bankruptcy court ultimately approved the plan of reorganization, noting that ELPC's concerns about decommissioning costs were now remote in time (a postponement solely attributable to HB6), stating in pertinent part as follows:

> And I think that the expenses that have been identified by the experts here, that are distant in time, are not unimportant – they're certainly important, but they are remote. And, therefore, the value of them as a present value is relatively *de minimis* compared to all of the other assets and claims that we have before us. And so I don't think it threatens feasibility.[16]

### 4. The Numerous Methods and Means of Defendants' Bailout Scheme

93. As set forth above, the Bailout Scheme employed many methods and means, including the following:

(a) Using bankruptcy proceedings to try to evade liability for the Nuclear Plants;

(b) Concealing the Bailout Scheme from the investing public and the bankruptcy court presiding over proceedings related to the Nuclear Plants;

(c) Paying lobbyists to orchestrate and execute the political corruption necessary to pass and preserve HB6;

---

[15]     Bankruptcy ECF No. 3057 at 2-3.

[16]     Bankruptcy ECF No. 3101 (August 26, 2019 Transcript at 265).

- 29 -

(d)      Creating and using a web of pass-through entities to transfer and conceal the money to finance the Bailout Scheme;

(e)      Making personal payments to corrupt politicians and at least one regulator;

(f)      Financing and supporting political campaigns with undisclosed contributions far greater than legally permitted;

(g)      Using corrupted politicians to advance HB6 for consideration, to amend HB6 for FirstEnergy's additional benefit, and ultimately to pass the bill;

(h)      Using a corrupted regulator to help write and support HB6; and

(i)      Corruptly preventing a referendum to repeal HB6.

94.      In addition to these methods and means, defendants also executed the Bailout Scheme through a series of materially false and misleading public statements, including statements about the following topics:

(a)      FirstEnergy's compliance with laws and regulations governing its business, operations and disclosures to investors;

(b)      The adherence of FirstEnergy and its executives to the Company's internal policies and Code of Conduct;

(c)      The nature of FirstEnergy's business and operations, including its external and regulatory affairs;

(d)      FirstEnergy's transition from the competitive generation business to a fully regulated utility company;

(e)      The extent and nature of the Company's political contributions and political activities;

(f)      FirstEnergy's efforts to pass HB6 and to separate from FES;

(g)     FirstEnergy's maintenance of effective internal control over its financial reporting; and

(h)     The material risks applicable to FirstEnergy's business, operations and prospects.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

95.     The Class Period begins on February 21, 2017.  On that date, FirstEnergy filed with the SEC its annual report on Form 10-K for the fiscal year ended December 31, 2016 (the "2016 10-K").  Jones, Pearson and Taylor signed the 2016 10-K on behalf of FirstEnergy.  Schneider also signed the 2016 10-K on behalf of FES.  In its 2016 10-K, FirstEnergy indicated that the Company was pursuing "*[l]egislative or regulatory solutions for generation assets that recognize their environmental or energy security benefits* . . . [a]dditional asset sales and/or plant deactivations . . . [r]estructuring FES debt with its creditors, and/or . . . [s]eeking protection under U.S. bankruptcy laws for FES and possibly FENOC."  The 2016 10-K also stated, with respect to FirstEnergy's subsidiary, FES, that "management is exploring capital and other cost reductions, asset sales, and other options to improve cash flow *as well as continuing with legislative efforts to explore a regulatory type solution*."

96.     Substantively similar statements were included in the annual report the Company filed with the SEC on Form 10-K on February 20, 2018 for the fiscal year ended December 31, 2017 ("2017 10-K"), in quarterly reports the Company filed with the SEC on Form 10-Q on April 27, 2017, on July 27, 2017 and on October 26, 2017 (the "2017 10-Qs"), respectively, and in preliminary and definitive proxy statements the Company filed with the SEC on Forms PRE 14A and DEF 14A on March 3, 2017 and March 30, 2017 (the "2017 Proxy Statements"), respectively.  The 2017 10-K was signed by Jones, Pearson and Taylor on behalf of FirstEnergy.  Schneider also signed the 2017 10-K on behalf of FES.  Each of the 2017 10-Qs was signed by Taylor on behalf of FirstEnergy.

- 31 –

97.     The 2016 10-K (dated February 21, 2017) also stated that FirstEnergy and its subsidiaries "comply with the related regulations, orders, policies and practices prescribed by the SEC, FERC, and, as applicable, the PUCO, the PPUC, the MDPSC, the NYPSC, the WVPSC, the VSCC, and the NJBPU" and that FES "complies with the regulations, orders, policies and practices prescribed by the SEC, FERC, NRC and applicable state regulatory authorities."

98.     The Company included substantively similar statements in each of the other Form 10-Ks and Form 10-Qs filed by the Company during the Class Period.  The Company filed the other Form 10-Ks, in addition to the above-referenced 2017 10-K, on February 19, 2019 (the "2018 10-K")[17] and on February 10, 2020 (the "2019 10-K").  The 2018 Form 10-K was signed by Jones and Strah while the 2019 10-K was signed by Jones and Strah.  The Company filed the other Form 10-Qs, in addition to the above-referenced 2017 10-Qs, on April 23, 2018, on July 31, 2018, and on October 25, 2018 (together, the Company's "2018 10-Qs"); on April 23, 2019, on July 23, 2019, and on November 4, 2019 (together, the Company's "2019 10-Qs"); and on April 23, 2020 (the Company's "2020 Q1 10-Q"), respectively.

99.     The Company's 2016 10-K (dated February 21, 2017) further represented that FirstEnergy's and FES's internal controls over financial reporting and disclosures were effective, stating in pertinent part as follows:

> The respective management of FirstEnergy and FES, with the participation of each respective registrant's chief executive officer and chief financial officer, have reviewed and evaluated the effectiveness of their registrant's disclosure controls and procedures, as defined in the Securities Exchange Act of 1934, as amended, Rules 13a-15(e) and 15d-15(e), as of the end of the period covered by this report.  Based on that evaluation, the chief executive officer and chief financial officer of each

---

[17]     On March 6, 2019, FirstEnergy filed a Form 10K/A with the SEC to replace the Exhibit 23 - Consent of Independent Registered Public Accounting Firm that was filed with the original 2018 10-K.  In connection therewith, Jones and Strah filed certifications that the annual report did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

registrant have concluded that each respective registrant's disclosure controls and procedures were effective as of the end of the period covered by this report.

*    *    *

Management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) of the Securities Exchange Act of 1934. Using the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in *Internal Control – Integrated Framework* published in 2013, the respective management of each registrant conducted an evaluation of the effectiveness of their registrant's internal control over financial reporting under the supervision of each respective registrant's Chief Executive Officer and Chief Financial Officer. Based on that evaluation, the respective management of each registrant concluded that their registrant's internal control over financial reporting was effective as of December 31, 2016.

This statement was also made in the Company's 2017 10-K, and the same substantive statement regarding the effectiveness of FirstEnergy's internal controls was included in FirstEnergy's 2018 10-K and 2019 10-K. The Company included substantially similar statements regarding the effectiveness of its and/or FES's internal controls in its 2017 10-Qs, 2018 10-Qs, 2019 10-Qs and 2020 Q1 10-Q.

100.    The Company's 2016 10-K also stated that "there were no changes in internal control over financial reporting that have materially affected, or are reasonably likely to materially affect, FirstEnergy's or FES['s] internal control over financial reporting." This statement was also made in the Company's 2017 10-K, and the same substantive statement regarding the absence of changes to FirstEnergy's internal controls was included in the Company's 2018 10-K and 2019 10-K. The Company included similar statements regarding the absence of changes to FirstEnergy's and/or FES's internal controls in its 2017 10-Qs, 2018 10-Qs, 2019 10-Qs and 2020 10-Q.

101.    The Company's 2016 10-K also featured 20 pages of "Risk Factors" on a variety of subjects which purportedly included the most significant risks facing the Company, including, *inter alia*: (i) "Risks Related to the Transition to a Fully Regulated Utility"; (ii) risks related to FES, including the FES bankruptcy proceedings; (iii) risks related to the "deactivation of one or more of

the nuclear generating units"; (iv) the risk that a "Failure to Provide Safe and Reliable Service and Equipment Could Result in Serious Injury or Loss of Life That May Harm Our Business Reputation and Adversely Affect our Operating Results"; (v) risks from "Temperature Variations as well as Weather Conditions or other Natural Disasters"; (vi) the risk that "Cyber-Attacks, Data Security Breaches and Other Disruptions to Our Information Technology Systems Could Compromise Our Business Operations, Critical and Proprietary Information and Employee and Customer Data, Which Could Have a Material Adverse Effect on Our Business, Financial Condition and Reputation"; (vii) risks related to "Physical Acts of War, Terrorism or Other Attacks on any of Our Facilities or Other Infrastructure"; "Risks Associated With Regulation," including PUCO specifically; and (ix) "Risks Associated with Climate Change." None of the Company's SEC filings mentioned any risks in connection with the Bailout Scheme. The Company's Risk Factors in its Form 10-Ks for 2017-2019 were virtually identical to the foregoing, with minor differences primarily attributable to timing (*e.g.*, by the time of its 2018 10-K, FirstEnergy had already transitioned to a fully regulated utility company).

102.    Jones and Pearson filed signed certifications with the SEC attesting that the 2016 10-K: "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading." Jones and Pearson also attested that they had "designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision." Jones and Pearson further certified that FirstEnergy's disclosure controls had been designed to ensure that material information relating to the Company and its consolidated subsidiaries were made known to them. Jones, Pearson and/or Strah filed substantively identical certifications in connection with the other Form 10-Ks and Form 10-Qs the Company filed during

- 34 –

the Class Period. Schneider also filed substantively identical certifications on behalf of FES in connection with the 2016 10-K, the 2017 10-Qs and the 2017 10-K.

103. On February 22, 2017, FirstEnergy held an earnings call with analysts and investors. Jones, Pearson, Taylor and Vespoli participated in the call. During the call, Jones stated: "[w]e continue to assess and evaluate a number of strategic alternatives for our companies for our competitive business, including asset sales, legislative or regulatory initiatives for generation that recognize its environmental or energy security benefits." Jones continued in pertinent part as follows:

> *In Ohio, we have had meaningful dialogue with our fellow utilities and with legislators on solutions that can help ensure Ohio's future energy security*. Our top priority is the preservation of our two nuclear plants in the state and legislation for a zero emission nuclear program is expected to be introduced soon. The ZEN program is intended to give state lawmakers greater control and flexibility to preserve valuable nuclear generation. . . .
>
> *We are advocating for Ohio's support for its two nuclear plants, even though the likely outcome is that [the Company] won't be the long-term owner of these assets. We are optimistic, given these discussions we have had so far and we will keep you posted as this process unfolds*.

104. In its 2017 Proxy Statements, FirstEnergy represented that the Company was committed to "good corporate governance," which was important to the success of its business and advancing shareholder interests, and identified "integrity," "openness" and "trust" as among the core "behaviors" through which "employees contribute [to FirstEnergy's] success." FirstEnergy expounded upon the foregoing terms in Corporate Responsibility Reports issued in 2019 and 2020, which included a message from Jones and the Chair of the Corporate Governance and Corporate Responsibility Committee that corporate responsibility includes "upholding high standard for corporate governance." FirstEnergy stated in pertinent part as follows:

- Integrity: We consistently demonstrate ethical behaviors, values, expectations and outcomes. We work to create an environment where ethical behaviors are expected. We have strength of character, strength of will and moral fiber.

- Openness: We are authentic, humble and true to ourselves. We communicate openly and honestly. We actively listen and respond with empathy. . . .

- Trust: We are honest, reliable, respectful, consistent, dependable and credible. We are committed to doing what's right. We respect and trust the capabilities, intention and performance of others.[18]

105.    The 2017 Proxy Statements also stated that FirstEnergy's Code of Business Conduct (the "Code of Conduct") "applies to all employees, including the CEO, CFO, and Chief Accounting Officer," and that the Board had a Director Code of Ethics and Business Conduct ("Director Code of Conduct"). FirstEnergy repeated substantively identical statements to those referenced herein and above in preliminary and definitive proxies filed with the SEC on March 2, 2018, March 30, 2018 (together, the Company's "2018 Proxy Statements"), March 1, 2019, April 1, 2019 (together, the Company's "2019 Proxy Statements"), March 4, 2020 and April 1, 2020 (together, the Company's "2020 Proxy Statements").

106.    In a version of FirstEnergy's Code of Conduct made available prior to the statements noted above (dated September 15, 2015),[19] Jones stated as follows:

> *Maintaining high ethical standards builds trust with our customers, shareholders, fellow employees, and the communities we serve. At FirstEnergy, we are all responsible for upholding high standards and being aware of ethical issues that we may face on the job. . . . It applies equally to all employees of FirstEnergy Corp., including the Chief Executive Officer, Chief Financial Officer and Chief Accounting Officer.*
>
> *Everything we do reflects on us both personally and as a company.*

---

[18]    FirstEnergy Corporate Responsibility Report, FirstEnergy_2018CorporateResponsibility Report.pdf. Substantially similar language remains posted on FirstEnergy's website, although it has been subsequently updated to include fallout from the Bailout Scheme, as discussed below. *See* FirstEnergy Corporate Responsibility, Mission, Core Values and Behaviors, https://fecorporateresponsibility.com/governance/mission-core-values-and-behaviors/ (last visited Feb. 26, 2021).

[19]    FirstEnergy Corp. Policy 101, Code of Business Conduct (Sept. 15, 2015), https://web.archive.org/web/20151017035327/https://www.firstenergycorp.com/content/dam/investo r/files/policies-charters/code-of-business-conduct.pdf.

107. This version of FirstEnergy's Code of Conduct also stated, among other things, as follows:

**Commitment to Maintaining the Highest Standards of Business Conduct**

*This Code of Business Conduct (the "Code") serves as a reminder of the high standards we must meet in our day-to-day business activities*. It also helps to guide us when formulating and pursuing Company goals and objectives.

*As FirstEnergy employees, we are all responsible for complying with the principles included in this Code*.

\*　　\*　　\*

**Guiding Principles of Business Conduct**

*It is the responsibility of every one of us to comply with all applicable laws, rules and regulations and all provisions of this Code and related policies and procedures. This Code is designed to encourage you to lead by example with ethics and integrity* . . . . In addition, our Company has adopted a Corporate Compliance Program ("Program") to assist all business units and employees to fully comply with all applicable laws, regulations and policies. The Program demonstrates that we intend to operate our business in accordance with sound business ethics. It includes many guiding principles for specific standards of conduct.

"*Maintaining high ethical standard builds trust with customers, shareholders, fellow employees, and the communities we serve. At FirstEnergy, we are all responsible for upholding high standards and being aware of ethical issues that we may face on the job*."

**Relationship with Others**

**Fair Dealing** – *We have built a reputation as a trustworthy and ethical member of our community and our industry. We are committed to maintaining the highest levels of integrity and fairness within our Company*. When we fail to negotiate, perform or market in good faith, we may seriously damage our reputation and lose the loyalty of our customers. You must conduct business, including dealings with the Company's customers, suppliers, competitors and other employees honestly and fairly and not take unfair advantage of anyone through any misrepresentation of material facts, manipulation, concealment, abuse of privileged information, fraud or other unfair business practice.

\*　　\*　　\*

**Protection of Corporate Assets, Including Corporate Funds** –*We have a responsibility to use Company assets efficiently and to protect them from loss, theft, misuse or waste. Company assets and funds may be used only for legitimate business purposes and may never be used for illegal purposes*. Do not keep

– 37 –

undisclosed funds nor establish any undisclosed accounts while conducting your work. ***Do not knowingly cause corporate funds to be used for unlawful purposes*** or for purposes other than those described by the documentation supporting payment.

*     *     *

**Compliance with the Law** – Endeavor to comply with both the letter and spirit of all applicable U.S. and foreign laws, rules, and regulations. . . .  Do not knowingly take, or permit to be taken, or permit to be taken, any action on behalf of the Company that violates any law, rule or regulation.  Acknowledge that you are expected to have an understanding of the applicable laws, rules and regulations that affect our work assignments.

108.    The latest version of FirstEnergy's Code of Conduct (revised on May 26, 2020),

contains substantially similar language as above, and also includes the additional highlighted

language below:

You must conduct business, including dealings with the Company's customers, suppliers, competitors and other personnel, honestly and fairly and not take unfair advantage of anyone through any misrepresentations of material facts, manipulation, concealment, abuse of privileged information, fraud, ***bribes, kickbacks, illegal payments, cash gifts, cash equivalent gifts or other unfair business practices. Also, please be aware that special rules apply when dealing with government employees***.[20]

109.    A version of the FirstEnergy Director Code of Conduct made available prior to the

statements discussed above (dated September 15, 2015), which contains language similar to that

contained in the current version of the Director Code of Conduct, stated in pertinent part as follows:

The Board of Directors (the "Board") of FirstEnergy Corp. (the "Company") has adopted the following Code of Ethics and Business Conduct (the "Code") for directors of the Company.  This Code is intended to provide guidance to directors to help them recognize and deal with ethical issues, to help foster a culture of honesty and accountability, and to provide mechanisms to report unethical conduct.  Each director must comply with this Code.

*     *     *

Directors shall protect the Company's assets from loss, theft, misuse and waste.  ***Directors shall also ensure that the Company's assets are being used efficiently and for legitimate business purposes***.

---

[20]    FirstEnergy Corp. Policy 101, Code of Business Conduct, https://www.firstenergycorp.com /content/dam/investor/files/policies-charters/code-of-business-conduct.pdf (May 26, 2020).

- 38 –

\*     \*     \*

> *Directors shall comply, and oversee compliance by employees, officers and other directors, with laws, rules and regulations applicable to the Company.*
>
> Directors shall not take unfair advantage of others through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or through any other unfair-dealing practice.[21]

110. The 2017 Proxy Statements were filed in connection with an annual shareholder meeting scheduled for May 16, 2017 where shareholders were asked to vote on, among other things, a shareholder proposal requesting an annual report on the Company's lobbying policies and payments. In recommending that shareholders vote against the proposal, FirstEnergy stated in pertinent part as follows:

> By engaging with elected officials, regulators, community and business leaders, and other decision makers, your Company strives to ***conduct its business as transparently as possible to serve customers effectively and help build public trust***.
>
> In addition to the existing extensive framework of laws and public disclosure, your Company adopted a Political Activity Policy, which was most recently updated in October 2016.

\*     \*     \*

> The Political Activity Policy also provides links to access your Company's federal lobbying reports. Your Company complies with all federal and state lobbying registration and disclosure requirements, which include filing all required reports with the U.S. Congress and applicable state agencies.

111. The FirstEnergy Corporate Political Activity Policy (the "Political Activity Policy") asserted: "[The Company] has decision-making and oversight processes in place for political contributions and expenditures to ensure such contributions or expenditures are legally permissible and in the best interests of FirstEnergy. . . . Any corporate political contributions by FirstEnergy are

---

[21]    FirstEnergy Corp. Board of Directors Code of Ethics and Business Conduct https://web.archive.org/web/20151017064427/https://www.firstenergycorp.com/content/dam/ investor/files/policies-charters/Board-Code-of-Conduct.pdf (Sept. 15, 2015).

made in accordance with applicable laws, rules and regulations."[22]  This language also appears in the latest version of the Company's Political Activity Policy.[23]  An excerpt of this language also appears in the Company's Corporate Responsibility Reports.

112.    On April 7, 2017, *The News Messenger* published an article titled "Bill would help Davis-Besse – Proposal includes small rate hike."  In the article, Jones is quoted as stating: "'FirstEnergy applauds Ohio lawmakers for introducing a thoughtful program that recognizes the significant benefits Ohio's nuclear power plants bring to customers, communities and the state.'"

113.    On April 28, 2017, FirstEnergy held an earnings call with analysts and investors. Jones, Pearson, Taylor and Vespoli participated in the call.  During the call, Pearson stated: "we are encouraged by recent energy policy discussions that could ultimately have a positive impact on the nation's electric system."  Jones provided additional details regarding those policy discussions, stating in pertinent part:

> [W]e are closely monitoring 2 important new developments at the state and federal level.  On the legislative front, bills were introduced in both the Ohio House and Senate this month that could help keep nuclear assets as part of Ohio's generation mix.
>
> The Zero Emission Nuclear Resource Program, or ZEN, is intended to recognize the critical energy security environmental attributes of nuclear power plants in Ohio by compensating them on a per megawatt hour basis. . . .  I had the opportunity to testify at the initial hearing on ZEN which was held in the Ohio House earlier this week.  Multiple hearings are expected in each chamber prior to summer recess, and ***we are working to get a bill on the governor's desk as quickly as possible.***

---

[22]     FirstEnergy Corporate Political Activity Policy (Feb. 19, 2015), https://web.archive.org/ web/20151022181658if_/https://www.firstenergycorp.com/investor/corporate_governance/policies_c harters/corporate_political_activity_policy.html#gsc.tab=0 (last visited Feb. 26, 2021).

[23]     FirstEnergy Corporate Political Activity Policy (May 12, 2020), https://firstenergycorp .com/investor/corporate_governance/responsibility/corporate_political_activity_policy.html (last visited Feb. 26, 2021).

114.     On May 17, 2017, the *Akron Beacon Journal* published an article titled "FirstEnergy CEO Looks Ahead, Chuck Jones Says He Comes To Work Every Day with Goal of Keeping Company's Headquarters in Akron." In the article, Jones is reported as stating: "[R]egardless of whether FirstEnergy continues to own its generating plants by the time the ZEN legislation could pass, 'it needs to happen and it needs to happen regardless of when it happens,' and he will continue to fight for it."

115.     On July 28, 2017, FirstEnergy held an earnings call with analysts and investors. Jones, Pearson and Vespoli participated in the call. During the call, Pearson reaffirmed the Company's commitment to pursuing a legislative solution for the Nuclear Plants. In responding to an analyst's question about the connection between proposed legislation in Ohio and a possible FES bankruptcy, Pearson stated:

> I am going to continue to fight for this ZEN legislation because it is the right thing to do for the state of Ohio. It's the right thing to do for those assets. It gives those assets the best chance of running under new owners. I'm not sure those assets will run unless there is something done either federally or by the state of Ohio to ensure that they get a different financial return model, and that's bad. So we're going to continue to work on ZEN whether or not – irrespective of what happens with FES.

116.     On September 7, 2017, Pearson participated in a Barclays CEO Energy-Power Conference. During the conference, Pearson, in response to questions about nuclear subsidy discussions in light of opposition from the then-Governor of Ohio, stated in pertinent part: "[w]e continue to advocate the benefits of having those plants running" and "we're going to continue to educate all the constituents in Ohio. And hopefully, we'll be able to get some type of legislation introduced in Ohio as well as supported by the [G]overnor."

117.     On October 27, 2017, FirstEnergy held an earnings call with analysts and investors. Jones, Pearson and Vespoli participated in the call. During the call, Jones stated: "[w]hile the Ohio legislature was on recess this summer, we continued working on a modified approach to help compensate the state's nuclear plants for the fuel diversity, environmental and other benefits that

they provide."  Later in the call, Jones, in response to an analyst's question about why potential legislative solutions for the Nuclear Plants were progressing despite opposition from the then-Governor of Ohio, stated in pertinent part as follows:

> I think the fact that New York and Illinois have already taken measures to protect these fuel-secured nuclear facilities in particular.  The DOE initiative on top of it, the fact that other states concurrently are looking at it all are creating an awareness about what's going on in our nation and the importance of these assets to not only physical security but also economic security.  So I don't think it's a surprise that Ohio is willing to relook at it.  I think we've got to deal with the legislature first.  And then once we have the legislature passing the bill, then we'll see where the governor really is at that time.

118.    On February 21, 2018, FirstEnergy held an earnings call with analysts and investors.  Jones, Pearson, Taylor and Vespoli participated in the call.  During the call, Jones stated that FirstEnergy had been "very actively involved in a multitude of efforts at both the state and federal levels to support our generation assets," but that he was disappointed those efforts had not yet resulted in "meaningful legislative or regulatory support" for the Company's nuclear facilities.  Jones added that FES would "continue to look at all options regarding these units," including by "continu[ing] to support policy solutions."

119.    On March 28, 2018, *PR Newswire* distributed an article titled "FirstEnergy Solutions Files Deactivation Notice for Three Competitive Nuclear Generating Plants in Ohio and Pennsylvania; - 4,048 Megawatts of Electricity Generating Capacity to Retire by 2021."  The article stated that the plants would continue to operate as "FES seeks legislative policy solutions as an alternative to deactivation or sale."  The article further quoted Don Moul ("Moul"), the President of FES Generation Companies and Chief Nuclear Officer, as stating:

> "We call on elected officials in Ohio and Pennsylvania to consider policy solutions that would recognize the importance of these facilities to the employees and local economies in which they operate, and the unique role they play in providing reliable, zero-emission electric power for consumers in both states.  We stand ready to roll-up our sleeves and work with policy makers to find solutions that will make it feasible to continue to operate these plants in the future."

- 42 –

120. On March 31 2018, *PR Newswire* distributed an article titled "FirstEnergy Solutions and FirstEnergy Nuclear Operating Company File Voluntary Petitions for Chapter 11 Restructuring; – Operations Expected to Continue Normally During Restructuring." In the article, Schneider is quoted as stating: "'Given the prospective timing of federal and state review and our ongoing cash needs and debt service obligations, the FES and FENOC Boards of Directors determined that the Chapter 11 filing represents our best path forward *as we continue to pursue opportunities for restructuring, asset sales and legislative and regulatory relief*.'"

121. On April 23, 2018, FirstEnergy held an earnings call with analysts and investors. Jones, Pearson and Strah participated in the call. During the call, Jones stated: "I will continue personally to advocate for regulatory or legislative solutions, including FES['s] application for an emergency order under the Federal Power Act that recognize the attributes of fuel-secure baseload generation and to ensure our customers continue to have a stable, reliable power supply."

122. On April 25, 2018, *PR Newswire* published an article titled "FirstEnergy Solutions Files Certification Letter with NRC Affirming Plans to Deactivate Three Nuclear Generating Plants." The article quoted Moul as stating: "'[w]e are actively seeking policy solutions at the state and federal level as an alternative.'"

123. On June 2, 2018, *The Plain Dealer* of Cleveland published an article titled "Trump moves to save nuclear, coal plants that can't compete Energy." In the article, Moul is quoted as stating: "'While this marks an important first step, until timing and details of the order are clear, additional support at the state level will be necessary to protect the jobs in Ohio and Pennsylvania.'" The article also quotes Jones as stating: "'The company has advocated for solutions that recognize the critical attributes coal and nuclear plants provide because preserving these vital facilities is the right thing to do for the industry, the electric grid and our customers.'"

124.    On August 1, 2018, FirstEnergy held an earnings call with analysts and investors. Jones, Pearson, Vespoli and Strah participated in the call.  During the call, Jones, in response to an analyst's question about his thoughts on support for nuclear assets, stated in pertinent part as follows:

> So any thoughts around the future of those assets are now questions to be posed to FES.  I would say that, from my perspective, I continue to feel that the market policies in our countries have severe flaws that closing perfectly good nuclear plants in the long run is not going to be a good thing for our country.  In the long-run, it's not going to be a good thing for the 6 million customers that I'm paid to look out for.  Because I think having a diverse mix of generation provides the more secure future for those customers from both physical security, grid resiliency and an economic stability perspective.  So to the extent my voice matters in this process, I'm going to continue to be a loud advocate for it.  I do believe that the deferred (inaudible) is still very seriously looking at this issue.  And we are hopeful that they intend – that they will eventually step forward and do something to stabilize it.

125.    On December 17, 2018, *Crain's Cleveland Business* published an article titled "Newsmakers of the Year; FirstEnergy/Charles Jones."  In the article, Schneider, in connection with FES's bankruptcy, is quoted as stating: "'The Chapter 11 filing represents our best path forward as we continue to pursue opportunities for restructuring, asset sales and ***legislative and regulatory relief***.'"  In the same article, Moul is quoted as stating: "'We call on elected officials in Ohio and Pennsylvania to consider policy solutions that would recognize the importance of these facilities to the employees and local economies in which they operate, and the unique role they play in providing reliable, zero-emission electric power for consumers in both states.'"

126.    On January 23, 2019, *PR Newswire* distributed an article titled "FirstEnergy Solutions Corp. Reaches Restructuring Support Agreement with Key Stakeholders; – Agreement Contemplates Continued Ownership and Operation of Retail and Wholesale Load-Serving Business Beyond Chapter."  In the article, Schneider is quoted as stating as follows:

> "It is important to note that nothing in this agreement provides for the Company to continue operating its fossil or nuclear generation assets beyond their currently contemplated deactivation dates.  Without legislative support and market reforms operating beyond those dates will be a significant challenge.  ***We remain optimistic***

- 44 –

*that such support may be forthcoming, will solidify the tax base and tremendous economic value these plants provide to the surrounding communities in Ohio and Pennsylvania*."

127.    On February 20, 2019, FirstEnergy held an earnings call with analysts and investors. Jones and Strah participated in the call.  During the earning call, Jones, in response to an analyst's question about whether there was "anything at all" that FirstEnergy was working on with respect to energy utility legislation in Ohio, stated in pertinent part as follows:

> Obviously, if our new leaders of the states – we have a new governor, a new speaker of the house, we're going to have a new Chairman of the Public Utilities Commission. ***If they determine that they think the time is right to really put energy policy for the state back on the table in some fashion, legislatively, then we would expect to engage and provide our input***.  But it's too early in the process for me to talk about what that might mean.

128.    On July 23, 2019, FirstEnergy filed a Form 8-K with the SEC.  The Form 8-K attached a presentation titled "2Q 2019 Strategic & Financial Highlights."  In the presentation, FirstEnergy stated:

> On July 23, House Bill 6 was approved by the Ohio legislature
>
> – We believe this bill is good for customers
>
> – Contributes to Ohio's economic success and the security and resiliency of the regional electric grid while mitigating the potential impact of uncertain electric markets on our customers electric bills
>
> – Includes provisions that allow electric utilities to implement decoupling mechanisms . . .

129.    On July 24, 2019, FirstEnergy held an earnings call with analysts and investors. Jones and Strah participated in the call.  During the call, Jones stated in pertinent part as follows:

> In other developments, House Bill 6 was approved by the Ohio legislature and signed by Governor DeWine yesterday.  As you know, the key issue of House Bill 6 is the support it provides to nuclear assets in the state.  While we no longer own this generation, we believe this legislation is good for our customers because it will contribute to the state's economic success and the security and resiliency of the regional electric grid, while mitigating the potential impact of uncertain electric markets on our customers' electric bills now and in the future.  House Bill 6 also include provisions that allow electrical utilities to implement a decoupling

mechanism, which further supports energy efficiency initiatives that benefit Ohio customers, while providing revenue certainty to utilities.

*    *    *

But the bill was a clean energy bill at its heart. The decoupling is included in the bill to support Ohio's clean energy goals. It allows all of the utilities to continue to work with customers to drive further energy efficiencies without a concern for the impact on the revenues with the companies. In Ohio, we have a shared mechanism for lost distribution revenue that this now eliminates the need for us to worry about that. And its ultimately going to help reduce customer bills because that energy efficiency mandates on our bills, we're going to grow significantly over the next several years.

*    *    *

I just want to take a moment to say how great it is in the State of Ohio to have leadership in Columbus who actually looks at issues and is willing to lead. I want to complement our Governor, Lieutenant Governor, Senate President, Speaker of the House, numerous members of the legislature and Senate and the Chairman of the Commission because they all worked together on a very complex bill here, with the goal I think of providing stable and transparent rates for customers going forward and keeping their Ohio utilities strong at the same time. And I think they came up with an approach that was very strong in terms of looking out for this industry and our customers in the State of Ohio.

130.     On July 24, 2019, *PR Newswire* distributed an article titled "FirstEnergy Solutions Applauds Enactment of HB6 Legislation," in which Judge was quoted as stating in pertinent part as follows:

> "We are very pleased that Governor Mike DeWine signed HB6 following its successful bi-partisan passage in the General Assembly. . . . We're also thankful for the support and commitment by Speaker Householder and Senate President Obhof who understood the importance of protecting 90% of the state's zero-emissions electricity, substantial employment and the need to provide affordable rates from a diverse portfolio of generation sources for Ohioans."

131.     In the Company's Form 10-Q for the quarter ending September 30, 2019 (dated November 4, 2019), FirstEnergy stated that on July 23, 2019, "Ohio enacted legislation establishing support for nuclear energy supply in Ohio. In addition to the provisions supporting nuclear energy, the legislation included a provision implementing a decoupling mechanism for Ohio electric utilities." A substantively similar statement was included in the Company's 2020 Form 10-Q.

- 46 –

132.    On November 4, 2019, FirstEnergy held an earnings call with analysts and investors. Jones and Strah participated in the call. During the call, Jones, in response to a question about 2020 guidance and decoupling in Ohio, stated: "We expect to file the decoupling rates and the commission has 60 days to approve them. . . . As far as how I look at it, I think it establishes a fixed cost for the base distribution costs in Ohio. . . . [I]t takes about 1/3 of our company and I think [it] makes it somewhat recession-proof."

133.    On March 5, 2020, *Energy News Network* published an article titled "Campaign contributions pay off for Ohio utilities and coal interests," which discussed the ties between public utilities and political contributions. In the article, Mark Durbin, a FirstEnergy spokesperson, is quoted as stating: "'FirstEnergy Corp. makes and discloses all campaign contributions in accordance with applicable state and federal laws. . . . In the meantime, FirstEnergy continues to focus on transforming into a fully regulated utility that is making investments that will strengthen the electric system, boost reliability for customers and prepare the grid for smart technologies.'"

134.    On April 24, 2020, FirstEnergy held an earnings call with analysts and investors. Jones and Strah participated in the call. In his opening remarks, Strah stated: "Before I turn the call over to your questions, I'd like to reiterate FirstEnergy's overall value proposition, which is very simple, but also very unique, especially in periods of extreme volatility and uncertainty like we're facing today. FirstEnergy is a low-risk, fully regulated, stable and predictable wires utility that spans 5 states. . . . We have very good regulatory relationships in our jurisdictions."

135.    Defendants' 2017 and 2018 statements referenced in ¶¶95-125 above were materially false and misleading when made. The true facts, which defendants knew or recklessly disregarded, as detailed herein, including in ¶¶64-94, 137-138, were as follows:

(a)     that FirstEnergy, its officers, employees, and other representatives and affiliates had launched an elaborate campaign to corrupt the political process in order to secure the passage of legislation and regulatory action favoring the Company and its affiliates;

(b)     that FirstEnergy and its most senior executives had knowingly violated numerous state and federal laws and regulations and internal Company policies and the Company Code of Conduct in furtherance of the Bailout Scheme;

(c)     that FirstEnergy had misrepresented the extent and nature of the Company's political contributions and regulatory and external affairs activities;

(d)     that FirstEnergy had failed to maintain effective internal control over its financial reporting; and

(e)     that, as a result of (a)-(d) above, FirstEnergy was subject to an extreme risk of reputational, legal and financial harm.

136.     Defendants' 2019 and 2020 statements referenced in ¶¶95-111, 126-134 above were materially false and misleading when made.  The true facts, which defendants knew or recklessly disregarded, as detailed herein, including in ¶¶64-94, 137-138, were as follows:

(a)     that FirstEnergy, its officers, employees and other representatives and affiliates had executed an elaborate campaign to corrupt the political process in order to secure the passage of legislation and regulatory action favoring the Company and its affiliates, including to secure the passage and preservation of HB6;

(b)     that FirstEnergy and its most senior executives had knowingly violated numerous state and federal laws and regulations and internal Company policies and the Company Code of Conduct in furtherance of the Bailout Scheme;

(c)     that FirstEnergy had misrepresented the extent and nature of its political contributions and regulatory and external affairs activities;

(d)     that FirstEnergy had failed to maintain effective internal control over its financial reporting;

(e)     that FirstEnergy and its senior executive had disguised a $4 million payment made in April 2019 for the benefit of the incoming PUCO Chairman as being made "in connection with the termination of a purported consulting agreement" to curry regulatory favors, including to cancel a PUCO review of FirstEnergy's revenues and expenses to avoid a possible rate cut and to garner support for HB6;

(f)     that FirstEnergy and its representatives and affiliates had subverted a citizens' ballot initiative to repeal HB6 by, among other unscrupulous tactics detailed herein, hiring more than 15 signature gathering firms (and thus conflicting them out of supporting the initiative) and bribing ballot initiative insiders and signature collectors; and

(g)     that, as a result of (a)-(f) above, FirstEnergy was subject to an extreme undisclosed risk of reputational, legal and financial harm.

137.    FirstEnergy's political action committee, the FirstEnergy PAC, disclosed political contributions during the Class Period, including approximately $39,000 to the committee "Friends of Larry Householder" from July 2017 to November 2019.  Relative to legal donors, these reported contributions were substantial, as FirstEnergy PAC's disclosed spending in 2018 alone was enough to place FirstEnergy among the largest 25 donors to Ohio campaigns that year.  But, despite topping state contribution lists, FirstEnergy's disclosed contributions represented only a fraction of the Company's overall political spending and were in fact dwarfed by the size of the Company's actual (but concealed) political contributions as follows:

|      | FirstEnergy's Disclosed Contributions | FirstEnergy's Concealed Contributions |
|------|---------------------------------------|---------------------------------------|
| 2017 | $231,091                              | $1,000,000                            |
| 2018 | $577,720                              | $1,400,000                            |

- 49 -

|  | **FirstEnergy's Disclosed Contributions** | **FirstEnergy's Concealed Contributions** |
|---|---|---|
| 2019 | $311,757 | $55,596,836 |
| 2020 | $174,000 | $2,000,000 |
| ***Total*** | ***$1,294,568*** | ***$59,996,836*** |

138. After news of the Bailout Scheme was revealed, on July 21, 2020, Ohio Secretary of State Frank LaRose referred FirstEnergy to the Ohio Elections Commission for numerous apparent or alleged violations of Ohio law based upon its role in the Bailout Scheme, including for, among other things, knowingly concealing or misrepresenting the Company's political contributions. LaRose submitted a formal complaint to the Commission on August 27, 2020.

a.      **Item 303 Requirements**

139. In addition to the materially false and misleading statements identified above, defendants also violated their affirmative obligations to provide certain material information in SEC filings as required by applicable SEC rules and regulations. Specifically, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303 ("Item 303"), required defendants to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a materially favorable and unfavorable impact on the sales or revenues or income from continuing operations."

140. In May 1989, the SEC issued an interpretive release on Item 303 ("1989 Interpretive Release"), stating, in pertinent part, as follows:

> Required disclosure is based on currently known trends, events, and uncertainties that are reasonably expected to have material effects, such as: A reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract.
>
> *          *          *
>
> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

- 50 –

141.    Further, the 1989 Interpretive Release sets forth the following test to determine if disclosure under Item 303(a) is required:

Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:

(1)    Is the trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required.

(2)    If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition.  Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

142.    Item 303 required FirstEnergy's quarterly and annual financial reports issued during the Class Period to disclose the involvement of the Company and its senior executives in the Bailout Scheme.  Defendants' failure to disclose their involvement in the largest bribery and corruption scheme in Ohio history and the corrupt underpinnings of HB6 and FirstEnergy's separation from FES violated Item 303 because these activities represented known trends and uncertainties that were likely to and did have a material negative impact on the Company's business and financial results.

## DEFENDANTS' FRAUDULENT SCHEME UNRAVELS

143.    On July 21, 2020, the U.S. Attorney's Office for the Southern District of Ohio issued a press release stating, in part:

**Ohio House Speaker, former chair of Ohio Republican Party, 3 other individuals & 501(c)(4) entity charged in federal public corruption racketeering conspiracy involving $60 million**

The Ohio Speaker of the House was arrested this morning and charged in a federal racketeering conspiracy involving approximately $60 million paid to a 501(c)(4) entity to pass and uphold a billion-dollar nuclear plant bailout.

It is alleged that **Larry Householder**, 61, of Glenford, Ohio, and the enterprise conspired to violate the racketeering statute through honest services wire fraud, receipt of millions of dollars in bribes and money laundering.

Four other individuals were also arrested and charged.  They include:

- 51 –

- **Mathew Borges**, 48, of Bexley, a lobbyist who previously served as chair of the Ohio Republican Party;

- **Jeffrey Longstreth**, 44, of Columbus, Householder's longtime campaign and political strategist;

- **Neil Clark**, 67, of Columbus, a lobbyist who owns and operates Grant Street Consultants and previously served as budget director for the Ohio Republican Caucus; and

- **Juan Cespedes**, 40, of Columbus, a multi-client lobbyist.

* * *

The affidavit filed in support of the criminal complaint also alleges:

- In 2018, the enterprise spent energy company-to-Generation Now money on approximately 21 different state candidates – 15 (including Householder) in the primary, and six additional candidates in the general election. The Enterprise spent more than one million in fall 2018 alone to flood the airways with negative ads against enterprise opponents. Most of these candidates won the 2018 general election. All who won voted for Householder as Speaker.

- Money passed from the energy company through Generation Now was used to pay for Householder campaign staff, which would otherwise have been paid by Householder's candidate committee, Friends of Larry Householder.

- Householder received more than $400,000 in personal benefits as a result of the payments into Generation Now, including funds to settle a personal lawsuit, to pay for costs associated with his residence in Florida, and to pay off thousands of dollars of credit card debt.

- The enterprise paid $15,000 to an individual to provide insider information about the ballot initiative and offered to pay signature collectors for the ballot initiative $2,500 cash and plane fare to stop gathering signatures.

144.    On July 21, 2020, FirstEnergy issued a statement announcing that it had received subpoenas in connection with the government's investigation into HB6. On this news and the public disclosure of criminal charges, several analysts downgraded their ratings recommendations for FirstEnergy. For example, on July 21, 2020, Wolfe Research issued a report titled "Ohi-uh-oh," which downgraded its rating recommendation of FirstEnergy because of the bribery scandal and

lowered its price target to "reflect[] a 20% discount given the risks," which included "fines, B/S and credit, mgmt. risk, and political/regulatory [risk]."

145.    On July 22, 2020, a number of media outlets reported on the federal criminal charges. For example, *Cleveland.com* posted an article titled "FirstEnergy was relentless in quest to have Ohio legislature bail out the utility's nuclear plants" providing the following additional details regarding FirstEnergy's long-running efforts to rid itself of liabilities arising from the Nuclear Plants:

> FirstEnergy Corp. tried and failed more than once to convince state lawmakers to subsidize the company's two Ohio nuclear power plants, but was unable to achieve its goal until Larry Householder became speaker of the Ohio House of Representatives in 2019.
>
> As speaker, Householder wasted little time pushing through House Bill 6, legislation that included the $1 billion nuclear plant bailout at the center of racketeering charges leveled against Householder and four others on Tuesday.
>
> \*      \*      \*
>
> **Early calls for help**
>
> FirstEnergy let it be known as far back as 2016 that it wanted relief for Perry nuclear plant in Lake County and Davis-Besse nuclear plant east of Toledo.
>
> During an annual energy conference in early 2017, Rep. Bill Seitz, a Cincinnati Republican, revealed that FirstEnergy was in "substantial financial trouble." FirstEnergy proposed something called "zero emission credits," which would allow the utility to charge extra on electric bills because it was generating carbon-free nuclear power.
>
> The credits would allow FirstEnergy to collect $300 million a year in perpetuity.
>
> \*      \*      \*
>
> **A legislative failure**
>
> Testifying before the same committee, Ned Hill, a professor in the John Glenn College of Public Affairs at Ohio State University, referred to FirstEnergy financial engineering as "fanciful."
>
> \*      \*      \*

- 53 –

4823-8789-7564.v3

The House bill and the companion Senate bill never made it out of the committee. Changes were made and a new bill was introduced in the House in October of 2017, but it too languished in committee.

The Ohio Consumers' Counsel and the Ohio Manufacturers' Association were among those who opposed idea as did then-House Speaker Cliff Rosenberger.

### A new plan of attack

FirstEnergy wasn't about to give up. In March of 2018, First Energy announced plans to get out of the nuclear power business within three years by closing Davis-Besse in 2020, and the Perry and Beaver Valley plant near Pittsburgh in 2021.

Shortly after the announcement, FirstEnergy Solutions Corp, which was the nuclear division of First Energy, filed for bankruptcy protection. It now operates under the name Energy Harbor.

The company set about lobbying the state legislature for the nuclear subsidies it had failed to obtain. That strategy, according to the federal prosecutors, included funneling millions of dollars to an organization, Generation Now, controlled by Householder.

146. On July 22, 2020, Barclays issued an analyst report downgrading its rating of FirstEnergy. The Barclays analyst report explained in pertinent part as follows:

Following a deeper read of the 81-page criminal complaint filed by the FBI, we are downgrading FE to Equal Weight: *We see the details of evidence discussed in the complaint as concerning on many levels for FE (although it is not named in the report) and expect the ongoing investigation to focus on the company*. A key component of FE's investment thesis is a re-rating opportunity toward regional peers, which we now view as unlikely as negative headlines and investigation updates could continue to weigh on the stock.

*We update our price target to $37 and our valuation framework to assume FE trades at a 20% discount to the group average multiple (previously assumed 5% premium)* while maintaining all financial estimates: We reiterate our initial reaction outlined in *FE: Initial Reaction to Ohio Probe* (published 7/21/20), that the immediate financial impacts appear minimal, however after reading through evidence in greater detail – we believe the nature of the allegations and investigation will weigh on sentiment and limit the re-rating opportunity. The investigation also presents a new risk of any activity that may have occurred in prior years and calls HB 6 into question (HB 6 included decoupling provisions in OH). All allegations in the criminal complaint are just allegation, but raise the overall risk profile for FE as the investigation enters its broader public phase and FE faces intense scrutiny.

- 54 –

147.     On July 22, 2020, Scotiabank also issued an analyst report titled "RICO Charges Are Tough to Look Through – Downgrading to Sector Perform," which stated in pertinent part as follows:

> **OUR TAKE**: *Negative.  We are downgrading FE to Sector Perform (from Sector Outperform) as we can no longer recommend the stock after the DOJ/FBI arrests and investigations announced yesterday.  Though FE wasn't named explicitly, it's unambiguous to us that FE is the "Company A" referred to in the affidavit.*  The FBI has outlined probable cause to believe that "Company A" and several OH politicians and lobbyists were engaged in an elaborate "pattern of racketeering activity" related to "bribery" and money laundering, among other crimes.  Based on the affidavit and the DOJ/FBI press conference yesterday, we struggle to see a scenario in which shares outperform peers over the next 12 months.  Instead, it seems quite likely to us that things will get worse for FE before they get better.  We continue to see only modest risk to the company's LT financial outlook and await more details before drawing any concrete conclusions, but we don't expect any time soon.  As the FBI said yesterday, "this is the end of the beginning", and additional search warrants and subpoenas will be served in the coming days.  We have reduced our TP to $39 (from $53), as we now apply a 25% discount to our sector anchor multiple of 19x (from parity previously).

148.     The price of FirstEnergy stock plummeted on this news, falling to a low of $22.85 per share on July 22, 2020 before "recovering" to close at $27.09, *34% below* the stock's closing price on July 20, 2020 of $41.26 per share, on abnormally high trading volume.

149.     On July 23, 2020, Standard & Poor's ("S&P") announced that it was placing FirstEnergy and its subsidiaries on CreditWatch with negative implications.  In the announcement, S&P stated in pertinent part as follows:

> Although FirstEnergy is not named as a defendant in the criminal complaint, we believe the severity of the charges outlined in the criminal complaint and the allegation that the bribery payments began as early as March 2017, prior to Energy Harbor Corp.'s emergence from bankruptcy under its new ownership, could possibly implicate FirstEnergy Corp. in some manner.

> If subsequent investigations directly implicate FirstEnergy, we believe it could reflect a material deficiency in the company's governance, insufficient internal controls, or could result in a weakening of the company's management of regulatory risk.

150.    On July 24, 2020, Moody's announced it was downgrading its outlook for FirstEnergy.  In the announcement, a Moody's analyst stated, "'We see the criminal complaint as a potential sign of higher corporate governance risk and we expect more information will become available over the next few months.'"  The announcement continued, "The possible corporate governance failure is directly related to the board's organizational structure, compliance and reporting standards, policies and procedures.  The complaint also raises questions around management's credibility and track record.  However, the level of uncertainty around the complaint remains very high."

151.    On July 23, 2020, FirstEnergy filed a Form 8-K with the SEC.  The Form 8-K attached, among other things, a press release that announced the Company's financial results for the second quarter of 2020 and commented on the DOJ investigation.  In the press release, Jones stated: "'I believe that FirstEnergy acted ethically in this matter.  At no time did our support for Ohio's nuclear plants interfere with or supersede our ethical obligations to conduct our business properly.  I believe the facts will become clear as the investigation progresses.'"

152.    On July 24, 2020, FirstEnergy held an earnings call with analysts and investors.  Jones, Strah and Taylor participated in the call.  During the call, Jones sought to quell investor concerns and distance FirstEnergy from FES.  Jones opened the call by discussing the federal criminal charges filed in connection with HB6.  Jones stated, in pertinent part as follows:

> I believe that FirstEnergy acted properly in this matter.
>
> This is a serious and disturbing situation.  Ethical behavior and upholding the highest standards of conduct are foundational values for the entire FirstEnergy family and me personally.  ***These high standards have fostered the trust of our employees, our customers and the financial community***.  We strive to apply these standards in all business dealings, including our participation in the political process.  As you know, we have supported keeping Ohio's 2 nuclear plants in operation. . . .  So as we discussed on previous earnings calls, we supported legislative solutions for the nuclear plants even after we stopped operating them.  We were strong supporters of House Bill 6 and opposed the referendum effort to repeal it.

- 56 –

*But let me be clear, at no time does our support for nuclear plants in Ohio
interfere or supersede our ethical obligations to conduct our business properly*.

153.    After delivering these opening remarks, Jones responded to an analyst's question

about the Company's political contributions, in pertinent part, as follows:

> Well, first, let me take the second half first.  And as of November of '16,
> when we essentially made the competitive generation business noncore, FES
> separated fiduciarily, financially and operationally from being a part of FirstEnergy.
> They put in place an independent board.  And from November '16, I've had no input
> into any of the decisions they've made.  Obviously, we've had a lot of discussions
> between the 2 companies as it relates to transition and shared services and so forth.
> But in terms of decision-making authority, mine ended in November of 2016.  On
> your specific question, as I've said, I'm not going to get into the details of the case,
> but I will say this, that of the funds that are referenced in the Department of Justice
> affidavit, FirstEnergy's share of that is 25%. . . .  [W]e do make prudent decisions to
> spend corporate funds on issues that we believe are important to our customers and
> shareholders.  Beyond that, we intend to provide the details on what we spent, how
> we spend it to the Department of Justice in the coming weeks.

154.    Jones continued to attest to his innocence throughout the call, claiming that at all

times he acted "transparently, ethically, professionally."  Jones stated in pertinent part as follows:

> I can tell you this, in every meeting, every phone call, every text message that I
> participate in, I've talked about our obligations to conduct our business transparently,
> ethically, professionally.  I have no worries that I did anything that wasn't that way.
> And we let the merits of our arguments carry the day when we are operating in the
> political environment.

155.    Later during the call, Jones, responded to an analyst's question regarding lobbyists

referenced in the Criminal Complaint, in pertinent part, as follows:

> Well, let me say this.  We do employ lobbyists.  When we do, we expect them
> to act in the same ethical manner that we hold ourselves accountable for.  The
> lobbyists named in the affidavit and subsequently arrested, did not work for
> FirstEnergy on House Bill 6.  And to my knowledge, they have never worked for
> FirstEnergy.  Who they work for, I'm not sure, but I know they did not work for us.

156.    Jones also doubled down on his statements regarding the propriety of the Company's

conduct, stating in pertinent part as follows:

> I would just say that – so first of all, our statement was that we believe that
> FirstEnergy acted properly in our dealings on House Bill 6.  We can't speak to what
> happened by anybody other than FirstEnergy.  The financial support we provided to

– 57 –

House Bill 6 isn't complicated. We know what we did. We know why we did it. We're looking forward to sharing that with the Department of Justice. That's what gives me the confidence to be able to say that we acted properly.

157. As analysts continued to inquire about his knowledge of and role in the events revealed in the Criminal Complaint, Jones repeatedly claimed he had done nothing wrong, stating in pertinent part as follows:

I would just say this. I think that the CEO reference in some of that affidavit wasn't me. I don't know who it was, but it was not me. And I made – I've never made a payment directly to a lobbyist in my life nor asked any lobbyists to I've never made a payment directly to a lobbyist in my life nor asked any lobbyists to make a payment to anyone else on behalf of our company in my life.

158. When asked about the impact of a repeal of HB6 on the decoupling provision and FirstEnergy financially, Jones responded in pertinent part as follows:

All right. So the first question is, if House Bill 6 is repealed, what else happens. I mentioned it in my prepared remarks that House Bill 6 went into law actually resulted in a rate reduction for our customers despite the surcharges related to the nuclear plants. And that was as a result of some of the previous payments that were being made for customers for renewable energy charges. It would depend how it's repealed, how it's replaced, if at all, on what happens with those renewable energy surcharges on the decoupling piece. The decoupling provisions in House Bill 6 can have many benefits, it provides rate certainty for both customers and shareholders until our next base rate case. In the case of shareholders, it could provide a benefit depending on weather during a normal economic downturn but right now, as I've said, with loads up due to workers being at home from – as a result of the pandemic, combined with hot weather, last month and this month, decoupling is actually providing a benefit to the customers. So if decoupling goes away, those are the types of benefits that are going to go away.

*　　*　　*

Not anything that's significant nor that we could accommodate within our plan. It's a few pennies a share, probably maximum that it would benefit us. And as I said, if it's not there, the real risk is also shared by customers because they'd be paying a whole lot higher electric bills this summer than they're paying.

159. On July 27, 2020, FirstEnergy issued a statement on behalf of Jones, purporting to "clarify" his recent comments. The release stated, "[l]eaders at FirstEnergy, me included, had frequent discussions with FES leadership and its board about the strategic review and, as it

- 58 –

4823-8789-7564.v3

progressed, numerous matters related to FES, including employee impacts and shared services." Jones further "clarified" FES in fact did receive "support from FirstEnergy's External Affairs team to varying degrees" during the Class Period.

160. On July 28, 2020, Fitch Ratings ("Fitch") announced it was revising its outlook for FirstEnergy to negative. In the announcement, Fitch stated:

> The rating actions reflect credit concerns regarding potential illicit activity at FE in connection with an ongoing federal bribery/racketeering investigation. The investigation has resulted in criminal charges against Ohio Assembly Speaker Larry Householder, four associates and a non-profit organization, Generation Now. Among other things, the affidavit alleges that Householder and his associates engaged in bribery and other illegal actions designed to ensure House Bill (H.B.) 6 was enacted and remained in effect (in light of a referendum effort to repeal the legislation).

> While the indictment does not explicitly name FE or its affiliates, pseudonyms referred to in the affidavit are widely-believed to refer to FE, its corporate services subsidiary, FirstEnergy Service Company (FESC), and former subsidiary, Energy Harbor.

161. On August 10, 2020, FirstEnergy filed a Notification of Late Filing with the SEC on Form 12b-25. In the notice, FirstEnergy advised the SEC that the Company would not file its quarterly report for the period ending June 30, 2020 within the prescribed period and required additional time because of the DOJ investigation and pending and threatened litigation.

162. On September 18, 2020, *Utilitydive.com* posted a story titled "Ohio regulators launch probe into FirstEnergy's political and charitable contributions" reporting that PUCO had opened an investigation into FirstEnergy's political and charitable contributions in response to a request from the Ohio Consumers' Counsel.

163. On September 19, 2020, the *Athens Messenger* published an article titled "Ohio regulators decline to force FirstEnergy to hire an independent auditor," which stated that PUCO was requiring FirstEnergy to show that ratepayer funds were not directly or indirectly used to fund political or charitable support for HB6. In the article, Mark Durbin, a spokesperson for FirstEnergy,

- 59 –

is quoted as stating: "'there were no expenses for political activity and lobbying for the years 2017-

2020 included in customers' rates at CEI, Toledo Edison, and Ohio Edison.'" The article also quotes

Jennifer Young, a FirstEnergy spokesperson, as stating: "FirstEnergy's PAC contributions are legal

and reported consistent with established federal, state and legal requirements."

164.    On September 23, 2020, the Ohio AG filed a lawsuit against FirstEnergy and other

entities and individuals alleging "corrupt activit[ies]" in violation of Ohio law and seeking, among

other things, to enjoin the implementation of HB6. The lawsuit alleged that FirstEnergy and its

affiliates knew that nuclear asset-saving legislation "would require a special combination of political

experience, name identification and the willingness to play rough. FirstEnergy Corp. and its

affiliates needed a legislative general to lead the charge. They found Larry Householder." The

complaint also alleged in pertinent part as follows:

> Over three years, corporate interests with more than a billion dollars to gain
> spent tens of millions of dollars disguised as independent expenditures by so called
> "Social Interest Organizations" buying influence, aggregating power and deceiving
> voters. An aspiring House Speaker used political influence, campaign contributions,
> threats to committee assignments and a team of henchmen to reach the dais and pass
> a sweetheart deal for his sponsor. And a gang of political operatives and corporate
> insiders used a web of dark money groups, political action committees and for-profit
> corporations to buy their way out of facing a referendum that threatened the
> legislation that lay at the heart of all of these efforts.

165.    On this news, the price of FirstEnergy stock declined by 3.5% to close at $27.58 per

share on September 23, 2020 as compared to $28.57 per share on September 22, 2020.

166.    Analysts and media outlets attributed this decline to the Ohio AG's lawsuit. On

September 23, 2020, an RBC Capital Markets analyst report commented: "The most obvious

takeaway from the Ohio AG's complaint is that it formally ties FE and its subsidiaries to the HB6

scandal," and thus "should put further pressure on the stock." Similarly, investor news site,

*TheFly.com*, reported: "FirstEnergy down 3% after report of lawsuit from Ohio's Attorney General."

167.    On September 25, 2020, *Radio.Wosu.org*, an Ohio public media station, posted an article regarding the Ohio AG's lawsuit against FirstEnergy.  In the article, Jennifer Young, a FirstEnergy spokesperson, is quoted as stating: "The [C]ompany has followed the law when it comes to political contributions."  Young is also quoted as stating: "'The attorney general's lawsuit unjustly targets the [company] for lawfully participating in the political process and advocating for policy that is consistent with our interests.'"

168.    On October 14, 2020, *The Wall Street Journal* reported that Energy Harbor, the successor to FES, had been subpoenaed in connection with the federal investigation.

169.    On October 26, 2020, the *Akron Beacon Journal* published an article titled "FirstEnergy – What happened with the checks?; Some candidates did not receive money from the group."  The article stated that "the company had been holding onto the checks, which were issued July 16, since federal investigators arrested former Ohio House Speaker Larry Householder and four others July 21."  The article quoted a FirstEnergy spokesperson as stating: "'Holding the July 16 checks allowed the company more time to investigate and assess the situation, and we decided to cancel the un-mailed checks in September out of an abundance of caution.'"

170.    On October 27, 2020, the Columbus City Attorney announced that the cities of Cincinnati and Columbus had jointly filed a lawsuit in Franklin County Court of Common Pleas against FirstEnergy.  In the press release titled "Columbus and Cincinnati File Suit to Halt Payments of HB 6 Fees to Save Taxpayers Millions of Dollars," the Columbus City Attorney, Zach Klein, is quoted as stating: "'Because of HB 6, the people of Ohio are required to pay a $900 million corporate bailout to FirstEnergy that was created through corruption, bribery and deception.  In the City of Columbus alone, our residents are on the hook for $25 million of their own money. . . .'" The article also quotes the Mayor of Cincinnati, John Cranley, as stating in pertinent part as follows:

> "We are filing suit to protect ratepayers from being taken advantage of in one of the largest political corruption scandals in state history. . . .  We will aggressively work

to seek an injunction from the courts to stop the unconstitutional corrupt statute from taking effect in January 2021. Ohio utility ratepayer should not have to pay into a corporate bailout fund that was secured through fraud, deceit and intimidation."

171.  On October 29, 2020, Longstreth and Cespedes pled guilty to the charged Racketeer Influenced and Corrupt Organizations Act ("RICO") conspiracy. Cespedes, a lobbyist retained by FES, like Longstreth, admitted that he committed his criminal acts "to conceal the nature, source, ownership, and control of the payments" into Generation Now "in return for specific official action by HOUSEHOLDER relating to the passage and preservation of legislation that would go into effect and save the operation[s] of [the Nuclear Plants]."

172.  Also on October 29, 2020, after the close of the market, FirstEnergy issued a press release announcing the termination of Jones and two other executives: (i) Dennis M. Chack, Senior Vice President of Product Development, Marketing, and Branding; and (ii) Michael J. Dowling, Senior Vice President of External Affairs. In the release, FirstEnergy disclosed that the Internal Review Committee of the Board had determined that the "executives [had] violated certain Company policies and its code of conduct." Donald Misheff, Chairman of the Board, also stated: "'I look forward to working with Chris[topher D. Pappas] in his role as Executive Director to oversee the management team's execution of FirstEnergy's strategic initiatives, engage with the Company's external stakeholders, and *support the development of enhanced controls and governance policies and procedures*.'"

173.  The market viewed these terminations as confirmation of wrongdoing. For example, on October 29, 2020, Guggenheim issued an analyst report titled "FE: CEO and Two Other Executives Terminated over Internal Investigation," which observed that the dismissals "all but confirm[] some degree of impropriety at FE corporate."

174.  On October 30, 2020, FirstEnergy filed a Form 8-K with the SEC. The release stated, "Following the Committee's determination regarding these violations of certain Company policies

- 62 –

and its code of conduct, the Company is re-evaluating its controls framework, which could include identifying one or more material weaknesses."

175.    On October 23, 2020, S&P downgraded FirstEnergy.  In connection with its downgrade, S&P stated in pertinent part as follows:

> We view the severity of these violations at the highest level within the company as demonstrative of insufficient internal controls and a cultural weakness.  We view these violations as significantly outside of industry norms and, in our view, represent a material deficiency in the company's governance.  To account for these deficiencies, we revised our assessment of the company's Management & Governance score downward to weak from fair, which lowers the issuer credit rating by two notches.

176.    On October 30, 2020, Fitch downgraded the long-term issuer default rating for FirstEnergy and its subsidiaries and revised its ratings outlook.  Fitch explained: "[t]he rating actions reflect the termination of three senior executives including former FE CEO Charles E. Jones and two other senior executives and ongoing credit concerns regarding potential illicit activity at FE in connection with an ongoing federal bribery/racketeering investigation."

177.    On this news, the price of FirstEnergy stock declined by 6.6% to close at $29.72 per share on October 30, 2020 as compared to $31.81 per share on October 29, 2020.

178.    On November 2, 2020, FirstEnergy filed a Form 8-K with the SEC.  In the Form 8-K, FirstEnergy disclosed that on August 10, 2020 the SEC had informed FirstEnergy that it had opened an investigation into possible securities laws violations by the Company and, on September 1, 2020, the SEC had issued a subpoena to FirstEnergy and certain of its officers.  The Form 8-K attached a presentation titled "3Q 2020 Strategic & Financial Highlights."   The presentation included a leadership transaction update, supplied by Christopher Pappas, Executive Director, which stated: "During the course of our internal review related to the ongoing government investigation regarding House Bill 6, the Independent Review Committee of the Board determined that three executives violated certain FirstEnergy policies and its code of conduct. . . .  On October 29, 2020, FirstEnergy

- 63 –

announced that the three executives were all terminated effective immediately." Pappas made a substantively similar statement during the earnings call FirstEnergy held on the same day.

179. During the call, Taylor stated: "as we noted in Friday's 8-K, the violations of certain company policy and code of conduct by the terminated executives has caused us to reevaluate our controls framework, and that could lead to identifying 1 or more material weaknesses."

180. During the call, Taylor, in response to an analyst question about how the Company intended to finance a potential fine or penalty, stated:

> I think that's why we're taking the steps that we're taking now to provide additional balance sheet flexibility. When we cut back CapEx, when we think about operating expense reductions, that doesn't necessarily max out your balance sheet over the next 2 years to fund that growth. In fact, it improves your balance sheet. So that's why we're taking the steps that we're taking to just kind of make sure that we address this uncertainty because we don't know where we're going to be in a year or so with the Department of Justice and whether or not there's going to be a fine or penalty. So we're just slowing back on growth for the near term. We can take additional actions if necessary. And I think that will provide plenty of balance sheet flexibility.

181. On the same call, Taylor was asked about the impact of a repeal of HB6 and stated:

> So I think you would go back – the assumption would be we would go back to the rate construct that we had in 2018. So you would remove the decoupling mechanism, but then you would reestablish your energy efficiency rider under the Rider DSE. So that would be the construct. So it would be about a $0.05 hit to earnings. And then you would no longer – going forward, depending on how they repealed and replaced, if decoupling was no longer part of the rate structure going forward, then you would have those – that mechanism that Rider DSE in place going forward.

182. On November 4, 2020, PUCO initiated an audit of FirstEnergy's compliance with corporate separation laws and regulations. PUCO issued a request for proposal seeking an independent third-party auditor to conduct a review of FirstEnergy's corporate separation from Energy Harbor during the time period leading up to the passage of HB6 and the subsequent ballot referendum efforts. In its announcement of the audit, PUCO stated: "information recently filed by FirstEnergy Corp. with the Securities and Exchange Commission indicating an internal investigation

- 64 –

by FirstEnergy Corp. warranted further examination of compliance with corporate separation regulations by FirstEnergy's electric distribution utilities and its affiliates."

183.    On this news, the price of FirstEnergy stock declined by 3.5% to close at $29.06 per share on November 4, 2020 as compared to $30.12 per share on November 3, 2020.

184.    On November 9, 2020, FirstEnergy filed a Form 8-K with the SEC.  In the Form 8-K, FirstEnergy disclosed that Reffner, the Senior Vice President and Chief Legal Officer of FirstEnergy, and Ebony Yeboah-Amankwah ("Yeboah-Amankwah"), the Vice President, General Counsel and Chief Ethics Officer of FirstEnergy, were terminated by the Company effective November 8, 2020.

185.    On November 13, 2020, the Ohio AG filed a lawsuit in the Court of Common Pleas, Franklin County, seeking to enjoin Energy Harbor from collecting subsidies pursuant to HB6.

186.    On November 16, 2020, media outlets reported that FBI agents had raided the home of PUCO Chairman Randazzo.

187.    On this news, the price of FirstEnergy stock declined by 3.4% to close at $28.50 per share on November 16, 2020, as compared to $29.51 per share on November 13, 2020.

188.    On November 17, 2020, FirstEnergy announced, after the close of the market, that the Company had received notice from the NYSE that it was not in compliance with continued listing requirements due to the Company's failure to file the quarterly report for the quarter ended September 30, 2020, which had been due November 16, 2020.

189.    On November 19, 2020, FirstEnergy filed with the SEC an amendment to its annual report for fiscal year 2019 on Form 10-K/A and belatedly filed with the SEC its quarterly report on Form 10-Q for the quarter ending September 30, 2020.  In the Form 10-Q, FirstEnergy stated that it was "considering reductions to its Regulated Distribution and Regulated Transmission capital investment plans and reductions to operating expenses, as well as changes to its planned equity

issuances, to allow for flexibility should a fine be imposed as a result of the government investigation." In the Form 10-K/A, FirstEnergy stated that management was restating its report on the maintenance of effective internal controls for the fiscal year 2019 in light of its subsequent conclusion that "material weakness[es]" existed as of December 31, 2019.

190.    In both filings, FirstEnergy disclosed additional details surrounding the Company's termination of Jones and other executives. Specifically, the filings stated in pertinent part as follows:

> ***These executives were terminated as of October 29, 2020. Such former members of senior management did not maintain and promote a control environment with an appropriate tone of compliance in certain areas of FirstEnergy's business, nor sufficiently promote, monitor or enforce adherence to certain FirstEnergy policies and its code of conduct. Furthermore, certain former members of senior management did not reasonably ensure that relevant information was communicated within our organization and not withheld from our independent directors, our Audit Committee, and our independent auditor***. Among the matters considered with respect to the determination by the committee of independent members of the Board of Directors that certain former members of senior management violated certain FirstEnergy policies and its code of conduct related to a payment of approximately $4 million made in early 2019 in connection with the termination of a purported consulting agreement, as amended, which had been in place since 2013. The counterparty to such agreement was an entity associated with an individual who subsequently was appointed to a full-time role as an Ohio government official directly involved in regulating the Ohio Companies, including with respect to distribution rates.

191.    Both filings also stated that Reffner and Yeboah-Amankwah were terminated by the Company because of "inaction and conduct that the Board determined was influenced by the improper tone at the top."

192.    Both filings also admitted that FirstEnergy's internal controls had not been effective and that the Company's senior executives had "failed to set an appropriate tone at the top" and that its employees had violated the "Company's policies and code of conduct." The filings stated in pertinent part as follows:

> The management of FirstEnergy, with the participation of the acting chief executive officer and chief financial officer, have reviewed and evaluated the effectiveness of its disclosure controls and procedures, as defined under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), in Rules 13a-

15(e) and 15d-15(e), as of September 30, 2020. ***Based on that evaluation, the acting chief executive officer and chief financial officer of FirstEnergy have concluded that its disclosure controls and procedures were not effective as of September 30, 2020, solely as a result of the material weakness in FirstEnergy's internal control over financial reporting described below.***

\*　　\*　　\*

***Material Weakness in Internal Control Over Financial Reporting Existing as of September 30, 2020***

\*　　\*　　\*

We did not maintain an effective control environment as our senior management failed to set an appropriate tone at the top. Specifically, certain members of senior management failed to reinforce the need for compliance with the Company's policies and code of conduct, which resulted in inappropriate conduct that was inconsistent with the Company's policies and code of conduct. . . . [T]his control deficiency could have resulted in material misstatements to the annual or interim consolidated financial statements that would not have been prevented or detected. Accordingly, our management has concluded that this control deficiency constitutes a material weakness.

193. On November 19, 2020, the *WFMJ* website posted a story titled "FirstEnergy: Ohio regulator's firm got $4 million consulting fee," which reported that PUCO Chairman Randazzo was the recipient of the $4 million payment cited by FirstEnergy in connection with its termination of Jones and other executives. The article stated in pertinent part as follows:

Public Utilities Commission of Ohio Chairman Sam Randazzo was not mentioned by name in the company's tardy quarterly report with the in [sic] a U.S. Securities and Exchange Commission. However, Randazzo fits the description of someone who "subsequently was appointed to a full-time role as an Ohio government official directly involved in regulating" FirstEnergy. Randazzo was appointed chairman by Republican Ohio Gov. Mike DeWine on Feb. 4, 2019. FBI agents searched Randazzo's Columbus home Monday. The agency has declined to comment on what they are investigating.

194. On November 20, 2020, Randazzo announced his resignation as PUCO Chairman. On the same day, Fitch announced it was again downgrading the ratings of FirstEnergy and FirstEnergy Transmissions LLC, stating in pertinent part as follows:

The rating action reflects recent disclosures of a $4.3 million payment from FE [FirstEnergy] to an individual who is now a government official involved in

– 67 –

regulating FE's Ohio-based utility distribution subsidiaries. Fitch believes the disclosure significantly deepens regulatory, political, legal and liquidity risks already heighted by investigations underway at the Department of Justice (DOJ) and SEC.

195. On this news, the price of FirstEnergy stock declined by 3.6% to close at $28.00 per share on November 20, 2020, as compared to $29.04 per share on November 19, 2020.

196. On November 24, 2020, FirstEnergy announced that it and its subsidiary, FirstEnergy Transmission, LLC, had drawn down nearly $2 billion under their respective credit facilities to proactively "preserve financial flexibility." The drawdown was widely viewed as FirstEnergy's preparation for a large fine or monetary penalty. Notably, during FirstEnergy's November 2, 2020 earnings call, Taylor had responded to an analyst's question about financing a potential fine or penalty from a balance sheet perspective by stating, "I think that's why we're taking the steps that we are taking now to provide additional balance sheet flexibility."

197. On this news, rating agencies downgraded FirstEnergy's rating to junk status. On November 24, 2020, Moody's issued an announcement titled "Approximately $10 billion of debt securities downgraded," which downgraded FirstEnergy. Moody's explained that "[t]he rating actions reflect our view that regulatory scrutiny in Ohio is likely to increase, potentially resulting [in] negative financial implications for both FirstEnergy and its Ohio utility subsidiaries. The rating actions reflect higher corporate governance risk, resulting from FirstEnergy's lack of oversight of internal controls." A Moody's analyst continued in pertinent part as follows:

> "The disclosure of a payment by FirstEnergy to a government official who directly regulated the company's Ohio utilities is likely to increase both regulatory risk and financial uncertainty for both FirstEnergy and its Ohio utility subsidiaries. . . . Furthermore, FirstEnergy's decision to draw down $2 billion on its credit facilities is viewed as unusual behavior for an investment grade utility holding company. It was done to preserve liquidity but could be a sign that additional negative developments related to corporate governance may occur, possibly limiting access to these credit facilities of the capital markets."

198. The next day, S&P Global Market Intelligence issued an announcement titled "S&P downgrades FirstEnergy following $1.95B draw on revolving credit facility," which downgraded

FirstEnergy. S&P explained: "'Although we believe the company's decision to significantly increase its borrowings under its revolving credit facility demonstrates prudent risk management given the unique challenges the company is facing, in our view, it is also an acknowledgment that the company may not have consistent access to the capital markets.'"

199.     Analysts also viewed FirstEnergy's drawdown as foreshadowing further bad news. For example, a November 24, 2020 Bank of America analyst report stated, "We perceive this as an indication of higher likelihood of further negative announcements to come associated with the federal investigation, including heightened risk of ultimate penalty/settlement with DoJ." Similarly, a December 1, 2020 Wells Fargo analyst report stated, "[R]ecent revelations related to former PUCO Chair Sam Randazzo raise further questions around FE's historical relationship with OH regulators – and raises concerns that heightened scrutiny in other jurisdictions could potentially uncover additional malfeasance."

200.     On this news, over the four-day trading period from November 19, 2020 to November 24, 2020, the price of FirstEnergy stock declined by 8.2% to close at $26.66 per share on November 24, 2020, compared to $29.04 per share on November 19, 2020.

201.     On December 28, 2020, *The Courier* website posted a story titled, "Nuclear plant subsidy stopped," which reported that the Ohio Supreme Court had ordered a temporary stay of the collection of fees pursuant to HB6. The order had come a week after Common Pleas Judge Chris Brown had granted a preliminarily injunction to stop the collection of fees. In the article, Judge Brown was quoted as stating, "[t]o not impose an injunction would be to allow certain parties to prevail. It would give the OK that bribery is allowed in the state of Ohio and that any ill-gotten gains can be received."

202.     On January 14, 2021, the Ohio AG announced that it had filed a motion in the Court of Common Pleas, Franklin County, to enjoin FirstEnergy from collecting the fees tied to a PUCO-

- 69 –

approved rider and the decoupling provisions in HB6. In the announcement, the Ohio AG stated: "'First we had to stop the collection of the fee created to line the pockets of Energy Harbor and now we are trying to stop the guaranteed profits for FirstEnergy and inappropriate rate increases to Ohioans.'" In the motion, the Ohio AG stated that "[g]ranting this preliminary relief restores the *status quo anti* by enjoining the effectiveness of this criminally offensive portion of H.B. 6." The motion continued in pertinent part as follows:

> Despite discovery being stayed, additional facts continue to come to light cementing the connections between FirstEnergy and H.B. 6. The most recent revelations begin to shed light on FirstEnergy's use of Sam Randazzo, who Hs resigned as chair of PUCO after a H.B.6 related FBI raid on his house. FirstEnergy admitted to clearing its C-suites because of a $4 million payment to an entity linked to Randazzo made immediately prior to Randazzo becoming chair of PUCO. The entity is believed to be Sustain Funding Alliance of Ohio. In its SEC filing, FirstEnergy itself questions the validity of the payments through a significant use of the word "purported." FirstEnergy stated that the payment was "in connection with the termination of a purported consulting agreement." FirstEnergy admits the payment happened, but implies that the 'purported' basis is invalid. . . . This, of course, begs the question of what the $4 million Randazzo payment actually paid for.

> It appears to have purchased Randazzo's ongoing effort – even while chair of the PUCO – to craft the language of H.B.6 for FirstEnergy's benefit. . . .

> H.B. 6 enacted a new decoupling mechanism targeted to benefit FirstEnergy codified at R.C. 4928.471.

*    *    *

> The H.B.6 decoupling provision was odd, and especially beneficial to FirstEnergy because rather than allowing PUCO to determine an appropriate profit level, H.B.6 required the PUCO to approve an application that requested a decoupling mechanism "designed to recover the electric distribution utility's 2018 annual revenues." R.C. 4928.471(B). In short, the PUCO must allow the applicant to match its 2018 annual revenues in perpetuity. Of course, 2018 was FirstEnergy's largest annual revenues ever.

203. On February 1, 2021, FirstEnergy filed a Form 8-K with the SEC announcing it had reached a settlement with the Ohio AG and the cities of Cincinnati and Columbus. In the Form 8-K, FirstEnergy stated in pertinent part as follows:

- 70 –

On January 31, 2021, FirstEnergy reached a settlement with the [the Ohio AG and the cities of Cincinnati and Columbus] with respect to the temporary restraining order and preliminary injunction request and related issues. In connection with the settlement, [FirstEnergy and FirstEnergy's Ohio utilities (the "Ohio Companies")] filed an application on February 1, 2021, with the Public Utilities Commission of Ohio ("PUCO") to set their respective decoupling riders (Rider CSR) to zero. Within five business days of any PUCO order approving the application, the Ohio Companies will ensure that no additional customer bills will include will ensure that no additional customer bills will include new decoupling rider charges. FirstEnergy expects to set the Ohio Companies remaining Rider CSR regulatory asset balance of approximately $110 million to $0.

In the absence of the decoupling riders permitted under Ohio House Bill 6, the Ohio Companies believe they would have collected lost distribution revenue estimated at $85 million for the year ended December 31, 2020.

204.    On the same day, *Reuters* published an article titled "Ohio AG, FirstEnergy agree to end $102 million surcharge in nuclear bailout scandal." In the article, the Ohio AG was quoted as stating, "'This agreement recognizes the corrupt influence used to guarantee a for-profit company above-market returns for years to come by operation of law.'"

205.    On February 5, 2021, Generation Now pled guilty to the charged RICO conspiracy. In the statement of facts attached to the plea agreement, Generation Now admitted to "receiv[ing] money from Company A (as defined in the Indictment [*i.e.*, FirstEnergy]) for the benefit of the [d]efendants and others in return for specific official action by HOUSEHOLDER relating to the passage and preservation of legislation that would go into effect and save the operation of two nuclear power plants in Ohio; and [to engaging] in financial transactions that were designed to conceal the nature, source, ownership, and control of the payments made by Company A to GENERATION NOW."

206.    On February 16, 2021, FirstEnergy filed a current report on Form 8-K with the SEC which, among other things, revealed: (i) that the Company was subject to an audit by The Federal Energy Regulatory Commission's ("FERC") in connection with its governmental and lobbying activities; (ii) that the Company had determined the prior $4 million payment to PUCO Chairman

Randazzo "may have been for purposes other than those represented within the consulting agreement"; (iii) that the loss of HB6 coupling revenues would reduce the revenues to be received by FirstEnergy's Ohio subsidiaries by $115 million in 2021 alone; and (iv) that the Company would be recognizing a $108 million pre-tax charge in the fourth quarter of 2020 in connection with lost distribution revenues. The filing also provided the following new risk disclosure, which acknowledged the importance to FirstEnergy investors of the severe risks and potential harm faced by the Company as a result of its participation in the Bailout Scheme:

> Any appearance of non-compliance with anti-corruption laws, as well as any alleged failures to comply with anti-corruption laws, could have an adverse impact on our reputation or relationships with regulatory authorities, and result in a material inquiry or investigation by such federal, state and local regulatory agencies, and result in adverse rulings against us, which could have a material adverse impact on our financial condition, operating results and operations.

207.    On February 18, 2021, FirstEnergy announced the Company's fourth quarter and full year 2020 financial results. During the quarter, FirstEnergy suffered a $0.15 per share hit to earnings due to the Company's settlement with the Ohio AG and the cities of Cincinnati and Columbus. In addition, FirstEnergy disclosed that the $4 million payment to Randazzo was part of a pattern of improper transactions by the Company that had not been properly reported to investors and that had negatively impacted ratepayers stretching back more than a decade. In a separate release issued that same day, FirstEnergy announced the continued overhaul of key leadership positions at the Company, including the appointment of a new Vice Chairman of the Board, steps FirstEnergy stated were necessary to "rebuild trust with FirstEnergy's external stakeholders, including regulators and the financial community."

## ADDITIONAL SCIENTER ALLEGATIONS

208.    As alleged herein, defendants acted with scienter in that: (i) they knew or recklessly disregarded that their public documents and statements issued or disseminated were materially false and misleading; (ii) they knew or recklessly disregarded that such statements or documents would be

issued or disseminated to the investing public; and (iii) they participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Officer Defendants, by virtue of their receipt of information reflecting the true facts regarding FirstEnergy, their control over and/or receipt and/or modification of FirstEnergy's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning FirstEnergy, participated in the fraudulent scheme and knew of the materially adverse facts alleged herein.

209. The affidavit and complaint filed in the Criminal Proceedings make clear that FirstEnergy's most senior executives directly facilitated and oversaw the illicit activities alleged therein. For example, Jones had 84 personal phone contacts with Householder during the Class Period at the exact time that FirstEnergy was funneling tens of millions of dollars to the enterprise and it was taking part in overt acts in furtherance of the illicit activities detailed herein. The Officer Defendants' scienter is also established by the breadth and magnitude of the alleged activities, which involved the largest money-laundering and bribery scheme in Ohio history, and the massive disparity between what FirstEnergy paid versus the benefits it received. If the recipients of FirstEnergy's $60 million payments were the only ones acting with unlawful intent, they would not have simply gifted a $2 billion return to FirstEnergy and the individuals comprising it, such as Jones.

210. In addition, FirstEnergy's extensive contacts with Householder were well known within the organization and covered by outside media organizations. Beyond Householder's January 2017 ride on a FirstEnergy airplane and the regular contact by FirstEnergy employees with members of the Bailout Scheme, the Company's support for Householder was well documented in the media (who nonetheless did not report on the illicit nature of this relationship), including news organizations such as *Cleveland.com* and the *Energy and Policy Institute*.

- 73 –

211.    Jones' efforts to conceal his personal involvement following news of Householder's arrest further confirms that he was knowingly complicit in the corrupt enterprise.  For example, during the earnings call following the arrest of Householder, Jones stated that, "I've never made a payment directly to a lobbyist in my life nor asked any lobbyists to make a payment to anyone else on behalf of our company in my life."  Yet, only a few months later, FirstEnergy fired him for his role in disguising a $4 million payment to Randazzo.  Jones also confirmed his personal involvement during the Company's earnings call conducted for the first quarter of 2018, stating, "I will continue ***personally*** to advocate for regulatory or legislative solutions."

212.    FirstEnergy's termination of Jones and four other top executives further strengthens an already-compelling inference of scienter.  It is implausible that the individuals who comprise FirstEnergy unwittingly financed the largest political corruption scheme in Ohio state history and in doing so accidentally obtained the precise legislatively "fix" for the Nuclear Plants that they had been discussing for years.  It is similarly unlikely that the Company would fire Jones and multiple other senior officers for having dumb luck, especially because the Company expressly acknowledged that the firings were due to these executives' failure to adhere to Company policies and the Code of Conduct, setting an inappropriate tone at the top, and withholding information required to be disclosed.  The timing of these firings and the Company's express explanations for them is only compatible with a determination that Jones and the others acted with culpable states of mind.

213.    The Officer Defendants managing FirstEnergy also had the motive and opportunity to commit fraud.  For example, these executives received tens of millions of dollars in performance-based compensation substantially due to the Bailout Scheme, and several engaged in insider sales that were highly suspicious in both timing and amount.  Jones alone reaped $10 million in insider trading proceeds during the Class Period.  The Officer Defendants also took advantage of the inflated prices for FirstEnergy securities to conduct $5 billion worth of debt and equity sales.

- 74 –

Securing HB6 provided the Company with $2 billion in expected value and allowed the Officer Defendants to deliver on their highest strategic priority – finding a "solution" for the Nuclear Plants – for which they and FirstEnergy were richly rewarded.

214.    In addition to their orchestration of the fraudulent scheme, defendants' scienter is evidenced by: (i) admissions of wrongdoing by the perpetrators of the Bailout Scheme; (ii) defendants' direct participation in the Bailout Scheme; (iii) defendants' efforts to conceal the Bailout Scheme; (iv) the multitude of lawsuits, investigations and other proceedings brought against defendants in connection with the Bailout Scheme; (v) the magnitude of the Bailout Scheme; (vi) defendants' sale of $5 billion of debt and equity securities during the Class Period; (vii) defendants' desire to boost FirstEnergy's credit rating and reduce the cost of acquiring capital; and (viii) the Officer Defendants' receipt of tens of millions of dollars in performance-based compensation and insider sale proceeds.

## A.    Admissions of Wrongdoing by Bailout Scheme Members

215.    Defendants' scienter is demonstrated by direct admissions of wrongdoing by the perpetrators of the Bailout Scheme, including certain of the defendants themselves.  For example, in connection with its agreement to plead criminally guilty to RICO conspiracy violations, Generation Now admitted that the Bailout Scheme was established in coordination with FirstEnergy and that the Company knowingly took steps to conceal its involvement in criminal wrongdoing.  Specifically, Generation Now admitted that it "received money from [FirstEnergy] for the benefit of the Defendants and others in return for specific official action by HOUSEHOLDER relating to the passage and preservation of legislation that would go into effect and save the operation of two nuclear power plants in Ohio."  Generation Now further admitted that it "engaged in financial transactions that were designed to conceal the nature, source, ownership, and control of the payments made by [FirstEnergy]."  Similarly, Longstreth – described as FirstEnergy's "point of contact" with

Householder – admitted in connection with his criminal plea agreement that he, together with other members of the Bailout Scheme, "engag[ed] in financial transactions that were designed to conceal the nature, source, ownership, and control of the payments made by [FirstEnergy]."

216.     FirstEnergy has likewise conceded that its executives engaged in the wrongdoing that forms the subject of this complaint.  In October and November 2020, FirstEnergy fired several high ranking officers for their role in perpetrating the Bailout Scheme.  In explaining these executive terminations, the Company admitted that defendants Jones, Chack and Dowling were terminated for personally "violat[ing] certain FirstEnergy policies and its code of conduct" and for failing to "maintain and promote a control environment with an appropriate tone of compliance in certain areas of FirstEnergy's business."   FirstEnergy specified that these violations concerned the Company's improper influence campaign, providing the examples, "[a]mong" others, of their making an illicit $4 million payment in April 2019 to an entity controlled by Randazzo just prior to his assumption of the PUCO Chairmanship and of their attempts to improperly conceal their activities.  FirstEnergy has subsequently acknowledged "that payments under the consulting agreement may have been for purposes other than those represented within the consulting agreement."  Randazzo would go on to write key pieces of HB6 and publicly testify in support of the bill without disclosing these payments.  Similarly, FirstEnergy admitted that it terminated defendant Reffner and another senior legal officer for their failure to prevent wrongdoing (as their jobs required) and because of their personal, affirmative "conduct that the Board determined was influenced by the improper tone at the top."  FirstEnergy has confirmed that all five terminations "relat[e] to *United States v. Larry Householder, et al.*" and associated internal and governmental investigations.  In addition, FirstEnergy has announced a wide-ranging overhaul of its senior leadership positions and compliance and anti-corruption policies, practices and procedures, thereby acknowledging their material inadequacy during the Class Period.

- 76 –

217.    In addition, FirstEnergy has admitted that it failed to "maintain an effective control environment as [its] senior management failed to set an appropriate tone at the top." FirstEnergy has further admitted that "certain members of senior management failed to reinforce the need for compliance with the Company's policies and code of conduct, which resulted in inappropriate conduct that was inconsistent with the Company's policies and code of conduct." As a result, FirstEnergy suffered from a material weakness in its internal control over financial reporting that "could have resulted in material misstatements to the annual or interim consolidated financial statements that would not have been prevented or detected."

218.    Jones also made numerous statements attesting to the knowledge of FirstEnergy and its executives, including his own personal knowledge, regarding the Bailout Scheme. For example, in response to an analyst question about what FirstEnergy knew regarding the facts alleged in the Criminal Proceedings, Jones responded, "The financial support we provided to House Bill 6 isn't complicated. We know what we did. We know why we did it." Jones also admitted that FirstEnergy knowingly contributed at least $15 million to the Bailout Scheme, although he misrepresented the extent and nature of the Company's involvement. As discussed below, the false and misleading nature of Jones' statements, in which he admitted knowing the details of FirstEnergy's payments in support of HB6 but denied culpability, provide further indicia of scienter.

**B.    Defendants' Direct Participation in the Bailout Scheme**

219.    Defendants' own, direct roles in the Bailout Scheme further confirm their scienter of the adverse facts detailed herein. The Officer Defendants directly oversaw and participated in material aspects of the Bailout Scheme, and FirstEnergy served as its corporate kingpin. Each of the Officer Defendants held a senior position at FirstEnergy and/or FES with responsibility for directing and managing the Company's business, political operations, regulatory and compliance activities, nuclear operations and/or financial reporting, among other aspects of FirstEnergy operations directly

- 77 –

implicated in the Bailout Scheme. The Officer Defendants held themselves out as the persons most knowledgeable about these subjects and regularly presented on them to investors during the Class Period. FirstEnergy was so central to the Bailout Scheme that perpetrators described the Company as its "Bank" and the "single largest client" of the corrupt lobbyists pushing for the passage and preservation of HB6. The Officer Defendants' job responsibilities, certifications, actions, statements and participation in FirstEnergy's extensive reporting and information distribution network and efforts to facilitate the Bailout Scheme during the Class Period confirm that each of the Officer Defendants knew or recklessly disregarded the Bailout Scheme, FirstEnergy's "unholy alliance" with corrupt political actors and the surrounding circumstances set forth herein.

220. **Jones**. As FirstEnergy's CEO, Jones was the ultimate head of the Company's lobbying activities, efforts to pass HB6 and pursuit of illicit "solutions" to deal with the problems posed by the Nuclear Plants. In these roles, Jones orchestrated the payment of tens of millions of dollars from the corporate treasury of FirstEnergy to finance the Bailout Scheme. Key members of the scheme, including the other Officer Defendants, reported to him. During the Class Period, Jones also repeatedly emphasized his direct and personal involvement in the Company operations implicated in the Bailout Scheme. For example, Jones described solving FirstEnergy's nuclear problems as his "top priority" and stated that he "personally" met with legislators regarding the Nuclear Plants. During a February 2018 earnings call, Jones acknowledged, "It is common knowledge that we were very actively involved in a multitude of efforts at both the state and federal levels to support" the Nuclear Plants, and later, during an April 2018 earnings call, proclaimed he would "continue personally to advocate for regulatory or legislative solutions." Similarly, in August 2018, Jones stated that he was "going to continue to be a loud advocate for" a government solution to the Nuclear Plants. After HB6 was signed into law, Jones personally thanked Householder and other Ohio politicians for their "willing[ness] to lead" in passing the bill.

- 78 –

221.    Jones backed up these words with overt acts in support of the Bailout Scheme.  He held at least 84 phone calls with Householder during the Class Period.  This included 30 calls in the short seven-month span from January 2019 to July 2019 – the period between when Householder became Speaker and when HB6 was signed into law.  Jones also participated in in-person meetings regarding the Bailout Scheme with other senior FirstEnergy executives, including a September 2019 meeting with an FES lobbyist to discuss the anti-repeal efforts being covertly funded by the Company.  In addition, Jones certified that he had personal "knowledge" that FirstEnergy's quarterly financial filings were accurate, complete and fairly presented in all material respects the Company's financial position.  He also certified that he was personally responsible for establishing and maintaining FirstEnergy's internal controls and procedures and that such internal controls and procedures were free from any material weaknesses, properly designed and effective to ensure accurate financial reporting and internal fraud detection.  In October 2020, FirstEnergy fired Jones because of his involvement in the Bailout Scheme and for making millions of dollars in illicit payments to an Ohio regulator.  Moreover, the Company has subsequently admitted that its internal controls were deficient in direct contradiction of Jones' Class Period statements.

222.    **Dowling**.  Dowling served as FirstEnergy's SVP of External Affairs during the Class Period.  In this role, he was responsible for FirstEnergy's governmental and regulatory affairs (including with the state of Ohio), energy policies, community outreach and political action committees.  Dowling was an instrumental participant in the Bailout Scheme, holding at least 14 phone contacts with Householder and several additional phone calls with other co-conspirators regarding the Bailout Scheme.  Many of these calls occurred in conjunction with payments from FirstEnergy to fund the Bailout Scheme.  For example, on March 12 and 13, 2018, Dowling had five telephone communications with Householder.  Two days later, FirstEnergy wired $300,000 to the corrupt enterprise through a pass-through vehicle.  Similarly, between April 27 and April 30, 2018,

Dowling had seven telephone communications with Longstreth, followed shortly thereafter by a $100,000 payment by FirstEnergy to members of the Bailout Scheme on May 4, 2018. FirstEnergy fired Dowling because of his direct involvement in the Bailout Scheme, including for facilitating an illicit $4 million payment to Randazzo in advance of Randazzo's assumption of the PUCO Chairmanship and HB6 advocacy.

223. **Pine**. Pine served as a FirstEnergy lobbyist and its Ohio Director of State Affairs during the Class Period. In this role, Pine was a central liaison between FirstEnergy and corrupt Ohio politicians and regulators, including members of the Bailout Scheme. During the Class Period, Pine had at least 188 phone contacts with Householder and his co-conspirators regarding the Bailout Scheme. Several of these calls occurred in conjunction with payments from FirstEnergy to fund the Bailout Scheme. For example, on March 12 and 13, 2018, Pine had four telephone communications with Householder. Two days later, FirstEnergy wired $300,000 to the corrupt enterprise through a pass-through vehicle. Similarly, between May 1 and May 4, 2018, Pine had five telephone contacts with Longstreth, immediately after which FirstEnergy made a $100,000 payment to members of the Bailout Scheme. Pine also worked closely with Ohio state legislators to draft HB6 on behalf of FirstEnergy and possessed intimate knowledge about the Company's efforts to shepherd the legislation through the Ohio legislature.

224. **Chack**. Chack served as FirstEnergy's SVP of Product Development, Marketing and Branding. He was responsible for FirstEnergy's corporate branding, corporate communications and marketing programs, including the Company's extensive media efforts in support of HB6 and efforts to oppose the repeal of the legislation. These marketing efforts espoused false and misleading information regarding the purported benefits of HB6 and the public harms that would occur if HB6 were repealed. Chack, along with other FirstEnergy executives, worked to obscure the Company's role in funding this media campaign. Because of his job responsibilities, Chack worked directly with

- 80 –

Jones and other FirstEnergy executives to shape the Company's misleading HB6 messaging strategy and almost certainly attended a September 2019 meeting between FirstEnergy executives and an FES lobbyist to discuss anti-repeal efforts being covertly funded by the Company. FirstEnergy fired Chack in October 2020 because of his direct involvement in the Bailout Scheme, including for facilitating an illicit $4 million payment to Randazzo in advance of his assumption of the PUCO Chairmanship and HB6 advocacy.

225. **Pearson**. Pearson served as FirstEnergy's CFO until March 2018, at which time he transitioned to its VP of Finance in order to focus "his utmost attention" on dealing with the Nuclear Plants until his retirement in April 2019. Pearson was a member of the Restructuring Working Group overseeing the Company's restructuring of FES. In these roles, he had direct oversight and responsibility for FirstEnergy's accounting, financial planning, internal auditing, corporate risk, investor disclosures and efforts to eliminate the Company's liability exposure to the Nuclear Plants. As a result, Pearson was directly involved in and intimately familiar with key aspects of the Bailout Scheme. Pearson reviewed and determined the Company's accounting for its payments and political contributions, including FirstEnergy's illicit payments to the Bailout Scheme. During the Class Period, Pearson also certified that he had personal "knowledge" that FirstEnergy's quarterly financial filings were accurate, complete and fairly presented in all material respects the Company's financial position. He also certified that he was personally responsible for establishing and maintaining FirstEnergy's internal controls and procedures and that such internal controls and procedures were free from any material weaknesses, properly designed and effective to ensure accurate financial reporting and internal fraud detection. FirstEnergy would later admit that its internal controls were deficient in direct contradiction of defendant Pearson's Class Period statements.

226. **Strah**. Strah served as VP of FirstEnergy's Utilities Operations until March 2018, at which time he transitioned to CFO before assuming the role of President of FirstEnergy in May 2020. In these roles, he had direct oversight and responsibility for FirstEnergy's accounting, financial planning, internal auditing, corporate risk and investor disclosures. Strah reviewed and determined the Company's accounting for its payments and political contributions, including FirstEnergy's illicit payments to the Bailout Scheme. During the Class Period, Strah certified that he had personal "knowledge" that FirstEnergy's quarterly financial filings were accurate, complete and fairly presented in all material respects the Company's financial position. He also certified that he was personally responsible for establishing and maintaining FirstEnergy's internal controls and procedures and that such internal controls and procedures were free from any material weaknesses, properly designed and effective to ensure accurate financial reporting and internal fraud detection. FirstEnergy would later admit that its internal controls were deficient in direct contradiction of defendant Strah's Class Period statements.

227. **Reffner**. At the start of the Class Period, Reffner served as FirstEnergy's VP Legal, and he was promoted to FirstEnergy's VP General Counsel in 2018 and its SVP Chief Legal Officer in May 2020. In these roles, Reffner was responsible for FirstEnergy's legal, ethics, internal auditing, risk management and related affairs during the Class Period. He oversaw the Company's fulfillment of its legal and ethical obligations, internal control policies and procedures and adherence to internal control, risk management and compliance guidelines. As a result, Reffner was directly involved in and intimately familiar with FirstEnergy's extensive efforts to facilitate the Bailout Scheme and prevent its detection. FirstEnergy fired Reffner in November 2020 because of his "conduct" in support of the Bailout Scheme and failure to prevent its occurrence.

228. **Vespoli**. Vespoli served as FirstEnergy's Executive VP of Corporate Strategy and Regulatory Affairs and Chief Legal Officer until her retirement in April 2019. Vespoli was also part

of the FirstEnergy Restructuring Working Group overseeing the restructuring of FirstEnergy's nuclear subsidiaries and the efforts to achieve a legislative "solution," which ultimately culminated with the passage of HB6. In these roles, she had direct oversight and responsibility for the Company's lobbying activities and political contributions, interaction with regulators and state representatives, legal and regulatory compliance activities and efforts to eliminate the Company's liability exposure to the Nuclear Plants. Jones described Company professionals overseen by Vespoli as a "fully-engaged team of financial and legal advisors" seeking solutions for FES and stated that the regulatory affairs team overseen by Vespoli were "closely monitoring the status of initiatives at both the state and federal levels." Vespoli was directly involved in and intimately familiar with key aspects of the Bailout Scheme. Although Vespoli retired before she could be fired by FirstEnergy for her role in the Bailout Scheme, her responsibilities mirrored those of her successor, Reffner, who was ultimately terminated by the Company for his misconduct and complicity in connection with the Bailout Scheme.

229. **Schneider**. Schneider served as CEO and Chairman of FES at the start of the Class Period. He remained CEO of FES until Judge assumed that position in March 2019 and remained FES Chairman until FES completed its bankruptcy restructuring. In these roles, Schneider facilitated FES's part in the Bailout Scheme through his responsibilities for FES's lobbying and regulatory efforts, separation from FirstEnergy and efforts to find "solutions" for the Nuclear Plants. As part of Jones' plan to create the appearance of FES independently supporting Householder (captured in a recorded phone conversation involving Cespedes), Schneider directed FES to retain one of the Bailout Scheme's most important lobbyists: Mathew Borges. Schneider retained Borges in close consultation with FirstEnergy and the Company's other senior executives involved in the Bailout Scheme, including Jones. As a result, Schneider was directly involved in the Bailout Scheme and intimately familiar with its operations.

- 83 –

230.     **Judge**.  Judge is the CEO and President of FES (now Energy Harbor).  He assumed this position in February 2019, prior to which he served as the Chief Risk Officer of FirstEnergy.  In these roles, Judge facilitated FES's part in the Bailout Scheme through his responsibilities for FES's lobbying and regulatory efforts, separation from FirstEnergy and efforts to find "solutions" for the Nuclear Plants.  Judge personally met with Householder to discuss the Bailout Scheme, including in a March 2019 meeting at Vern Riffe State Office Tower ("Riffe Tower") in Columbus.  As part of Jones' plan to create the appearance of FES independently supporting Householder (captured in a recorded phone conversation involving Cespedes), Judge directed FES to retain one of the Bailout Scheme's most important lobbyists: Cespedes.  Judge retained Cespedes in close consultation with FirstEnergy and the Company's other senior executives involved in the Bailout Scheme, including Jones.  Judge periodically met with Cespedes to receive updates on the Bailout Scheme, including during the aforementioned March 2019 Riffe Tower meeting, which Cespedes attended, and also during a November 2019 dinner attended by Judge, Cespedes and other Bailout Scheme members.  Judge also directed and oversaw the use of FES employees in commercials opposing the repeal of HB6, as part of the misleading ad campaign opposing the repeal effort.  Following the passage of HB6, Judge personally thanked Householder, stating, "We're also thankful for the support and commitment by Speaker Householder."

## C.     Defendants' Efforts to Conceal the Bailout Scheme

231.     Defendants' extensive efforts to cover up their wrongdoing further bolster a compelling inference of scienter.  These efforts demonstrate that defendants both: (i) knew of the adverse facts alleged herein; and (ii) knew that their activities were unlawful and improper and risked material damage to the Company and its investors if ever revealed.

232.     Defendants in the Criminal Proceedings have admitted that members of the Bailout Scheme "engaged in financial transactions that were designed to conceal the nature, source,

- 84 –

ownership, and control of the payments made by [FirstEnergy]."  FirstEnergy itself has likewise admitted that members of senior management, including Jones, Chack and Dowling, failed to "reasonably ensure that relevant information was communicated . . . and not withheld" in connection with the Bailout Scheme.

233.     Moreover, FirstEnergy employed an elaborate dark money network for the express purpose of concealing its illicit payments in support of the Bailout Scheme, including, *inter alia*: (i) Generation Now, Inc.; (ii) JPL & Associates LLC; (iii) Friends of Larry Householder; (iv) Constant Content Co.; (v) 17 Consulting Group LLC; (vi) Partners for Progress, Inc.; (vii) Coalition for Growth & Opportunity, Inc.; (viii) Hardworking Ohioans, Inc.; (ix) Growth & Opportunity PAC, Inc.; (x) Ohioans for Energy Security, LLC; and (xi) FirstEnergy PAC FSL.  The use of this dark money network allowed FirstEnergy to obscure the source of its payments to fund the Bailout Scheme and to conceal the Company and the Officer Defendants' role in it.  As an example of the ways in which FirstEnergy used this complex web to conceal its support for the Bailout Scheme, in October 2019 FirstEnergy funneled $3.5 million to pay for a direct mailer campaign opposing the repeal of HB6 first through Generation Now and then through three different bank accounts, making the source of the funds almost impossible to trace.  Lobbyist Neil Clark described the appeal of using 501(c)(4) organizations to further the Bailout Scheme as follows: "it's a secret, a (c)(4) is secret. Nobody knows the money goes to the Speaker's account . . . it's not recorded."

234.     Tellingly, even after Householder was arrested and the fraudulent scheme perpetrated by FirstEnergy and the Officer Defendants began to unravel, Jones told a series of brazen lies to perpetuate the cover-up.  During an investor call immediately after the arrests, Jones claimed, "I don't know who" is the "CEO [of Company A]" referred to in the Criminal Complaint, "but it was not me."  This claim of ignorance was belied by the Criminal Complaint's direct quotes of Jones' past statements, attributed to the "Company A Corp.'s CEO," which left no doubt about the CEO's

identity. As prosecutors noted when announcing Householder's arrest, "Everyone in this room knows who Company A is."

235. During the call, Jones also strongly disavowed any wrongdoing. However, almost immediately after issuing these falsehoods, Jones had to walk them back. The very next business day, Jones issued a series of "clarifications," conceding that he did not in fact "literally" emphasize ethics in all interactions with politicians. Jones also acknowledged that FirstEnergy continued to provide FES external affairs support during the Class Period, notwithstanding his prior claim that the Company was "virtually out of the external affairs business for FES very shortly after November of 2016." The extent of Jones' attempt to cover-up defendants' roles in the Bailout Scheme would be further revealed when FirstEnergy announced his termination in October 2020. The reasons FirstEnergy provided for firing Jones and other executives included their failure to act transparently, ethically and professionally and their illicit payment of millions of dollars to a top Ohio regulator.

**D.    The Historic Magnitude of the Bailout Scheme**

236. The historic magnitude of defendants' fraudulent scheme further confirms that defendants possessed scienter of the undisclosed, adverse facts detailed herein. The Bailout Scheme involved one of the largest bribery and corruption schemes in U.S. history, and it was perpetrated through an extensive network of FirstEnergy and FES employees, politicians, lobbyists, regulators, political action committees, front companies and dark money vehicles. FirstEnergy funneled more than $60 million over a multi-year period to Householder and his corrupt affiliates to ensure the passage and defense of HB6, one of the most consequential pieces of energy regulation impacting Ohio citizens in recent history. FirstEnergy's financial commitment to the criminal enterprise was so vast that conspirators internally referred to the Company as the "Bank" and its willingness to spend "unlimited" cash to further its corrupt ends as "Monopoly money." In return for these lavish contributions, FirstEnergy secured a $1.3 billion rate payer-funded bailout of the Nuclear Plants,

lucrative decoupling provisions that locked-in an estimated $700 million in guaranteed revenues, an amiable exit to the FES bankruptcy proceedings, and a much-needed "fix" for the Company's nuclear problems.

237.     Bribery and corruption were at the core of FirstEnergy's business model and used to navigate the Company's most pressing operational and financial challenges.  The Bailout Scheme was FirstEnergy's "top priority" and directly overseen and implemented by the Company's most senior management, including the Officer Defendants.  FirstEnergy's efforts to deal with its failing nuclear subsidiaries was a central topic of concern for investors and analysts and featured prominently during almost every Company earnings call during the Class Period.  When the Bailout Scheme was finally revealed, the repercussions were enormous, resulting in, *inter alia*: (i) at least five arrests and three guilty pleas by co-conspirators; (ii) more than a dozen lawsuits, investigations and compulsory audits of FirstEnergy; (iii) the termination of several high-ranking FirstEnergy executives, including four of the Officer Defendants; (iv) a collapse in the price of FirstEnergy securities; (v) multiple rating agency downgrades; and (vi) the need for FirstEnergy to take a nearly $2 billion credit drawdown to ensure sufficient liquidity to pay expected fines and penalties.

**E.     Defendants Are Sued and Investigated for Their Riles in the Bailout Scheme**

238.     FirstEnergy and many of the Officer Defendants are now subject to a host of lawsuits, investigations, regulatory reviews and other proceedings as a result of their participation in the Bailout Scheme.

239.     In addition to being identified as "Company A" in the Criminal Proceedings, FirstEnergy has been named as a defendant in more than a dozen shareholder lawsuits, customer and ratepayer class actions, and state and municipal proceedings.  Many of these lawsuits have already found early success in attempting to hold FirstEnergy and its officers accountable for their violations of law in connection with the Bailout Scheme.  For example, in December 2020, the Ohio AG and

the cities of Cincinnati and Columbus successfully secured a preliminary injunction before Franklin County Judge Chris Brown which blocked the HB6 nuclear subsidies. *See Ohio v. FirstEnergy et al.*, No. 20-CV-06281, Or. (Ct. C.P. Franklin Cnty. Dec. 21, 2020). Then, in January 2021, the parties reached a settlement in which FirstEnergy agreed to forego the fees associated with HB6's decoupling provisions. Similarly, on February 10, 2021, Judge Edmund A. Sargus, Jr. denied in their entirety motions to dismiss a rate payer class action alleging RICO conspiracy and other violations against defendants FirstEnergy, Jones, Pearson, Strah, Taylor and Dowling. *See* Opinion & Order Denying Defendants' Motion to Dismiss, *Smith v. FirstEnergy Corp., et al.*, No. 2:20-cv-03755, ECF No. 43 (S.D. Ohio Feb. 10, 2021).

240. FirstEnergy, FES and certain officers have also received subpoenas from the U.S. Attorney's Office for the Southern District of Ohio and the SEC in connection with investigations into the Bailout Scheme. In addition, FirstEnergy's primary regulator, PUCO, has launched a series of audits to examine the Company's support for HB6, use of customer funds, compliance with applicable laws and regulations, and separation from FES, among other issues. The FERC Division of Investigations has also launched an audit in connection with the Company's lobbying and governmental affairs activities.

## F. Defendants Issued $5 Billion in Equity and Debt at Artificially Inflated Prices

241. FirstEnergy's Form 10-K filings repeatedly acknowledged that the Company's "business is capital intensive, requiring significant resources to fund operating expenses, construction expenditures, scheduled debt maturities and interest payments, dividend payments and contributions to pension plan." To meet these capital requirements during the Class Period, defendants took advantage of the artificially inflated price of FirstEnergy securities and the investment grade credit ratings generated by their fraudulent conduct and issued $2.5 billion in common and preferred stock and another $2.5 billion in debt securities.

- 88 –

242.     On January 22, 2018, when FirstEnergy common stock was trading at the artificially inflated price of $32.45 per share, FirstEnergy announced that it had issued $1.62 million in mandatorily convertible preferred shares and $850 million in common stock.  Defendants hailed the private placement as "transformational" and, in FirstEnergy's 2019 Form 10-K, claimed it "supported the company's transition to a fully regulated utility company and positions FirstEnergy for sustained investment-grade credit metrics."

243.     In February 2020, while FirstEnergy stock was trading above $53 per share and the Company had received investment-grade corporate credit ratings from S&P, Moody's and Fitch as a result of the Bailout Scheme, defendants issued $1.75 billion in debt securities.  Specifically, defendants issued $300 million of 2.050% notes due in 2025, $600 million of 2.650% notes due in 2030, and $850 million of 3.400% notes due in 2050.  According to the prospectus for the sale of these securities, FirstEnergy needed the $1.75 billion to repay the Company's term loan credit agreement that was expiring in September 2021, to fund cash payments pursuant to the FES bankruptcy settlement agreement, and to fund working capital needs.

244.     Less than four months later, in June 2020, defendants issued another $750 million in debt securities while the Company's credit rating continued to be investment-grade and its common stock traded above $43 per share as a result of defendants' misstatements and material omissions.  Specifically, defendants issued $300 million of 1.600% notes due in 2026 and $450 million of 2.250% notes due in 2030.  According to the prospectus for these securities, FirstEnergy intended to use the money to repay $750 million borrowed under a term loan credit agreement that was due to expire in September 2020.

## I.     Defendants' Fraud Boosted FirstEnergy's Credit Rating and Reduced Its Cost of Acquiring Capital

245.     In late 2016, PUCO approved a "Distribution Modernization Rider" increasing FirstEnergy customers' rates to provide "credit support" for FirstEnergy as it faced mounting

problems with the Nuclear Plants. At the time, a Moody's credit opinion and an S&P research update both noted that there was a serious risk of FirstEnergy's credit rating being downgraded. According to FirstEnergy, any downgrade would hinder access to capital markets and make the cost of borrowing money higher. FirstEnergy's SEC filings during the Class Period also acknowledged that "[a] downgrade in [FirstEnergy] credit ratings from the nationally recognized credit rating agencies, particularly to a level below investment grade, could negatively affect our ability to access the bank and capital markets" and "a downgrade could increase the cost of . . . capital," "increase our interest expense on certain of FirstEnergy's long-term debt," and "impact our ability to grow our regulated business or execute on our business strategies." But if defendants could preserve and improve FirstEnergy investment grade credit ratings, it would reduce the cost of acquiring capital, including interest rates on debt offerings and loan terms, which would directly benefit the Company's reported financial results. As Jones stated during a conference call with analysts and investors at the beginning of the Class Period on February 22, 2017: "[w]e are committed to investment grade credit metrics at FE Corp."

246. Based significantly on the Bailout Scheme and the claimed resolution of the financial problems posed by the Nuclear Plants, defendants were able to increase FirstEnergy's credit ratings with all three major rating agencies: S&P, Moody's and Fitch. Indeed, during a February 20, 2019 conference call discussing FirstEnergy's settlement with FES creditors, which was achieved due to the promise of a legislative solution for the Nuclear Plants, Jones assured investors that, "[t]he settlement and our improved risk profile as a utility with stable, predictable earnings and cash flow cleared the way for an across-the-board upgraded S&P, including an upgraded issuer credit rating at FE Corp. and a positive credit outlook with Fitch." As a result of the improved credit ratings, FirstEnergy was able to accomplish the sale of $2.5 billion in debt securities in the first half of 2020 as detailed above and to substantially reduce its cost of raising capital.

- 90 –

247. But when the truth about defendants' fraudulent scheme came to light, FirstEnergy's credit ratings collapsed. On July 24, 2020, Moody's revised FirstEnergy's credit rating to negative from stable as a result of the illegal activity identified in the July 21, 2020 Criminal Complaint. Over the next few months, as a result of the truth emerging about defendants' fraudulent scheme, all three of the major ratings agencies downgraded FirstEnergy, and, by November 2020, the Company's credit rating had been reduced to junk status across the board.

## J. Defendants' Fraud Allowed Them to Reap $90 Million in Salary and Bonus Compensation and $14 Million in Insider Trading Proceeds

248. The Officer Defendants were incentivized to conceal their criminal Bailout Scheme in order to keep their executive positions at FirstEnergy and continue collecting lucrative salaries and incentive-based compensation. According to FirstEnergy's 2020 Proxy Statements, the Officer Defendants were eligible for performance-based compensation that far exceeded what they received in the form of earned salaries. This performance-based compensation largely based on FirstEnergy's reported financial results. The Proxy Statements reported the compensation for Jones, Pearson, Strah, Reffner and Vespoli as follows:

| Defendant[24] | 2017 Compensation | 2018 Compensation | 2019 Compensation |
|---|---|---|---|
| Charles Jones | $15,281,885 92.6% Perf. Based | $11,123,128 89.8% Perf. Based | $14,684,659 92.3% Perf. Based |
| James Pearson[25] | $5,977,966 83.9% Perf. Based | $3,895,599 83.0% Perf. Based | $7,258,952 97.7% Perf. Based |
| Steven Strah | $3,976,975 85.9% Perf. Based | $3,495,512 83.0% Perf. Based | $6,034,128 89.3% Perf. Based |
| Robert Reffner[26] | | | $2,467,891 |

---

[24] FirstEnergy did not report compensation figures for Chack, Dowling, Pine, Reffner or Taylor, but as FirstEnergy executives, each of these defendants were eligible for performance-based compensation during the Class Period that was significantly larger than their annual salaries.

[25] As reported in FirstEnergy's 2020 Proxy Statements, Pearson's 2019 compensation included $1.6 million he received upon departing the Company effective April 1, 2019, $1.3 million of which was a lump-sum payment "equivalent to what [he] would have received under the FirstEnergy Executive Severance Benefits Plan."

[26] FirstEnergy did not report Reffner's compensation for 2017 or 2018.

| Defendant[24] | 2017 Compensation | 2018 Compensation | 2019 Compensation |
|---|---|---|---|
| | | | 78.2% Perf. Based |
| Leila Vespoli[27] | $5,117,611<br>85.1% Perf. Based | $4,123,650<br>81.5% Perf. Based | $7,022,512<br>97.4% Perf. Based |

249.     In total, Jones, Pearson, Strah, Reffner and Vespoli collected over $90.4 million in compensation in the three years before their fraudulent scheme was disclosed. Nearly 90% of that compensation was in the form of performance-based bonuses that were largely predicated on FirstEnergy's reported financial performance.

250.     In addition to their collection of tens of millions of dollars in compensation, Jones, Pearson, Vespoli and Chack also reaped nearly $14 million in insider trading proceeds. As reflected below, Jones, Pearson, Vespoli and Chack sold their stock while the price of FirstEnergy stock was artificially inflated as a result of their fraudulent scheme:

| Defendant | Date | # of Shares Sold | Share Price | Total Proceeds |
|---|---|---|---|---|
| Charles Jones | March 1, 2018<br>March 1, 2019 | 116,045<br>148,302 | $32.48<br>$40.73 | $3,769,142<br>$6,040,340 |
| James Pearson | January 9, 2019 | 40,000 | $37.87 | $1,514,800 |
| Dennis Chack | March 1, 2019 | 10,145 | $40.73 | $ 413,206 |
| Leila Vespoli | March 1, 2018<br>March 1, 2019 | 36,367<br>24,400 | $32.48<br>$41.33 | $1,181,200<br>$1,008,452 |

251.     These sales were highly suspicious in both timing and amount. Based on the Form 4s that were filed in conjunction with the stock sales, each of these defendants sold a substantial portion of their FirstEnergy holdings and their insider trading during the Class Period was unusual in timing compared to their pre-Class Period transactions. In comparison to the nearly 265,000 shares of FirstEnergy stock he sold during the Class Period, Jones did not make any stock sales in the 18 months before the Class Period began. In addition, Jones' Class Period sales were more than 700%

---

[27]     As reported in FirstEnergy's 2020 Proxy Statements, Vespoli's 2019 compensation included $1.7 million she received upon departing the Company effective April 1, 2019, $1.5 million of which was a lump-sum payment "equivalent to what [she] would have received under the FirstEnergy Executive Severance Benefits Plan."

greater in terms of volume than his sales during the 45 months before the Class Period began and nearly double the number of FirstEnergy shares he sold in the ten years prior to the Class Period. In total, Jones sold 39% of his FirstEnergy stock holdings during the Class Period. Similarly, Pearson and Chack did not engage in any sales of FirstEnergy stock and Vespoli sold only 16,631 FirstEnergy shares in the 45 months before the beginning of the Class Period, but these defendants sold 28%, 24% and 26% of their holdings, respectively, in 2018 and 2019 when the price of FirstEnergy stock was artificially inflated by defendants' misstatements and omissions. These sales occurred at the height of the fraud, as FirstEnergy was shepherding FES through bankruptcy and secretly bankrolling the Bailout Scheme to ensure the passage of HB6. Defendants' sales of a significant amount of their personal FirstEnergy shareholdings at artificially inflated prices while they were actively engaged in the fraudulent scheme detailed herein further bolsters an already compelling inference of scienter.

## NO SAFE HARBOR

252.    FirstEnergy's purported "Safe Harbor" warnings accompanying its reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability. The specific statements pled herein were not FLS or identified as such, but rather statements of present and historical fact. To the extent any statements can properly be considered FLS, such statements were not accompanied by meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the purportedly FLS. For example, none of defendants' statements during the Class Period identified the participation of FirstEnergy and its senior executives in the Bailout Scheme, which posed an extreme, undisclosed risk of reputational, legal and financial harm to the Company and its investors.

253.    Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and/or the FLS was

authorized and approved by an executive officer of FirstEnergy who knew that the FLS was false. None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

### APPLICATION OF PRESUMPTION OF RELIANCE; FRAUD ON THE MARKET

254. At all relevant times, FirstEnergy securities traded in an efficient market for the following reasons, among others:

(a) FirstEnergy stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) according to the Company's Form 10-K for the fiscal year ended December 31, 2019, FirstEnergy had more than 540 million shares outstanding as of January 31, 2020;

(c) as of September 30, 2020, FirstEnergy had over $22 billion in long-term debt and other long-term obligations outstanding, including billions of dollars in senior notes that were actively traded by investors throughout the Class Period;

(d) as a regulated issuer, FirstEnergy filed periodic public reports with the SEC;

(e) FirstEnergy regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the Internet and other wide-ranging public disclosures; and

(f) unexpected material news about FirstEnergy was rapidly reflected in and incorporated into prices for the Company's shares during the Class Period.

- 94 –

255.     As a result of the foregoing, the markets for FirstEnergy securities promptly digested current information regarding FirstEnergy from publicly available sources and reflected such information in the price of FirstEnergy securities.  Under these circumstances, all purchasers of FirstEnergy securities during the Class Period suffered similar injury through their purchases of FirstEnergy securities at artificially inflated prices, and a presumption of reliance applies.

256.     A presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because Plaintiffs' claims are based, in significant part, on defendants' material omissions.  Because this action involves defendants' failure to disclose material adverse information regarding FirstEnergy's business, operations and risks, positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of defendants' material misstatements and omissions set forth above, that requirement is satisfied here.

## LOSS CAUSATION/ECONOMIC LOSS

257.     The markets for FirstEnergy securities were open, well-developed and efficient at all relevant times.  During the Class Period, as detailed herein, defendants engaged in a fraudulent scheme and wrongful course of business that artificially inflated the price of FirstEnergy securities by making false and misleading statements, and omitting material information, about FirstEnergy's business and operations.  As defendants' misleading statements and material omissions became apparent to the market, beginning on July 21, 2020, the price of FirstEnergy securities fell, as the prior artificial inflation came out.  As a result of their purchase or acquisition of FirstEnergy securities during the Class Period, Plaintiffs and other members of the Class suffered economic loss.

258.     As a direct result of the July 21 and 22, 2020 disclosures described above, FirstEnergy common stock plummeted, dropping 17% on July 21, 2020 and another 21% on July 22,

2020.  From a close of $41.26 per share on July 20, 2020, FirstEnergy common stock price dropped $14.17 to $27.09 per share by the end of the day on July 22, 2020, resulting in a market capitalization loss of over $7.68 billion.  These losses were suffered as FirstEnergy common stock traded on extremely high volume of over 41 million shares traded on July 21, 2020 and nearly 136 million shares traded on July 22, 2020.

259.    As reflected in the chart below, while the price of FirstEnergy stock fell nearly 35%, the S&P 500 Index and the S&P Utilities Index both increased on July 21, 2020 and July 22, 2020:



260.    The price of FirstEnergy's debt securities also traded at artificially inflated prices during the Class Period and declined as a result of the July 21 and July 22, 2020 disclosures about defendants' fraudulent conduct.  For example, several FirstEnergy senior notes declined as follows:

| | 3.40% due 2050 | 4.85% due 2047 | 2.65% due 2030 | 2.25% due 2030 | 3.90% Due 2027 |
|---|---|---|---|---|---|

| | 3.40% due 2050 | 4.85% due 2047 | 2.65% due 2030 | 2.25% due 2030 | 3.90% Due 2027 |
|---|---|---|---|---|---|
| July 20, 2020 Closing Price | $1136.51 | $1380.84 | $1069.07 | $1033.37 | $1157.39 |
| July 22, 2020 Closing Price | $1004.85 | $1269.54 | $1008.27 | $975.69 | $1087.23 |
| % Change | -11.6% | -8.1% | -5.7% | -5.6% | -6.1% |
| $ Change | -$131.66 | -$111.30 | -$60.80 | -$57.68 | -$70.16 |

261.    As a direct result of the October 29, 2020 disclosures and developments described above, FirstEnergy common stock fell another 6.6% on high trading volume, from $31.81 on October 29, 2020, to a closing price of $29.72 on October 30, 2020, resulting in a market capitalization loss of over $1.1 billion.

262.    As reflected in the chart below, while the price of FirstEnergy stock fell 6.6% on October 30, 2020, the S&P 500 Index and the S&P Utilities Index declined only 1.20% and 0.92%, respectively:



263. The price of FirstEnergy's debt securities also declined as a result of the October 29, 2020 disclosures about defendants' fraudulent conduct. For example, several FirstEnergy senior notes declined as follows:

| | 3.40% due 2050 | 4.85% due 2047 | 7.37% due 2031 | 2.65% due 2030 | 2.25% due 2030 |
|---|---|---|---|---|---|
| Oct. 29, 2020 Closing Price | $965.77 | $1172.30 | $1398.70 | $1012.69 | $983.86 |
| Oct. 30, 2020 Closing Price | $915.97 | $1089.53 | $1344.53 | $975.11 | $938.81 |
| % Change | -5.2% | -7.1% | -3.9% | -3.7% | -4.5% |
| $ Change | -$49.80 | -$82.77 | $54.17 | -$37.58 | -$44.55 |

264. As a direct result of the November 19 and November 24, 2020 disclosures described above, over the three trading days following November 19, 2020, FirstEnergy common stock fell

another 8.2% on high trading volume, from $29.04 on November 19, 2020 to a closing price of
$26.66 on November 24, 2020, resulting in a further market capitalization loss of nearly $1.3 billion.

265. As reflected in the chart below, while the price of FirstEnergy stock fell 8.2%, the
S&P 500 Index and the S&P Utilities Index both increased from November 19 to November 24,
2020:



266. The price of FirstEnergy's debt securities also declined as a result of the November
2020 disclosures about defendants' fraudulent conduct. For example, several FirstEnergy senior
notes declined as follows:

|  | 3.40%<br>due 2050 | 7.37%<br>due 2031 | 2.65%<br>due 2030 | 2.25%<br>due 2030 | 2.05%<br>due 2025 |
|---|---|---|---|---|---|
| Nov. 19, 2020<br>Closing Price | $954.09 | $1370.69 | $996.44 | $964.92 | $1008.80 |
| Nov. 24, 2020<br>Closing Price | $943.90 | $1353.50 | $984.39 | $952.99 | $1001.41 |

|  | 3.40%<br>due 2050 | 7.37%<br>due 2031 | 2.65%<br>due 2030 | 2.25%<br>due 2030 | 2.05%<br>due 2025 |
|---|---|---|---|---|---|
| % Change | -1.1% | -1.3% | -1.2% | -1.2% | -.73% |
| $ Change | -$10.19 | $17.19 | -$12.05 | -$11.93 | -$7.39 |

267. The economic loss suffered by Plaintiffs and other members of the Class was a direct result of defendants' wrongful conduct, which inflated the prices of FirstEnergy securities and resulted in the subsequent decline in the value of those securities when defendants' prior false and misleading statements and omissions were revealed. The declines in the price of FirstEnergy securities pled herein were a direct result of the nature, extent and impact of defendants' prior false and misleading statements and omissions being revealed to investors and the market. The timing and magnitude of the price declines of FirstEnergy securities negates any inference that the losses suffered by Plaintiffs and other Class members were caused by changed market conditions, macroeconomic or industry factors, or Company-specific factors unrelated to defendants' wrongful conduct.

## COUNT I

### For Violation of §10(b) of the Exchange Act and Rule 10b-5
### Against the Exchange Act Defendants

268. Plaintiffs incorporate all paragraphs above by reference.

269. During the Class Period, the Exchange Act Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading and/or engaged in a fraudulent scheme in violation of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. The Exchange Act Defendants also engaged in a fraudulent

scheme and course of business by participating in and facilitating the Bailout Scheme as detailed herein.

270.     The Exchange Act Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of FirstEnergy securities during the Class Period.

271.     Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for FirstEnergy securities.  Plaintiffs and the Class would not have purchased FirstEnergy securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

**COUNT II**

**For Violation of §20(a) of the Exchange Act**
**Against the Exchange Act Defendants**

272.     Plaintiffs incorporate all paragraphs above by reference.

273.     Each of the Officer Defendants were control persons of FirstEnergy within the meaning of §20(a) of the Exchange Act by virtue of their positions as directors, senior executives and/or major stockholders of the Company and exercised actual control over the Company during the Class Period and possessed the power to control FirstEnergy in connection with the wrongful activities alleged herein.  The Officer Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of FirstEnergy.  The Officer Defendants were also each critical to the implementation of the Bailout

- 101 –

Scheme by having taken actions to ensure that the Bailout Scheme was carried out on behalf of FirstEnergy. By reason of their positions with the Company and their ownership of Company securities, the Officer Defendants had the power and authority to cause the Company to engage in the wrongful conduct complained of herein.

274. FirstEnergy was a control person of the Officer Defendants and all of its employees, as well as other key members of the Bailout Scheme, within the meaning of §20(a) of the Exchange Act. Specifically, FirstEnergy exercised actual control over, *inter alia*, the Officer Defendants, FES (now known as Energy Harbor), Generation Now, Larry Householder, Jeffrey Longstreth, Neil Clark, Matthew Borges, Juan Cespedes and Samuel Randazzo during the Class Period and possessed the power to control these individuals and entities in connection with the wrongful activities alleged herein.

275. By reason of such wrongful conduct, for which various individuals and entities are primarily liable, as set forth above, the Officer Defendants and FirstEnergy are jointly and severally liable with and to the same extent as these primary violators pursuant to §20(a) of the Exchange Act.

## SECURITIES ACT ALLEGATIONS

276. This section incorporates solely ¶¶1-6, 14-26 and expressly disavows all averments of fraud contained herein for the purposes of pleading claims under the Securities Act as such claims do not require a showing of fraud or scienter.

**Securities Act Defendants**

277. Defendant FirstEnergy is the issuer of the notes sold in the Offerings (defined herein).

278. Defendant Jones served as FirstEnergy's CEO at the time of the Offerings and signed the registration statements for the Offerings.

279. Defendant Strah served as FirstEnergy's CFO at the time of the Offerings and signed the registration statements for the Offerings.

- 102 –

280.    Defendant Jason J. Lisowski ("Lisowski") served as FirstEnergy's VP Controller and Chief Accounting Officer at the time of the Offerings.  Lisowski signed the registration statements for the Offerings.

281.    Defendants George M. Smart, Paul T. Addison, Michael J. Anderson, Steven J. Demetriou, Julia L. Johnson, Donald T. Misheff, Thomas N. Mitchell, James F. O'Neil III, Christopher D. Pappas, Sandra Pianalto, Luis A. Reyes, Jerry Sue Thornton and Leslie Turner are referred to as the "Director Defendants."  Each of the Director Defendants signed the registration statement for the Offerings, and/or were named as directors in the registration statements for the Offerings.

282.    Defendants Jones, Strah, Lisowski and Director Defendants are referred to collectively as the "Individual Defendants."

283.    Defendants Barclays Capital Inc., BofA Securities, Inc., Citigroup Global Markets Inc., J.P. Morgan Securities LLC, Morgan Stanley & Co. LLC, Mizuho Securities USA LLC, PNC Capital Markets LLC, RBC Capital Markets, LLC, Santander Investment Securities Inc., Scotia Capital (USA) Inc., SMBC Nikko Securities America, Inc., CIBC World Markets Corp., KeyBanc Capital Markets Inc., TD Securities (USA) LLC, U.S. Bancorp Investments, Inc. and MUFG Securities Americas Inc. are collectively referred to herein as the "Underwriter Defendants."  Each of the Underwriter Defendants served as underwriters and/or underwriter representatives for the Offerings.

284.    FirstEnergy, the Individual Defendants, and the Underwriter Defendants are referred to collectively as the "Securities Act Defendants."

## BACKGROUND OF THE OFFERINGS

285.     On March 6, 2018, FirstEnergy filed a shelf registration statement with the SEC on Form 3-ASR, pursuant to which the Company could conduct multiple securities offerings (the "Shelf Registration Statement").

286.     On February 19, 2020, FirstEnergy filed a prospectus supplement that incorporated and formed part of the Shelf Registration Statement (the "February Registration Statement"). Pursuant to the February Registration Statement, FirstEnergy registered for issuance over $1.7 billion of FirstEnergy notes as follows: (i) approximately $300 million of 2.05% Series A Notes due 2025; (ii) approximately $600 million of 2.65% Series B Notes due 2030; and (iii) approximately $850 million of 3.40% Series C Notes due 2050 (the "February 2020 Offering"). Defendants successfully solicited investors for the February 2020 Offering, issuing and selling over $1.7 billion of FirstEnergy notes near par.

287.     The Underwriter Defendants served as underwriters and underwriter representatives for the February 2020 Offering as follows:

| Underwriters | Principal Amount of Series A Notes | Principal Amount of Series B Notes | Principal Amount of Series C Notes |
|---|---|---|---|
| Barclays Capital Inc. | $ 36,000,000 | $ 72,000,000 | $ 102,000,000 |
| BofA Securities, Inc. | $ 36,000,000 | $ 72,000,000 | $ 102,000,000 |
| Citigroup Global Markets Inc. | $ 36,000,000 | $ 72,000,000 | $ 102,000,000 |
| J.P. Morgan Securities LLC | $ 36,000,000 | $ 72,000,000 | $ 102,000,000 |
| Morgan Stanley & Co. LLC | $ 36,000,000 | $ 72,000,000 | $ 102,000,000 |
| Mizuho Securities USA LLC | $ 14,394,000 | $ 28,788,000 | $ 40,783,000 |
| PNC Capital Markets LLC | $ 14,394,000 | $ 28,788,000 | $ 40,783,000 |
| RBC Capital Markets, LLC | $ 14,394,000 | $ 28,788,000 | $ 40,783,000 |
| Santander Investment Securities Inc. | $ 14,394,000 | $ 28,788,000 | $ 40,783,000 |
| Scotia Capital (USA) Inc. | $ 14,394,000 | $ 28,788,000 | $ 40,783,000 |
| SMBC Nikko Securities America, Inc. | $ 14,394,000 | $ 28,788,000 | $ 40,783,000 |
| CIBC World Markets Corp. | $ 6,728,000 | $ 13,454,000 | $ 19,060,000 |
| KeyBanc Capital Markets Inc. | $ 6,727,000 | $ 13,455,000 | $ 19,060,000 |
| MUFG Securities Americas Inc. | $ 6,727,000 | $ 13,455,000 | $ 19,060,000 |
| TD Securities (USA) LLC | $ 6,727,000 | $ 13,454,000 | $ 19,061,000 |
| U.S. Bancorp Investments, Inc. | $ 6,727,000 | $ 13,454,000 | $ 19,061,000 |
| **Total** | $ 300,000,000 | $ 600,000,000 | $ 850,000,000 |

288.     On June 4, 2020, FirstEnergy filed a second prospectus supplement that incorporated and formed part of the Shelf Registration Statement (the "June Registration Statement"). Pursuant to

4823-8789-7564.v3

the June Registration Statement, FirstEnergy registered for issuance $750 million of FirstEnergy notes as follows: (i) $300 million of 1.60% Series A Notes due 2026; and (ii) $450 million of 2.25% Series B Notes due 2030 (the "June 2020 Offering"). Defendants successfully solicited investors for the June 2020 Offering, selling $750 million of FirstEnergy notes near par.

289. The Underwriter Defendants served as underwriters and underwriter representatives for the June 2020 Offering as follows:

| Underwriters | Principal Amount of Series A Notes | Principal Amount of Series B Notes |
|---|---|---|
| Mizuho Securities USA LLC | $ 63,600,000 | $ 95,400,000 |
| Morgan Stanley & Co. LLC | 63,600,000 | 95,400,000 |
| Scotia Capital (USA) Inc. | 63,600,000 | 95,400,000 |
| CIBC World Markets Corp. | 23,700,000 | 35,550,000 |
| KeyBanc Capital Markets Inc. | 23,700,000 | 35,550,000 |
| TD Securities (USA) LLC | 23,700,000 | 35,550,000 |
| U.S. Bancorp Investments, Inc. | 23,700,000 | 35,550,000 |
| Citizens Capital Markets, Inc. | 4,800,000 | 7,200,000 |
| Fifth Third Securities, Inc. | 4,800,000 | 7,200,000 |
| Huntington Securities, Inc. | 4,800,000 | 7,200,000 |
| **Total** | $ 300,000,000 | $ 450,000,000 |

290. The February 2020 Offering and the June 2020 Offering are collectively referred to herein as the "Offerings," and the February Registration Statement and the June Registration Statement are referred to collectively as the "Registration Statements." The Registration Statements expressly incorporated and thereby repeated and restated FirstEnergy's Form 10-K annual report for the year ended December 31, 2019. The June Registration Statement further incorporated by reference FirstEnergy's Form 10-Q quarterly report for the three months ended March 31, 2020.

## MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS IN THE REGISTRATION STATEMENTS

291. The Registration Statements contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and were not prepared in accordance with SEC rules and regulations governing the preparation of such documents.

292. Specifically, the Registration Statements failed to disclose that FirstEnergy and several of the Company's most senior executives had carried out an illegal bribery scheme that

– 105 –

involved the funneling of tens of millions of dollars to state politicians, lobbyists and at least one

senior Ohio regulator to promote favorable legislation and regulatory treatment in violation of state

and federal law, numerous regulations applicable to FirstEnergy, and the Company's own internal

policies. These undisclosed adverse facts exposed FirstEnergy to extraordinary risk of financial,

legal and reputational loss and materially diminished the value of the notes sold in the Offerings.

293.   Similarly, the Registration Statements represented that FirstEnergy and its

subsidiaries "comply with the related regulations, orders, policies and practices prescribed by the

SEC, FERC, and, as applicable, the NRC, the PUCO, the PPUC, the MDPSC, the NYPSC, the

WVPSC, the VSCC and the NJBPU." These statements were materially false and misleading

because the participation of FirstEnergy and its top executives in the Bailout Scheme violated

numerous laws, violations, orders policies and practices applicable to FirstEnergy and its business.

294.   With respect to the Company's internal control over financial reporting, the

Registration Statements stated that the "financial statements and management's assessment of the

effectiveness of internal control over financial reporting . . . incorporated in this prospectus

supplement by reference to our Annual Report on Form 10-K for the year ended December 31,

2019." The referenced Annual Report, which formed part of the Registration Statements by express

incorporation, in turn stated in pertinent part as follows:

> Management is responsible for establishing and maintaining adequate internal
> control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) of the
> Securities Exchange Act of 1934. Using the criteria set forth by the Committee of
> Sponsoring Organizations of the Treadway Commission in Internal Control –
> Integrated Framework published in 2013, management conducted an evaluation of
> the effectiveness of their internal control over financial reporting under the
> supervision of the chief executive officer and chief financial officer. ***Based on that
> evaluation, management concluded that FirstEnergy's internal control over
> financial reporting was effective as of December 31, 2019***.

295.   The statements identified in ¶294 were materially false and misleading when made

because as of December 31, 2019 and at the time of the Offerings, FirstEnergy did not maintain

effective internal control over financial reporting. Indeed, FirstEnergy later admitted that the Company suffered from material weaknesses in its internal controls, stating in pertinent part as follows:

> The management of FirstEnergy, with the participation of the acting chief executive officer and chief financial officer, have reviewed and evaluated the effectiveness of its disclosure controls and procedures, as defined under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), in Rules 13a-15(e) and 15d-15(e), as of September 30, 2020. ***Based on that evaluation, the acting chief executive officer and chief financial officer of FirstEnergy have concluded that its disclosure controls and procedures were not effective as of September 30, 2020, solely as a result of the material weakness in FirstEnergy's internal control over financial reporting described below.***

> \*       \*       \*

> ***Material Weakness in Internal Control Over Financial Reporting Existing as of September 30, 2020***

> \*       \*       \*

> ***We did not maintain an effective control environment as our senior management failed to set an appropriate tone at the top. Specifically, certain members of senior management failed to reinforce the need for compliance with the Company's policies and code of conduct, which resulted in inappropriate conduct that was inconsistent with the Company's policies and code of conduct.***

> ***[T]his control deficiency could have resulted in material misstatements to the annual or interim consolidated financial statements that would not have been prevented or detected. Accordingly, our management has concluded that this control deficiency constitutes a material weakness.***

296. The issues identified by FirstEnergy that caused it to conclude that the Company suffered from a material weakness predated the Offerings, and thus should have been disclosed in the Registration Statements, but were not. For example, FirstEnergy has subsequently admitted to the illicit payment of $4 million to a top Ohio energy regulator by Jones and other Company executives on FirstEnergy's behalf in April 2019. As FirstEnergy has belatedly acknowledged, these executives "did not maintain and promote a control environment with an appropriate tone of compliance in certain areas of FirstEnergy's business, nor sufficiently promote, monitor or enforce

- 107 –

adherence to certain FirstEnergy policies and its code of conduct." In addition, since at least February 2017, FirstEnergy and its most senior executives spent tens of millions of dollars and engaged in other illicit activities to corruptly influence Ohio politicians, lobbyists and political operatives in order to secure favored legislation and regulatory actions, including the passage and preservation of HB6, which provided decoupling provisions for the Company and a bailout of the Company's failing nuclear subsidiaries worth an estimated $2 billion over the life of the bill. These actions subjected FirstEnergy to an extreme undisclosed risk of reputational, legal and financial harm.

297.    In addition to the materially false and misleading statements in the Registration Statements identified above, the Securities Act Defendants also violated their affirmative obligations to provide certain material information in the Registration Statements as required by applicable SEC rules and regulations.

298.    Item 303 required the Registration Statements to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a materially favorable and unfavorable impact on the sales or revenues or income from continuing operations."

299.    The failure of the Registration Statement to disclose the participation by FirstEnergy and the Company's senior executives in the Bailout Scheme, carried out in order to promote favorable legislation and regulatory treatment for the Company worth billions of dollars, violated Item 303 because these undisclosed facts, trends and uncertainties were known and would and did have an unfavorable impact on the Company's sales, revenues and income from continuing operations.

300.    In addition, Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105 ("Item 105"), required, in the "Risk Factors" section of the Registration Statements, a discussion of the most significant factors that made the Offerings risky or speculative and that each risk factor adequately

describe the risk. Because the omitted material facts alleged in ¶¶1-6, 292-296 were not disclosed, as well as the consequent material adverse effects on the Company's results and prospects, the Securities Act Defendants violated Item 105. Indeed, the Bailout Scheme was of the most significant risks facing the Company at the time of the Offerings, and thus was required to be disclosed to investors pursuant to Item 105 but was not.

301. After the Offerings closed, the price of the securities sold therein declined substantially as a result of the Securities Act Defendants' violations of law complained of herein, falling nearly 10% below par in some cases.

**COUNT III**

**For Violation of §11 of the Securities Act**
**Against the Securities Act Defendants**

302. Plaintiffs incorporate ¶¶1-6, 14-26, 276-301 by reference.

303. This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against the Securities Act Defendants.

304. The Securities Act Defendants are liable under theories of strict liability for their violations of §11 of the Securities Act. Plaintiffs do not allege that the Securities Act Defendants had scienter or fraudulent intent in connection with Count III.

305. The Registration Statements used to complete the Offerings contained untrue statements of material fact, omitted to state material facts required to be stated therein and/or omitted to state other facts necessary to make the statements made therein not misleading.

306. By reason of the conduct herein alleged, each defendant named herein violated §11 of the Securities Act.

307. Plaintiffs acquired FirstEnergy notes in and traceable to the Offerings. Specifically: (i) Lead Plaintiff LACERA purchased FirstEnergy notes directly in and traceable to the February 2020 Notes Offering and the June 2020 Notes Offering; (ii) Plaintiff Amalgamated Bank purchased

- 109 –

FirstEnergy notes directly in and traceable to the June 2020 Notes Offering; (iii) Plaintiff Wisconsin Laborers' Pension Fund purchased FirstEnergy notes directly in and traceable to the February 2020 Notes Offering; and (iv) City of Irving Supplemental Benefit Plan purchased FirstEnergy notes traceable to the June 2020 Notes Offering.

308.     Plaintiffs and the Class have sustained damages as the value of the notes issued in the Offerings have declined due to the Securities Act Defendants' violations.

309.     At the time of their purchases of the FirstEnergy notes issued in the Offerings, Plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.  Less than one year has elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based to the time that Plaintiffs commenced this action.  Less than three years have elapsed between the time that the notes upon which this Count is brought was offered to the public and the time Plaintiffs commenced this action.

## COUNT IV

### For Violations of §12(a)(2) of the Securities Act
### Against the Securities Act Defendants

310.     Plaintiffs incorporate ¶¶1-6, 14-26, 276-309 by reference.

311.     This Count is brought pursuant to §12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2), on behalf of the Class, against the Securities Act Defendants.

312.     The Securities Act Defendants are liable under theories of strict liability for their violations of §12(a)(2) of the Securities Act.  Plaintiffs do not allege that the Securities Act Defendants had scienter or fraudulent intent in connection with Count IV.

313.     By means of the defective prospectuses used to complete the Offerings (the "Prospectuses"), the Securities Act Defendants issued, promoted and sold FirstEnergy notes to

- 110 –

Plaintiffs and other members of the Class for their own benefit and the benefit of those associated with them. The Underwriter Defendants additionally solicited their brokerage clients and other members of the investing public to submit indications of interest and subscriptions to purchase FirstEnergy notes in the Offerings.

314. The Prospectuses used to complete the Offerings contained untrue statements of material fact, omitted to state material facts required to be stated therein and/or omitted to state other facts necessary to make the statements made therein not misleading.

315. The Securities Act Defendants owed Plaintiffs and the other members of the Class who purchased FirstEnergy notes pursuant to the Prospectuses the duty to make a reasonable and diligent investigation of the statements contained in the Prospectuses to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. The Securities Act Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectuses as set forth above.

316. By reason of the conduct alleged herein, the Securities Act Defendants violated §12(a)(2) of the Securities Act. As a direct and proximate result of such violations, the Plaintiffs and the other members of the Class who purchased FirstEnergy notes pursuant to the Prospectuses sustained substantial damages in connection with their purchases. The Plaintiffs and the other members of the Class who purchased the FirstEnergy notes issued pursuant to the Prospectuses seek damages to the extent permitted by law or seek to rescind and recover the consideration paid for the FirstEnergy notes so purchased, and hereby tender such FirstEnergy notes to the Securities Act Defendants.

317. At the time of their purchases of the FirstEnergy notes issued in the Offerings, Plaintiffs and other members of the Class were without knowledge of the facts concerning the

wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein. Less than one year has elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based to the time that Plaintiffs commenced this action. Less than three years have elapsed between the time that the notes upon which this Count is brought was offered to the public and the time Plaintiffs commenced this action.

**COUNT V**

**For Violation of §15 of the Securities Act
Against FirstEnergy and the Individual Defendants**

318.    Plaintiffs incorporate ¶¶1-6, 14-26, 276-317 by reference.

319.    This Count is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77, on behalf of the Class, against FirstEnergy and the Individual Defendants.

320.    Each of the Individual Defendants were control persons of FirstEnergy within the meaning of §15 of the Securities Act by virtue of their positions as directors, senior executives and/or major stockholders of the Company and exercised actual control over the Company at the time of the Offerings and possessed the power to control FirstEnergy in connection with the Offerings. The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of FirstEnergy. The Individual Defendants were also each critical to effecting the Offerings, based on their involvement in preparing and signing the Registration Statements, soliciting investors to invest in the Offerings, and by having taken actions to ensure that the Offerings were successfully completed.

321.    FirstEnergy was a control person of the Individual Defendants and all of its employees within the meaning of §15 of the Securities Act. FirstEnergy exercised actual control over the Individual Defendants at the time of the Offerings and possessed the power to control the Individual Defendants in connection with the Offerings.

322.     By reason of such wrongful conduct, for which the Company and the Individual Defendants are primarily liable, as set forth above, the Individual Defendants and FirstEnergy are jointly and severally liable with and to the same extent as these primary violators pursuant to §15 of the Securities Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.     Determining that this action is a proper class action, certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding rescission or a rescissory measure of damages;

D.     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E.     Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED:  February 26, 2021          ROBBINS GELLER RUDMAN
                                      & DOWD LLP
                                   DARREN J. ROBBINS
                                   MARK SOLOMON
                                   JASON A. FORGE
                                   TOR GRONBORG
                                   BRIAN E. COCHRAN
                                   SARA B. POLYCHRON
                                   TING H. LIU
                                   FRANCISCO J. MEJIA

- 113 –

|  | s/ Brian E. Cochran |
| --- | --- |
|  | BRIAN E. COCHRAN |

655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com
marks@rgrdlaw.com
jforge@rgrdlaw.com
torg@rgrdlaw.com
bcochran@rgrdlaw.com
spolychron@rgrdlaw.com
tliu@rgrdlaw.com
fmejia@rgrdlaw.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
DANIEL J. PFEFFERBAUM
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
dpfefferbaum@rgrdlaw.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
CHAD JOHNSON
DESIREE CUMMINGS
420 Lexington Avenue, Suite 1832
New York, NY  10170
Telephone:  212/693-1058
chadj@rgrdlaw.com
dcummings@rgrdlaw.com

*Lead Counsel for Plaintiffs*
MURRAY MURPHY MOUL + BASIL LLP
JOSEPH F. MURRAY, Trial Attorney (0063373)
1114 Dublin Road
Columbus, OH 43215
Telephone: 614/488-0400
614/488-0401 (fax)
murray@mmmb.com

*Liaison Counsel*

- 114 –

## CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

Amalgamated Bank, as Trustee for the LongView LargeCap 500 Index Fund, LongView Quantitative LargeCap Fund, LongView Broad Market 3000 Index Fund, LongView LargeCap 500 Index Fund VEBA, LV LargeCap 1000 Value Index Fund, LongView Quantitative MidCap Fund, LongView Quant LargeCap Equity VEBA Fund and LongView Core Plus Fixed Income Fund ("Amalgamated Bank") declares:

1.     Amalgamated Bank has reviewed a complaint and authorizes its filing.

2.     Amalgamated Bank did not acquire the security that is the subject of this action at the direction of counsel or to participate in this private action or any other litigation under the federal securities laws.

3.     Amalgamated Bank is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.     Amalgamated Bank has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.     (a)     Amalgamated Bank has been appointed to serve as a representative party for a class in the following actions filed under the federal securities laws within the three-year period prior to the date of this Certification:

*Yuan v. Facebook, Inc.*, No. 5:18-cv-01725 (N.D. Cal.)

(b)     Amalgamated Bank initially sought to serve as a representative party for a class in the following actions filed under the federal securities laws within the three-year period prior to the date of this Certification:

*St. Clair County Employees' Ret. Sys. v. Acadia Healthcare Company, Inc.*, No. 3:18-cv-00988 (M.D. Tenn.)
*Heavy & General Laborers' Locals 472 & 172 Welfare Fund v. 3M Company*, No. 2:19-cv-15982 (D.N.J.)

6.     Amalgamated Bank will not accept any payment for serving as a representative party on behalf of the class beyond Amalgamated Bank's pro rata share of

FIRSTENERGY

any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

     I declare under penalty of perjury that the foregoing is true and correct.  Executed this _____ day of February, 2021.

> Amalgamated Bank, as Trustee for the
> LongView LargeCap 500 Index Fund,
> LongView Quantitative LargeCap Fund,
> LongView Broad Market 3000 Index Fund,
> LongView LargeCap 500 Index Fund VEBA,
> LV LargeCap 1000 Value Index Fund,
> LongView Quantitative MidCap Fund,
> LongView Quant LargeCap Equity VEBA Fund
> and LongView Core Plus Fixed Income Fund

By: _____
        *Eleanor Innes*
        Digitally signed by Eleanor Innes
        Date: 2021.02.24 10:16:30 -05'00'

> Eleanor Innes, Senior Vice President &
> Director of Equities, Investment
> Management Division

- 2 -

## SCHEDULE A

## SECURITIES TRANSACTIONS

**LongView Broad Market 3000 Index Fund**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 04/27/2017 | 2,148 | $30.52 |
| 05/03/2017 | 128 | $28.95 |
| 05/09/2017 | 452 | $28.76 |
| 06/14/2017 | 105 | $29.59 |
| 06/23/2017 | 570 | $28.91 |
| 08/17/2017 | 154 | $32.65 |
| 11/16/2017 | 4,150 | $34.64 |
| 12/18/2017 | 95 | $31.51 |
| 03/19/2018 | 13 | $33.79 |
| 03/29/2018 | 294 | $34.01 |
| 06/01/2018 | 1,971 | $34.20 |
| 06/19/2018 | 2,155 | $34.92 |
| 06/22/2018 | 1,528 | $35.09 |
| 07/18/2018 | 181 | $35.67 |
| 09/21/2018 | 560 | $36.90 |
| 11/23/2018 | 327 | $37.51 |
| 03/26/2019 | 2,521 | $42.00 |
| 04/01/2019 | 751 | $41.45 |
| 04/02/2019 | 2,927 | $41.34 |
| 04/04/2019 | 1,141 | $39.44 |
| 05/31/2019 | 2,442 | $41.24 |
| 06/26/2019 | 751 | $42.53 |
| 06/28/2019 | 3,170 | $42.81 |
| 12/20/2019 | 737 | $48.83 |
| 05/01/2020 | 2,348 | $40.85 |

| Date Sold | Amount of Shares Sold | Price |
|---|---|---|
| 09/18/2017 | 13 | $31.25 |
| 01/30/2018 | 290 | $32.32 |
| 02/20/2018 | 1,000 | $32.80 |
| 08/16/2018 | 865 | $37.06 |
| 10/02/2018 | 1,687 | $37.42 |

*Opening position of 12,124 shares.

**LongView LargeCap 500 Index Fund**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 03/17/2017 | 2,200 | $31.36 |
| 08/03/2017 | 500 | $32.06 |
| 09/21/2017 | 2,900 | $31.15 |
| 10/02/2017 | 400 | $30.85 |

| | | |
|---|---|---|
| 12/29/2017 | 300 | $30.62 |
| 01/23/2018 | 400 | $32.00 |
| 09/21/2018 | 4,900 | $36.90 |
| 02/19/2019 | 400 | $39.60 |
| 03/15/2019 | 2,400 | $41.23 |
| 04/10/2019 | 250 | $40.83 |
| 05/09/2019 | 200 | $41.36 |
| 06/25/2019 | 550 | $43.46 |
| 07/22/2019 | 200 | $43.60 |
| 07/31/2019 | 200 | $43.97 |
| 09/20/2019 | 3,800 | $47.39 |
| 11/06/2019 | 9,350 | $47.11 |
| 12/03/2019 | 200 | $47.81 |
| 12/18/2019 | 400 | $48.52 |
| 01/10/2020 | 200 | $47.99 |
| 03/06/2020 | 300 | $46.48 |
| 03/27/2020 | 1,550 | $38.60 |
| 04/20/2020 | 2,182 | $44.50 |

| Date Sold | Amount of Shares Sold | Price |
|---|---|---|
| 02/24/2017 | 400 | $32.32 |
| 05/09/2017 | 400 | $28.76 |
| 08/28/2017 | 1,600 | $32.80 |
| 10/25/2017 | 300 | $31.85 |
| 12/18/2017 | 900 | $31.51 |
| 12/21/2017 | 300 | $30.59 |
| 01/16/2018 | 300 | $29.92 |
| 01/29/2018 | 300 | $32.17 |
| 06/04/2018 | 300 | $33.82 |
| 06/28/2018 | 300 | $36.19 |
| 09/14/2018 | 300 | $37.83 |
| 09/26/2018 | 1,100 | $35.91 |
| 09/28/2018 | 300 | $37.17 |
| 10/25/2018 | 3,300 | $37.89 |
| 11/01/2018 | 300 | $37.17 |
| 02/04/2019 | 300 | $38.54 |
| 02/07/2019 | 300 | $39.31 |
| 03/22/2019 | 3,000 | $41.77 |
| 03/25/2019 | 1,450 | $41.86 |
| 10/21/2019 | 200 | $48.50 |
| 12/16/2019 | 200 | $48.51 |
| 02/05/2020 | 250 | $51.91 |
| 03/09/2020 | 2,200 | $42.93 |
| 04/24/2020 | 1,930 | $42.32 |
| 05/22/2020 | 125 | $40.63 |

*Opening position of 50,833 shares.

**LongView LargeCap 500 Index Fund VEBA**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 03/17/2017 | 1,000 | $31.36 |
| 10/02/2017 | 300 | $30.85 |
| 12/27/2017 | 300 | $30.38 |
| 04/04/2018 | 700 | $34.18 |
| 09/21/2018 | 1,500 | $36.90 |
| 01/30/2019 | 500 | $38.75 |
| 03/15/2019 | 900 | $41.23 |
| 04/01/2019 | 600 | $41.45 |
| 06/03/2019 | 600 | $41.68 |
| 09/20/2019 | 1,500 | $47.39 |
| 10/01/2019 | 200 | $47.89 |
| 12/03/2019 | 200 | $47.81 |
| 12/31/2019 | 1,500 | $48.60 |
| 01/31/2020 | 250 | $50.79 |
| 03/02/2020 | 200 | $46.79 |
| 04/16/2020 | 938 | $44.87 |
| 05/20/2020 | 316 | $40.29 |

| Date Sold | Amount of Shares Sold | Price |
|---|---|---|
| 03/31/2017 | 900 | $31.82 |
| 02/27/2018 | 1,700 | $32.90 |
| 04/04/2018 | 300 | $34.18 |
| 06/01/2018 | 2,300 | $34.20 |
| 07/16/2018 | 300 | $36.15 |
| 01/03/2020 | 250 | $47.46 |
| 05/22/2020 | 17 | $40.63 |

*Opening position of 17,465 shares.

**LongView Quant LargeCap Equity VEBA Fund**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 02/21/2017 | 300 | $31.32 |
| 03/09/2017 | 1,200 | $31.30 |
| 09/04/2019 | 500 | $47.07 |
| 09/25/2019 | 1,700 | $48.56 |
| 01/29/2020 | 300 | $50.97 |
| 02/24/2020 | 600 | $51.35 |

| Date Sold | Amount of Shares Sold | Price |
|---|---|---|
| 04/19/2017 | 200 | $30.85 |
| 07/17/2017 | 2,900 | $30.33 |
| 08/04/2017 | 1,600 | $31.95 |
| 12/05/2019 | 200 | $48.26 |

| Date | Amount | Price |
|------|--------|-------|
| 01/31/2020 | 1,110 | $50.79 |
| 03/30/2020 | 200 | $40.33 |
| 04/08/2020 | 500 | $43.23 |
| 04/09/2020 | 700 | $45.10 |
| 04/24/2020 | 390 | $41.82 |

*Opening position of 3,200 shares.

**LongView Quantitative LargeCap Fund**

| Date Acquired | Amount of Shares Acquired | Price |
|---------------|---------------------------|-------|
| 02/21/2017 | 7,100 | $31.32 |
| 03/09/2017 | 32,400 | $31.30 |
| 03/21/2017 | 100 | $31.01 |
| 09/04/2019 | 13,100 | $47.07 |
| 09/25/2019 | 50,600 | $48.56 |
| 11/11/2019 | 700 | $46.22 |
| 01/29/2020 | 3,300 | $50.97 |
| 02/24/2020 | 9,500 | $51.35 |

| Date Sold | Amount of Shares Sold | Price |
|-----------|-----------------------|-------|
| 04/19/2017 | 400 | $30.94 |
| 04/25/2017 | 900 | $30.61 |
| 05/03/2017 | 700 | $28.74 |
| 07/17/2017 | 80,400 | $30.33 |
| 08/04/2017 | 42,800 | $31.95 |
| 09/18/2019 | 300 | $48.11 |
| 10/25/2019 | 2,100 | $48.01 |
| 11/06/2019 | 38,600 | $47.11 |
| 12/05/2019 | 2,400 | $48.26 |
| 01/07/2020 | 200 | $47.65 |
| 03/19/2020 | 1,700 | $35.99 |
| 03/27/2020 | 19,300 | $38.60 |
| 03/30/2020 | 300 | $40.33 |
| 03/31/2020 | 1,000 | $40.07 |
| 04/09/2020 | 7,300 | $45.10 |
| 04/16/2020 | 300 | $44.86 |
| 04/24/2020 | 3,700 | $41.82 |

*Opening position of 85,600 shares.

**LongView Quantitative MidCap Fund**

| Date Acquired | Amount of Shares Acquired | Price |
|---------------|---------------------------|-------|
| 03/02/2017 | 9,000 | $31.87 |

| Date Sold | Amount of Shares Sold | Price |
|---|---|---|
| 07/25/2017 | 9,000 | $30.97 |

**LV LargeCap 1000 Value Index Fund**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 03/31/2017 | 1,126 | $31.83 |
| 04/03/2017 | 267 | $31.47 |
| 05/01/2017 | 628 | $29.47 |
| 07/05/2017 | 189 | $29.22 |
| 09/18/2017 | 22 | $31.26 |
| 12/18/2017 | 62 | $31.52 |
| 12/29/2017 | 788 | $30.63 |
| 02/28/2018 | 122 | $32.34 |
| 03/20/2018 | 52 | $33.83 |
| 09/21/2018 | 189 | $36.91 |
| 12/21/2018 | 30 | $37.20 |
| 06/28/2019 | 844 | $42.82 |
| 11/13/2019 | 935 | $46.93 |
| 12/20/2019 | 188 | $48.83 |
| 04/20/2020 | 651 | $44.50 |

| Date Sold | Amount of Shares Sold | Price |
|---|---|---|
| 06/23/2017 | 63 | $28.90 |
| 08/15/2017 | 190 | $32.69 |
| 06/21/2018 | 146 | $35.14 |
| 06/22/2018 | 6 | $35.08 |
| 09/28/2018 | 131 | $37.16 |
| 01/18/2019 | 129 | $38.86 |
| 02/13/2019 | 378 | $39.50 |
| 06/26/2020 | 1,946 | $36.85 |
| 07/13/2020 | 371 | $40.83 |

*Opening position of 6,163 shares.

**Bond**

**LongView Core Plus Fixed Income Fund**

| Date Acquired | Type of Debt | Face Amount | Price |
|---|---|---|---|
| 06/03/2020 | 1.6% due 01/15/2026 | 84,000 | $99.85 |

Prices listed are rounded up to two decimal places.

CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

WISCONSIN LABORERS' PENSION FUND ("Plaintiff") declares:

1.      Plaintiff has reviewed a complaint and authorized its filing.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.      Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

*Cambridge Retirement System v. JELD-WEN Holding, Inc.*, No. 3:20-cv-00112 (E.D. Va.)

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this __8th__ day of February, 2021.

WISCONSIN LABORERS' PENSION FUND

By: _____

John J. Schmitt, Chairman

FIRSTENERY

## SCHEDULE A

## SECURITIES TRANSACTIONS

**Common Stock**

| Date<br>Acquired | Type/Amount of<br>Securities Acquired | Price |
|---|---|---|
| 09/21/2018 | 15,308 | $36.96 |
| 09/27/2018 | 412 | $36.45 |
| 10/05/2018 | 426 | $37.69 |
| 11/09/2018 | 437 | $37.98 |
| 07/01/2020 | 21 | $39.65 |
| 07/01/2020 | 336 | $39.57 |
| 07/01/2020 | 3,570 | $39.90 |
| 07/02/2020 | 266 | $39.93 |
| 07/02/2020 | 120 | $40.06 |
| 07/02/2020 | 713 | $40.03 |
| 07/02/2020 | 744 | $40.18 |
| 07/07/2020 | 1,036 | $40.30 |
| 07/08/2020 | 545 | $40.46 |
| 07/09/2020 | 409 | $40.31 |
| 07/10/2020 | 481 | $40.64 |

| Date<br>Sold | Type/Amount of<br>Securities Sold | Price |
|---|---|---|
| 10/15/2018 | 538 | $37.48 |
| 10/16/2018 | 344 | $37.63 |
| 10/22/2018 | 429 | $38.59 |
| 10/24/2018 | 366 | $38.82 |
| 10/26/2018 | 394 | $36.75 |
| 10/26/2018 | 518 | $36.48 |
| 10/26/2018 | 1,545 | $36.72 |
| 10/29/2018 | 362 | $37.24 |
| 10/30/2018 | 2,927 | $37.26 |
| 11/13/2018 | 374 | $38.54 |
| 12/07/2018 | 371 | $39.16 |
| 12/10/2018 | 255 | $39.64 |
| 12/12/2018 | 2,761 | $39.37 |
| 12/17/2018 | 4,627 | $37.80 |
| 12/18/2018 | 772 | $37.68 |

**Bonds**

| Date<br>Acquired | Type of<br>Debt | Face<br>Amount | Price |
|---|---|---|---|
| 02/18/2020 | 3.4% due 03/01/2050 | 310,000 | $99.85 |

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

CITY OF IRVING SUPPLEMENTAL BENEFIT PLAN ("Plaintiff") declares:

1.  Plaintiff has reviewed a complaint and authorized its filing.

2.  Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.  Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.  Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.  Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

None.

6.  Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 23rd day of February, 2021.

CITY OF IRVING SUPPLEMENTAL
BENEFIT PLAN

By: _____
Brad Duff, Chairman

- 2 -

FIRSTENERGY

## SCHEDULE A

### SECURITIES TRANSACTIONS

**Bond**

| Date<br>Acquired | Type of<br>Debt | Face<br>Amount | Price |
|---|---|---|---|
| 06/23/2020 | 2.25% due 09/01/2030 | 30,000 | $100.08 |

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on February 26, 2021, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Brian E. Cochran
BRIAN E. COCHRAN

ROBBINS GELLER RUDMAN
   & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)

E-mail: bcochran@rgrdlaw.com

1 –

4823-8789-7564.v3

# Mailing Information for a Case 2:20-cv-03785-ALM-KAJ Owens v. FirstEnergy Corp. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Daniel E. Barenbaum**
  dbarenbaum@bermantabacco.com,sfservice@bermantabacco.com

- **Jordan M. Baumann**
  jbaumann@jonesday.com

- **Javier Bleichmar**
  jbleichmar@bfalaw.com

- **Peter Borkon**
  pborkon@bfalaw.com

- **Brian E. Cochran**
  bcochran@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **James Rubin Cummins**
  jcummins@cumminslaw.us,hpoindexter@cumminslaw.us,docket@cumminslaw.us

- **Justin Robert Donoho**
  jdonoho@bakerlaw.com

- **Marjorie P Duffy**
  mpduffy@jonesday.com,epalmer@jonesday.com,rfargabrite@jonesday.com

- **Robert Stephen Faxon**
  rfaxon@jonesday.com

- **Jason A. Forge**
  JForge@rgrdlaw.com

- **Sarah V. Geiger**
  sgeiger@kmklaw.com,mtrue@kmklaw.com

- **Tor Gronborg**
  torg@rgrdlaw.com,cbarrett@rgrdlaw.com,e_file_sd@rgrdlaw.com,christina@rgrdlaw.com

- **Daniel Richard Karon**
  dkaron@karonllc.com,cgood@karonllc.com,bhollowell@karonllc.com

- **Nicole Lavallee**
  nlavallee@bermantabacco.com,sfservice@bermantabacco.com

- **Albert Grant Lin**
  alin@bakerlaw.com,phubbard@bakerlaw.com

- **Joseph F Murray**
  murray@mmmb.com,tiffany@mmmb.com,tiffany@ecf.courtdrive.com,murray@ecf.courtdrive.com

- **Danielle S. Myers**
  DMyers@rgrdlaw.com,dmyers@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **Carole Schwartz Rendon**
  crendon@bakerlaw.com

- **Geoffrey J. Ritts**
  gjritts@jonesday.com

- **Darren J Robbins**
  tedp@rgrdlaw.com

- **William Scherman**
  wscherman@gibsondunn.com

- **Victoria Lynn Serrani**
  vlserrani@bmdllc.com

- **Christopher W.H. Sullivan**
  csullivan@gibsondunn.com

- **Joseph J. Tabacco, Jr.**
  jtabacco@bermantabacco.com

- **Robert J Wagoner**
  Lainie@wagonerlawoffice.com,bob@wagonerlawoffice.com

- **F. Joseph Warin**
  fwarin@gibsondunn.com

- **Daniel Rubin Warren**
  dwarren@bakerlaw.com

- **Lesley Weaver**
  lweaver@bfalaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)

# EXHIBIT 4

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| In re FIRSTENERGY CORP. SECURITIES LITIGATION, | ) ) ) | No. 2:20-cv-03785-ALM-KAJ |
|  | ) | CLASS ACTION |
|  | ) |  |
| _____ | ) | Judge Algenon L. Marbley |
|  | ) | Magistrate Judge Kimberly A. Jolson |
| This Document Relates To: | ) |  |
|  | ) |  |
| ALL ACTIONS. | ) | **ORAL ARGUMENT REQUESTED** |

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS CHARLES JONES AND MICHAEL DOWLING'S MOTION FOR PROTECTIVE ORDER

Fifth Amendment concerns sufficient to warrant a stay of the civil proceedings.") (internal quotation marks and citations omitted, emphasis added).

The government focused significant and detailed attention on Jones and Dowling during the recent *Householder* trial, implicitly labeling them as co-conspirators and the alleged architects of the "Bailout Scheme" that forms the basis for Plaintiffs' claims in this case. As a result, the Fifth Amendment implications of Jones and Dowling being noticed for deposition are now clearly apparent. In its effort to convict Householder and Borges, the government introduced numerous exhibits concerning Jones and Dowling, including statements provided by FirstEnergy (which Plaintiffs received during discovery in this case). Moreover, Plaintiffs have acknowledged that the government's work is not done, referencing "the government's ongoing investigation" in a recent joint stipulation with FirstEnergy. Dkt. 432.[1] In light of the risk of prejudice against Jones and Dowling by moving forward with these depositions and forcing them to choose between their Fifth Amendment rights or an adverse inference, Jones and Dowling respectfully request that the Court issue a protective order deferring their depositions until no earlier than September 8, 2023.

Granting such a narrow and limited request will not prejudice Plaintiffs. Plaintiffs already sought and received numerous extensions related to discovery, including a recent extension of fact discovery until October 20, 2023. *See* Dkt. 317, 318, 370, 372, 410, 413, 432, 433. Even with a protective order staying just these two depositions until at least September 8, 2023, Plaintiffs will still have time to depose Jones and Dowling before the fact discovery cut-off. Further, postponing these depositions will not impede Plaintiffs' ability to proceed with discovery of other parties and non-parties. Currently, Plaintiffs have scheduled ten (10) days of depositions before May 23, 2023, with several others noticed for upcoming depositions.

---

[1]     Curiously, even though they are defendants here, Jones and Dowling were not consulted about the agreement between Plaintiffs and FirstEnergy.

# EXHIBIT 5

## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| IN RE FIRSTENERGY CORP. SECURITIES LITIGATION, <br><br> This document relates to: <br><br>      ALL ACTIONS. | Case No. 2:20-cv-03785-ALM-KAJ <br><br> Chief Judge Algenon L. Marbley <br><br> Magistrate Judge Kimberly A. Jolson |
| MFS SERIES TRUST I, ET AL., <br><br>           PLAINTIFFS, <br><br> V. <br><br> FIRSTENERGY CORP., ET AL., <br><br>           DEFENDANTS. | Case No. 2:21-cv-05839-ALM-KAJ <br><br> Chief Judge Algenon L. Marbley <br><br> Magistrate Judge Kimberly A. Jolson |
| BRIGHTHOUSE FUNDS TRUST II – MFS VALUE PORTFOLIO, ET AL., <br><br>           PLAINTIFFS, <br><br> V. <br><br> FIRSTENERGY CORP., ET AL., <br><br>           DEFENDANTS. | Case No. 2:22-cv-00865-ALM-KAJ <br><br> Chief Judge Algenon L. Marbley <br><br> Magistrate Judge Kimberly A. Jolson |

## <u>ORDER</u>

This matter is before the Court on Defendants' Motion to Stay Proceedings Pending Interlocutory Appeal (Doc. 577). In the Motion, Defendants request the Court to enter an order staying all proceedings in these actions pending a final resolution of their interlocutory appeal of the Court's Order Granting Class Certification. (*Id.* at 2; *see* Doc. 435).

Pursuant to Rule 53 of the Federal Rules of Civil Procedure and its Order Appointing the Special Master (Doc. 541), the Court **REFERS** the Motion to the Special Master to submit a Report and Recommendation for the Court to consider. The Special Master is **DIRECTED** to set a briefing schedule and a hearing on the Motion. All discovery is **STAYED** during the pendency of this Motion. Additionally, the Court **DIRECTS** the Special Master to reduce the findings and reasoning of his November 30, 2023 Notice of Order on the Motion to Stay (Doc. 575) to a Report and Recommendation for the Court to consider.

       **IT IS SO ORDERED.**

Date: December 1, 2023

_____
ALGENON L. MARBLEY
CHIEF UNITED STATES DISTRICT JUDGE

/s/ Kimberly A. Jolson
_____
KIMBERLY A. JOLSON
UNITED STATES MAGISTRATE JUDGE

# EXHIBIT 6

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | | |
|---|---|---|
| In re FIRSTENERGY CORP. SECURITIES LITIGATION | ) ) ) | No. 2:20-cv-03785-ALM-KAJ |
| | ) | CLASS ACTION |
| This Document Relates To: | ) ) | Judge Algenon L. Marbley |
| ALL ACTIONS. | ) ) | Magistrate Judge Kimberly A. Jolson |
| | ) | |

PLAINTIFFS' ACCOUNTING OF DISCOVERY

MURRAY MURPHY MOUL
  + BASIL LLP
JOSEPH F. MURRAY (0063373)
1114 Dublin Road
Columbus, OH  43215
Telephone:  614/488-0400
614/488-0401 (fax)
murray@mmmb.com


Liaison Counsel

ROBBINS GELLER RUDMAN
  & DOWD LLP
DARREN J. ROBBINS (*pro hac vice*)
MARK SOLOMON (*pro hac vice*)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com
marks@rgrdlaw.com


Class Counsel

Pursuant to the May 16, 2024 Order By Special Master, Lead Plaintiff Los Angeles County Employees Retirement Association ("Lead Plaintiff" or "LACERA"), and plaintiffs Amalgamated Bank, as Trustee for the LongView LargeCap 500 Index Fund, LongView Quantitative LargeCap Fund, LongView Broad Market 3000 Index Fund, LongView LargeCap 500 Index Fund VEBA, LV LargeCap 1000 Value Index Fund, LongView Quantitative MidCap Fund, LongView Quant LargeCap Equity VEBA Fund and LongView Core Plus Fixed Income Fund ("Amalgamated Bank"), City of Irving Supplemental Benefit Plan, and Wisconsin Laborers' Pension Fund (collectively, "Plaintiffs") submit the following accounting of their completed discovery, as well as a non-binding accounting of their anticipated discovery.

As detailed below, to date, the parties have conducted depositions of 32 individuals and entities, including fact witnesses, expert witnesses, and Rule 30(b)(6) witnesses. Plaintiffs anticipate 51 additional fact depositions (including those previously scheduled by Defendants), as well as 8 depositions that will require a maximum of 2 hours each to revisit subject areas FirstEnergy foreclosed prior to the Court's May 6, 2024 Order & Opinion (ECF 653). As for written discovery, Plaintiffs have served over two-dozen sets of Requests for Production ("RFPs"); 122 third-party document subpoenas; two sets of Requests for Admissions ("RFAs"); and one set of interrogatories. Plaintiffs have received over three million pages of documents and expect to receive significant productions based on the Court's January 11, 2024 (ECF 618), February 13, 2024 (ECF 628), and May 6, 2024 (ECF 653) Orders & Opinions. Plaintiffs anticipate serving additional written discovery requests, including third-party document subpoenas.

- 1 -

## I. DEPOSITIONS

### A. Completed Depositions[1]

| NOTICING PARTY | PERSON/ENTITY |
|---|---|
| Plaintiffs | Defendant Charles E. Jones |
| Plaintiffs | Defendant Dennis M. Chack |
| Plaintiffs/Defendants | Defendant FirstEnergy 30(b)(6) (Tracy Ashton & Joseph Storsin) |
| Plaintiffs | Defendant George M. Smart |
| Plaintiffs/Defendants | Defendant James F. Pearson* |
| Defendants | Defendant Jason J. Lisowski* |
| Plaintiffs | Defendant Jerry Sue Thornton |
| Plaintiffs | Defendant Julia L. Johnson* |
| Plaintiffs | Defendant Michael J. Dowling |
| Plaintiffs | Defendant Paul T. Addison* |
| Plaintiffs | Defendant Sandra Pianalto* |
| Plaintiffs/Defendants | Defendant Steven E. Strah* |
| Plaintiffs | Defendant Thomas N. Mitchell* |
| Defendants | Lead Plaintiff LACERA 30(b)(6) (Esmeralda del Bosque) |
| Defendants | Plaintiff Amalgamated Bank 30(b)(6) (Eleanor Innes) |
| Defendants | Plaintiff City of Irving Supplemental Benefit Plan 30(b)(6) (Brad Duff) |
| Defendants | Plaintiff Wisconsin Laborers 30(b)(6) (John Schmitt) |
| Defendants | Third-Party Asim Haque |
| Defendants | Third-Party David Pinter |
| Plaintiffs | Third-Party Defendants' Expert (Dr. Jennifer Marietta-Westberg) |
| Defendants | Third-Party Eileen Mikkelsen |
| Defendants | Third-Party Irene Prezelj* |

---

[1]     As indicated by asterisks below, 8 depositions were completed subject to the resolution of Defendant FirstEnergy Corp.'s ("FirstEnergy") instructions to witnesses not to answer certain questions.  Pursuant to the Court's May 6, 2024 order, each deposition will be re-opened for up to 2 hours to complete the questioning FirstEnergy prevented.  Order by Special Master on Motion to Compel, ECF 571 at PageID 12387; *see also* Order & Opinion, ECF 653 at PageID 14272-74. "Defendants" refers to: (i) FirstEnergy; (ii) Charles E. Jones, James F. Pearson, Steven E. Strah, K. Jon Taylor, Michael J. Dowling, Dennis M. Chack, Robert Reffner, Leila L. Vespoli; John Judge; Donald R. Schneider, and Jason J. Lisowski; (iii) George M. Smart, Paul T. Addison, Michael J. Anderson, Steven J. Demetriou, Julia L. Johnson, Donald T. Misheff, Thomas N. Mitchell, James F. O'Neil III, Christopher D. Pappas, Sandra Pianalto, Luis A. Reyes, Jerry Sue Thornton, and Leslie M. Turner (collectively, the "Director Defendants"); and (iv)  Barclays Capital, Inc., BofA Securities, Inc., Citigroup Global Markets, Inc., J.P. Morgan Securities, LLC, Morgan Stanley & Co. LLC, Mizuho Securities USA LLC, PNC Capital Markets LLC, RBC Capital Markets, LLC, Santander Investment Securities Inc., Scotia Capital (USA) Inc., SMBC Nikko Securities America, Inc., CIBC World Markets Corp., KeyBanc Capital Markets, Inc., TD Securities (USA) LLC, U.S. Bancorp Investments, Inc., and MUFG Securities Americas Inc. (collectively, the "Underwriter Defendants").

| NOTICING PARTY | PERSON/ENTITY |
|---|---|
| Defendants | Third-Party Plaintiffs' Expert (Cynthia Jones) |
| Defendants | Third-Party Plaintiffs' Expert (Dr. Scott Dalrymple) |
| Plaintiffs | Underwriter Defendant Barclays Capital Inc. 30(b)(6) (Rob Stowe) |
| Plaintiffs | Underwriter Defendant BofA Securities, Inc. 30(b)(6) (Julien Dumolin-Smith & David Mikula) |
| Plaintiffs | Underwriter Defendant Citigroup Global Markets, Inc. 30(b)(6) (Brian Bednarski) |
| Plaintiffs | Underwriter Defendant J.P. Morgan Securities, LLC 30(b)(6) (Charles Wortman & Jeremy Tonet) |
| Plaintiffs | Underwriter Defendant KeyBanc Capital Markets Inc. 30(b)(6) (Ryan Pirnat) |
| Plaintiffs | Underwriter Defendant Mizuho Securities USA LLC 30(b)(6) (Michael Donohue) |
| Plaintiffs | Underwriter Defendant RBC Capital Markets, LLC 30(b)(6) (Anthony Ianno) |
| Plaintiffs | Underwriter Defendant Scotia Capital 30(b)(6) (Michael Ravanesi & Andrew Weisel) |

**B. Previously Noticed/Scheduled Depositions Plaintiffs Expect to Be Re-Scheduled**

**1. Parties**

| NOTICING PARTY | PERSON/ENTITY |
|---|---|
| Plaintiffs | Defendant Christopher D. Pappas |
| Plaintiffs | Defendant Donald R. Schneider |
| Plaintiffs | Defendant Donald T. Misheff |
| Plaintiffs | Defendant James F. O'Neil III |
| Plaintiffs | Defendant John Judge |
| Plaintiffs | Defendant K. Jon Taylor |
| Plaintiffs | Defendant Leila L. Vespoli |
| Plaintiffs | Defendant Leslie M. Turner |
| Plaintiffs | Defendant Luis A. Reyes |
| Plaintiffs | Defendant Michael J. Anderson |
| Plaintiffs | Defendant Robert Reffner |
| Plaintiffs | Defendant Steven J. Demetriou |
| Plaintiffs | Underwriter Defendant CIBC World Markets Corp. 30(b)(6) |
| Plaintiffs | Underwriter Defendant MUFG Securities Americas Inc. 30(b)(6) |
| Plaintiffs | Underwriter Defendant PNC Capital Markets LLC 30(b)(6) |
| Plaintiffs | Underwriter Defendant Santander Investment Securities Inc. 30(b)(6) |
| Plaintiffs | Underwriter Defendant SMBC Nikko Securities America, Inc. 30(b)(6) |
| Plaintiffs | Underwriter Defendant TD Securities (USA) LLC 30(b)(6) |

EXHIBIT 7

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| In re FIRSTENERGY CORP. SECURITIES LITIGATION | ) ) ) | No. 2:20-cv-03785-ALM-KAJ |
| | ) | CLASS ACTION |
| This Document Relates To: | ) ) ) | Judge Algenon L. Marbley Magistrate Judge Kimberly A. Jolson |
| ALL ACTIONS. | ) ) ) | |

LEAD PLAINTIFF'S FIRST REQUEST FOR DOCUMENTS TO ALL DEFENDANTS

MURRAY MURPHY MOUL + BASIL LLP
JOSEPH F. MURRAY (0063373)
  murray@mmmb.com
1114 Dublin Road
Columbus, OH 43215
Telephone:  614/488-0400
614/488-0401 (fax)

ROBBINS GELLER RUDMAN & DOWD LLP
DARREN J. ROBBINS (darrenr@rgrdlaw.com)
MARK SOLOMON (marks@rgrdlaw.com)
JASON A. FORGE (jforge@rgrdlaw.com)
TOR GRONBORG (torg@rgrdlaw.com)
BRIAN E. COCHRAN (bcochran@rgrdlaw.com)
SARA B. POLYCHRON (spolychron@rgrdlaw.com)
TING H. LIU (tliu@rgrdlaw.com)
FRANCISCO J. MEJIA (fmejia@rgrdlaw.com)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Liaison Counsel

Lead Counsel for Lead Plaintiff Los Angeles County Employees Retirement Association

[Additional counsel appear on signature page.]

Pursuant to Federal Rules of Civil Procedure 26 and 34 and the Court's June 14, 2021 Opinion and Order (ECF No. 175), Lead Plaintiff Los Angeles County Employees Retirement Association requests that Defendants (defined below) respond to and produce for inspection and copying the documents designated under the heading "Documents Requested" within 10 days of the service of this Request for Production, to the offices of Murray Murphy Moul + Basil LLP, 1114 Dublin Road, Columbus, OH 43215, or at such other place the parties mutually agree.

The responding parties are required to produce all requested documents that are in their actual or constructive possession, custody or control, or in the actual or constructive possession, custody or control of their officers, employees, agents or representatives. The responding parties shall produce said documents as they are kept in the usual course of business and shall organize and label them to correspond with the categories in the request.

## I.  DEFINITIONS

Unless stated otherwise, the terms set forth below are defined as follows:

1.  "Defendants" refers to FirstEnergy Corp. and the Individual and Underwriter Bank Defendants (defined below).

2.  "Document" or "documents" is defined to be synonymous in meaning and equal in scope to the usage of the term "documents or electronically stored information" in Federal Rule of Civil Procedure 34(a)(1)(A) and encompasses communications. A draft or non-identical copy is a separate document within the meaning of this term.

3.  "Electronic data" refers to any original and any non-identical copies (whether non-identical because of notes made on copies or attached comments, annotations, marks, transmission notations or highlighting of any kind), mechanical, facsimile, electronic, magnetic, digital or other programs (whether private, commercial or work-in-progress), programming notes or instructions, activity listings of electronic mail receipts or transmittals, output resulting from the use of any

4849-3778-7376.v1

software program, including word processing documents, spreadsheets, database files, charts, graphs and outlines, electronic mail or "e-mail," electronic messaging services, electronic forums or discussion services, operating systems, source code of all types, programming languages, linkers and compilers, peripheral drives, PDF files, PRF files, batch files, ASCII files, crosswalks, code keys, pull down tables, logs, file layouts or any miscellaneous files or file fragments, regardless of the media on which they reside and regardless of whether said electronic data consists of an active file, backup file, deleted file or file fragment. "Electronic data" also includes, without limitation, any items stored on computer, smartphone or tablet memory or memories, hard drives, zip drives, CD-ROM discs, or in any other vehicle for electronic or digital data storage or transmittal, files, folder tabs or containers and labels appended to or associated with any physical storage device associated with each original and each copy.

4. "Electronically stored information" or "ESI" refers to any original and non-identical copies (whether non-identical because of notes made on copies or attached comments, annotations, marks, transmission notations or highlighting of any kind), mechanical, facsimile, electronic, magnetic, digital or other programs, programming notes or instructions, activity listings of electronic mail receipts or transmittals, output resulting from the use of any software program, including word processing documents, spreadsheets, database files, charts, graphs and outlines, electronic mail or "e-mail," operating systems, source code of all types, programming languages, linkers and compilers, peripheral drives, PDF files, PRF files, batch files, ASCII files, crosswalks, code keys, pull-down tables, logs, file layouts or any miscellaneous files or file fragments, regardless of the media on which they reside and regardless of whether said electronic data consists of an active file, backup file, deleted file or file fragment. "ESI" also includes, without limitation, any items stored on computer memory or memories, hard drives, zip drives, CD-ROM discs or in any other vehicle for electronic or digital data storage or transmittal, files, folder tabs or containers and labels appended to

- 2 -

or associated with any physical storage device associated with each original and each copy. "ESI" also includes, without limitation, any MMS or SMS text messages and any electronic instant messages, including, but not limited to, messages in an internal messaging system or external personal account on desktop, laptop, mobile phone, tablet or other mobile device, concerning the topics in the following requests.

5.    "Identify," with respect to documents, means to give, to the extent known, the: (a) type of document; (b) general subject matter; (c) date of the document; and (d) author(s), addressee(s) and recipient(s).

6.    "Identify," with respect to persons, means to give, to the extent known, the person's full name, present or last known address, present or last known e-mail address and when referring to a natural person, additionally, the present or last known place of employment. Once a person has been identified in accordance with this subparagraph, only the name of that person need be listed in response to subsequent discovery requesting the identification of that person.

7.    "FirstEnergy" or the "Company" refers to FirstEnergy Corp., any of its direct or indirect subsidiaries, divisions or affiliates (foreign and domestic), predecessors, successors, present and former officers, directors, employees, agents, directors and all other persons acting or purporting to act on its behalf.

8.    "Individual Defendants" means Charles E. Jones, James F. Pearson, Steven E. Strah, K. Jon Taylor, Michael Dowling, Dennis M. Chack, Ty R. Pine, Robert Reffner, Leila L. Vespoli, John Judge and Donald R. Schneider; current and former FirstEnergy directors Jason J. Lisowski, George M. Smart, Paul T. Addison, Michael J. Anderson, Steven J. Demetriou, Julia L. Johnson, Donald T. Misheff, Thomas N. Mitchell, James F. O'Neil III, Christopher D. Pappas, Sandra Pianalto, Luis A. Reyes, Jerry Sue Thornton and Leslie Turner, and includes, without limitation, their agents, employees or other persons occupying similar positions or performing similar functions.

9.      "Person" or "persons" means any natural person or any legal entity, including, without limitation, any business or governmental entity or association.

10.     "Underwriter Bank Defendants" refers Barclays Capital Inc., BofA Securities, Inc., Citigroup Global Markets Inc., J.P. Morgan Securities LLC, Morgan Stanley & Co. LLC, Mizuho Securities USA LLC, PNC Capital Markets LLC, RBC Capital Markets, LLC, Santander Investment Securities Inc., Scotia Capital (USA) Inc., SMBC Nikko Securities America, Inc., CIBC World Markets Corp., KeyBanc Capital Markets Inc., TD Securities (USA) LLC, U.S. Bancorp Investments, Inc. and MUFG Securities Americas Inc. and any of their direct or indirect subsidiaries, divisions or affiliates (foreign and domestic), predecessors, successors, present and former officers, directors, employees, agents, directors and all other persons acting or purporting to act on its behalf.

11.     "You" or "your" means the person or entity responding to these requests.

12.     "All," "any" and "each" shall each be construed as encompassing any and all.

13.     The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

## II.      INSTRUCTIONS

1.      In responding to these requests, you shall produce all responsive documents which are in your possession, custody or control, or in the possession, custody or control of your predecessors, successors, parents, subsidiaries, divisions or affiliates, or any of your respective directors, executives, officers, partners, managing agents, agents, employees, accountants or any other representative.  A document shall be deemed to be within your control if you have the ability or right to secure the document or a copy of the document from another person having possession or custody of the document.

2.      Pursuant to the Federal Rules of Civil Procedure, you are to produce for inspection and copying by Lead Plaintiff original documents as they are kept in the usual course of business and you shall organize and label them to correspond with the categories in these requests.

3.      In responding to these requests, you shall produce all responsive documents available at the time of production and you shall supplement your responses as required by Federal Rule of Civil Procedure 26(e).

4.      If any responsive document was, but no longer is, in your possession or subject to your control, state whether the document is: (a) missing or lost; (b) destroyed; (c) transferred voluntarily or involuntarily to others; or (d) otherwise disposed of, and in each instance identify the name and address of its current or last known custodian, and the circumstances surrounding such disposition.

5.      If you claim any form of privilege or any other objection, whether based on statute, common law or otherwise, as a ground for not producing any requested document, please furnish a list identifying each document for which the privilege or other objection is claimed together with the following information:

     (a)      the privilege being asserted;

     (b)      the person on whose behalf the privilege is asserted;

     (c)      a precise statement of the facts upon which the claim of privilege is based; and

     (d)      identify the purported privileged document including:

       (i)      its nature, *e.g.*, letter, memorandum, tape, etc.;

      (ii)      the date it was prepared;

     (iii)      the date the document bears;

     (iv)      the date the document was sent;

      (v)      the date it was received;

- 5 -

      (vi)        the name of the person who prepared the document;

      (vii)       the name(s) of the person(s) who received the document;

      (viii)     the name of each person to whom it was sent or was intended to be sent, including all addressees and all recipients of copies; and

      (ix)       a statement of whom each identified person represented or purported to represent at all relevant times.

6.     If a portion of any document responsive to these requests is withheld under claim of privilege pursuant to Instruction No. 5, any non-privileged portion of such document must be produced with the portion claimed to be privileged redacted.

7.     You are to produce each document requested herein in its entirety, without deletion or excision (except as qualified by Instructions Nos. 5 and 6 above) regardless of whether you consider the entire document to be relevant or responsive to the requests.

8.     The singular of any term includes the plural, and the disjunctive shall include the conjunctive, and vice versa. Construe the terms "and" and "or" as used in this document in the conjunctive and disjunctive so as to produce the broadest scope of documents pursuant to each request.

## III.    PRODUCTION OF HARD COPY DOCUMENTS – FORMAT

Absent an agreed upon protocol, hard copy documents should be scanned as single-page, Group IV, 300 DPI TIFF images with an .opt image cross-reference file and a delimited database load file (*i.e.*, .dat). The database load file should contain the following fields: "BEGNO," "ENDNO," "PAGES," "VOLUME" and "CUSTODIAN." The documents should be logically unitized (*i.e.*, distinct documents shall not be merged into a single record, and single documents shall not be split into multiple records) and be produced in the order in which they are kept in the usual course of business. If an original document contains color to understand the meaning or content of

- 6 -

the document, the document shall be produced as single-page, 300 DPI JPG images with JPG compression and a high quality setting as to not degrade the original image. Multi-page OCR text for each document should also be provided. The OCR software shall maximize text quality over process speed. Settings such as "auto-skewing" and "auto-rotation" should be turned on during the OCR process.

## IV. PRODUCTION OF ESI

Absent an agreed upon protocol, ESI shall be produced as follows:

1. *Format*: Electronically stored information ("ESI") should be produced in single-page, black and white, TIFF Group IV, 300 DPI TIFF images with the exception of spreadsheet type files, source code, audio and video files, which should be produced in native format. TIFFs should show any and all text and images which would be visible to the reader using the native software that created the document. For example, TIFFs of e-mail messages should include the BCC line. PowerPoint documents shall be processed with hidden slides and all speaker notes unhidden, and shall be processed to show both the slide and the speaker's notes on the TIFF image. If an original document contains color, the document should be produced as single-page, 300 DPI JPG images with JPG compression and a high quality setting as to not degrade the original image. Parties are under no obligation to enhance an image beyond how it was kept in the usual course of business.

2. *Format – Native Files*: If a document is produced in native, a single-page Bates stamped image slip sheet stating the document has been produced in native format should also be provided. Each native file should be named according to the Bates number it has been assigned, and should be linked directly to its corresponding record in the load file using the NATIVELINK field. To the extent that either party believes that specific documents or classes of documents, not already identified within this protocol, should be produced in native format, the parties should meet and confer in good faith.

- 7 -

3.  *De-Duplication*: Each party shall remove exact duplicate documents based on MD5 or SHA-1 hash values, at the family level.  Attachments should not be eliminated as duplicates for purposes of production, unless the parent e-mail and all attachments are also duplicates.  An e-mail that includes content in the BCC or other blind copy field shall not be treated as a duplicate of an e-mail that does not include content in the content in those fields, even if all remaining content in the e-mail is identical.  Removal of near-duplicate documents and e-mail thread suppression is not acceptable.  De-duplication should be done across the entire collection (global de-duplication) and the CUSTODIAN field should list each custodian, separated by a semi-colon, who was a source of that document.  Should the CUSTODIAN metadata field produced become outdated due to rolling productions, an overlay file providing all the custodians for the affected documents should be produced prior to substantial completion of the document production.

4.  *Technology Assisted Review*: Predictive coding/technology-assisted-review shall not be used for the purpose of culling the documents to be reviewed or produced without notifying the requesting party prior to use and with ample time to meet and confer in good faith regarding a mutually agreeable protocol for the use of such technologies.

5.  *Metadata*: All ESI shall be produced with a delimited, database load file that contains the metadata fields listed in Table 1, attached hereto.  The metadata produced should have the correct encoding to enable preservation of the documents' original language.

6.  *Embedded Objects*: The parties should meet and confer over the inclusion or exclusion of embedded files from the production.

7.  *Compressed Files Types*: Compressed file types (*i.e.*, .ZIP, .RAR, .CAB, .Z) should be decompressed so that the lowest level document or file is extracted.

8.  *Structured Data*: To the extent a response to discovery requires production of electronic information stored in a database, the parties should discuss methods of production best

- 8 -

providing all relevant information, including, but not limited to, duplication of databases or limited access for the purpose of generating reports.  Parties shall consider whether all relevant information may be provided by querying the database for discoverable information and generating a report in a reasonably usable and exportable electronic file.  A document reference sheet shall be provided to describe the purpose of the database and meaning of all tables and column headers produced.

9. *Exception Report*: The producing party shall compile an exception report enumerating any unprocessed or unprocessable documents, their file type and the file location.

10. *Encryption*: To maximize the security of information in transit, any media on which documents are produced may be encrypted.  In such cases, the producing party shall transmit the encryption key or password to the receiving party, under separate cover, contemporaneously with sending the encrypted media.

11. *Redactions*: If documents that the parties have agreed to produce in native format need to be redacted, the parties should meet and confer regarding how to implement redactions while ensuring that proper formatting and usability are maintained.

## V. DOCUMENTS REQUESTED

REQUEST FOR DOCUMENT PRODUCTION NO. 1:

All documents produced, provided or received by any of the Defendants in the course of litigation against FirstEnergy arising out of the HB6 bribery scheme, including any deposition testimony.

REQUEST FOR DOCUMENT PRODUCTION NO. 2:

All documents that the Defendants have produced or provided to, or received from, any regulatory or government agency, federal or state law enforcement agency, or legislative body or representative in connection with the HB6 bribery scheme, including any deposition testimony.

- 9 -

DATED: June 28, 2021          MURRAY MURPHY MOUL + BASIL LLP

*/s/ Joseph F. Murray*

JOSEPH F. MURRAY, Trial Attorney (0063373)
1114 Dublin Road
Columbus, OH 43215
Telephone: 614/488-0400
614/488-0401 (fax)
murray@mmmb.com

Liaison Counsel

ROBBINS GELLER RUDMAN
  & DOWD LLP
DARREN J. ROBBINS
MARK SOLOMON
JASON A. FORGE
TOR GRONBORG
BRIAN E. COCHRAN
SARA B. POLYCHRON
TING H. LIU
FRANCISCO J. MEJIA
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com
marks@rgrdlaw.com
jforge@rgrdlaw.com
torg@rgrdlaw.com
bcochran@rgrdlaw.com
spolychron@rgrdlaw.com
tliu@rgrdlaw.com
fmejia@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
DANIEL J. PFEFFERBAUM
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
dpfefferbaum@rgrdlaw.com

ROBBINS GELLER RUDMAN
  &DOWD LLP
CHAD JOHNSON
DESIREE CUMMINGS
420 Lexington Avenue, Suite 1832
New York, NY 10170
Telephone: 212/432-5100
chadj@rgrdlaw.com
dcummings@rgrdlaw.com

Lead Counsel for Lead Plaintiff Los Angeles
County Employees Retirement Association

- 11 -

## DECLARATION OF SERVICE BY EMAIL

I, Tor Gronborg, not a party to the within action, hereby declare that on June 28, 2021, I

served the attached LEAD PLAINTIFF'S FIRST REQUEST FOR DOCUMENTS TO ALL

DEFENDANTS to the parties listed below by e-mail:

| NAME | FIRM | EMAIL |
|---|---|---|
| Geoffrey J. Ritts<br>Robert S. Faxon | JONES DAY<br>901 Lakeside Ave.<br>Cleveland, OH 44114 | gjritts@jonesday.com<br>rfaxon@jonesday.com |
| Marjorie P. Duffy<br>Jordan M. Baumann | JONES DAY<br>325 John H. McConnell<br>Blvd, Suite 600<br>Columbus, OH 43215 | mpduffy@jonesday.com<br>jbaumann@jonesday.com |
| John F. McCaffrey<br>John A. Favret | TUCKER ELLIS LLP<br>950 Main Avenue - Suite 1100<br>Cleveland, OH 44113 | john.mccaffrey@tuckerellis.com<br>john.favret@tuckerellis.com |
| Douglas M. Mansfield | LAPE MANSFIELD<br>NAKASIAN & GIBSON,<br>LLC<br>9980 Brewster Lane, Suite 150<br>Powell, OH 43065 | dmansfield@lmng-law.com |
| Michael L. Kichline<br>Laura H. McNally | MORGAN, LEWIS &<br>BOCKIUS LLP<br>1701 Market Street<br>Philadelphia, PA 19103 | michael.kichline@morganlewis.com<br>laura.mcnally@morganlewis.com |
| Kari Hall<br>Preston Burton<br>Adam Miller<br>Bree Murphy | BUCKLEY LLP<br>2001 M Street, NW<br>Washington, DC 20036 | khall@buckleyfirm.com<br>pburton@buckleyfirm.com<br>amiller@buckleyfirm.com<br>bmurphy@buckleyfirm.com |
| Veronica E. Callahan<br>Aaron F. Miner<br>Zheng (Jane) He | ARNOLD & PORTER<br>KAYE SCHOLER LLP<br>250 West 55th Street<br>New York, NY 10019 | veronica.callahan@arnoldporter.com<br>aaron.miner@arnoldporter.com<br>jane.he@arnoldporter.com |
| David H. Wallace | TAFT STETTINIUS &<br>HOLLISTER, LLP<br>200 Public Square, Suite 3500<br>Cleveland, OH 44118 | dwallace@taftlaw.com |
| Daniel R. Warren | BAKER & HOSTETLER | dwarren@bakerlaw.com |

| NAME | FIRM | EMAIL |
|------|------|-------|
| Carole S. Rendon | LLP<br>127 Public Square, Suite 2000<br>Cleveland, OH 44114 | crendon@bakerlaw.com |
| Albert G. Lin | BAKER & HOSTETLER LLP<br>200 Civic Center Drive, Suite 1200<br>Columbus, OH 43215 | alin@bakerlaw.com |
| Justin R. Donoho | BAKER & HOSTETLER LLP<br>One North Wacker Drive, Suite 4500<br>Chicago, IL 60606 | jdonoho@bakerlaw.com |
| F. Joseph Warin<br>William Scherman<br>Jason J. Mendro<br>Christopher W.H. Sullivan | GIBSON, DUNN & CRUTCHER LLP<br>1050 Connecticut Ave, N.W.<br>Washington, DC 20036 | fwarin@gibsondunn.com<br>wscherman@gibsondunn.com<br>jmendro@gibsondunn.com<br>csullivan@gibsondunn.com |
| John C. Fairweather<br>Lisa S. DelGrosso | BROUSE McDOWELL<br>388 South Main Street, Suite 500<br>Akron, OH 44311 | jfairweather@brouse.com<br>ldelgrosso@brouse.com |
| Steven S. Scholes<br>David S. Rosenbloom<br>Paul Helms | MCDERMOTT WILL & EMERY LLP<br>444 West Lake Street, Suite 4000<br>Chicago, IL 60606 | sscholes@mwe.com<br>drosenbloom@mwe.com<br>phelms@mwe.com |
| Victor A. Walton, Jr.<br>Joseph M. Brunner | VORYS, SATER, SEYMOUR AND PEASE LLP<br>301 East Fourth Street, Suite 3500<br>Great American Tower<br>Cincinnati, OH 45202 | vawalton@vorys.com<br>jmbrunner@vorys.com |
| Andrew P. Guran | VORYS, SATER, SEYMOUR AND PEASE LLP<br>106 South Main Street, Suite 1100<br>Akron, OH 44308 | apguran@vorys.com |
| John R. Mitchell<br>Kip T. Bollin | THOMPSON HINE LLP<br>3900 Key Center<br>127 Public Square | John.Mitchell@ThompsonHine.com<br>Kip.Bollin@ThompsonHine.com |

4849-3778-7376.v1

| NAME | FIRM | EMAIL |
|---|---|---|
| | Cleveland, Ohio 44114 | |
| Christine M. Haaker | THOMPSON HINE LLP<br>Austin Landing I<br>10050 Innovation Drive,<br>Suite 400<br>Miamisburg, OH 45342 | Christine.Haaker@ThompsonHine.com |
| Robert W. Trafford<br>Jay A. Yurkiw<br>Kirsten R. Fraser | PORTER WRIGHT<br>MORRIS & ARTHUR LLP<br>41 South High Street, Suite 2900<br>Columbus, OH 43215 | rtrafford@porterwright.com<br>jyurkiw@porterwright.com<br>kfraser@porterwright.com |
| Brian S. Weinstein<br>Sofia A. Vitiello | DAVIS POLK &<br>WARDWELL LLP<br>450 Lexington Avenue<br>New York, NY 10017 | brian.weinstein@davispolk.com<br>sofia.vitiello@davispolk.com |

I declare under penalty of perjury that the foregoing is true and correct. Executed on June 28, 2021, at San Diego, California.

*/s/ Tor Gronborg*
_____
TOR GRONBORG

4849-3778-7376.v1

EXHIBIT 8

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| In re FIRSTENERGY CORP. SECURITIES LITIGATION | ) ) ) | No. 2:20-cv-03785-ALM-KAJ |
| | ) | CLASS ACTION |
| | ) | |
| This Document Relates To: | ) ) | Chief Judge Algenon L. Marbley |
| | ) | Magistrate Judge Kimberly A. Jolson |
| ALL ACTIONS. | ) ) | |

## CHARLES E. JONES'S RESPONSES AND OBJECTIONS TO LEAD PLAINTIFFS' FIRST REQUEST FOR DOCUMENTS TO ALL DEFENDANTS

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure and Local Rule 26.1, Defendant Charles E. Jones, by and through his undersigned attorneys, serves his Responses and Objections ("Responses") to Lead Plaintiffs' First Request for Documents to All Defendants (the "Requests").

### GENERAL OBJECTIONS

The following General Objections are incorporated by reference into each and every response provided by Mr. Jones, whether specifically mentioned or not. The identification of certain General Objections or other objections in a given response is not intended, nor shall it be construed, as a waiver or exclusion in any way of all other General Objections.

1.      The following responses are based on Mr. Jones's present knowledge, information, and belief. He reserves the right to amend, revise, correct, supplement, or clarify any of the responses herein.

2.      By providing responses to the Requests, Mr. Jones does not concede that any information contained herein or any document produced is relevant, material, discoverable, or admissible into evidence.

3.      By providing responses to the Requests, Mr. Jones does not concede that documents that are responsive to any Request exist.

4.      Mr. Jones objects to the extent Plaintiffs request Mr. Jones to produce documents prior to an agreement among all parties regarding an ESI protocol and protective order setting forth the terms and procedures for confidentiality designations.  Mr. Jones will produce available non-privileged, non-duplicative, responsive documents subject to such ESI protocol and protective order.

5.      Mr. Jones objects to the extent that Plaintiffs request that he immediately produce documents with service of his Responses to the Requests on the ground that it is inconsistent with the Opinion and Order entered by the Court on June 14, 2021 (ECF No. 175) (the "Lift Order").  Subject to and without waiving his General or Specific Objections, Mr. Jones will produce documents consistent with production time frames set forth in any scheduling order, or to be agreed upon by the parties.

6.      Mr. Jones objects to the extent that Plaintiffs' Requests seek documents or information outside the scope of the Lift Order.  Under the Private Securities Litigation Reform Act ("PSLRA"), discovery is generally stayed until motions to dismiss are decided.  15 U.S.C. § 78u-4(b)(3)(B).  Productions prior to the resolution of the motions to dismiss are only permitted pursuant to the Lift Order.  *See id.*  Accordingly, discovery outside the scope of the Lift Order is not currently permitted under the PSLRA.

7.      Mr. Jones objects to the extent that the Requests seek materials containing or reflecting information protected by the attorney-client privilege, the attorney work-product doctrine, or any other applicable law, rule, or privilege.  If materials containing privileged or protected information or work product are inadvertently disclosed, such disclosure shall not

constitute a waiver of any privileges or protections, and Mr. Jones reserves the right to demand and obtain the return of any inadvertently produced or disclosed materials or to object to the use or introduction of such documents or information.

8.      Mr. Jones objects to the extent the Requests are unreasonably cumulative and/or duplicative of each other, or duplicative of requests that are more properly directed to the documents, information, and data in the possession, custody, or control of other parties.

9.      Mr. Jones objects to the extent the Requests seek documents and information concerning settlement communications that are protected from identification or disclosure by Fed. R. Evid. 408 and 410.   *See Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.*, 332 F.3d 976 (6th Cir. 2003).

10.      Mr. Jones objects to the extent the Requests, including the instructions and definitions, are vague, are unduly burdensome, or purport to seek to impose burdens greater than those required by the Federal Rules of Civil Procedure, applicable local rules, or the Court's case-management orders.  Mr. Jones responds consistent with the Federal Rules of Civil Procedure, any applicable local rules, any scheduling or case-management orders entered by the Court, and any procedures outlined in a to-be-agreed upon ESI protocol, and subject to his threshold objection regarding the scope of discovery.

11.       Mr. Jones objects to the extent that the Requests are not limited in scope to the relevant time periods at issue in this consolidated action.

12.      Mr. Jones objects to the extent that the Requests seek disclosure of confidential, non-public, or proprietary information or information of a personal nature, or highly confidential, proprietary, or otherwise commercially sensitive information or trade secrets.

13.     Mr. Jones objects to the extent that the Requests seek information irrelevant to the claims or defenses of the parties or disproportionate to the needs of this consolidated action.

14.     Mr. Jones objects to the extent the Requests seek information contained in Plaintiffs' own files, within Plaintiffs' own knowledge, or within public sources available equally to Plaintiffs.

15.     Mr. Jones objects to the extent the Requests seek information within the possession of third parties equally available to Plaintiffs.

16.     Mr. Jones objects to the extent the Requests define terms or characterize the evidence in this case.  To the extent Mr. Jones uses any terms used by Plaintiffs in the Requests, such use is specifically limited solely to these Responses and shall not be construed in any way as an admission that such terms are correct or proper.

17.     Mr. Jones objects to the extent the Requests, including instructions and definitions, are overly broad, ambiguous, premature, or written in a form that is confusing or potentially misleading.

18.     Mr. Jones's Responses do not in any way constitute admissions or acknowledgements that any information sought is within the proper scope of discovery. Mr. Jones makes these Responses without waiving his right to object to the admissibility of documents produced herewith or to object to further discovery related to subject matters encompassed within the Requests.

Without waiving these General Objections, and incorporating each General Objection into each and every response contained herein, Mr. Jones provides his responses to the Requests as follows:

## REQUESTS FOR PRODUCTION

**REQUEST FOR DOCUMENT PRODUCTION NO. 1**: All documents produced, provided or received by any of the Defendants in the course of litigation against FirstEnergy arising out of the HB6 bribery scheme, including any deposition testimony.

**RESPONSE**: In addition to and without waiving the foregoing General Objections, Mr. Jones objects to the extent this Request seeks documents and information that are outside of his possession, custody, or control and/or in the possession of FirstEnergy or other third parties. Mr. Jones also objects to the extent that the Request encompasses documents outside the scope of the Lift Order.  Mr. Jones objects to the extent this Request seeks documents subject to the attorney-client privilege, the attorney work-product doctrine, or any other applicable privilege. Mr. Jones also objects to this Request on the ground that the phrases "produced, provided or received" are vague and ambiguous.  Mr. Jones further objects this Request is vague, ambiguous, and overly broad because "arising out of the HB6 bribery scheme" is an undefined phrase capable of multiple interpretations, and thus imposes the obligation on Mr. Jones to ascertain the intended meaning or scope of this Request.

Subject to and without waiving his General and Specific Objections, Mr. Jones will produce any available non-privileged, non-duplicative, responsive documents in his possession, custody, or control, consistent with the timing and procedures outlined in a to-be-agreed-upon ESI protocol, protective order, and any scheduling order entered by the Court.

**REQUEST FOR DOCUMENT PRODUCTION NO. 2**: All documents that the Defendants have produced or provided to, or received from, any regulatory or government agency, federal or state law enforcement agency, or legislative body or representative in connection with the HB6 bribery scheme, including any deposition testimony.

**RESPONSE**: In addition to and without waiving the foregoing General Objections, Mr. Jones objects to the extent that the Request encompasses documents outside the scope of the Lift Order.   Mr. Jones also objects to this Request on the ground that the phrase "produced, provided or received" are vague and ambiguous.  Mr. Jones further objects as this Request is vague, ambiguous, and overly broad because "in connection with the HB6 bribery scheme" is an undefined phrase capable of multiple interpretations, and thus imposes the obligation on Mr. Jones to ascertain the intended meaning or scope of this Request.  Mr. Jones further objects to the extent that the Request encompasses documents that are equally available to Plaintiffs from public sources.  Mr. Jones objects to the extent this Request seeks documents and information concerning settlement communications that are protected from identification and disclosure by Fed. R. Evid. 408 and 410.   *See Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.*, 332 F.3d 976 (6th Cir. 2003).

Subject to and without waiving his General and Specific Objections, Mr. Jones will produce any available non-privileged, non-duplicative, responsive documents in his possession, custody, or control, consistent with the timing and procedures outlined in a to-be-agreed-upon ESI protocol, protective order, and any scheduling order entered by the Court.

Dated: July 20, 2021                                   Respectfully submitted,


                                                        */s/  Albert G. Lin*
                                                        Daniel R. Warren (0054595)
                                                        Carole S. Rendon, Trial Attorney (0070345)
                                                        Baker & Hostetler LLP
                                                        127 Public Square, Suite 2000
                                                        Cleveland, OH 44114-1214
                                                        216-621-0200
                                                        Fax: 216-696-0740
                                                        dwarren@bakerlaw.com

crendon@bakerlaw.com

Albert G. Lin (0076888)
Baker & Hostetler LLP
200 Civic Center Drive, Suite 1200
Columbus, OH 43215
614-228-1541
Fax: 614-462-2616
alin@bakerlaw.com

William Scherman (*Pro Hac Vice*)
Jason Mendro (*Pro Hac Vice*)
Christopher W.H. Sullivan (*Pro Hac Vice*)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Ave, N.W.
Washington, DC 20036-5306
202.955.8500
Fax: 202.467.0539
wscherman@gibsondunn.com
jmendro@gibsondunn.com
csullivan@gibsondunn.com

*Attorneys for Charles E. Jones*

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing **Charles E. Jones'**

**Responses and Objections to Lead Plaintiff's First Request for Documents** was served on

counsel of record for the parties by email transmission, this July 20, 2021.

Joseph F. Murray (0063373)
Brian K. Murphy (0070654)
**MURRAY MURPHY MOUL + BASIL LLP**
1114 Dublin Road
Columbus, OH 43215
Telephone: (614) 488-0400
Facsimile: (614) 488-0401
murray@mmmb.com

*Liaison Counsel for Plaintiffs*

Timothy D. Katsiff (*pro hac vice*)
David L. Axelrod (*pro hac vice*)
Jeremy R. Teaberry (ID No. 0082870)
Emilia McKee Vassallo (*pro hac vice*)
**BALLARD SPAHR LLP**
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
Telephone: (215) 665-8500
Facsimile: (215) 864-8999
katsifft@ballardspahr.com
axelrodd@ballardspahr.com
teaberryj@ballardspahr.com
mckeevassalloe@ballardspahr.com

*Attorneys for Defendant James. F. Pearson*

John F. McCaffrey (0039486)
John A. Favret (0080427)
**TUCKER ELLIS LLP**
950 Main Avenue, Suite 1100
Cleveland, OH 44113
Telephone: (216) 592-5000
Facsimile: (216) 592-5009
john.mccaffrey@tuckerellis.com
john.favret@tuckerellis.com

*Attorneys for Defendant Michael J. Dowling*

Kari K. Hall (0076442)
Preston Burton (*pro hac vice*)
Adam Miller (*pro hac vice*)
Bree Murphy (*pro hac vice*)
**BUCKLEY LLP**
2001 M Street NW, Suite 500
Washington, DC 20036
Telephone: (202) 349-8000
Facsimile: (202) 349-8080
khall@buckleyfirm.com
pburton@buckleyfirm.com
amiller@buckleyfirm.com
bmurphy@buckleyfirm.com

*Attorneys for Defendant Donald R. Schneider*

John C. Fairweather (0018216)
Lisa S. DelGrosso (0064938)
**BROUSE MCDOWELL**
388 South Main Street, Suite 500
Akron, OH 44311
Telephone: (330) 535-5711
Facsimile: (330) 253-8601
jfairweather@brouse.com
ldelgrosso@brouse.com

Steven S. Scholes (*pro hac vice*)
David S. Rosenbloom (*pro hac vice*)
Paul M.G. Helms (*pro hac vice*)
**MCDERMOTT WILL & EMERY LLP**
444 West Lake Street
Chicago, IL 60606-0029
Telephone: (312) 372-2000
Facsimile: (312) 984-7700
sscholes@mwe.com
drosenbloom@mwe.com
phelms@mwe.com

*Attorneys for Defendant Robert P. Reffner*

David H. Wallace (0037210)
**TAFT STETTINIUS & HOLLISTER, LLP**
200 Public Square, Suite 3500
Cleveland, OH 44114-2302
Telephone: (216) 706-3898
Facsimile: (216) 241-3707
dwallace@taftlaw.com

Veronica E. Callahan (*pro hac vice*)
Aaron F. Miner (*pro hac vice*)
Zheng (Jane) He (*pro hac vice*)
**ARNOLD & PORTER KAYE SCHOLER LLP**
250 West 55th Street
New York, NY 10019-9710
Telephone: (212) 836-8000
Facsimile: (212) 836-8689
veronica.callahan@arnoldporter.com
aaron.miner@arnoldporter.com
jane.he@arnoldporter.com

*Attorneys for Defendant Leila L. Vespoli*

Victor A. Walton, Jr. (0055241)
Joseph M. Brunner (0085485)
**VORYS, SATER, SEYMOUR & PEASE LLP**
301 E. Fourth Street, Suite 3500
Great American Tower
Cincinnati, OH 45201-0236
Telephone: (513) 723-4000
Facsimile: (513) 852-7808
vawalton@vorys.com
jmbrunner@vorys.com

Andrew P. Guran (0090649)
**VORYS, SATER, SEYMOUR & PEASE LLP**
106 S. Main Street, Suite 1100
Akron, OH 44308
Telephone: (330) 208-1000
Facsimile: (330) 208-1001
apguran@vorys.com

*Attorneys for Defendant John Judge*

John R. Mitchell (0066759)
Kip T. Bolin (0065275)
**THOMPSON HINE LLP**
3900 Key Center
127 Public Square
Cleveland, OH 44114
Telephone: (216) 566-5500
Facsimile: (216) 566-5800
john.mitchell@thompsonhine.com
kip.bollin@thompsonhine.com

Christine M. Haaker
**THOMPSON HINE LLP**
Austin Landing I
10050 Innovation Drive, Suite 400
Miamisburg, OH 45342-4934
Telephone: (937) 443-6822
Facsimile: (937) 443-6635
christine.haaker@thompsonhine.com

*Attorneys for Defendant Ty R. Pine*

Geoffrey J. Ritts, Trial Attorney (0062603)
Robert S. Faxon (0059678)
**JONES DAY**
North Point
901 Lakeside Avenue
Cleveland, OH 44114.1190
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
gjritts@jonesday.com
rfaxon@jonesday.com

Marjorie P. Duffy (0083452)
Jordan M. Baumann (0093844)
**JONES DAY**
325 John H. McConnell Blvd., Suite 600
Columbus, OH 43215-2673
Telephone: (614) 469-3939
Facsimile: (614) 461-4198
mpduffy@jonesday.com
jbaumann@jonesday.com

*Attorneys for Defendants FirstEnergy
Corp., Steven E. Strah, K. Jon Taylor, Jason
J. Lisowski, George M. Smart, Paul T.
Addison, Michael J. Anderson, Steven J.
Demetriou, Julia L. Johnson, Donald T.
Misheff, Thomas, N. Mitchell, James F.
O'Neil III, Christopher,D. Pappas, Sandra
Pianalto, Luis A. Reyes, Jerry Sue Thornton,
and Leslie M. Turner*

Robert W. Trafford (0040270)
Jay. A. Yurkiw (0068143)
Kirsten R. Fraser (0093951)
**PORTER WRIGHT**
41 S High Street, Suite 2800
Columbus, OH 43215
Telephone: 614-227-2000
Facsimile: 614-227-2149
rtrafford@porterwright.com
jyurkiw@porterwright.com
kfraser@porterwright.com

Brian S. Weinstein (*pro hac vice*)
Sofia A. Vitiello (*pro hac vice*)
**DAVIS POLK & WARDWELL LLP**
450 Lexington Ave
New York, NY 10017
Telephone: (212) 450-4000
brian.weinstein@davispolk.com
sofia.vitiello@davispolk.com

*Attorneys for Defendants Barclays Capital
Inc., BofA Securities, Inc., Citigroup Global
Markets Inc., J.P. Morgan Securities LLC,
Morgan Stanley & Co. LLC, Mizuho
Securities USA LLC, PNC Capital Markets
LLC, RBC Capital Markets, LLC, Santander
Investment Securities Inc., Scotia Capital
(USA) Inc., SMBC Nikko Securities America,
Inc., CIBC World Markets Corp., KeyBanc
Capital Markets Inc., TD Securities (USA)
LLC, U.S. Bancorp Investments, Inc. and
MUFG, Securities Americas Inc.*

Wendy West Feinstein (0064973)
**MORGAN, LEWIS & BOCKIUS LLP**
One Oxford Centre, 32nd Floor
Pittsburgh, PA 15219-6401
Telephone: (412) 560-7455
Facsimile: (412) 560-7001
wendy.feinstein@morganlewis.com

Michael L. Kichline (*pro hac vice*)
Laura H. McNally (*pro hac vice*)
**MORGAN, LEWIS & BOCKIUS LLP**
1701 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-5000
Facsimile: (215) 963-5001
michael.kichline@morganlewis.com
laura.mcnally@morganlewis.com

Douglas M. Mansfield (0063443)
**LAPE MANSFIELD NAKASIAN &
GIBSON LLC**
9980 Brewster Lane, Suite 150
Powell, OH 43065
Telephone: (614) 763-2316
Facsimile: (614) 467-3704
dmansfield@lmng-law.com

*Attorneys for Defendant Dennis M. Chack*

*/s/ Albert G. Lin*

EXHIBIT 9

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| IN RE FIRSTENERGY CORP. SECURITIES LITIGATION, | Case No. 2:20-cv-03785-ALM-KAJ |
| This document relates to: | <u>CLASS ACTION</u> |
| ALL ACTIONS. | Judge Algenon L. Marbley<br>Magistrate Judge Kimberly A. Jolson |

## <u>MICHAEL J. DOWLING'S RESPONSES AND OBJECTIONS TO LEAD PLAINTIFF'S FIRST REQUEST FOR DOCUMENTS TO ALL DEFENDANTS</u>

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Defendant Michael J. Dowling ("Dowling") submits his Responses and Objections to Lead Plaintiff's First Request for Production of Documents Directed to All Defendants ("Requests").

## <u>GENERAL OBJECTIONS</u>

Dowling's General Objections apply to Lead Plaintiff's Requests and are incorporated by reference into each of Dowling's specific Responses and Objections set forth below. These General Objections form a part of the response to each Request and are set forth here to avoid repetition. The absence of a reference to an applicable General Objection should not be construed as a waiver of the objection as to a specific Request.

1. Dowling objects to the Requests to the extent they seek documents outside the scope set forth in the Court's Opinion and Order (Doc. No. 175).

2. Dowling's responses are based on his present knowledge, information, and belief. Dowling reserves the right to amend, revise, correct, supplement, or clarify any of the responses herein.

3. By providing responses to the Requests, Dowling does not concede that any information

contained herein or any document produced is relevant, material, discoverable, or admissible into evidence.

4.     By providing responses to the Requests, Dowling does not concede that documents responsive to any Request exist.

5.     Dowling objects to the extent Plaintiffs request that Dowling produce documents prior to an agreement among the parties as to an ESI protocol and confidential protective order. Dowling's commitment to produce documents means that he will produce available, non-privileged, non-duplicative, responsive documents subject to an ESI protocol and a confidential protective order.

6.     Dowling objects to the extent Plaintiffs request that Dowling immediately produce documents with service of his Responses, as it is inconsistent with the Court's Opinion and Order (Doc. No. 175). Dowling will produce documents consistent with production timelines agreed upon by the parties.

7.     Dowling objects to the Requests, including the instructions and definitions, are vague, unduly burdensome, and to the extent they impose requirements, obligations, and duties beyond those imposed by the Federal Rules of Civil Procedure, the Local Rules, the Court's rules, or any case management or scheduling order entered by the Court. Dowling responds consistent with his objection to scope, the Federal Rules of Civil Procedure, any applicable rules, any scheduling or case-management orders entered by the Court, and any procedures outlined in an agreed upon ESI protocol.

8.     Dowling objects to the Requests, including the instructions and definitions contained therein, to the extent they seek discovery of matters protected from disclosure by the attorney-client privilege, the attorney-work product doctrine, common interest privilege, or any other applicable privilege or protection. Dowling's responses are not intended to be, and should not in

any way be deemed to be, a waiver of any such privilege or protection. Any inadvertent production of documents or information that is protected or privileged from discovery does not constitute a waiver or other basis for objecting to the production of such material or its subject matters. Dowling expressly reserves the right to seek return of such documents and information or to object to the use or introduction of such documents or information.

9.     Dowling objects to the Requests on the ground that they seek confidential, non-public, or proprietary information, information of a personal nature, information that is highly confidential, proprietary, or otherwise commercially sensitive information, or trade secrets.

10.     Dowling objects to the Requests, including the instructions and definitions contained therein, to the extent they are overly broad, unduly burdensome, premature, and/or seek information beyond the scope of discovery under the applicable rules.

11.     Dowling objects to the extent the Requests seeks documents and information concerning settlement communications that are protected from identification or disclosure by Fed. R. Evid. 408 and 410. *See Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.*, 332 F.3d 976 (6th Cir. 2003).

12.     Dowling objects to the Requests to the extent they are unreasonably cumulative and/or duplicative of each other, or duplicative of requests that are more properly directed to the documents, information, and data in the possession, custody, or control of other parties.

13.     Dowling objects to the Requests to the extent they seek documents not relevant to claims and/or defenses at issue in the instant litigation and are disproportional to the needs of this case.

14.     Dowling objects to the Requests, including the instructions and definitions contained therein, to the extent they are vague, ambiguous, use undefined terms, or otherwise fail to specify with sufficient particularity the nature of the documents or information sought.

15.     Dowling objects to these Requests to the extent they seek public records equally available to Plaintiffs. Further, Dowling objects to the Requests to the extent the documents sought are within the possession of third parties equally available to Plaintiffs.

16.     Dowling objects to the Requests to the extent the Requests seek documents outside his possession, custody, or control.

17.     Dowling objects to the extent the Requests define terms or characterize the evidence in this case. To the extent Dowling uses any terms used by Plaintiffs in the Requests, such use is specifically limited solely to these responses and shall not be construed in any way as an admission that such terms are correct or proper.

18.     Dowling's Reponses do not constitute admissions or acknowledgements that any information sought is within the scope of discovery. Dowling makes these Responses without waving his right to object to the admissibility of any documents produced or to object to discovery related subject matters encompassed within the Requests.

Subject to and without waiving these General Objections, and specifically incorporating each General Objection above into each response below, Dowling submits the following Responses and Objections to Lead Plaintiff's Requests.

## DOCUMENTS REQUESTED

## REQUEST FOR DOCUMENT PRODUCTION NO. 1

All documents produced, provided or received by any of the Defendants in the course of litigation against FirstEnergy arising out of the HB6 bribery scheme, including any deposition testimony.

## RESPONSE:

**In addition to his General Objections, Dowling objects to this Request to the extent it**

seeks documents that are outside of his possession, custody, or control. Dowling objects to the Request to the extent it seek documents outside the scope set forth in the Court's Opinion and Order (Doc. No. 175). Dowling also objects to the extent the Request seeks documents protected from disclosure by the attorney-client privilege, the attorney-work product doctrine, or any other applicable privilege or protection. Dowling further objects on the ground that the Request is vague, ambiguous, and overly broad as to the undefined phrase "arising out of the HB6 bribery scheme", and it is vague and ambiguous as to the phrase "produced, provided or received." Subject to and without waiving these objections, Dowling will produce any available non-privileged, non-duplicative, responsive documents in his possession, custody, or control, consistent with the timing and procedures outlined in an agreed upon ESI protocol, confidential protective order, and any scheduling order entered by the Court.

## REQUEST FOR DOCUMENT PRODUCTION NO. 2

All documents that the Defendants have produced or provided to, or received from, any regulatory or government agency, federal or state law enforcement agency, or legislative body or representative in connection with the HB6 bribery scheme, including any deposition testimony.

## RESPONSE:

In addition to his General Objections, Dowling objects to this Request to the extent it seeks documents that are outside of his possession, custody, or control. Dowling objects to the Request to the extent it seek documents outside the scope set forth in the Court's Opinion and Order (Doc. No. 175). Dowling also objects to the extent it seeks documents protected from disclosure by the attorney-client privilege, the attorney-work product doctrine, or any other applicable privilege or protection. Dowling further objects on the ground that the

**Request is vague, ambiguous, and overly broad as to the undefined phrase "in connection with the HB6 bribery scheme", and it is vague and ambiguous as to the phrase "produced or provided to, or received." Subject to and without waiving these objections, Dowling will produce any available non-privileged, non-duplicative, responsive documents in his possession, custody, or control, consistent with the timing and procedures outlined in an agreed upon ESI protocol, confidential protective order, and any scheduling order entered by the Court.**

DATED: July 20, 2021                    Respectfully submitted,

*/s/ John F. McCaffrey*
John F. McCaffrey (0039486)
John A. Favret (0080427)
TUCKER ELLIS LLP
950 Main Avenue - Suite 1100
Cleveland, OH 44113
Tel:        216.592.5000
Fax:       216.592.5009
E-mail:   john.mccaffrey@tuckerellis.com
              john.favret@tuckerellis.com

*Attorneys for Defendant Michael J. Dowling*

## CERTIFICATE OF SERVICE

The undersigned certifies that on July 20, 2021 the foregoing Michael J. Dowling's Responses and Objections to Lead Plaintiff's First Request for Production of Documents was served by e-mail on counsel of record for the parties.

*/s/ John F. McCaffrey*
*One of the Attorneys for Defendant Michael*
*J. Dowling*

# EXHIBIT 10

# BakerHostetler

Baker & Hostetler LLP

Key Tower
127 Public Square, Suite 2000
Cleveland, OH 44114-1214

T 216.621.0200
F 216.696.0740
www.bakerlaw.com

Rachael L. Israel
direct dial: 216.861.7014
risrael@bakerlaw.com

May 31, 2022

**VIA E-MAIL (DAVIDM@RGRDLAW.COM)**

David W. Mitchell
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA 92101

> Re: *In re FirstEnergy Corp Securties Litigation*, No. 2:20-cv-03785 (SD Ohio)
> Defendant Jones' Responses to Lead Plaintiff's Document Requests

Dear David:

I am writing in response to your May 20, 2022 letter regarding our meet and confer call on May 18, 2022. Please see below our responses to your letter, which I have organized under the same topic headings.

### Contours of Mr. Jones' Search

In the derivative cases, Mr. Jones searched for and produced responsive documents from his primary personal iPhone, his primary personal iPad, both of his Gmail accounts and his hard copy files. All of the documents Mr. Jones produced in the derivative cases and provided to the SEC were reproduced to you in Production Volume Jones_Securities Litigation_VOL001 on March 28, 2022.[1]

During our May 18 call, you inquired about which of Mr. Jones' other devices and accounts have been collected, searched and produced to date. To that end, please refer to the enclosed *Exhibit A*, which contains our current understanding of Mr. Jones' phone numbers, accounts and devices, and the production status of each.

---

[1] This volume includes materials bates labeled Jones_Securities Litigation 000001 - Jones_Securities Litigation 003685.

May 31, 2022
Page 2

      In an email on May 18, 2022, you shared numbers from the Derivative Plaintiff's Text Message Protocol, which was prepared by Counsel for Lead Derivative Plaintiffs. There is a significant factual error in that Protocol – it incorrectly associates the number 330-285-4513 with both Mr. Jones and Juan Cespedes. The 330-285-4513 number was associated with a FirstEnergy cell phone used by Mr. Jones before October 29, 2020. To our knowledge, this number has never been associated with Mr. Cespedes. After October 29, 2020, Mr. Jones returned this device to the company and has not since used this number. *See Exhibit A*.

      FirstEnergy has custody and control of the materials associated with Mr. Jones' FirstEnergy email account. Based on our review of FirstEnergy's productions in this case and other cases, we can confirm that FirstEnergy has produced emails from the account used by Mr. Jones while he was employed by the company.

### Spoliation

      In the derivative cases, Mr. Jones produced a call log from his personal Verizon account statements for his personal cell phone[2] and a log of text messages from the same.[3] While these materials came from Mr. Jones' personal Verizon account, the material we referenced in the call was not produced by Verizon. Following the discovery of the auto-delete setting on Mr. Jones' personal, post-termination cell phone, Mr. Jones' counsel, in consultation with Derivative Plaintiffs' Counsel and with the assistance of Interhack, collected data from a number of additional personal devices used by Mr. Jones after his termination in an attempt to recover and/or cross-reference the data from his personal cell phone. *See Exhibit A* for the details of these devices.

      From this process, counsel identified data related to three text message conversation threads[4] with two individuals identified in the Derivative Text Message Protocol – Mr. Dowling and Mr. Smart. Mr. Jones' messages with Mr. Dowling have been produced by Mr. Dowling. *See* DOWLING0000199, DOWLING0000203. The recovery process recovered the substance of one message with Mr. Smart and data related to a second message with Mr. Smart but not any substantive message content. While we do not believe that these messages contain responsive information, we will produce the available data and substance of these messages to you. In addition, after a search protocol has been agreed upon in this case, Mr. Jones will produce any responsive, non-privileged materials from this text message data.

---

[2] *See* Jones_Securities Litigation 002055, 002081, 002107, 002130, 002155, 002182, 002209, 002235, 002261, 002288, 002312, 002338, 002365, and 002392.

[3] *See* Jones_Securities Litigation 002421.

[4] Mr. Dowling has produced the conversation as two different threads, but the substance of the post-termination messages, dated January 14, 2021, is the same.

May 31, 2022
Page 3

### Derivative Counsel Communications – Regarding Spoliation

The requested correspondence is attached as *Exhibit B* to this letter.

### Privilege Log

Mr. Jones' privilege log from the derivative cases is attached as *Exhibit C* to this letter.

### Depositions of Mr. Jones

Mr. Jones was not deposed or interviewed in the derivative cases. We will neither confirm nor deny whether Mr. Jones has been interviewed or deposed by any regulatory or governmental authority. Without confirming or denying whether such interviews or depositions have taken place, we note there are no written transcripts to produce.

### Request Nos. 1 & 2

We will produce to Lead Plaintiff any additional documents received from or provided to the government under our continuing discovery obligations in this case.

### Additional Devices

Between July 2020 and October 29, 2020, when he was employed by FirstEnergy, Mr. Jones did not obtain an additional cell phone beyond those identified in the attached *Exhibit A*.

### General Objection No. 3

We agree that the Relevant Time Period shall be February 1, 2017 – June 20, 2021.

### General Objection No. 17

Your summary regarding General Objection No. 17 is correct.

### RFP No. 8

Your summary regarding RFP No. 8 is correct.

### RFP No. 61

Your summary regarding RFP No. 61 is correct.

### RFP No. 74

We are not aware of any materials referenced in Mr. Jones' initial disclosure that have been withheld. Mr. Jones will produce any documents identified in his initial disclosures, to the extent that they have not already been produced. Mr. Jones reserves his right to supplement this response to include any other documents or categories of documents or data identified during

May 31, 2022
Page 4

investigation or during the course of discovery that contain information that he may use to support his defenses in this action.

### RFP No. 78

Your summary regarding RFP No. 78 is correct.

### Termination Documents

Subject to and without waiving any objections in Mr. Jones' responses to your requests for production, Mr. Jones has produced and/or will produce reasonably available non-privileged, non-duplicative, responsive documents in his possession, custody or control concerning FirstEnergy's termination of Mr. Jones's employment on October 29, 2020, if any.

Please let me know if you would like to further discuss any of the matters covered in this letter.

Very truly yours,

Rachael L. Israel

Enclosures

EXHIBIT 11

**State of Ohio v. Michael J. Dowling (CR-2024-02-0473-B)**
**Discovery Material**

April 1, 2024 – Response to Defendant's Request for Discovery
- Crim.R.16(B)(1) – Statement of the Defendant and Co-Defendants
  - o  Written statement of defendant Michael J. Dowling
    - ▪ Defendant/Suspect Statement - M. Dowling - 10.19.2023 Transcript
      - • Delivered to Defense Attorney via web portal
    - ▪ Defendant/Suspect Statement - M. Dowling - 10.20.2023 Transcript
      - • Delivered to Defense Attorney via web portal
    - ▪ None
  - o  Oral statement of defendant Michael J. Dowling
    - ▪ None
  - o  Police summary of statements of defendant Michael J. Dowling
    - ▪ Any summaries will be provided
  - o  Grand Jury testimony of defendant Michael J. Dowling
    - ▪ None

- Crim.R.16(B)(2) – Criminal Records of the Defendant, Co-Defendants, and Witnesses
  - o  Criminal record of defendant Michael J. Dowling
    - ▪ None known at this time

- Crim.R.16(B)(5) – Evidence Favorable to Defendant
  - o  Potentially Exculpatory Evidence:
    - ▪ None known at this time

- Crim.R.16(B)(1)-(7); Crim.R.16(K)
  - o  The following documents were delivered to the defense:
    - ▪ 1. Investigative Report - 2024-01-16_Anderson, Dave Interview
    - ▪ 2. Investigative Report - 2024-01-25_Housley, Kristina Interview
    - ▪ 3. Investigative Report - 2024-02-07_Ebony Yeboah-Amankwah[1]
    - ▪ 4. Other Document - Debbie Ryan Proffer 1.24.2024
    - ▪ 5. Other Document - Ebony Yeboah-Amankwah Proffer 2.5.2024
    - ▪ 6. Other Document - Jason Lisowski Proffer Agreement (Executed)
    - ▪ 7. Other Document - Jason Rafeld Proffer Letter 1.16.2024
    - ▪ 8. Other Document - Jonathon McGee Proffer Letter 12.4.2023
    - ▪ 9. Other Document - Pat Tully Proffer Letter 12.4.2023
    - ▪ 10. Audio Recorded Statement - 2023-09-06 Hadden, J.B. Interview
    - ▪ 11. Audio Recorded Statement - 2023-09-18 Cupp, Robert Interview
    - ▪ 12. Audio Recorded Statement - 2023-11-30 Haque, Asim Interview
    - ▪ 13. Audio Recorded Statement - 2023-12-01 Brakey, Matt Interview
    - ▪ 14. Audio Recorded Statement - 2023-12-04 Tully, Pat Interview

---

[1]  The highlighted individuals are witnesses that Jones and Dowling have subpoenaed for depositions.

- 15. Audio Recorded Statement - 2023-12-2023 Christopher, Mahila Interview Part 1
- 16. Audio Recorded Statement - 2023-12-2023 Christopher, Mahila Interview Part 2
- 17. Audio Recorded Statement - 2024-01-08 Pritchard, Matt Part 1
- 18. Audio Recorded Statement - 2024-01-08 Pritchard, Matt Part 2
- 19. Audio Recorded Statement - 2024-01-11 <mark>Brakey, Matt</mark> Interview Part 1
- 20. Audio Recorded Statement - 2024-01-11 <mark>Brakey, Matt</mark> Interview Part 2
- 21. Audio Recorded Statement - 2024-01-12 Elisar, Scott Interview
- 22. Audio Recorded Statement - 2024-01-16 Anderson, Dave Interview
- 23. Audio Recorded Statement - 2024-01-16 DeAngelo, James Interview
- 24. Audio Recorded Statement - 2024-01-16 O'Donnell Jr., Terrence Interview
- 25. Audio Recorded Statement - 2024-01-16 Rafeld, Jason Interview
- 26. Audio Recorded Statement - 2024-01-18 Bojko, Kimberly Interview
- 27. Audio Recorded Statement - 2024-01-19 <mark>Bingaman, Brad</mark> Interview
- 28. Audio Recorded Statement - 2024-01-25 Corrigan Kimberly Interview
- 29. Audio Recorded Statement - 2024-01-25 Housley Kristina Interview
- 30. Audio Recorded Statement - 2024-01-29 Petricoff Howard Interview
- 31. Audio Recorded Statement - 2024-02-01 Chack, Dennis Interview
- 32. Audio Recorded Statement - 2024-02-06 Dawson, Michael Interview
- 33. Audio Recorded Statement - Debbie Ryan Interview 1.24.2023
- 34. Audio Recorded Statement - Gene Pierce Interview 11.1.2023
- 35. Audio Recorded Statement - Howard Petricoff Interview 10.27.2023
- 36. Audio Recorded Statement - Jason Lisowski Audio Interview 2.5.2024
- 37. Audio Recorded Statement - Jonathon McGee audio interview 12.4.2023
- 38. Audio Recorded Statement - Jonathon McGee subpoena service 10.31.2023
- 39. Audio Recorded Statement - <mark>Josh Rubin</mark> Audio Interview 1.5.2024
- 40. Audio Recorded Statement - Kevin Murray Audio Interview
- 41. Audio Recorded Statement - Mark Coffey Follow Up 1.22.2024
- 42. Audio Recorded Statement - Mark Coffey Summit Financial 1.17.2024 1
- 43. Audio Recorded Statement - Mark Coffey Summit Financial 1.17.2024 2
- 44. Audio Recorded Statement - Ohio Ethics Commission 1.17.2024
- 45. Audio Recorded Statement - Tim Mott Interview 11-27-2023
- 46. Investigative Report - 2024-01-17_ Ethics Commission Meeting, Subpoena, & Response
- 47. Audio Recorded Statement - 2023-08-10 Greenspan, Dave Interview
- 48. Audio Recorded Statement - 2023-08-22 Carfagna, Enrico Interview
- 49. Investigative Report - 2023-08-10 Greenspan, David Interview
- 50. Investigative Report - 2023-08-22 Carfagna, Enrico Interview

- 51. Investigative Report - 2023-09-18 Cupp, Robert Interview
- 52. Investigative Report - 2023-10-27 Howard Petricoff Interview
- 53. Investigative Report - 2023-11-27 Timothy Mott Interview
- 54. Investigative Report - 2023-12-04 Jonathon McGee Interview
- 55. Investigative Report - 2024-01-25 Corrigan, Kim Interview
- 56. Investigative Report - 2024-02-01 Chack, Dennis Interview
- 57. Investigative Report - 2024-02-06 Dawson, Michael Interview
- 58. Audio Recorded Statement - Dan Conway Interview 1 3.4.2024
- 59. Subpoena - 2024-02-21_ Renee Rambo and Anthony Smith Subpoena Service
- 60. Audio Recorded Statement - Dan Conway Interview 3 3.4.2024
- 61. Investigative Report - 2024-01-19 ==Bingaman, Bradley== Interview
- 62. Audio Recorded Statement - Dan Conway Interview 2 3.4.2024
- 63. Investigative Report - 2023-06-26 Tyron Pine Subpoena Service
- 64. Investigative Report - 2024-02-09_ Attempt to Serve; Samuel Randazzo
- 65. Investigative Report - 2024-02-09_ Attempt to Serve; Charles Jones
- 66. Investigative Report - 2024-02-09 Attempt to Serve Dowling
- 67. Investigative Report - 2024-01-18_ McNees Wallance & Nurick Subpoena Response
- 68. Investigative Report - 2024-01-18_ Kevin Murray Subpoena Service
- 69. Investigative Report - 2024-01-17_ Ethics Commission Meeting, Subpoena, & Response
- 70. Investigative Report - 2024-01-12_ Debbie Ryan Subpoena Service
- 71. Investigative Report - 2024-01-11_ Sam Randazzo Subpoena 3 Response
- 72. Investigative Report - 2024-01-10_ Mark Coffey Subpoena Service
- 73. Investigative Report - 2024-01-10_ Laurel Dawson Subpoena Service
- 74. Investigative Report - 2024-01-10_ Fidelity Investments Subpoena Service
- 75. Investigative Report - 2024-01-10_ Charles Schwab Subpoena Service
- 76. Investigative Report - 2024-01-09_ James DeAngelo Esq. Subpoena Service
- 77. Investigative Report - 2024-01-03_ Subpoena Service to McNees Firm
- 78. Investigative Report - 2024-01-02 Summit Financial Subpoena Service and Response
- 79. Investigative Report - 2023-12-21_ Sam Randazzo Subpoena 2 Response
- 80. Investigative Report - 2023-12-15 Randazzo, Samuel Subpoena Service
- 81. Investigative Report - 2023-12-12 Mahila Christopher Subpoena Service
- 82. Investigative Report - 2023-12-11 ==Joshua Rubin== Subpoena Service
- 83. Investigative Report - 2023-12-07 Timothy Mott Subpoena Service for Records
- 84. Investigative Report - 2023-11-20 Tim Mott Subpoena Service

- 85. Investigative Report - 2023-11-20 Patrick Tully Subpoena Service
- 86. Investigative Report - 2023-11-20 Matthew Pritchard Subpoena Service
- 87. Investigative Report - 2023-11-20 Debbie Ryan Subpoena Service
- 88. Investigative Report - 2023-10-31 Jonathon McGee Subpoena Service
- 89. Investigative Report - 2023-09-20 Inspector General Correspondence
- 90. Investigative Report - 2023-08-16 Householder and Borges Sentencing Transcripts
- 91. Investigative Report - 2023-08-15 Sam Randazzo Subpoena Service
- 92. Investigative Report - 2023-08-12 Sam Randazzo Subpoena Service for Records
- 93. Investigative Report - 2023-08-10 Calfee, Halter & Griswold Subpoena & Response
- 94. Investigative Report - 2023-08-04 Michael VanBuren Subpoena Service
- 95. Investigative Report - 2023-07-19 First Energy Records Received
- 96. Investigative Report - 2023-06-29_ FirstEnergy Corp Subpoena Served
- 97. Investigative Report - 2023-06-28_ Mikkelsen, Eileen Subpoena Served
- 98. Investigative Report - 2023-06-27_ Yeboah-Amankwah, Ebony Subpoena Served
- 99. Investigative Report - 2023-06-27_ Vespoli, Leila Subpoena Served
- 100. Investigative Report - 2023-06-27_ Bailey, Joel Subpoena Served
- 101. Investigative Report - 2023-05-18 Subpoena Service_ PNC, HNB, 5_3, and JP Morgan Chase
- 102. Email Copy - RE_ Eileen Mikkelson Subpoena (Declining to Appear for Voluntary Interview)
- 103. Court Filing - PUCO - OCC Set 17-INT-001-027 and 028-039
- 104. Court Filing - PUCO - OCC 1st Set Disc. Req. - 3rd Supp. Stip. - FE 14-1297-ELSSO - Final 12.2.15c
- 105. Transcript - Combined Transcript, USA v. Householder et al.
- 106. Court Filing - Federal Government Exhibit 204E, USA v. Householder et al., Larry Householder Calendar
- 107. Court Filing - Federal Government Exhibit 431G, USA v. Householder et al., 3-16-19 Email Kiani to Griffing re Prep for Tuesday Meeting
- 108. Curriculum Vitae - C. Beckett- CV
- 109. Expert Report - Courtney Beckett Analysis; AEP Settlement Funds
- 110. Expert Report - Courtney Beckett Analysis; Industrial Energy Users-Ohio Chase Acct 0785
- 111. Expert Report - Courtney Beckett Analysis; Industrial Energy Users-Ohio Chase Acct 3571
- 112. Expert Report - Courtney Beckett Analysis; Industrial Energy Users-Ohio Chase Acct 7715

- ▪ 113. Expert Report - Courtney Beckett Analysis; Industrial Energy Users-Ohio Chase Acct 8267
- ▪ 114. Expert Report - Courtney Beckett Analysis; Bank Records Involved_Randazzo
- ▪ 115. Expert Report - Courtney Beckett Analysis; FE Payments Summary to Randazzo Accts
- ▪ 116. Expert Report - Courtney Beckett Analysis; IEU-Ohio Admin Company LLC Chase Bank x0798 - 2016-2020
- ▪ 117. Expert Report - Courtney Beckett Analysis; Randazzo Personal-Chase Bank 4786
- ▪ 118. Expert Report - Courtney Beckett Analysis; SFA of Ohio- Chase Bank 9838 - 2016-2020
- ▪ 119. Audio Recorded Statement - 2023-09-19 Gray, Bryan Interview
- ▪ 120. Investigative Report - 2023-09-19 Gray, Bryan Interview
- ▪ 121. Audio Recorded Statement - 2024-03-22 Willis Maureen Interview – Audio Interview (Case Documents) (1010050)
- ▪ 122. Audio Recorded Statement - 2024-03-13 Rambo, Renee Interview – Audio Interview (Case Documents) (1006028)

April 11, 2024 – Supplemental Response to Request for Discovery
- • Crim.R.16(B)(1)-(7); Crim.R.16(K)
  - ○ The following documents were delivered to the defense:
    - ▪ 1. Investigative Report - Matter 2023-1173 2024-02-06 Dawson, Michael Interview - Investigative Report (Reports) (991023)
    - ▪ 2. Audio Recorded Statement - Matter 2023-1173 2024-02-06 Dawson, Michael Interview - Audio Interview (Case Documents) (990493)
    - ▪ 3. Investigative Report - Matter 2023-1173 2024-02-01_ Chack, Dennis Interview - Investigative Report (Reports) (991033)
    - ▪ 4. Audio Recorded Statement - Matter 2023-1173 2024-02-01 Chack, Dennis Interview - Audio Interview (Case Documents) (990867)
    - ▪ 5. 2023-11-30 Asim Haque Interview Transcript - Transcripts (Case Documents) (960648) * * * NOT VERBATIM, CONTAINS ERRORS * *
    - ▪ 6. Audio Recorded Statement - 2024-01-11 <mark>Brakey, Matt</mark> Interview Part 1
    - ▪ 7. Transcript - <mark>Reffner, Robert</mark> Interview Part 4, Transcript_for_Axon_Capture_Audio_2024-04-05_120444_333.m4a * * * NOT VERBATIIM * * *
    - ▪ 8. Transcript - <mark>Reffner, Robert</mark> Interview Part 3, Transcript_for_Axon_Capture_Audio_2024-04-05_112824_333.m4a * * * NOT VERBATIIM * * *
    - ▪ 9. Transcript - <mark>Reffner, Robert</mark> Interview Part 2, Transcript_for_Axon_Capture_Audio_2024-04-05_103732_333.m4a* * * NOT VERBATIIM * * *
    - ▪ 10. Transcript - <mark>Reffner, Robert</mark> Interview Part 1, Transcript_for_Axon_Capture_Audio_2024-04-05_101820_333.m4a* * * NOT VERBATIIM * * *

- 11. Audio Recorded Statement - Reffner, Robert Interview Part 3, Axon_Capture_Audio_2024-04-05_112824_333
- 12. Audio Recorded Statement - Reffner, Robert Interview Part 4, Axon_Capture_Audio_2024-04-05_120444_333
- 13. Audio Recorded Statement - Reffner, Robert Interview Part 2, Axon_Capture_Audio_2024-04-05_103732_333
- 14. Audio Recorded Statement - Reffner, Robert Interview Part 1, Axon_Capture_Audio_2024-04-05_101820_333
- 15. Audio Recorded Statement - 2024-03-21 DeMarco, Paul Interview – Audio Interview (Case Documents) (1006030)
- 16. Audio Recorded Statement - 2024-03-08 Trombold M Beth Interview Part 2 - Audio Interview
- 17. Audio Recorded Statement - 2024-03-08 Trombold M Beth Interview Part 1 - Audio Interview (Case Documents) (1011002)
- 18. Audio Recorded Statement - 2024-03-08 Fleck Kathie Interview Part 1 – Audio Interview (Case Documents) (1011004)
- 19. Audio Recorded Statement - 2024-03-08 Fleck Kathie Interview Part 2 – Audio Interview
- 20. Transcript - Debbie Ryan_Interview Transcription 1.24.2024
- 21. Correspondence - Chack -OH AG NPA
- 22. Audio Recorded Statement - 2024-03-06 Deters Dennis Interview - Audio Interview (Case Documents) (1017681)
- 23. Audio Recorded Statement - 2024-03-04 Conway Dan Interview - Audio Interview (Case Documents) (1017647)
- 24. Audio Recorded Statement - 2024-03-06 Friedman Larry Interview – Audio Interview (Case Documents) (1017672)
- 25. Court Filing - Pine Immunity

April 18, 2024 – Supplemental Response to Request for Discovery
- Crim.R.16(B)(1)-(7); Crim.R.16(K)
  - The following documents were delivered to the defense:
    - 1. Correspondence - Reffner Proffer Letter 4.5.2024
    - 2. Evidence List - Documents from Robert Reffner Interview 4.5.2024
    - 3. Evidence List - Chack Documents
    - 4. Email Copy - RE_ Subpoena for Ebony Yeboah-Amankwah
    - 5. Email Attachment - Yeboah Documents
    - 6. Email Attachment - Yeboah – Draft OH AG NPA
    - 7. Email Copy - RE_ Interviews
    - 8. Email Attachment - PUCO Commissioner Documents
    - 9. Email Copy - Pine Documents
    - 10. Email Attachment - Pine Documents (2)
    - 11. Email Copy - Lisowski Documents
    - 12. Email Attachment - Jason Lisowski Proffer Agreement
    - 13. Email Attachment - Lisowski
    - 14. Email Copy - Documents for follow up with Matt Brakey
    - 15. Email Attachment - 2015 Workpapers (2)

- ▪ 16. Email Attachment - 2017 WPs - not used (2)
- ▪ 17. Email Attachment - 2018 AJE Workpapers (2)
- ▪ 18. Email Copy - Elisar Documents
- ▪ 19. Email Attachment - Elisar Documents (2)
- ▪ 20. Email Copy - RE_ Documents for follow up with <mark>Matt Brakey</mark>
- ▪ 21. Financial Records - File Memo - Meeting 08 15 2016
- ▪ 22. Email Copy - RE_ PUCO interviews
- ▪ 23. Email Attachment - Mahila Christopher Docs
- ▪ 24. Email Copy - RE_ PUCO interviews (2)
- ▪ 25. Email Attachment - Audit of the Legacy Generation Resource Rider of AEP
- ▪ 26. Email Copy - RE_ PUCO interviews (3)
- ▪ 27. Email Attachment - 8-21-23 Audit Report
- ▪ 28. Expert Report - 2024-04-15 - LT Matthew Meyer re Report of G. Jonson
- ▪ 29. Curriculum Vitae - G Jonson CV - 2024
- ▪ 30. Evidence List - <mark>Bingaman</mark> Documents
- ▪ 31. Correspondence - <mark>Brad Bingaman</mark> Proffer Agreement-Version 2
- ▪ 32. Bank Records - SB1447888-F2 Extension Letter (2)
- ▪ 33. Bank Records - SB1447888-F25_SCD_1 (1) IEU OH ADMIN
- ▪ 34. Correspondence - FirstEnergy Document Requests

May 17, 2024 – Supplemental Response to Request for Discovery
- • Crim.R.16(B)(1)-(7); Crim.R.16(K)
  - ○ The following documents were delivered to the defense:
    - ▪ 1. Order - PUCO 502(D) ORDER
    - ▪ 2. Correspondence - RE_ Documents for follow up with <mark>Matt Brakey</mark> (2)
    - ▪ 3. Other Document - IEU1 Brochure
    - ▪ 4. Other Document - IEU-Ohio Brocure EX100017083.pdf.pdf
    - ▪ 5. Other Document - IEU2 Brochure
    - ▪ 6. Correspondence - RE_ Request for limited waiver
    - ▪ 7. Investigative Report - 2024-01-11 <mark>Brakey, Mathew</mark> Interview
    - ▪ 8. Investigative Report - 2024-01-02 Mark Coffey Follow-Up Interview
    - ▪ 9. Investigative Report - 2024-01-17 Summit Financial Interview; Mark Coffey
    - ▪ 10. Investigative Report - 2024-03-04 Conway, Daniel Interview
    - ▪ 11. Investigative Report - 2024-01-12 Elisar, Scott Interview
    - ▪ 12. Investigative Report - 2024-03-08 Interview with Katherine Fleck
    - ▪ 13. Investigative Report - 2024-03-06 Larry Friedeman Interview
    - ▪ 14. Investigative Report - 2023-09-06 James JB Hadden Interview
    - ▪ 15. Investigative Report - 2024-02-05 Jason Lisowski Interview
    - ▪ 16. Investigative Report - 2023-11-01 Gene Pierce Interview
    - ▪ 17. Investigative Report - Ty Pine Atty Communication
    - ▪ 18. Investigative Report - 2024-01-16 Jason Rafeld Interview
    - ▪ 19. Investigative Report - 2024-01-05 <mark>Josh Rubin</mark> Interview
    - ▪ 20. Investigative Report - 2024-03-08 M. Beth Trombold Interview

- 21. Investigative Report - 2024-03-04 Maureen Willis Subpoena Interview
- 22. Investigative Report - Maureen Willis communication
- 23. Email Attachment - OCIC 003-4 * * * Designated Confidential Pursuant to Protective Order and Subject to Evid. R. 502(D) Order * * *
- 24. Audio Recorded Statement - 5.17.2024 Greg Price PUCO Interview 2 * * * Designated Confidential Pursuant to Protective Order and Subject to Evid. R. 502 (D) Order * * *
- 25. Audio Recorded Statement - 5.17.2024 Greg Price PUCO Interview 1 * * * Designated Confidential Pursuant to Protective Order and Subject to Evid. R. 502 (D) Order * * *
- 26. Email Attachment - OCIC 001-2 * * * Designated Confidential Pursuant to Protective Order and Subject to Evid. R. 502(D) Order * * *
- 27. Email Copy - RE_ Subpoena
- 28. Email Attachment - Questions for Maureen Willis.3.5.2024

June 17, 2024 – Supplemental Response to Request for Discovery
- Crim.R.16(B)(1)-(7); Crim.R.16(K)
  - The following documents were delivered to the defense:
    - 1. Subpoena Response - FE_OCIC_Privilege Update_PROD01
    - 2. Email Attachment - FirstEnergy - OCIC - Privilege Log (2024.06.06)
    - 3. Correspondence - FirstEnergy Subpoena (PDF COPY)
    - 4. Email Copy - 2024.06.06 Letter to OCIC
    - 5. Correspondence - FirstEnergy Subpoena (3)
    - 6. Correspondence - Signed <mark>Reffner</mark> Proffer Letter 4.5.2024
    - 7. Correspondence - IEU_OELC
    - 8. Correspondence - 2021-08-26 Ohio Inspector General Complaint
    - 9. Investigative Report - 2024-01-18 Bojko, Kimberly Interview
    - 10. Investigative Report - 2024-05-23 Daniel, Matthew Interview
    - 11. Audio Recorded Statement - 2024-05-30 Stover Tiffany Interview
    - 12. Audio Recorded Statement - 2024-05-23 Daniel Matthew Interview
    - 13. Audio Recorded Statement - 2023-10-24 Weinstein Casey Interview
    - 14. Investigative Report - 2023-10-24 Weinstein, Casey Interview
    - 15. Email Copy - RE_ Scott Elisar

June 18, 2024 – Defendant Michael J. Dowling's Response to the State of Ohio's Request for Discovery
- A. Crim.R. 16(H)(1) – laboratory or hospital reports, books, papers, documents, photographs, tangible objects, buildings or places
  - Mr. Dowling has no such materials in his possession or reasonably available to him.
- B. Crim.R. 16(H)(2) – results of physical or mental examinations, experiments or scientific tests
  - Mr. Dowling has no such materials in his possession or reasonably available to him.
- C. Crim.R. 16(H)(3) – evidence that tends to negate the guilt of Mr. Dowling, is material to punishment, or tends to support an alibi

- o Mr. Dowling has produced and will produce material responsive to this request. Additionally, Mr. Dowling reserves the right to supplement this discovery response.
- D. Crim.R. 16(H)(4) – investigative reports
  - o Mr. Dowling has no such materials in his possession or reasonably available to him.
- E. Crim.R. 16(H)(5) – written or recorded statement by a witness in Mr. Dowling's case-in-chief or any witness that he reasonably anticipates calling as a witness in surrebuttal
  - o Mr. Dowling has in his possession or reasonably available to him several deposition transcripts reflecting the recorded statements of witnesses identified pursuant to Crim.R. 16(I). Mr. Dowling reserves the right to supplement this discovery response.
  - o Mr. Dowling will produce the deposition transcripts of
    - ▪ <mark>Ebony Yeboah-Amankwah</mark>, July 21, 2022, In the matter of The Ohio Edison Company, The Cleveland Electric Illuminating Company, and The Toledo Edison Company's Compliance with R.C. 4928.17, and the Ohio Administrative Code Chapter 4901:1-37, Case No. 17-974-EL-UNC
    - ▪ <mark>Brad Bingaman</mark>, March 13, 2023, In the Matter of FirstEnergy Corp., SEC File No. C-08716-A

July 16, 2024 – Supplemental Response to Request for Discovery
- Crim.R.16(B)(1)-(7); Crim.R.16(K)
  - o The following documents were delivered to the defense:
    - ▪ 1. Other Document - Documents obtained from Search Warrant at E. Mound & Noble St * * * Designated Confidential under terms of Agreed Protective Order * * *
    - ▪ 2. Investigative Report - 2024-04-12 Search Warrant of SFA * * * Designated Confidential under terms of Agreed Protective Order * * *
    - ▪ 3. Other Document - Randazzo taint records review-Special Agent Barbeau * * * Designated Confidential under terms of Agreed Protective Order * * *
    - ▪ 4. Other Document - Exhibit 51 from Householder Criminal Trial
    - ▪ 5. Other Document - Exhibit 325A from Householder Criminal Trial
    - ▪ 6. Other Document - Exhibit 233 from Householder Criminal Trial
    - ▪ 7. Investigative Report - 2024-03-21 De Marco, Paul Interview
    - ▪ 8. Investigative Report - 2024-03-13 Smith, Anthony Interview
    - ▪ 9. Audio Recorded Statement - 2024-03-13 Smith Anthony Interview
    - ▪ 10. Other Document - 2024-06-26 Ryan John Interview Part 1 * * * DESIGNATED CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER and subject to 502(d) Order * * *
    - ▪ 11. Other Document - 2024-06-26 Ryan John Interview Part 2 * * * DESIGNATED CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER and subject to 502(d) Order * * *
    - ▪ 12. Other Document - George Jonson related Emails and Documents * * * Designated Confidential under terms of Agreed Protective Order * * *

- 13. Other Document - First Energy - Forensic Accounting Supervisor Review
- 14. Email Attachment - Discovery response documents combined-Part-2
- 15. Correspondence - State v_ Dowling _ State v_ Jones CR-2024-02-0473 (2)
- 16. Subpoena Response - OCC's Responses to Subpoena Duces Tecum - Part 2 documents
- 17. Email Attachment - Discovery response documents combined-Part-1
- 18. Subpoena Response - OCC's Responses to Subpoena Duces Tecum - Part 1 documents
- 19. Email Attachment - OCC Discovery responses to Dowling subpoena. 5.27.24c

August 16, 2024 – Supplemental Response to Request for Discovery
- Crim.R.16(B)(1)-(7); Crim.R.16(K)
  - The following documents were delivered to the defense:
    - 1. Other Document - First Energy Non Prosecution Agreement
    - 2. Investigative Report - 2024-07-18 Larry Obhof Interview
    - 3. Audio Recorded Statement - Larry Obhof Audio interview 7.18.2024
    - 4. Audio Recorded Statement - Mark Clark Interview 8.8.2024
    - 5. Audio Recorded Statement - Tom Froehle Interview 8.14.2024
    - 6. Audio Recorded Statement - Mark Hayden Interview 1 7.30.2024
    - 7. Audio Recorded Statement - Mark Hayden Interview 2 7.30.2024
    - 8. Audio Recorded Statement - Mark Hayden Interview 3 7.30.2024
    - 9. Investigative Report - <mark>Santino Fanelli</mark> Subpoena served 7.23.2024
    - 10. Correspondence - Communication with Atty FE Board Members
    - 11. Correspondence - Dan McCarthy response to invitation letter 7.22.2024
    - 12. Investigative Report - Joel Bailey Subpoena served 7.22.2024
    - 13. Investigative Report - <mark>Justin Biltz</mark> Subpoena served 7.23.2024
    - 14. Other Document - 2024-07-17 Invitation Letter Deliveries
    - 15. Other Document - 2024-07-23 Invitation Letter Deliveries
    - 16. Other Document - Mark Hayden Interview Documents (provided for purposes of 7.30.2024 Interview)

September 16, 2024 – Supplemental Response to Request for Discovery
- Crim.R.16(B)(5)
  - Potentially Exculpatory Evidence:
    - Other Document - May 2024 Resolution Discussion – DESIGNATED CONFIDENTIAL UNDER TERMS OF AGREED PROTECTIVE ORDER
      - Delivered to Defense Attorney via web portal
    - Other Document - May 2024 Discussion Presentation - CONFIDENTIAL UNDER AGREED PROTECTIVE ORDER
      - Delivered to Defense Attorney via web portal

- - Other Document - January 2024 Presentation - CONFIDENTIAL UNDER AGREED PROTECTIVE ORDER
      - Delivered to Defense Attorney via web portal
  - Correspondence - FE_OAG Letter --- DESIGNATED CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
      - Delivered to Defense Attorney via web portal
- Crim.R.16(B)(1)-(7); Crim.R.16(K)
  - The following documents were delivered to the defense:
    - 1. Transcript - FirstEnergy Corp (FE) Q2 2020 Earnings Call Transcript
    - 2. Other Document - Complaint SEC v Jones
    - 3. Other Document - FE_OCIC_Privilege Update_PROD02 – DESIGNATED CONFIDENTIAL PURSUANT TO AGREED PROTECTIVE ORDER
    - 4. Other Document - FE_OCIC_Privilege Update_PROD02_zip_ file on Box
    - 5. Email Attachment - 2024.09.09 Letter to OCIC
    - 6. Other Document - FirstEnergy Subpoena Response
    - 7. Other Document - Randazzo Search Documents - 2nd Privilege Review - DESIGNATED CONFIDENTIAL PURSUANT TO TERMS OF AGREED PROTECTIVE ORDER
    - 8. Correspondence - Randazzo Search Documents Requested by McCaffrey
    - 9. Investigative Report - 2024-08-21 Defense Atty BWC Review
    - 10. Investigative Report - 2024-06-26 Ryan, John Interview
    - 11. Other Document - Documents obtained from Brian Gray
    - 12. Other Document - OCC Public Records Response
    - 13. Other Document - Tony Alexander Interview Documents
    - 14. Correspondence - FE_OAG Letter --- DESIGNATED CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
    - 15. Correspondence - McCaffrey Israel Discovery Letter 9.10.2024
    - 16. Audio Recorded Statement - 8.30.2024 Anthony Alexander Interview 1
    - 17. Audio Recorded Statement - 8.30.2024 Anthony Alexander Interview 2
    - 18. Other Document - January 2024 Presentation - CONFIDENTIAL UNDER AGREED PROTECTIVE ORDER
    - 19. Other Document - May 2024 Discussion Presentation - CONFIDENTIAL UNDER AGREED PROTECTIVE ORDER
    - 20. Other Document - May 2024 Resolution Discussion – DESIGNATED CONFIDENTIAL UNDER TERMS OF AGREED PROTECTIVE ORDER

September 18, 2024 – Supplemental Response to Request for Discovery
- Crim.R.16(B)(1)-(7); Crim.R.16(K)
  - The following documents were delivered to the defense:

- 1. Opinion - Ohio Consumers Counsel v. PUCO, 2006-ohio-5789 - Supreme Court Case Requiring Disclosure of Side Agreements
- 2. Correspondence - Docs Requested by Defense Outside Matrix – DESIGNATED CONFIDENTIAL PURSUANT TO TERMS OF AGREED PROTECTIVE ORDER
- 3. Correspondence - RE_ OMA
- 4. Investigative Report - 2023-12-04 Tully, Pat Interview IR
- 5. Investigative Report - 2024-03-06 Dennis Deters Interview
- 6. Investigative Report - 2024-01-16 DeAngelo, James Interview IR
- 7. Investigative Report - 2023-11-30 Haque, Asim Interview
- 8. Investigative Report - 2024-01-22 Kevin Murray Interview
- 9. Investigative Report - 2024-01-16 Terrence O'Donnell Interview
- 10. Investigative Report - 2024-01-08 Matt Pritchard Interview
- 11. Investigative Report - 2024-01-24 Debbie Ryan Interview
- 12. Investigative Report - 2024-05-30 Stover, Tiffany Interview
- 13. Other Document - 2015 AEP-IEU Settlement Related Documents – DESIGNATED CONFIDENTIAL PURSUANT TO AGREED PROTECTIVE ORDER
- 14. Investigative Report - 2024-04-05 Interview with Robert Reffner

12

**State of Ohio v. Charles E. Jones (CR-2024-02-0473-C)**
**Discovery Material**

April 1, 2024 – Response to Defendant's Request for Discovery
- Crim.R.16(B)(1) – Statement of the Defendant and Co-Defendants
    o Written statement of defendant Charles E. Jones
        ▪ None known at this time
    o Oral statement of defendant Charles E. Jones
        ▪ None
    o Police summary of statements of defendant Charles E. Jones
        ▪ Any statements will be provided
    o Grand Jury testimony of defendant Charles E. Jones
        ▪ None
- Crim.R.16(B)(2) – Criminal Records of the Defendant, Co-Defendants, and Witnesses
    o Criminal record of defendant Charles E. Jones
        ▪ None known at this time
- Crim.R.16(B)(5) – Evidence Favorable to Defendant
    o Potentially Exculpatory Evidence:
        ▪ None known at this time
- Crim.R.16(B)(1)-(7); Crim.R.16(K)
    o The following documents were delivered to the defense:
        ▪ 1. Investigative Report - 2023-08-10 Calfee, Halter & Griswold Subpoena & Response
        ▪ 2. Investigative Report - 2023-08-15 Sam Randazzo Subpoena Service
        ▪ 3. Investigative Report - 2023-05-18 Subpoena Service_ PNC, HNB, 5_3, and JP Morgan Chase
        ▪ 4. Investigative Report - 2023-06-27_ Vespoli, Leila Subpoena Served
        ▪ 5. Investigative Report - 2023-06-27_ Yeboah-Amankwah, Ebony Subpoena Served
        ▪ 6. Investigative Report - 2023-06-28_ Mikkelsen, Eileen Subpoena Served
        ▪ 7. Investigative Report - 2023-06-29_ FirstEnergy Corp Subpoena Served
        ▪ 8. Investigative Report - 2023-07-19 First Energy Records Received
        ▪ 9. Investigative Report - 2023-08-04 Michael VanBuren Subpoena Service
        ▪ 10. Investigative Report - 2023-08-12 Sam Randazzo Subpoena Service for Records
        ▪ 11. Investigative Report - 2023-08-16 Householder and Borges Sentencing Transcripts
        ▪ 12. Investigative Report - 2023-09-20 Inspector General Correspondence
        ▪ 13. Investigative Report - 2023-10-31 Jonathon McGee Subpoena Service
        ▪ 14. Investigative Report - 2023-11-20 Debbie Ryan Subpoena Service
        ▪ 15. Investigative Report - 2023-11-20 Matthew Pritchard Subpoena Service
        ▪ 16. Investigative Report - 2023-11-20 Patrick Tully Subpoena Service
        ▪ 17. Investigative Report - 2023-11-20 Tim Mott Subpoena Service
        ▪ 18. Investigative Report - 2023-12-07 Timothy Mott Subpoena Service for Records

13

- 19. Investigative Report - 2023-12-11 Joshua Rubin Subpoena Service
- 20. Investigative Report - 2023-12-12 Mahila Christopher Subpoena Service
- 21. Investigative Report - 2023-12-15 Randazzo, Samuel Subpoena Service
- 22. Investigative Report - 2023-12-21_ Sam Randazzo Subpoena 2 Response
- 23. Investigative Report - 2024-01-02 Summit Financial Subpoena Service and Response
- 24. Investigative Report - 2024-01-03_ Subpoena Service to McNees Firm
- 25. Investigative Report - 2024-01-09_ James DeAngelo Esq. Subpoena Service
- 26. Investigative Report - 2024-01-10_ Charles Schwab Subpoena Service
- 27. Investigative Report - 2024-01-10_ Fidelity Investments Subpoena Service
- 28. Investigative Report - 2024-01-10_ Laurel Dawson Subpoena Service
- 29. Investigative Report - 2024-01-10_ Mark Coffey Subpoena Service
- 30. Investigative Report - 2024-01-11_ Sam Randazzo Subpoena 3 Response
- 31. Investigative Report - 2024-01-12_ Debbie Ryan Subpoena Service
- 32. Investigative Report - 2024-01-17_ Ethics Commission Meeting, Subpoena, & Response
- 33. Investigative Report - 2024-01-18_ Kevin Murray Subpoena Service
- 34. Investigative Report - 2024-01-18_ McNees Wallance & Nurick Subpoena Response
- 35. Investigative Report - 2024-02-09 Attempt to Serve
- 36. Investigative Report - 2024-02-09_ Attempt to Serve; Charles Jones
- 37. Investigative Report - 2024-02-09_ Attempt to Serve; Samuel Randazzo
- 38. Investigative Report - 2023-06-26 Tyron Pine Subpoena Service
- 39. Investigative Report - 2024-01-16_ Anderson, Dave Interview
- 40. Investigative Report - 2024-01-25_ Housley, Kristina Interview
- 41. Investigative Report - 2024-02-07_ Ebony Yeboah-Amankwah Appearance
- 42. Other Document - Debbie Ryan Proffer 1.24.2024
- 43. Other Document - Ebony Yeboah-Amankwah Proffer 2.5.2024
- 44. Other Document - Jason Lisowski Proffer Agreement (Executed)
- 45. Other Document - Jason Rafeld Proffer Letter 1.16.2024
- 46. Other Document - Jonathon McGee Proffer Letter 12.4.2023
- 47. Other Document - Pat Tully Proffer Letter 12.4.2023
- 48. Audio Recorded Statement - 2023-09-06 Hadden, J.B. Interview
- 49. Audio Recorded Statement - 2023-09-18 Cupp, Robert Interview
- 50. Audio Recorded Statement - 2023-09-19 Gray, Bryan Interview
- 51. Audio Recorded Statement - 2023-11-30_Haque, Asim Interview
- 52. Audio Recorded Statement - 2023-12-01 Brakey, Matt Interview
- 53. Audio Recorded Statement - 2023-12-04 Tully, Pat Interview

14

- 54. Audio Recorded Statement - 2023-12-2023 Christopher, Mahila Interview Part 1
- 55. Audio Recorded Statement - 2023-12-2023 Christopher, Mahila Interview Part 2
- 56. Audio Recorded Statement - 2024-01-08 Pritchard, Matt Part 1
- 57. Audio Recorded Statement - 2024-01-08 Pritchard, Matt Part 2
- 58. Audio Recorded Statement - 2024-01-11 <mark>Brakey, Matt</mark> Interview Part 1
- 59. Audio Recorded Statement - 2024-01-11 <mark>Brakey, Matt</mark> Interview Part 2
- 60. Audio Recorded Statement - 2024-01-12 Elisar, Scott Interview
- 61. Audio Recorded Statement - 2024-01-16 Anderson, Dave Interview
- 62. Audio Recorded Statement - 2024-01-16 DeAngelo, James Interview
- 63. Audio Recorded Statement - 2024-01-16 O'Donnell Jr., Terrence Interview
- 64. Audio Recorded Statement - 2024-01-16 Rafeld, Jason Interview
- 65. Audio Recorded Statement - 2024-01-18 Bojko, Kimberly Interview
- 66. Audio Recorded Statement - 2024-01-19 <mark>Bingaman, Brad</mark> Interview
- 67. Audio Recorded Statement - 2024-01-25 Corrigan Kimberly Interview
- 68. Audio Recorded Statement - 2024-01-25 Housley Kristina Interview
- 69. Audio Recorded Statement - 2024-01-29 Petricoff Howard Interview
- 70. Audio Recorded Statement - 2024-02-01 Chack, Dennis Interview
- 71. Audio Recorded Statement - 2024-02-06 Dawson, Michael Interview
- 72. Audio Recorded Statement - Debbie Ryan Interview 1.24.2023
- 73. Audio Recorded Statement - Gene Pierce Interview 11.1.2023
- 74. Audio Recorded Statement - Howard Petricoff Interview 10.27.2023
- 75. Audio Recorded Statement - Jason Lisowski Audio Interview 2.5.2024
- 76. Audio Recorded Statement - Jonathon McGee audio interview 12.4.2023
- 77. Audio Recorded Statement - Jonathon McGee subpoena service 10.31.2023
- 78. Audio Recorded Statement - <mark>Josh Rubin</mark> Audio Interview 1.5.2024
- 79. Audio Recorded Statement - Kevin Murray Audio Interview
- 80. Audio Recorded Statement - Mark Coffey Follow Up 1.22.2024
- 81. Audio Recorded Statement - Mark Coffey Summit Financial 1.17.2024 1
- 82. Audio Recorded Statement - Mark Coffey Summit Financial 1.17.2024 2
- 83. Audio Recorded Statement - Ohio Ethics Commission 1.17.2024
- 84. Audio Recorded Statement - Tim Mott Interview 11-27-2023
- 85. Investigative Report - 2024-01-17_ Ethics Commission Meeting, Subpoena, & Response
- 86. Audio Recorded Statement - 2023-08-10 Greenspan, Dave Interview
- 87. Audio Recorded Statement - 2023-08-22 Carfagna, Enrico Interview
- 88. Investigative Report - 2023-08-10 Greenspan, David Interview
- 89. Investigative Report - 2023-08-22 Carfagna, Enrico Interview

- 90. Investigative Report - 2023-09-18 Cupp, Robert Interview
- 91. Investigative Report - 2023-09-19 Gray, Bryan Interview
- 92. Investigative Report - 2023-10-27 Howard Petricoff Interview
- 93. Investigative Report - 2023-11-27 Timothy Mott Interview
- 94. Investigative Report - 2023-12-04_ Jonathon McGee Interview
- 95. Investigative Report - 2024-01-25 Corrigan, Kim Interview
- 96. Investigative Report - 2024-02-01_ Chack, Dennis Interview
- 97. Investigative Report - 2024-02-06 Dawson, Michael Interview
- 98. Audio Recorded Statement - Dan Conway Interview 2 3.4.2024
- 99. Investigative Report - 2024-01-19 Bingaman, Bradley Interview
- 100. Audio Recorded Statement - Dan Conway Interview 3 3.4.2024
- 101. Subpoena - 2024-02-21_ Renee Rambo and Anthony Smith Subpoena Service
- 102. Audio Recorded Statement - Dan Conway Interview 1 3.4.2024
- 103. Transcript - Combined Transcript, USA v. Householder et al.
- 104. Expert Report - Courtney Beckett Analysis; SFA of Ohio- Chase Bank 9838 - 2016-2020
- 105. Expert Report - Courtney Beckett Analysis; Randazzo Personal- Chase Bank 4786
- 106. Expert Report - Courtney Beckett Analysis; IEU-Ohio Admin Company LLC – Chase Bank x0798 - 2016-2020
- 107. Expert Report - Courtney Beckett Analysis; FE Payments Summary to Randazzo Accts
- 108. Expert Report - Courtney Beckett Analysis; Bank Records Involved_Randazzo
- 109. Expert Report - Courtney Beckett Analysis; Industrial Energy Users- Ohio Chase Acct 8267
- 110. Expert Report - Courtney Beckett Analysis; Industrial Energy Users- Ohio Chase Acct 7715
- 111. Expert Report - Courtney Beckett Analysis; Industrial Energy Users- Ohio Chase Acct 3571
- 112. Expert Report - Courtney Beckett Analysis; Industrial Energy Users- Ohio Chase Acct 0785
- 113. Expert Report - Courtney Beckett Analysis; AEP Settlement Funds
- 114. Curriculum Vitae - C. Beckett- CV
- 115. Audio Recorded Statement - 2024-03-22 Willis Maureen Interview – Audio Interview (Case Documents) (1010050)
- 116. Audio Recorded Statement - 2024-03-13 Rambo, Renee Interview – Audio Interview (Case Documents) (1006028)
- 117. Court Filing - PUCO - OCC Set 17-INT-001-027 and 028-039
- 118. Court Filing - PUCO - OCC 1st Set Disc. Req. - 3rd Supp. Stip. - FE 14-1297-ELSSO - Final 12.2.15c
- 119. Court Filing - Federal Government Exhibit 204E, USA v. Householder et al., Larry Householder Calendar

- 120. Court Filing - Federal Government Exhibit 431G, USA v. Householder et al., 3-16-19 Email Kiani to Griffing re Prep for Tuesday Meeting
- 121. Email Copy - RE_ Eileen Mikkelson Subpoena
- 122. Investigative Report - 2023-06-27_ Bailey, Joel Subpoena Served

April 11, 2024 – Supplemental Response to Request for Discovery
- Crim.R.16(B)(1)-(7); Crim.R.16(K)
  - The following documents were delivered to the defense:
    - 1. Investigative Report - Matter 2023-1173 2024-02-06 Dawson, Michael Interview - Investigative Report (Reports) (991023)
    - 2. Audio Recorded Statement - Matter 2023-1173 2024-02-06 Dawson, Michael Interview - Audio Interview (Case Documents) (990493)
    - 3. Investigative Report - Matter 2023-1173 2024-02-01_ Chack, Dennis Interview - Investigative Report (Reports) (991033)
    - 4. Audio Recorded Statement - Matter 2023-1173 2024-02-01 Chack, Dennis Interview - Audio Interview (Case Documents) (990867)
    - 5. 2023-11-30 Asim Haque Interview Transcript - Transcripts (Case Documents) (960648) * * * NOT VERBATIM, CONTAINS ERRORS * *
    - 6. Audio Recorded Statement - 2024-01-11 Brakey, Matt Interview Part 1
    - 7. Transcript - Reffner, Robert Interview Part 4, Transcript_for_Axon_Capture_Audio_2024-04-05_120444_333.m4a * * * NOT VERBATIIM * * *
    - 8. Transcript - Reffner, Robert Interview Part 3, Transcript_for_Axon_Capture_Audio_2024-04-05_112824_333.m4a * * * NOT VERBATIIM * * *
    - 9. Transcript - Reffner, Robert Interview Part 2, Transcript_for_Axon_Capture_Audio_2024-04-05_103732_333.m4a* * * NOT VERBATIIM * * *
    - 10. Transcript - Reffner, Robert Interview Part 1, Transcript_for_Axon_Capture_Audio_2024-04-05_101820_333.m4a* * * NOT VERBATIIM * * *
    - 11. Audio Recorded Statement - Reffner, Robert Interview Part 3, Axon_Capture_Audio_2024-04-05_112824_333
    - 12. Audio Recorded Statement - Reffner, Robert Interview Part 4, Axon_Capture_Audio_2024-04-05_120444_333
    - 13. Audio Recorded Statement - Reffner, Robert Interview Part 2, Axon_Capture_Audio_2024-04-05_103732_333
    - 14. Audio Recorded Statement - Reffner, Robert Interview Part 1, Axon_Capture_Audio_2024-04-05_101820_333
    - 15. Audio Recorded Statement - 2024-03-21 DeMarco, Paul Interview – Audio Interview (Case Documents) (1006030)
    - 16. Audio Recorded Statement - 2024-03-08 Trombold M Beth Interview Part 2 - Audio Interview

17

- 17. Audio Recorded Statement - 2024-03-08 Trombold M Beth Interview Part 1 - Audio Interview (Case Documents) (1011002)
- 18. Audio Recorded Statement - 2024-03-08 Fleck Kathie Interview Part 1 – Audio Interview (Case Documents) (1011004)
- 19. Audio Recorded Statement - 2024-03-08 Fleck Kathie Interview Part 2 – Audio Interview
- 20. Transcript - Debbie Ryan_Interview Transcription 1.24.2024
- 21. Correspondence - Chack -OH AG NPA
- 22. Audio Recorded Statement - 2024-03-06 Deters Dennis Interview - Audio Interview (Case Documents) (1017681)
- 23. Audio Recorded Statement - 2024-03-04 Conway Dan Interview - Audio Interview (Case Documents) (1017647)
- 24. Audio Recorded Statement - 2024-03-06 Friedman Larry Interview – Audio Interview (Case Documents) (1017672)
- 25. Court Filing - Pine Immunity

April 18, 2024 – Supplemental Response to Request for Discovery
- Crim.R.16(B)(1)-(7); Crim.R.16(K)
  - The following documents were delivered to the defense:
    - 1. Correspondence - Reffner Proffer Letter 4.5.2024
    - 2. Evidence List - Documents from Robert Reffner Interview 4.5.2024
    - 3. Evidence List - Chack Documents
    - 4. Email Copy - RE_ Subpoena for Ebony Yeboah-Amankwah
    - 5. Email Attachment - Yeboah Documents
    - 6. Email Attachment - Yeboah - Draft OH AG NPA
    - 7. Email Copy - RE_ Interviews
    - 8. Email Attachment - PUCO Commissioner Documents
    - 9. Email Copy - Pine Documents
    - 10. Email Attachment - Pine Documents (2)
    - 11. Email Copy - Lisowski Documents
    - 12. Email Attachment - Jason Lisowski Proffer Agreement
    - 13. Email Attachment - Lisowski
    - 14. Email Copy - Documents for follow up with Matt Brakey
    - 15. Email Attachment - 2015 Workpapers (2)
    - 16. Email Attachment - 2017 WPs - not used (2)
    - 17. Email Attachment - 2018 AJE Workpapers (2)
    - 18. Email Copy - Elisar Documents
    - 19. Email Attachment - Elisar Documents (2)
    - 20. Email Copy - RE_ Documents for follow up with Matt Brakey
    - 21. Financial Records - File Memo - Meeting 08 15 2016
    - 22. Email Copy - RE_ PUCO interviews
    - 23. Email Attachment - Mahila Christopher Docs
    - 24. Email Copy - RE_ PUCO interviews (2)
    - 25. Email Attachment - Audit of the Legacy Generation Resource Rider of AEP
    - 26. Email Copy - RE_ PUCO interviews (3)

18

- 27. Email Attachment - 8-21-23 Audit Report
- 28. Expert Report - 2024-04-15 - LT Matthew Meyer re Report of G. Jonson
- 29. Curriculum Vitae - G Jonson CV - 2024
- 30. Evidence List - <mark>Bingaman</mark> Documents
- 31. Correspondence - <mark>Brad Bingaman</mark> Proffer Agreement-Version 2
- 32. Bank Records - SB1447888-F2 Extension Letter (2)
- 33. Bank Records - SB1447888-F25_SCD_1 (1) IEU OH ADMIN
- 34. Correspondence - FirstEnergy Document Requests

May 17, 2024 – Supplemental Response to Request for Discovery
- Crim.R.16(B)(1)-(7); Crim.R.16(K)
  - The following documents were delivered to the defense:
    - 1. Order - PUCO 502(D) ORDER
    - 2. Correspondence - RE_ Documents for follow up with <mark>Matt Brakey</mark> (2)
    - 3. Other Document - IEU1 Brochure
    - 4. Other Document - IEU-Ohio Brocure EX100017083.pdf.pdf
    - 5. Other Document - IEU2 Brochure
    - 6. Correspondence - RE_ Request for limited waiver
    - 7. Investigative Report - 2024-01-11 <mark>Brakey, Mathew</mark> Interview
    - 8. Investigative Report - 2024-01-02 Mark Coffey Follow-Up Interview
    - 9. Investigative Report - 2024-01-17 Summit Financial Interview; Mark Coffey
    - 10. Investigative Report - 2024-03-04 Conway, Daniel Interview
    - 11. Investigative Report - 2024-01-12 Elisar, Scott Interview
    - 12. Investigative Report - 2024-03-08 Interview with Katherine Fleck
    - 13. Investigative Report - 2024-03-06 Larry Friedeman Interview
    - 14. Investigative Report - 2023-09-06 James JB Hadden Interview
    - 15. Investigative Report - 2024-02-05 Jason Lisowski Interview
    - 16. Investigative Report - 2023-11-01 Gene Pierce Interview
    - 17. Investigative Report - Ty Pine Atty Communication
    - 18. Investigative Report - 2024-01-16 Jason Rafeld Interview
    - 19. Investigative Report - 2024-01-05 <mark>Josh Rubin</mark> Interview
    - 20. Investigative Report - 2024-03-08 M. Beth Trombold Interview
    - 21. Investigative Report - 2024-03-04 Maureen Willis Subpoena Interview
    - 22. Investigative Report - Maureen Willis communication
    - 23. Email Attachment - OCIC 003-4 * * * Designated Confidential Pursuant to Protective Order and Subject to Evid. R. 502(D) Order * * *
    - 24. Audio Recorded Statement - 5.17.2024 Greg Price PUCO Interview 2 * * * Designated Confidential Pursuant to Protective Order and Subject to Evid. R. 502 (D) Order * * *
    - 25. Audio Recorded Statement - 5.17.2024 Greg Price PUCO Interview 1 * * * Designated Confidential Pursuant to Protective Order and Subject to Evid. R. 502 (D) Order * * *
    - 26. Email Attachment - OCIC 001-2 * * * Designated Confidential Pursuant to Protective Order and Subject to Evid. R. 502(D) Order * * *

19

- 27. Email Copy - RE_ Subpoena
- 28. Email Attachment - Questions for Maureen Willis.3.5.2024

June 17, 2024 – Supplemental Response to Request for Discovery
- Crim.R.16(B)(1)-(7); Crim.R.16(K)
  - The following documents were delivered to the defense:
    - 1. Subpoena Response - FE_OCIC_Privilege Update_PROD01
    - 2. Email Attachment - FirstEnergy - OCIC - Privilege Log (2024.06.06)
    - 3. Correspondence - FirstEnergy Subpoena (PDF COPY)
    - 4. Email Copy - 2024.06.06 Letter to OCIC
    - 5. Correspondence - FirstEnergy Subpoena (3)
    - 6. Correspondence - Signed Reffner Proffer Letter 4.5.2024
    - 7. Correspondence - IEU_OELC
    - 8. Correspondence - 2021-08-26 Ohio Inspector General Complaint
    - 9. Investigative Report - 2024-01-18 Bojko, Kimberly Interview
    - 10. Investigative Report - 2024-05-23 Daniel, Matthew Interview
    - 11. Audio Recorded Statement - 2024-05-30 Stover Tiffany Interview
    - 12. Audio Recorded Statement - 2024-05-23 Daniel Matthew Interview
    - 13. Audio Recorded Statement - 2023-10-24 Weinstein Casey Interview
    - 14. Investigative Report - 2023-10-24 Weinstein, Casey Interview
    - 15. Email Copy - RE_ Scott Elisar

July 16, 2024 – Supplemental Response to Request for Discovery
- Crim.R.16(B)(1)-(7); Crim.R.16(K)
  - The following documents were delivered to the defense:
    - 1. Other Document - Documents obtained from Search Warrant at E. Mound & Noble St * * * Designated Confidential under terms of Agreed Protective Order * * *
    - 2. Investigative Report - 2024-04-12 Search Warrant of SFA * * * Designated Confidential under terms of Agreed Protective Order * * *
    - 3. Other Document - Randazzo taint records review-Special Agent Barbeau * * * Designated Confidential under terms of Agreed Protective Order * * *
    - 4. Other Document - Exhibit 51 from Householder Criminal Trial
    - 5. Other Document - Exhibit 325A from Householder Criminal Trial
    - 6. Other Document - Exhibit 233 from Householder Criminal Trial
    - 7. Investigative Report - 2024-03-21 De Marco, Paul Interview
    - 8. Investigative Report - 2024-03-13 Smith, Anthony Interview
    - 9. Audio Recorded Statement - 2024-03-13 Smith Anthony Interview
    - 10. Other Document - 2024-06-26 Ryan John Interview Part 1 * * * DESIGNATED CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER and subject to 502(d) Order * * *
    - 11. Other Document - 2024-06-26 Ryan John Interview Part 2 * * * DESIGNATED CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER and subject to 502(d) Order * * *

20

- 12. Other Document - George Jonson related Emails and Documents * * * Designated Confidential under terms of Agreed Protective Order * * *
- 13. Other Document - First Energy - Forensic Accounting Supervisor Review
- 14. Email Attachment - Discovery response documents combined-Part-2
- 15. Correspondence - State v_ Dowling _ State v_ Jones CR-2024-02-0473 (2)
- 16. Subpoena Response - OCC's Responses to Subpoena Duces Tecum - Part 2 documents
- 17. Email Attachment - Discovery response documents combined-Part-1
- 18. Subpoena Response - OCC's Responses to Subpoena Duces Tecum - Part 1 documents
- 19. Email Attachment - OCC Discovery responses to Dowling subpoena. 5.27.24c

August 16, 2024 – Supplemental Response to Request for Discovery
- Crim.R.16(B)(1)-(7); Crim.R.16(K)
  - The following documents were delivered to the defense:
    - 1. Other Document - First Energy Non Prosecution Agreement
    - 2. Investigative Report - 2024-07-18 Larry Obhof Interview
    - 3. Audio Recorded Statement - Larry Obhof Audio interview 7.18.2024
    - 4. Audio Recorded Statement - Mark Clark Interview 8.8.2024
    - 5. Audio Recorded Statement - Tom Froehle Interview 8.14.2024
    - 6. Audio Recorded Statement - Mark Hayden Interview 1 7.30.2024
    - 7. Audio Recorded Statement - Mark Hayden Interview 2 7.30.2024
    - 8. Audio Recorded Statement - Mark Hayden Interview 3 7.30.2024
    - 9. Investigative Report - Santino Fanelli Subpoena served 7.23.2024
    - 10. Correspondence - Communication with Atty FE Board Members
    - 11. Correspondence - Dan McCarthy response to invitation letter 7.22.2024
    - 12. Investigative Report - Joel Bailey Subpoena served 7.22.2024
    - 13. Investigative Report - Justin Biltz Subpoena served 7.23.2024
    - 14. Other Document - 2024-07-17 Invitation Letter Deliveries
    - 15. Other Document - 2024-07-23 Invitation Letter Deliveries
    - 16. Other Document - Mark Hayden Interview Documents (provided for purposes of 7.30.2024 Interview)

September 16, 2024 – Supplemental Response to Request for Discovery
- Crim.R.16(B)(1)-(7); Crim.R.16(K)
  - The following documents were delivered to the defense:
    - 1. Transcript - FirstEnergy Corp (FE) Q2 2020 Earnings Call Transcript
    - 2. Other Document - Complaint SEC v Jones
    - 3. Other Document - FE_OCIC_Privilege Update_PROD02 – DESIGNATED CONFIDENTIAL PURSUANT TO AGREED PROTECTIVE ORDER

- 4. Other Document - FE_OCIC_Privilege Update_PROD02_zip_ file on Box
- 5. Email Attachment - 2024.09.09 Letter to OCIC
- 6. Other Document - FirstEnergy Subpoena Response
- 7. Other Document - Randazzo Search Documents - 2nd Privilege Review - DESIGNATED CONFIDENTIAL PURSUANT TO TERMS OF AGREED PROTECTIVE ORDER
- 8. Correspondence - Randazzo Search Documents Requested by McCaffrey
- 9. Investigative Report - 2024-08-21 Defense Atty BWC Review
- 10. Investigative Report - 2024-06-26 Ryan, John Interview
- 11. Other Document - Documents obtained from Brian Gray
- 12. Other Document - OCC Public Records Response
- 13. Other Document - Tony Alexander Interview Documents
- 14. Correspondence - FE_OAG Letter --- DESIGNATED CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER
- 15. Correspondence - McCaffrey Israel Discovery Letter 9.10.2024
- 16. Audio Recorded Statement - 8.30.2024 Anthony Alexander Interview 1
- 17. Audio Recorded Statement - 8.30.2024 Anthony Alexander Interview 2
- 18. Other Document - January 2024 Presentation - CONFIDENTIAL UNDER AGREED PROTECTIVE ORDER
- 19. Other Document - May 2024 Discussion Presentation - CONFIDENTIAL UNDER AGREED PROTECTIVE ORDER
- 20. Other Document - May 2024 Resolution Discussion – DESIGNATED CONFIDENTIAL UNDER TERMS OF AGREED PROTECTIVE ORDER

September 18, 2024 – Supplemental Response to Request for Discovery
- Crim.R.16(B)(1)-(7); Crim.R.16(K)
    - The following documents were delivered to the defense:
        - 1. Opinion - Ohio Consumers Counsel v. PUCO, 2006-ohio-5789 - Supreme Court Case Requiring Disclosure of Side Agreements
        - 2. Correspondence - Docs Requested by Defense Outside Matrix – DESIGNATED CONFIDENTIAL PURSUANT TO TERMS OF AGREED PROTECTIVE ORDER
        - 3. Correspondence - RE_ OMA
        - 4. Investigative Report - 2023-12-04 Tully, Pat Interview IR
        - 5. Investigative Report - 2024-03-06 Dennis Deters Interview
        - 6. Investigative Report - 2024-01-16 DeAngelo, James Interview IR
        - 7. Investigative Report - 2023-11-30 Haque, Asim Interview
        - 8. Investigative Report - 2024-01-22 Kevin Murray Interview
        - 9. Investigative Report - 2024-01-16 Terrence O'Donnell Interview
        - 10. Investigative Report - 2024-01-08 Matt Pritchard Interview
        - 11. Investigative Report - 2024-01-24 Debbie Ryan Interview

- 12. Investigative Report - 2024-05-30 Stover, Tiffany Interview
- 13. Other Document - 2015 AEP-IEU Settlement Related Documents – DESIGNATED CONFIDENTIAL PURSUANT TO AGREED PROTECTIVE ORDER
- 14. Investigative Report - 2024-04-05 Interview with Robert Reffner

# EXHIBIT 12

| From: | Jason Forge |
|---|---|
| To: | zzext-crendon; zzext-john.mccaffrey; zzext-john.favret; Israel, Rachael L.; zzext-jdunnaback |
| Subject: | Production of Documents Received from Ohio AG |
| Date: | Friday, September 27, 2024 6:31:48 PM |

Hi all, as you know, your clients long ago agreed to produce all non-privileged non-duplicative documents related to the "HB6 bribery scheme" that they received from (or provided to), *inter alia*, any government agency or state law enforcement agency. *See* Jones/Dowling's Responses to First RFP Request No. 2. This is an ongoing obligation.

The Ohio AG's criminal case against your clients (2024-02-0473-B/C) explicitly relates to the "HB6 bribery scheme," as both the Indictment and Supplemental Bill of Particulars expressly charge that Messrs. Jones and Dowling's criminal activities included their involvement in the payment of money in connection with the "bribery" of Sam Randazzo for, *inter alia*, official "acts related to House Bill 6 . . . ."

As such, please promptly produce all Discovery Material from Case No. 2024-02-0473-B/C that has not been designated as Confidential Discovery Material (we will seek a Court order for that). Because the Discovery Material has already been identified and transmitted, please confirm that you will produce it by no later than October 4, 2024. If not, we can discuss during Tuesday's call and, if necessary, Thursday's Status Conference.

Have a great weekend,
Jason

Jason A. Forge | Robbins Geller Rudman & Dowd
O 619 744 2645 | M 858 692 1117

# EXHIBIT 13

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| In re FIRSTENERGY CORP. SECURITIES LITIGATION | No. 2:20-cv-03785-ALM-KAJ CLASS ACTION |
| | Judge Algenon L. Marbley Magistrate Judge Kimberly A. Jolson |

STATE OF OHIO'S LIMITED MOTION TO INTERVENE AND LIMITED
MOTION TO STAY PORTIONS OF DISCOVERY PROCEEDINGS

The State of Ohio seeks leave to intervene on a limited basis in the above-captioned matter under Federal Rule of Civil Procedure 24 and moves to stay limited portions of discovery proceedings in this case through the conclusion of the parallel state criminal prosecution, *State of Ohio v. Dowling et al.,* Summit County Court of Common Pleas Case No. 2024-02-0473 B-E, which is currently pending. Specifically, if the State's request for limited intervention is granted, the State seeks to stay (1) the Plaintiffs' request that Jones and Dowling turn over state court criminal discovery items, and (2) Defendants Jones and Dowling's depositions of prosecution witnesses Ebony Yeboah Amankwah, Robert Reffner, Josh Rubin, Brad Bingaman, Matthew Brakey, and Steven Staub.

## 1. **Factual and procedural background**

On February 9, 2024, an Ohio grand jury indicted two of the defendants in this case, Charles E. Jones and Michael J. Dowling, for various criminal violations of state

nearly all the state Crim.R.16 discovery materials that the two men obtained as a result of state criminal proceedings against them.

During the September 30, 2024 meeting, counsel for Jones and Dowling stated that their obligation to provide a response to the Plaintiff's Request for Production of Documents was imminent, based recent discussions they had during weekly status meetings with the Special Master in this case. Counsel for Jones and Dowling indicated that if the State retroactively designated the Discovery Materials as Confidential Discovery Materials under the terms of an April 24, 2024 Protective Order[3] in the state criminal case, that designation would allow them to refuse to turn over the discovery that they have received in the State criminal case. During a subsequent conversation on October 1, 2024, counsel for Jones stated her belief that providing the state criminal discovery to the parties in the civil case (along with the likelihood that those discovery materials would be made publicly available while the criminal case is pending) would affect the fairness and integrity of the state criminal proceeding.

As a result of the September 30, 2024 meeting with counsel for Jones and Dowling, the State wrote a letter to counsel for all parties in the criminal case retroactively designating criminal discovery materials as Confidential Discovery Material under the terms of the state court protective order. (See Exhibit 2, attached).

---

[3] Available at:
https://clerkweb.summitoh.net/PublicSite/DisplayImage.asp?gstrPDFOH=vola00000007%20%20%20%20%20%20%20%200000622C (last viewed October 2, 2024).

# EXHIBIT 14



October 1, 2024

*Sent via email to all counsel of record, State v. Dowling et al.,*
*Summit County C.P. Case Nos. 2024-02-0473 B-E*

Re: *Designation of Discovery Materials as Confidential*
*Pursuant to April 24, 2024 Protective Order*

Dear Counsel:

This letter serves to notify you of changes to the State's designation of Confidential Discovery Material under the terms of the April 24, 2024 Protective Order in this case.

First, the Search Warrants, Affidavits, and Search Warrant Returns for 492 E. Mound Street and 493-491 E. Noble Street, Columbus, Ohio 43215 should no longer be designated as Confidential Discovery Material. The seal order governing those documents that was issued by the Franklin County Municipal Court has lapsed, and therefore there is no longer any need for those documents to have a Confidential Discovery Material designation.

Second, the State has elected to retroactively designate items as Confidential Discovery Material under the terms of the April 24, 2024 Protective Order. The following categories of items should be considered Confidential Discovery Material:

1. All Investigative Reports;
2. All recordings of witness interviews;
3. Any items obtained by the State pursuant to a search warrant;
4. All voluntarily provided Organized Crime Investigations Commission Task Force ("Task Force") work product, including but not limited to exhibit packets (including compilations of documents shown to witnesses), investigator or prosecutor notes, and internal Task Force correspondence between investigators prosecutors, and expert witnesses;
5. All documents obtained by the Task Force pursuant to an R.C. 177.03(A) subpoena duces tecum issued by the Task Force (including but not limited to all documents provided by FirstEnergy, IEU-Ohio, Chase Bank, Summit Financial Strategies, Tim Mott, and The Public Utilities Commission of Ohio in response to a Task Force subpoena);
6. All voluntarily provided correspondence between counsel for the State of Ohio and counsel for parties and/or witnesses;
7. All proffer letters and/or proffer agreements extended to a witness by the State of Ohio;

8. All Immunity Orders or Non-Prosecution Agreements;
9. All transcripts created by the Task Force, including AI-generated transcripts;
10. Any expert reports or material relied upon by experts that have not already been publicly filed on the docket of this case.

This retroactive designation of materials as Confidential Discovery Material is not intended to impair your use of these items in defense of your client(s), and is instead intended to safeguard the integrity and fairness of this criminal case while it is pending. If you have any questions or concerns, or need any clarification regarding the State's retroactive designation of Confidential Discovery Materials, please do not hesitate to contact me directly.

Very truly yours,

Matthew E. Meyer
Principal Assistant Attorney General
Ohio Attorney General's Office

cc:\  File
Kamil Shields, Esq., and Elizabeth Storey, Esq., Counsel of Record for FirstEnergy
Justin Withrow, Esq., and Paul Flannery, Esq., Counsel of Record for IEU-Ohio

# EXHIBIT 15

| From: | Rendon, Carole S. |
|---|---|
| To: | Shawn Judge; Rachel Cocalis |
| Cc: | "dennisc@sullcrom.com"; "gjuffrar@sullcrom.com"; "Rein, David M.J."; Jason Forge; Joe Murray; Christina Kopko; "McCaffrey, John F."; Israel, Rachael L.; "zzext-john.favret" |
| Subject: | RE: In re FirstEnergy Corp. Sec. Litig., No. 2:20-cv-03785-ALM-KAJ - Dispute re 10/3 Status Conference |
| Date: | Tuesday, October 1, 2024 12:21:55 PM |
| Attachments: | image001.png |
|  | image002.png |
|  | image003.png |

EXTERNAL SENDER
Special Master Judge:

The discovery issue raised by the plaintiffs, which they indicated could not conceivably impact a deposition prior to the one scheduled on October 24th, does not justify holding a hearing on one of the two most important High Holy Days on the Jewish calendar. To confirm – as plaintiffs have requested – all three lead counsel for Mr. Jones will not be working in observance of Rosh Hashanah. Many other lawyers for other parties impacted by this issue also will not be working in observance of the holiday.

In addition, as we mentioned during our meet and confer, while the High Holy Day of Rosh Hashanah does not technically begin until sundown tomorrow, most of us have family and friends arriving tomorrow from out of town and many of us are hosting large meals that traditionally begin in the early afternoon in order to conclude before sundown when many people attend the first service in celebration of the holiday. The Rosh Hashanah holiday continues through sundown on Friday, October 4. As a compromise, we suggested scheduling this conference for early next at your convenience. Plaintiffs refused.

As we further explained, there are no non-confidential documents that relate to any of the upcoming depositions that could be produced without violating the existing Order issued by Summit County Common Pleas Judge Susan Baker Ross. Earlier today, defense counsel provided Plaintiffs with written confirmation from the State of Ohio that all of the materials Plaintiffs seek – other than a handful of publicly available documents – have been designated as Confidential under Judge Baker Ross's Protective Order. That fact further undermines any urgency with respect to this matter.

We are prepared to provide you with our position statement by COB tomorrow and respectfully request that you re-schedule the hearing on this issue next week at your convenience following the conclusion of Rosh Hashanah.

Thank you,

Carole

**Carole S. Rendon**
She | Her | Hers
Partner
_____

<span style="color:red">BakerHostetler</span>
Key Tower
127 Public Square | Suite 2000
Cleveland, OH 44114-1214
T +1.216.861.7420

M +1.216.215.1621

crendon@bakerlaw.com
bakerlaw.com



---

**From:** Shawn Judge <skj@classlawgroup.com>
**Sent:** Tuesday, October 1, 2024 2:43 PM
**To:** Rachel Cocalis <RCocalis@rgrdlaw.com>
**Cc:** 'dennisc@sullcrom.com' <dennisc@sullcrom.com>; 'giuffrar@sullcrom.com'
<giuffrar@sullcrom.com>; 'Rein, David M.J.' <reind@sullcrom.com>; Jason Forge
<JForge@rgrdlaw.com>; Joe Murray <murray@mmmb.com>; Christina Kopko
<CKopko@rgrdlaw.com>; 'McCaffrey, John F.' <john.mccaffrey@tuckerellis.com>; Rendon, Carole S.
<crendon@bakerlaw.com>; Israel, Rachael L. <risrael@bakerlaw.com>; 'zzext-john.favret'
<john.favret@tuckerellis.com>
**Subject:** RE: In re FirstEnergy Corp. Sec. Litig., No. 2:20-cv-03785-ALM-KAJ - Dispute re 10/3 Status
Conference

[External Email: Use caution when clicking on links or opening attachments.]

Each side to submit positions statements limited to three pages or less by close of business
tomorrow.

When is the first deposition that the unproduced documents might affect?

We will be proceeding with the status conference scheduled for this Thursday unless a
party requests that it be rescheduled and provides me with a good reason for doing so –
and I grant the request.  In other words, simply ignoring the status conference is declining
the opportunity to be heard.  No formal motion is required, but I urge any party seeking to
adjust the schedule to act sooner rather than later and with good reason only.

In the event we reschedule, the discovery matter would be taken up at a status conference
to occur Monday.

Shawn Judge

---

**From:** Rachel Cocalis <RCocalis@rgrdlaw.com>
**Sent:** Tuesday, October 1, 2024 2:31 PM
**To:** Shawn Judge <skj@classlawgroup.com>
**Cc:** 'dennisc@sullcrom.com' <dennisc@sullcrom.com>; 'giuffrar@sullcrom.com'
<giuffrar@sullcrom.com>; 'Rein, David M.J.' <reind@sullcrom.com>; Jason Forge
<JForge@rgrdlaw.com>; Joe Murray <murray@mmmb.com>; Christina Kopko
<CKopko@rgrdlaw.com>; 'McCaffrey, John F.' <john.mccaffrey@tuckerellis.com>;
'crendon@bakerlaw.com' <crendon@bakerlaw.com>; Israel, Rachael L. <risrael@bakerlaw.com>;
'zzext-john.favret' <john.favret@tuckerellis.com>
**Subject:** FW: In re FirstEnergy Corp. Sec. Litig., No. 2:20-cv-03785-ALM-KAJ - Dispute re 10/3 Status

Conference

Special Master Judge,

There is an urgent discovery dispute between Plaintiffs' and Defendants Jones and Dowling concerning documents Jones and Dowling are declining to produce that directly relate to multiple witnesses who will be deposed this month.  Jones and Dowling refuse to address it at this week's status conference because the conference occurs over Rosh Hashanah. Though no one objected when you told the parties last week that this week's status would proceed as scheduled and Jones and Dowling have yet to confirm all of their counsel won't be working Thursday, Plaintiffs are available for a conference Thursday *or* any time tomorrow before the holiday.

Moreover, Plaintiffs would be happy to submit a position statement today that is no longer than three pages.

Thank you,
Rachel

---

**From:** Shawn Judge <skj@classlawgroup.com>
**Sent:** Wednesday, September 25, 2024 10:50 AM
**To:** Dennis, Casey A. <dennisc@sullcrom.com>
**Cc:** Giuffra Jr., Robert J. <giuffrar@sullcrom.com>; Rein, David M.J. <reind@sullcrom.com>; Jason Forge <JForge@rgrdlaw.com>; Joe Murray <murray@mmmb.com>; Christina Kopko <CKopko@rgrdlaw.com>
**Subject:** RE: In re FirstEnergy Corp. Sec. Litig., No. 2:20-cv-03785-ALM-KAJ - Sept. 12 Conference Transcript

EXTERNAL SENDER
Given the apparent absence of any pending issues necessitating conference attention, the status conference set for 9/26/24 is cancelled.  We will be having the conference the following week.  If any issues requiring attention arise before then, please reach out and we will hold a conference.

Shawn Judge

---

**From:** Shawn Judge <skj@classlawgroup.com>
**Sent:** Wednesday, September 18, 2024 2:30 PM
**To:** Dennis, Casey A. <dennisc@sullcrom.com>
**Cc:** Giuffra Jr., Robert J. <giuffrar@sullcrom.com>; Rein, David M.J. <reind@sullcrom.com>; Jason Forge <JForge@rgrdlaw.com>; Joe Murray <murray@mmmb.com>; Christina Kopko <CKopko@rgrdlaw.com>
**Subject:** RE: In re FirstEnergy Corp. Sec. Litig., No. 2:20-cv-03785-ALM-KAJ - Sept. 12 Conference Transcript

Please inform me by 4:00 pm EST if there is any issue that necessitates a status

conference tomorrow.  Absent any such affirmative notice, I will send a cancellation for tomorrow's conference and we will plan on a conference on September 26, 2024, as needed.

Thank you.

Shawn Judge

---

**From:** Dennis, Casey A. <dennisc@sullcrom.com>
**Sent:** Monday, September 16, 2024 3:58 PM
**To:** Shawn Judge <skj@classlawgroup.com>
**Cc:** Giuffra Jr., Robert J. <giuffrar@sullcrom.com>; Rein, David M.J. <reind@sullcrom.com>; Jason Forge <JForge@rgrdlaw.com>; Joe Murray <murray@mmmb.com>; Christina Kopko <CKopko@rgrdlaw.com>
**Subject:** In re FirstEnergy Corp. Sec. Litig., No. 2:20-cv-03785-ALM-KAJ - Sept. 12 Conference Transcript

Dear Special Master Judge,

Attached please find the transcript for the conference held on Thursday, September 12.

Respectfully,
Casey

**Casey A. Dennis**
**SULLIVAN & CROMWELL LLP**
125 Broad Street | New York, NY 10004-2498
+1 212 558 3728 (T)
dennisc@sullcrom.com | www.sullcrom.com

---

This e-mail is sent by a law firm and contains information that may be privileged and confidential. If you are not the intended recipient, please delete the e-mail and notify us immediately.

**NOTICE: This email message is for the sole use of the intended recipient(s) and may contain information that is confidential and protected from disclosure by the attorney-client privilege, as attorney work product, or by other applicable privileges.  Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.**

---

This email is intended only for the use of the party to which it is addressed and may contain information that is privileged, confidential, or protected by law. If you are not the intended recipient you are hereby notified that any dissemination, copying or distribution of this email or its contents is strictly prohibited. If you have received this message in error, please notify us immediately by replying to the message and deleting it from your computer.

Any tax advice in this email is for information purposes only. The content of this email is limited to the matters specifically addressed herein and may not contain a full description of all relevant facts or a complete analysis of all relevant issues or authorities.

Internet communications are not assured to be secure or clear of inaccuracies as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. Therefore, we do not accept responsibility for any errors or omissions that are present in this email, or any attachment, that have arisen as a result of e-mail transmission.

EXHIBIT 16

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
## for the
### Southern District of Ohio

| | |
|---|---|
| In re FirstEnergy Corp. Sec. Litig. | ) |
| _Plaintiff_ | ) |
| v. | ) Civil Action No. 2:20-cv-03785-ALM-KAJ |
| | ) |
| | ) |
| _Defendant_ | ) |

## SECOND SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:  Sustainability Funding Alliance of Ohio, Inc.
c/o Roger P. Sugarman, 6025 Cranberry Ct., Columbus, OH 43213

_(Name of person to whom this subpoena is directed)_

☑ _Production:_ **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See attached Schedule A.

| Place: Murray Murphy Moul+ Basil LLP<br>1114 Dublin Road<br>Columbus, OH 43215 | Date and Time:<br><br>10/11/2024 10:00 am |
|---|---|

☐ _Inspection of Premises:_ **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  09/30/2024

| CLERK OF COURT | | |
|---|---|---|
| _____<br>_Signature of Clerk or Deputy Clerk_ | OR | _Rachel Cocalis_<br>_Attorney's signature_ |

The name, address, e-mail address, and telephone number of the attorney representing _(name of party)_ Lead Plaintiff Los Angeles County Employees Retirement Association and Named Plaintiffs Amalgamated Bank, City of Irving Supplemental Benefit Plan, and Wisconsin Laborers' Pension Fund , who issues or requests this subpoena, are:

Rachel A. Cocalis, rcocalis@rgrdlaw.com, Robbins Geller Rudman & Dowd LLP, 655 West Broadway, Suite 1900, San Diego, CA 92101, (619) 231-1058

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 2:20-cv-03785-ALM-KAJ

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____            _____
                                          *Server's signature*

                                 _____
                                          *Printed name and title*

                                 _____
                                          *Server's address*

Additional information regarding attempted service, etc.:

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

# Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) For a Trial, Hearing, or Deposition.** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2) For Other Discovery.** A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) Avoiding Undue Burden or Expense; Sanctions.** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) Command to Produce Materials or Permit Inspection.**
  **(A)** Appearance Not Required. A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** Objections. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) Quashing or Modifying a Subpoena.**
  **(A)** When Required. On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** When Permitted. To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** Specifying Conditions as an Alternative. In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) Producing Documents or Electronically Stored Information.** These procedures apply to producing documents or electronically stored information:
  **(A)** Documents. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** Form for Producing Electronically Stored Information Not Specified. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** Electronically Stored Information Produced in Only One Form. The person responding need not produce the same electronically stored information in more than one form.
  **(D)** Inaccessible Electronically Stored Information. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) Claiming Privilege or Protection.**
  **(A)** Information Withheld. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** Information Produced. If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**SCHEDULE A**
**(Sustainability Funding Alliance of Ohio, Inc.)**

## I.      DEFINITIONS

Unless otherwise stated, the terms set forth below are defined as follows:

1.      "You" or "your" refers to Sustainability Funding Alliance of Ohio, Inc., any of its direct or indirect subsidiaries, divisions or affiliates (foreign and domestic), predecessors, successors, present and former officers, directors, employees, agents, and all other persons acting or purporting to act on its behalf.

2.      "Action" refers to this lawsuit captioned *In re FirstEnergy Corp. Sec. Litig.*, No. 2:20-cv-03785-ALM-KAJ (S.D. Ohio).

3.      "All," "any," and "each" shall each be construed as encompassing any and all.

4.      "Communication" or "communications" means any transmittal of information (in the form of facts, ideas, inquiries, or otherwise) whether orally or by document, telephone, telecopier, mail, fax, email, voicemail, cellular phone text message, instant message, personal delivery, or by any other means, be they analog, electronic or otherwise.

5.      "Concerning" means reflecting, relating to, referring to, describing, discussing, evidencing, addressing, or constituting in any way.

6.      "Criminal Defendants" means, collectively or individually, Larry Householder, Jeffrey Longstreth, Neil Clark, Matthew Borges, Juan Cespedes, and Generation Now, Inc.

7.      "Defendants" refers to FirstEnergy, the Individual Defendants, and the Underwriter Defendants (as each of those terms are defined below).

8.      "Defense Team" refers to the defendant in *Ohio v. Sustainability Funding Alliance of Ohio, Inc.*, No. CR-2024-02-0473-E (Summit Cnty. Ct. C.P.); defendant's counsel of record; employees of defendant's counsel of record (and its associated law firms, if any); and other

- 1 -

personnel engaged or employed by defense counsel of record, including any consultants, investigators, experts, or interpreters.

9.      "Discovery Material" shall include all documents and electronically stored information disclosed (defined below) by the Government (defined below) to the Defense Team, and all documents and electronically-stored information disclosed by the Defense Team to the Government pursuant to Ohio Rule of Criminal Procedure 16 in *Ohio v. Sustainability Funding Alliance of Ohio, Inc*., No. CR-2024-02-0473-E (Summit Cnty. Ct. C.P.).

10.      "Document" or "documents" is defined to be synonymous in meaning and equal in scope to the usage of the term "documents or electronically stored information" in Federal Rule of Civil Procedure 34(a)(1)(A) and encompasses communications.  A draft or non-identical copy is a separate document within the meaning of this term.

11.      "Electronic data" refers to any original and any non-identical copies (whether non-identical because of notes made on copies or attached comments, annotations, marks, transmission notations or highlighting of any kind), mechanical, facsimile, electronic, magnetic, digital or other programs (whether private, commercial or work-in-progress), programming notes or instructions, activity listings of electronic mail receipts or transmittals, output resulting from the use of any software program, including word processing documents, spreadsheets, database files, charts, graphs and outlines, electronic mail or "email," electronic messaging services, electronic forums or discussion services, operating systems, source code of all types, programming languages, linkers and compilers, peripheral drives, PDF files, PRF files, batch files, ASCII files, crosswalks, code keys, pull down tables, logs, file layouts or any miscellaneous files or file fragments, regardless of the media on which they reside and regardless of whether said electronic data consists of an active file, backup file, deleted file, or file fragment.  "Electronic data" also includes, without limitation, any items stored on computer, smartphone or tablet memory or memories, hard drives,

- 2 -

zip drives, CD-ROM discs, or in any other vehicle for electronic or digital data storage or transmittal, files, folder tabs or containers and labels appended to or associated with any physical storage device associated with each original and each copy.

12.     "Electronically stored information" or "ESI" refers to any original and non-identical copies (whether non-identical because of notes made on copies or attached comments, annotations, marks, transmission notations or highlighting of any kind), mechanical, facsimile, electronic, magnetic, digital or other programs, programming notes or instructions, activity listings of electronic mail receipts or transmittals, output resulting from the use of any software program, including word processing documents, spreadsheets, database files, charts, graphs and outlines, electronic mail or "email," operating systems, source code of all types, programming languages, linkers and compilers, peripheral drives, PDF files, PRF files, batch files, ASCII files, crosswalks, code keys, pull-down tables, logs, file layouts or any miscellaneous files or file fragments, regardless of the media on which they reside and regardless of whether said electronic data consists of an active file, backup file, deleted file, or file fragment.  "ESI" also includes, without limitation, any items stored on computer memory or memories, hard drives, zip drives, CD-ROM discs or in any other vehicle for electronic or digital data storage or transmittal, files, folder tabs, or containers and labels appended to or associated with any physical storage device associated with each original and each copy.  "ESI" also includes, without limitation, any MMS or SMS text messages and any electronic instant messages, including, but not limited to, messages in an internal messaging system or external personal account on desktop, laptop, mobile phone, tablet, or other mobile device, concerning the topics in the following requests.

13.     "ESP IV" refers to the Electric Security Plan IV filed with PUCO (defined below) in 2014, including, but not limited to, any subsequent stipulations, recommendations, purchase power agreements, and retail rate stability riders related thereto.

- 3 -

14. "FirstEnergy" or the "Company" refers to FirstEnergy Corp., any of its direct or indirect subsidiaries, including FirstEnergy Solutions Corp. ("FES"), FirstEnergy Nuclear Operating Company ("FENOC"), FirstEnergy Service Corporation ("FESC"), and Energy Harbor LLC, Energy Harbor Corp. and Energy Harbor Nuclear Corp. (collectively, "Energy Harbor"), divisions or affiliates (foreign and domestic), predecessors, successors, present and former officers, directors, employees, agents, and all other persons acting or purporting to act on its behalf.

15. "Government" refers to the members of the Ohio Attorney General's Office and the Summit County Prosecutor's Office who are counsel of record in *Ohio v. Sustainability Funding Alliance of Ohio, Inc.*, No. 2024-02-0473-E (Summit Cnty. Ct. C.P.); employees of the Ohio Attorney General's Office and the Summit County Prosecutor's Office; and other personnel engaged or employed by such counsel, including any consultants, investigators, experts, or interpreters.

16. "HB6" refers to Ohio House Bill 6, which was a purported "clean energy" bill designed to incentivize low carbon dioxide emitting power production, in particular nuclear power generation, and included a ratepayer-funded $1.3 billion bailout of the Nuclear Plants (defined below), as well as a ratepayer-funded decoupling provision worth some $700 million in subsidized revenues for FirstEnergy.

17. "Individual Defendants" refers to Charles E. Jones, James F. Pearson, Steven E. Strah, K. Jon Taylor, Michael J. Dowling, Dennis M. Chack, Robert Reffner, Leila L. Vespoli, John Judge, Donald R. Schneider, George M. Smart, Paul T. Addison, Michael J. Anderson, Steven J. Demetriou, Julia L. Johnson, Donald T. Misheff, Thomas N. Mitchell, James F. O'Neil III, Christopher D. Pappas, Sandra Pianalto, Luis A. Reyes, Jerry Sue Thornton, Leslie Turner, and Jason J. Lisowski.

- 4 -

18.     "Industrial Energy Users-Ohio" or "IEU-Ohio" refers to Industrial Energy Users-Ohio and any of their direct or indirect subsidiaries, divisions or affiliates (foreign and domestic), predecessors, successors, present and former officers, directors, employees, agents, and all other persons acting or purporting to act on its behalf.

19.     "Nuclear Plants" refers to the Perry Nuclear Generating Station and the Davis-Besse Nuclear Power Station.

20.     "Person" or "persons" means any natural person or any legal entity, including, without limitation, any business or government entity or association.

21.     "PUCO" means the Public Utilities Commission of Ohio.

22.     "Randazzo" means the individual named Samuel C. Randazzo, an attorney licensed in Ohio, who is a former chairman of the Public Utilities Commission of Ohio.

23.     "Underwriter Defendants," collectively and each individually an "Underwriter Defendant," refers to Barclays Capital Inc., BofA Securities, Inc., Citigroup Global Markets Inc., J.P. Morgan Securities LLC, Morgan Stanley & Co. LLC, Mizuho Securities USA LLC, PNC Capital Markets LLC, RBC Capital Markets, LLC, Santander Investment Securities Inc., Scotia Capital (USA) Inc., SMBC Nikko Securities America, Inc., CIBC World Markets Corp., KeyBanc Capital Markets Inc., TD Securities (USA) LLC, U.S. Bancorp Investments, Inc., and MUFG Securities Americas Inc., and any of their direct or indirect subsidiaries, divisions or affiliates (foreign and domestic), predecessors, successors, present and former officers, directors, employees, agents, and all other persons acting or purporting to act on their behalf

24.     The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

## II.    INSTRUCTIONS

1.    In responding to these requests, you shall produce all responsive documents which are in your possession, custody, or control, or in the possession, custody, or control of your predecessors, successors, parents, subsidiaries, divisions or affiliates, or any of your respective directors, executives, officers, partners, managing agents, agents, employees, attorneys, accountants, or any other representative.  A document shall be deemed to be within your control if you have the ability or right to secure the document or a copy of the document from another person having possession or custody of the document.

2.    Pursuant to the Federal Rules of Civil Procedure, you are to produce for inspection and copying by Plaintiffs, original documents as they are kept in the usual course of business and you shall organize and label them to correspond with the categories in these requests.

3.    In responding to these requests, you shall produce all responsive documents available at the time of production and you shall supplement your responses as required by Federal Rule of Civil Procedure 26(e).

4.    If any responsive document was, but no longer is, in your possession or subject to your control, state whether the document is: (a) missing or lost; (b) destroyed; (c) transferred voluntarily or involuntarily to others; or (d) otherwise disposed of, and in each instance identify the name and address of its current or last known custodian, and the circumstances surrounding such disposition.

5.    If you claim any form of privilege or any other objection, whether based on statute, common law, or otherwise, as a ground for not producing any requested document or portion of a document, please furnish a list identifying each document for which the privilege or other objection is claimed together with the following information:

(a)    the privilege being asserted;

- 6 -

(b)     the person on whose behalf the privilege is asserted;

(c)     a precise statement of the facts upon which the claim of privilege is based; and

(d)     identify the purported privileged document, including:

(e)     its nature (*e.g.*, letter, memorandum, tape, etc.);

(f)     the date it was prepared;

(g)     the date the document bears;

(h)     the date the document was sent;

(i)     the date it was received;

(j)     the name(s) of the person(s) who prepared the document;

(k)     the name(s) of the person(s) who received the document;

(l)     the name of each person to whom it was sent or was intended to be sent, including all addresses and all recipients of copies; and

(m)     a statement of whom each identified person represented or purported to represent at all relevant times.

6.     If a portion of any document responsive to these requests is withheld under a claim of privilege pursuant to Instruction No. 5, any non-privileged portion of such document must be produced with the portion claimed to be privileged redacted.

7.     You are to produce each document requested herein in its entirety, without deletion or excision (except as qualified by Instruction Nos. 5 and 6 above) regardless of whether you consider the entire document to be relevant or responsive to the requests.

8.     Provide a source list that clearly identifies who maintained the document and identifies the person or location it was collected from.

## III.    PRODUCTION OF HARD COPY DOCUMENTS AND ESI – FORMAT

Hard copy documents and ESI shall be produced according to the Joint Protocol For Production of Documents and Electronically Stored Information (ECF 204) ("Protocol"), filed on October 5, 2021 in this Action.  A copy of the Protocol is attached hereto as Exhibit A.

## IV.    RELEVANT TIME PERIOD

All requests herein refer to the period from January 1, 2009 through the present ("Relevant Time Period"), unless otherwise specifically indicated, and shall include all documents and information that relate to such period, even though prepared or published outside of the Relevant Time Period.  If a document prepared before this period is necessary for a correct or complete understanding of any document covered by a request, you must produce the earlier or subsequent document as well.  If any document is updated and the date of its preparation cannot be determined, the document shall be produced if otherwise responsive to the production request.

## V.    DOCUMENTS REQUESTED

REQUEST NO. 3:

All Discovery Material.

REQUEST NO. 4:

All Discovery Material concerning: (a) FirstEnergy; (b) IEU-Ohio; (c) ESP IV; (d) HB6; (e) PUCO; (f) Randazzo, including any entity created in whole or in part for the benefit of Randazzo, owned in whole or in part by Randazzo, or for which Randazzo had signature authority; (g) the Defendants in this Action; (h) the Criminal Defendants; (i) witnesses identified by the State; or (j) the bribery allegations charged in *Ohio v. Dowling*, No. CR-2024-02-0473-B (Summit Cnty. Ct. C.P.); *Ohio v. Jones*, No. CR-2024-02-0473-C (Summit Cnty. Ct. C.P.); *Ohio v. IEU-Ohio Administration Co. LLC*, No. CR-2024-02-0473-D (Summit Cnty. Ct. C.P.); and *Ohio v. Sustainability Funding Alliance of Ohio, Inc*., No. CR-2024-02-0473-E (Summit Cnty. Ct. C.P.).

**TABLE 1: METADATA FIELDS**[1]

| Field Name | Example / Format | Description |
|---|---|---|
| BEGNO | ABC0000001  (Unique ID) | The Document ID number associated with the first page of a document. |
| ENDNO | ABC0000003  (Unique ID) | The Document ID number associated with the last page of a document. |
| BEGATTACH | ABC0000001  (Unique ID Parent-Child Relationships) | The Document ID number associated with the first page of the parent document. |
| ENDATTACH | ABC0000008  (Unique ID Parent-Child Relationships) | The Document ID number associated with the last page of the last attachment. |
| VOLUME | VOL001 | The name of CD, DVD, or Hard Drive. |
| RECORDTYPE | eMail, Attachment, Scanned Doc, eFile, Chat/Text | The record type of a document. |
| SENTDATE | MM/DD/YYYY | The date the email or calendar entry was sent. |
| SENTTIME | HH:MM | The time the email or calendar entry was sent. |
| RECEIVEDDATE | MM/DD/YYYY | The date the document was received. |
| RECEIVEDTIME | HH:MM | The time the document was received. |
| CREATEDATE | MM/DD/YYYY | The date the document was created. |
| CREATETIME | HH:MM | The time the document was created. |
| LASTMODDATE | MM/DD/YYYY | The date the document was last modified. |
| LASTMODTIME | HH:MM | The time the document was last modified. |
| MEETING START DATE | MM/DD/YYYY | Start date of calendar entry. |
| MEETING START TIME | HH:MM | Start time of calendar entry. |
| MEETING END DATE | MM/DD/YYYY | End date of calendar entry. |
| MEETING END TIME | HH:MM | End time of calendar entry. |
| FILEPATH | i.e. /JsmithPC/Users/Jsmith/Desktop | The file path from the location in which the document was stored in the usual course of business.  This field should be populated for both email and e-files. |
| FILEPATH-DUP | i.e. /JSmith.pst/Inbox /Network Share/Accounting/… /TJohnsonPC/Users/TJohnson/My Documents/… | The file paths from the locations in which the duplicate documents were stored in the usual course of business.  This field should be populated for both email and e-files and separated by semicolons. |
| AUTHOR | jsmith | The author or owner of a document from extracted metadata. |
| LASTEDITEDBY | jsmith | The name of the last person to edit the document from extracted metadata. |
| FROM | Joe Smith <jsmith@email.com> | The display name and email address of the author of an email/calendar item. An email address should always be provided. |
| TO | Joe Smith <jsmith@email.com>; tjones@email.com | The display name and email address of the recipient(s) of an email/calendar item.  An email address should always be provided for every email if a recipient existed. |
| CC | Joe Smith <jsmith@email.com>; tjones@email.com | The display name and email of the copyee(s) of an email/calendar item.  An email address should always be provided for every email if a copyee existed. |
| BCC | Joe Smith <jsmith@email.com>; tjones@email.com | The display name and email of the blind copyee(s) of an email or calendar item. An email address should always be provided for every email if a blind copyee existed. |
| SUBJECT | | The subject line of the email message/calendar item. |
| MESSAGE TYPE | Appointment, Contact, Task, Distribution List, Message, etc. | An indication of the email system message type. |
| IMPORTANCE | Normal, Low, High | Email Importance Flag |
| TITLE | | The extracted document title of a document. |
| CUSTODIAN-ALL | Smith, Joe; Doe, Jane | All of the custodians of a document from which the document originated, separated by semicolons. |
| SOURCE | Computer, Mobile Phone, Email, Network Share, Slack, WhatsApp, Teams, Database Name, etc. | The source from which the document was collected. |
| ATTACH COUNT | Numeric | The number of attachments to a document. |
| FILEEXT | XLS | The file extension of a document. |
| FILENAME | Document Name.xls | The file name of a document. |
| FILESIZE | Numeric | The file size of a document (including embedded attachments). |
| TRACK CHANGES | Yes or No | The yes/no indicator of whether tracked changes exist in the file. |
| IS EMBEDDED | Yes or No | The yes/no indicator of whether a file is embedded in another document. |
| HASH | | The MD5 or SHA-1 Hash value or "de-duplication key" assigned to a document.  The same hash method (MD5 or SHA-1) should be used throughout production. |
| CONVERSATION INDEX | | ID used to tie together email threads. |
| REDACTED | Yes or Blank | If a document contains a redaction, this field will display 'Yes'. |
| TIMEZONE PROCESSED | PST, CST, EST, etc | The time zone the document was processed in.  **NOTE:** This should be the time zone where the documents were located at time of collection. |
| NATIVELINK | D:\NATIVES\ABC000001.xls | The full path to a native copy of a document. |
| FULLTEXT | D:\TEXT\ABC000001.txt | The path to the full extracted text of the document.  There should be a folder on the deliverable, containing a separate text file per document.  These text files should be named with their corresponding Bates numbers. **Note**: Emails should include header information: author, recipient, cc, bcc, date, subject, etc.  If the attachment or e-file does not extract any text, then OCR for the document should be provided. |

[1]For ESI other than email and e-docs that do not conform to the metadata listed here, such as text messages, Instant Bloomberg, iMessage, Google Chat, MS Teams, Slack, etc., the parties will meet and confer as to the appropriate metadata fields to be produced.

# EXHIBIT 17

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
## for the
### Southern District of Ohio

| | |
|---|---|
| In re FirstEnergy Corp. Sec. Litig. | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. 2:20-cv-03785-ALM-KAJ |
| | ) |
| | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: 
IEU - Ohio Administration Co. LLC
c/o Roger P. Sugarman, 6025 Cranberry Ct., Columbus, OH 43213

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See attached Schedule A.

| Place: Murray Murphy Moul+ Basil LLP 1114 Dublin Road Columbus, OH 43215 | Date and Time: 10/11/2024 10:00 am |
|---|---|

❏ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 09/30/2024

| *CLERK OF COURT* | | |
|---|---|---|
| | OR | *Rachel Cocalis* |
| Signature of Clerk or Deputy Clerk | | Attorney's signature |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*
Lead Plaintiff Los Angeles County Employees Retirement Association and Named Plaintiffs Amalgamated Bank, City of Irving Supplemental Benefit Plan, and Wisconsin Laborers' Pension Fund , who issues or requests this subpoena, are:

Rachel A. Cocalis, rcocalis@rgrdlaw.com, Robbins Geller Rudman & Dowd LLP, 655 West Broadway, Suite 1900, San Diego, CA 92101, (619) 231-1058

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 2:20-cv-03785-ALM-KAJ

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**SCHEDULE A**
**(IEU-Ohio Administration Co. LLC)**

## I.      DEFINITIONS

Unless otherwise stated, the terms set forth below are defined as follows:

1.      "You" or "your" refers to IEU-Ohio Administration Co. LLC, any of its direct or indirect subsidiaries, divisions or affiliates (foreign and domestic), predecessors, successors, present and former officers, directors, employees, agents, and all other persons acting or purporting to act on its behalf.

2.      "Action" refers to this lawsuit captioned *In re FirstEnergy Corp. Sec. Litig.*, No. 2:20-cv-03785-ALM-KAJ (S.D. Ohio).

3.      "All," "any," and "each" shall each be construed as encompassing any and all.

4.      "Communication" or "communications" means any transmittal of information (in the form of facts, ideas, inquiries, or otherwise) whether orally or by document, telephone, telecopier, mail, fax, email, voicemail, cellular phone text message, instant message, personal delivery, or by any other means, be they analog, electronic or otherwise.

5.      "Concerning" means reflecting, relating to, referring to, describing, discussing, evidencing, addressing, or constituting in any way.

6.      "Criminal Defendants" means, collectively or individually, Larry Householder, Jeffrey Longstreth, Neil Clark, Matthew Borges, Juan Cespedes, and Generation Now, Inc.

7.      "Defendants" refers to FirstEnergy, the Individual Defendants, and the Underwriter Defendants (as each of those terms are defined below).

8.      "Defense Team" refers to the defendant in *Ohio v. IEU-Ohio Administration Co. LLC*, No. CR-2024-02-0473-D (Summit Cnty. Ct. C.P.); defendant's counsel of record; employees of defendant's counsel of record (and its associated law firms, if any); and other personnel engaged

- 1 -

or employed by defense counsel of record, including any consultants, investigators, experts, or interpreters.

9.    "Discovery Material" shall include all documents and electronically stored information disclosed (defined below) by the Government (defined below) to the Defense Team, and all documents and electronically-stored information disclosed by the Defense Team to the Government pursuant to Ohio Rule of Criminal Procedure 16 in *Ohio v. IEU-Ohio Administration Co. LLC*, No. CR-2024-02-0473-D (Summit Cnty. Ct. C.P.).

10.    "Document" or "documents" is defined to be synonymous in meaning and equal in scope to the usage of the term "documents or electronically stored information" in Federal Rule of Civil Procedure 34(a)(1)(A) and encompasses communications.  A draft or non-identical copy is a separate document within the meaning of this term.

11.    "Electronic data" refers to any original and any non-identical copies (whether non-identical because of notes made on copies or attached comments, annotations, marks, transmission notations or highlighting of any kind), mechanical, facsimile, electronic, magnetic, digital or other programs (whether private, commercial or work-in-progress), programming notes or instructions, activity listings of electronic mail receipts or transmittals, output resulting from the use of any software program, including word processing documents, spreadsheets, database files, charts, graphs and outlines, electronic mail or "email," electronic messaging services, electronic forums or discussion services, operating systems, source code of all types, programming languages, linkers and compilers, peripheral drives, PDF files, PRF files, batch files, ASCII files, crosswalks, code keys, pull down tables, logs, file layouts or any miscellaneous files or file fragments, regardless of the media on which they reside and regardless of whether said electronic data consists of an active file, backup file, deleted file, or file fragment.  "Electronic data" also includes, without limitation, any items stored on computer, smartphone or tablet memory or memories, hard drives,

4890-7303-5755.v1

zip drives, CD-ROM discs, or in any other vehicle for electronic or digital data storage or transmittal, files, folder tabs or containers and labels appended to or associated with any physical storage device associated with each original and each copy.

12.    "Electronically stored information" or "ESI" refers to any original and non-identical copies (whether non-identical because of notes made on copies or attached comments, annotations, marks, transmission notations or highlighting of any kind), mechanical, facsimile, electronic, magnetic, digital or other programs, programming notes or instructions, activity listings of electronic mail receipts or transmittals, output resulting from the use of any software program, including word processing documents, spreadsheets, database files, charts, graphs and outlines, electronic mail or "email," operating systems, source code of all types, programming languages, linkers and compilers, peripheral drives, PDF files, PRF files, batch files, ASCII files, crosswalks, code keys, pull-down tables, logs, file layouts or any miscellaneous files or file fragments, regardless of the media on which they reside and regardless of whether said electronic data consists of an active file, backup file, deleted file, or file fragment.  "ESI" also includes, without limitation, any items stored on computer memory or memories, hard drives, zip drives, CD-ROM discs or in any other vehicle for electronic or digital data storage or transmittal, files, folder tabs, or containers and labels appended to or associated with any physical storage device associated with each original and each copy.  "ESI" also includes, without limitation, any MMS or SMS text messages and any electronic instant messages, including, but not limited to, messages in an internal messaging system or external personal account on desktop, laptop, mobile phone, tablet, or other mobile device, concerning the topics in the following requests.

13.    "ESP IV" refers to the Electric Security Plan IV filed with PUCO (defined below) in 2014, including, but not limited to, any subsequent stipulations, recommendations, purchase power agreements, and retail rate stability riders related thereto.

- 3 -

14. "FirstEnergy" or the "Company" refers to FirstEnergy Corp., any of its direct or indirect subsidiaries, including FirstEnergy Solutions Corp. ("FES"), FirstEnergy Nuclear Operating Company ("FENOC"), FirstEnergy Service Corporation ("FESC"), and Energy Harbor LLC, Energy Harbor Corp. and Energy Harbor Nuclear Corp. (collectively, "Energy Harbor"), divisions or affiliates (foreign and domestic), predecessors, successors, present and former officers, directors, employees, agents, and all other persons acting or purporting to act on its behalf.

15. "Government" refers to the members of the Ohio Attorney General's Office and the Summit County Prosecutor's Office who are counsel of record in *Ohio v. IEU-Ohio Administration Co. LLC*, No. 2024-02-0473-D (Summit Cnty. Ct. C.P.); employees of the Ohio Attorney General's Office and the Summit County Prosecutor's Office; and other personnel engaged or employed by such counsel, including any consultants, investigators, experts, or interpreters.

16. "HB6" refers to Ohio House Bill 6, which was a purported "clean energy" bill designed to incentivize low carbon dioxide emitting power production, in particular nuclear power generation, and included a ratepayer-funded $1.3 billion bailout of the Nuclear Plants (defined below), as well as a ratepayer-funded decoupling provision worth some $700 million in subsidized revenues for FirstEnergy.

17. "Individual Defendants" refers to Charles E. Jones, James F. Pearson, Steven E. Strah, K. Jon Taylor, Michael J. Dowling, Dennis M. Chack, Robert Reffner, Leila L. Vespoli, John Judge, Donald R. Schneider, George M. Smart, Paul T. Addison, Michael J. Anderson, Steven J. Demetriou, Julia L. Johnson, Donald T. Misheff, Thomas N. Mitchell, James F. O'Neil III, Christopher D. Pappas, Sandra Pianalto, Luis A. Reyes, Jerry Sue Thornton, Leslie Turner, and Jason J. Lisowski.

18.     "Industrial Energy Users-Ohio" or "IEU-Ohio" refers to Industrial Energy Users-Ohio and any of their direct or indirect subsidiaries, divisions or affiliates (foreign and domestic), predecessors, successors, present and former officers, directors, employees, agents, and all other persons acting or purporting to act on its behalf.

19.     "Nuclear Plants" refers to the Perry Nuclear Generating Station and the Davis-Besse Nuclear Power Station.

20.     "Person" or "persons" means any natural person or any legal entity, including, without limitation, any business or government entity or association.

21.     "PUCO" means the Public Utilities Commission of Ohio.

22.     "Randazzo" means the individual named Samuel C. Randazzo, an attorney licensed in Ohio, who is a former chairman of the Public Utilities Commission of Ohio.

23.     "Underwriter Defendants," collectively and each individually an "Underwriter Defendant," refers to Barclays Capital Inc., BofA Securities, Inc., Citigroup Global Markets Inc., J.P. Morgan Securities LLC, Morgan Stanley & Co. LLC, Mizuho Securities USA LLC, PNC Capital Markets LLC, RBC Capital Markets, LLC, Santander Investment Securities Inc., Scotia Capital (USA) Inc., SMBC Nikko Securities America, Inc., CIBC World Markets Corp., KeyBanc Capital Markets Inc., TD Securities (USA) LLC, U.S. Bancorp Investments, Inc., and MUFG Securities Americas Inc., and any of their direct or indirect subsidiaries, divisions or affiliates (foreign and domestic), predecessors, successors, present and former officers, directors, employees, agents, and all other persons acting or purporting to act on their behalf

24.     The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

4890-7303-5755.v1

## II.     INSTRUCTIONS

1.      In responding to these requests, you shall produce all responsive documents which are in your possession, custody, or control, or in the possession, custody, or control of your predecessors, successors, parents, subsidiaries, divisions or affiliates, or any of your respective directors, executives, officers, partners, managing agents, agents, employees, attorneys, accountants, or any other representative.  A document shall be deemed to be within your control if you have the ability or right to secure the document or a copy of the document from another person having possession or custody of the document.

2.      Pursuant to the Federal Rules of Civil Procedure, you are to produce for inspection and copying by Plaintiffs, original documents as they are kept in the usual course of business and you shall organize and label them to correspond with the categories in these requests.

3.      In responding to these requests, you shall produce all responsive documents available at the time of production and you shall supplement your responses as required by Federal Rule of Civil Procedure 26(e).

4.      If any responsive document was, but no longer is, in your possession or subject to your control, state whether the document is: (a) missing or lost; (b) destroyed; (c) transferred voluntarily or involuntarily to others; or (d) otherwise disposed of, and in each instance identify the name and address of its current or last known custodian, and the circumstances surrounding such disposition.

5.      If you claim any form of privilege or any other objection, whether based on statute, common law, or otherwise, as a ground for not producing any requested document or portion of a document, please furnish a list identifying each document for which the privilege or other objection is claimed together with the following information:

(a)      the privilege being asserted;

- 6 -

(b)      the person on whose behalf the privilege is asserted;

(c)      a precise statement of the facts upon which the claim of privilege is based; and

(d)      identify the purported privileged document, including:

(e)      its nature (*e.g.*, letter, memorandum, tape, etc.);

(f)      the date it was prepared;

(g)      the date the document bears;

(h)      the date the document was sent;

(i)      the date it was received;

(j)      the name(s) of the person(s) who prepared the document;

(k)      the name(s) of the person(s) who received the document;

(l)      the name of each person to whom it was sent or was intended to be sent, including all addresses and all recipients of copies; and

(m)      a statement of whom each identified person represented or purported to represent at all relevant times.

6.      If a portion of any document responsive to these requests is withheld under a claim of privilege pursuant to Instruction No. 5, any non-privileged portion of such document must be produced with the portion claimed to be privileged redacted.

7.      You are to produce each document requested herein in its entirety, without deletion or excision (except as qualified by Instruction Nos. 5 and 6 above) regardless of whether you consider the entire document to be relevant or responsive to the requests.

8.      Provide a source list that clearly identifies who maintained the document and identifies the person or location it was collected from.

## III.    PRODUCTION OF HARD COPY DOCUMENTS AND ESI – FORMAT

Hard copy documents and ESI shall be produced according to the Joint Protocol For Production of Documents and Electronically Stored Information (ECF 204) ("Protocol"), filed on October 5, 2021 in this Action.  A copy of the Protocol is attached hereto as Exhibit A.

## IV.    RELEVANT TIME PERIOD

All requests herein refer to the period from January 1, 2009 through the present ("Relevant Time Period"), unless otherwise specifically indicated, and shall include all documents and information that relate to such period, even though prepared or published outside of the Relevant Time Period.  If a document prepared before this period is necessary for a correct or complete understanding of any document covered by a request, you must produce the earlier or subsequent document as well.  If any document is updated and the date of its preparation cannot be determined, the document shall be produced if otherwise responsive to the production request.

## V.    DOCUMENTS REQUESTED

REQUEST NO. 1:

All Discovery Material.

REQUEST NO. 2:

All Discovery Material concerning: (a) FirstEnergy; (b) IEU-Ohio; (c) ESP IV; (d) HB6; (e) PUCO; (f) Randazzo, including any entity created in whole or in part for the benefit of Randazzo, owned in whole or in part by Randazzo, or for which Randazzo had signature authority; (g) the Defendants in this Action; (h) the Criminal Defendants; (i) witnesses identified by the State; or (j) the bribery allegations charged in *Ohio v. Dowling*, No. CR-2024-02-0473-B (Summit Cnty. Ct. C.P.); *Ohio v. Jones*, No. CR-2024-02-0473-C (Summit Cnty. Ct. C.P.); *Ohio v. IEU-Ohio Administration Co. LLC*, No. CR-2024-02-0473-D (Summit Cnty. Ct. C.P.); and *Ohio v. Sustainability Funding Alliance of Ohio, Inc.*, No. CR-2024-02-0473-E (Summit Cnty. Ct. C.P.).

- 8 -

**TABLE 1: METADATA FIELDS**[1]

| Field Name | Example / Format | Description |
|---|---|---|
| BEGNO | ABC0000001 (Unique ID) | The Document ID number associated with the first page of a document. |
| ENDNO | ABC0000003 (Unique ID) | The Document ID number associated with the last page of a document. |
| BEGATTACH | ABC0000001 (Unique ID Parent-Child Relationships) | The Document ID number associated with the first page of the parent document. |
| ENDATTACH | ABC0000008 (Unique ID Parent-Child Relationships) | The Document ID number associated with the last page of the last attachment. |
| VOLUME | VOL001 | The name of CD, DVD, or Hard Drive. |
| RECORDTYPE | eMail, Attachment, Scanned Doc, eFile, Chat/Text | The record type of a document. |
| SENTDATE | MM/DD/YYYY | The date the email or calendar entry was sent. |
| SENTTIME | HH:MM | The time the email or calendar entry was sent. |
| RECEIVEDDATE | MM/DD/YYYY | The date the document was received. |
| RECEIVEDTIME | HH:MM | The time the document was received. |
| CREATEDATE | MM/DD/YYYY | The date the document was created. |
| CREATETIME | HH:MM | The time the document was created. |
| LASTMODDATE | MM/DD/YYYY | The date the document was last modified. |
| LASTMODTIME | HH:MM | The time the document was last modified. |
| MEETING START DATE | MM/DD/YYYY | Start date of calendar entry. |
| MEETING START TIME | HH:MM | Start time of calendar entry. |
| MEETING END DATE | MM/DD/YYYY | End date of calendar entry. |
| MEETING END TIME | HH:MM | End time of calendar entry. |
| FILEPATH | i.e. /JsmithPC/Users/Jsmith/Desktop | The file path from the location in which the document was stored in the usual course of business. This field should be populated for both email and e-files. |
| FILEPATH-DUP | i.e. /JSmith.pst/Inbox<br>/Network Share/Accounting/…<br>/TJohnsonPC/Users/TJohnson/My Documents/… | The file paths from the locations in which the duplicate documents were stored in the usual course of business. This field should be populated for both email and e-files and separated by semicolons. |
| AUTHOR | jsmith | The author or owner of a document from extracted metadata. |
| LASTEDITEDBY | jsmith | The name of the last person to edit the document from extracted metadata. |
| FROM | Joe Smith <jsmith@email.com> | The display name and email address of the author of an email/calendar item. An email address should always be provided. |
| TO | Joe Smith <jsmith@email.com>; tjones@email.com | The display name and email address of the recipient(s) of an email/calendar item. An email address should always be provided for every email if a recipient existed. |
| CC | Joe Smith <jsmith@email.com>; tjones@email.com | The display name and email of the copyee(s) of an email/calendar item. An email address should always be provided for every email if a copyee existed. |
| BCC | Joe Smith <jsmith@email.com>; tjones@email.com | The display name and email of the blind copyee(s) of an email or calendar item. An email address should always be provided for every email if a blind copyee existed. |
| SUBJECT | | The subject line of the email/calendar item. |
| MESSAGE TYPE | Appointment, Contact, Task, Distribution List, Message, etc. | An indication of the email system message type. |
| IMPORTANCE | Normal, Low, High | Email Importance Flag |
| TITLE | | The extracted document title of a document. |
| CUSTODIAN-ALL | Smith, Joe; Doe, Jane | All of the custodians of a document from which the document originated, separated by semicolons. |
| SOURCE | Computer, Mobile Phone, Email, Network Share, Slack, WhatsApp, Teams, Database Name, etc. | The source from which the document was collected. |
| ATTACH COUNT | Numeric | The number of attachments to a document. |
| FILEEXT | XLS | The file extension of a document. |
| FILENAME | Document Name.xls | The file name of a document. |
| FILESIZE | Numeric | The file size of a document (including embedded attachments). |
| TRACK CHANGES | Yes or No | The yes/no indicator of whether tracked changes exist in the file. |
| IS EMBEDDED | Yes or No | The yes/no indicator of whether a file is embedded in another document. |
| HASH | | The MD5 or SHA-1 Hash value or "de-duplication key" assigned to a document. The same hash method (MD5 or SHA-1) should be used throughout production. |
| CONVERSATION INDEX | | ID used to tie together email threads. |
| REDACTED | Yes or Blank | If a document contains a redaction, this field will display 'Yes'. |
| TIMEZONE PROCESSED | PST, CST, EST, etc | The time zone the document was processed in. **NOTE**: This should be the time zone where the documents were located at time of collection. |
| NATIVELINK | D:\NATIVES\ABC000001.xls | The full path to a native copy of a document. |
| FULLTEXT | D:\TEXT\ABC000001.txt | The path to the full extracted text of the document. There should be a folder on the deliverable, containing a separate text file per document. These text files should be named with their corresponding Bates numbers. **Note**: Emails should include header information: author, recipient, cc, bcc, date, subject, etc. If the attachment or e-file does not extract any text, then OCR for the document should be provided. |

[1]For ESI other than email and e-docs that do not conform to the metadata listed here, such as text messages, Instant Bloomberg, iMessage, Google Chat, MS Teams, Slack, etc., the parties will meet and confer as to the appropriate metadata fields to be produced.

EXHIBIT 18

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re FirstEnergy Corp. Sec. Litig., | : | Case No. 2:20-cv-03785 |
| | : | |
| | : | Judge Algenon L. Marbley |
| | : | |
| | : | |

**RESPONSE OF NON-PARTY SUSTAINABILITY FUNDING ALLIANCE OF OHIO,**
**INC. TO LEAD PLAINTIFF'S SUBPOENA TO PRODUCE DOCUMENTS**

Non-party Sustainability Funding Alliance of Ohio, Inc. ("SFAO"), by and through its undersigned attorneys, hereby provides the following written response to the Subpoena dated September 30, 2024, issued by Lead Plaintiff Los Angeles County Employees Retirement Association, and named Plaintiffs, and served the 1st day of October 2024. This Response is made subject to the Amended Stipulated Protective Order (Doc #: 411) and the Supplemental Protective Order (Doc #: 639) and without waiving any applicable objection or privilege.

**GENERAL OBJECTIONS**

The following General Objections apply to the Subpoena and are hereby incorporated by reference into each Specific Response set forth below. The absence of a reference to an applicable General Objection should not be construed as a waiver of the objection as to a specific Request.

1. SFAO objects to the Subpoena, including the definitions contained therein, to the extent it imposes requirements, obligations, and duties beyond those imposed by the Federal Rules of Civil Procedure, the Local Rules of this Court or any applicable Order entered by the Court.

2. SFAO objects to the Subpoena to the extent it seeks discovery of matters protected from disclosure by the attorney-client privilege, the attorney work product doctrine, the common interest privilege, or any other applicable privilege or immunity.

3. SFAO objects to the Subpoena to the extent it is overly broad, unduly burdensome, premature, and/or seeks information beyond the scope of discovery under the applicable rules.

4. SFAO objects to the Subpoena to the extent it is unreasonably cumulative and/or duplicative or seeks information that is not relevant to claims and/or defenses at issue in the instant litigation.

5. SFAO objects to the Subpoena to the extent it seeks production of documents in the possession, custody, or control of other persons and/or entities (including parties to the case). Such documents, to the extent relevant to the subject matter involved in this action, can and should be obtained directly from those other persons and/or entities, thereby protecting SFAO from incurring expenses resulting from compliance.

6. SFAO objects to the Subpoena to the extent it is not proportional to the needs of this case.

7. SFAO objects to the Subpoena to the extent it fails to identify the requested documents with reasonable particularity.

## SFAO'S RESPONSES TO SUBPOENA REQUESTS

### RESPONSE TO REQUEST NO. 3

In addition to the foregoing General Objections, SFAO objects to Request No. 3 to the extent it seeks (1) irrelevant documents; and/or (2) documents that are in the possession, custody, or control of parties to this litigation.

Subject to and without waiving the foregoing objections, SFAO has not disclosed any documents or electronically stored information to the Government pursuant to Ohio Rule of Criminal Procedure 16.

Documents and electronically stored information disclosed by the Government to the SFAO "Defense Team" have been designated by the Government to be "Confidential Discovery Material" under the April 24, 2024 Confidentiality Agreement and Stipulated Protective Order entered by the Summit County Court of Common Pleas in *State of Ohio v. Sustainability Funding Alliance of Ohio, Inc.,* Case No. CR2024-02-0473-E.

Per this Order, "Confidential Discovery Material" is limited to the Defense Team and the Government, and may not be copied, disseminated, or distributed absent further Order of the Summit County Court of Common Pleas.

### RESPONSE TO REQUEST NO. 4

In addition to the foregoing General Objections, SFAO objects to Request No. 4 to the extent it seeks documents that are in the possession, custody, or control of parties to this litigation. Further, SFAO incorporates, as if fully rewritten herein, its response to Request No. 4.

3

Respectfully submitted,

 /s/ Roger P. Sugarman

Roger P. Sugarman          (0012007)
6025 Cranberry Ct.
Columbus, Ohio 43213
Telephone: (614) 578-6456
Email:          rogerpsugarman@gmail.com

And

Jeffrey R. Corcoran          (0088222)
Allen Stovall Neuman & Ashton LLP
10 W. Broad Street, Suite 2400
Columbus, Ohio 43215
Telephone:    (614) 221-8500
Facsimile:    (614) 221-5988
E-mail:          corcoran@asnalaw.com

*Attorneys for Non-Party*
*Sustainability Funding Alliance of Ohio, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing RESPONSE OF NON-PARTY SUSTAINABILITY FUNDING ALLIANCE OF OHIO, INC. TO LEAD PLAINTIFF'S SUBPOENA TO PRODUCE DOCUMENTS, dated September 30, 2024  was served by electronic mail this 11th day of October 2024, upon Rachel A. Cocalis, Esq., rcocalis@rgrdlaw.com, Robbins, Geller, Rudman, & Dowd, LLP, 655 W. Broadway, Ste. 1900, San Diego, CA 92101.

 /s/Roger P. Sugarman
 Roger P. Sugarman (0012007)

EXHIBIT 19

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re FirstEnergy Corp. Sec. Litig., | : | Case No. 2:20-cv-03785 |
| | : | |
| | : | Judge Algenon L. Marbley |
| | : | |
| | : | |

## RESPONSE OF NON-PARTY IEU-OHIO ADMINISTRATION COMPANY, LLC TO LEAD PLAINTIFF'S SUBPOENA TO PRODUCE DOCUMENTS

Third-party IEU-Ohio Administration Company, LLC ("IEUOA""), by and through its undersigned attorneys, hereby provides the following written response to the Subpoena dated September 30, 2024, issued by Lead Plaintiff Los Angeles County Employees Retirement Association, and named Plaintiffs, and served the 1st day of October 2024. This Response is made subject to the Amended Stipulated Protective Order (Doc #: 411) and the Supplemental Protective Order (Doc #: 639) and without waiving any applicable objection or privilege.

## GENERAL OBJECTIONS AND DEFINITIONS

The following General Objections apply to the Subpoena and are hereby incorporated by reference into each Specific Response set forth below. The absence of a reference to an applicable General Objection should not be construed as a waiver of the objection as to a specific Request.

1. IEUOA objects to the Subpoena, including the definitions contained therein, to the extent it imposes requirements, obligations, and duties beyond those imposed by the Federal Rules of Civil Procedure, the Local Rules of this Court or any applicable Order entered by the Court.

2. IEUOA objects to the Subpoena to the extent it seeks discovery of matters protected from disclosure by the attorney- client privilege, the attorney work product doctrine, the common interest privilege, or any other applicable privilege or immunity.

3. IEUOA objects to the Subpoena to the extent it is overly broad, unduly burdensome, premature, and/or seeks information beyond the scope of discovery under the applicable rules.

4. IEUOA objects to the Subpoena to the extent it is unreasonably cumulative and/or duplicative or seeks information that is not relevant to claims and/or defenses at issue in the instant litigation.

5. IEUOA objects to the Subpoena to the extent it seeks production of documents in the possession, custody, or control of other persons and/or entities (including parties to this case). Such documents, to the extent relevant to the subject matter involved in this action, can and should be obtained directly from those persons and/or entities, thereby protecting IEUOA from incurring expenses resulting from compliance.

6. IEUOA objects to the Subpoena to the extent it is not proportional to the needs of this case.

7. IEUOA objects to the Subpoena to the extent it fails to identify the requested documents with reasonable particularity.

<u>**IEUOA'S RESPONSES TO SUBPOENA REQUESTS**</u>

<u>**RESPONSE TO REQUEST NO. 1**</u>

In addition to the foregoing General Objections, IEUOA objects to Request No. 1 to the extent it seeks (1) irrelevant documents, and/or (2) documents that are in the possession, custody or control of parties to this litigation.

Subject to and without waiving the foregoing objections, IEUOA has not disclosed any documents or electronically stored information to the Government pursuant to Ohio Rule of Criminal Procedure 16.

Documents and electronically stored information disclosed by the Government to the IEUOA "Defense Team" ("Discovery Material") have been designated by the Government to be "Confidential Discovery Material" under the April 24, 2024 Confidentiality Agreement and Stipulated Protective Order entered by the Summit County Court of Common Pleas in *State of Ohio v. IEU-Ohio Administration Company, LLC*, Case No. CR2024-02-0473-D.

Per this Order, "Confidential Discovery Material" is limited to the Defense Team and the Government, and may not be copied, disseminated, or distributed absent further Order of the Summit County Court of Common Pleas.

<u>**REQUEST NO. 2**</u>

In addition to the foregoing General Objections, IEUOA objects to Request No. 2 to the extent it seeks documents that are in the possession, custody, or control of the parties to this litigation. Further, IEUOA incorporates, as if fully rewritten herein, its response to Request No. 1.

Respectfully submitted,

_/s/ Roger P. Sugarman_
Roger P. Sugarman (0012007)
6025 Cranberry Ct.
Columbus, Ohio 43213
Telephone: (614) 578-6456
Email: rogerpsugarman@gmail.com

And

Jeffrey R. Corcoran (0088222)
Allen Stovall Neuman & Ashton LLP
10 W. Broad Street, Suite 2400
Columbus, Ohio 43215
Telephone: (614) 221-8500
Facsimile: (614) 221-5988
E-mail: corcoran@asnalaw.com

*Attorneys for IEU-Ohio Administration Company, LLC*

## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing RESPONSE OF THIRD-PARTY IEU-OHIO ADMINISTRATION COMPANY, LLC TO LEAD PLAINTIFF'S SUBPOENA TO PRODUCE DOCUMENTS, dated September 30, 2024 was served by electronic mail this 11th day of October 2024, upon Rachel A. Cocalis, Esq., rcocalis@rgrdlaw.com, Robbins, Geller, Rudman, & Dowd, LLP, 655 W. Broadway, Ste. 1900, San Diego, CA 92101.

_/s/Roger P. Sugarman_
Roger P. Sugarman (0012007)

EXHIBIT 20

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | | |
|---|---|---|
| In re FIRSTENERGY CORP. SECURITIES LITIGATION | ) ) ) | No. 2:20-cv-03785-ALM-KAJ |
| | ) | CLASS ACTION |
| This Document Relates To: | ) ) ) | Judge Algenon L. Marbley Magistrate Judge Kimberly A. Jolson |
| ALL ACTIONS. | ) ) | |

PLAINTIFFS' RESPONSE TO STATE OF OHIO'S LIMITED
MOTION TO INTERVENE AND LIMITED MOTION TO
STAY PORTIONS OF DISCOVERY PROCEEDINGS

MURRAY MURPHY MOUL
  + BASIL LLP
JOSEPH F. MURRAY (0063373)
1114 Dublin Road
Columbus, OH  43215
Telephone:  614/488-0400
614/488-0401 (fax)
murray@mmmb.com


Liaison Counsel

ROBBINS GELLER RUDMAN
  & DOWD LLP
DARREN J. ROBBINS (*pro hac vice*)
MARK SOLOMON (*pro hac vice*)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com
marks@rgrdlaw.com


Class Counsel

## I.  INTRODUCTION

Plaintiffs support the Ohio AG's criminal prosecution and are concerned that defendants J-D are using this litigation to question the State's witnesses.[1]  There is no other explanation for what the Ohio AG's motion and accompanying evidence have confirmed – that J-D violated their discovery obligations and misled the Court about this violation by convincing the Ohio AG to retroactively designate witness statements and other plainly relevant documents (the "Withheld Documents") as confidential based on exactly what they denied to the Court just last week: that they had an "imminent" "obligation" to produce the Withheld Documents in response to RFP No. 2.

That said, even though we are talking about only 6 depositions, the Ohio AG still doesn't have a trial date after taking over 40 months to bring charges that reach only a portion of a fraud scheme that Plaintiffs have been trying to prosecute for over 4 years.  Accordingly, rather than issuing a blank check, Plaintiffs respectfully request that the Court enter an Order granting the Ohio AG's motion, subject to the Ohio AG: (1) getting the *Ohio AG Criminal Cases* to trial or otherwise resolved by February 1, 2025; and (2) submitting and appearing for monthly status reports and conferences, respectively, so the Court can reassess whether to maintain the stay in light of the Ohio AG's and J-D's efforts to get the *Ohio AG Criminal Cases* to trial.  Such an order will incentivize the Ohio AG and J-D to be expeditious, show comity to the Summit County state court, and keep this litigation on schedule to complete fact discovery by June 30, 2025.

---

[1]    All terms not otherwise defined herein have the same meaning as set forth in Plaintiffs' Position Statement Regarding Defendants Charles E. Jones and Michael J. Dowling's Violations of Federal Rule of Civil Procedure 26(e) and Request to Postpone Certain Deposition (ECF 691).  Additionally, unless otherwise noted, all emphasis is added and citations omitted.